UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

LEAGUE OF WOMEN VOTERS OF FLORIDA, PEOPLE
ACTING FOR COMMUNITY TOGETHER (PACT),
FLORIDA AFL-CIO, AMERICAN FEDERATION OF
STATE, COUNTY AND MUNICIPAL EMPLOYEES,
COUNCIL 79 (AFSCME), SEIU FLORIDA
HEALTHCARE UNION, as organizations and as
representatives of their members; MARILYNN WILLS; and
JOHN and JANE DOES 1-100,

CASE NO.

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Plaintiffs,

v.

SUE M. COBB, individually and in her official capacity as
Secretary of State for the State of Florida, and DAWN
ROBERTS, individually and in her official capacity as
Director of the Division of Elections within the Department
of State for the State of Florida,

Defendants.

_____/

Plaintiffs, by their attorneys, the Brennan Center for Justice at NYU School of Law,

Advancement Project, Kramer Levin Naftalis & Frankel LLP, and Becker & Poliakoff, P.A., as

and for their complaint against defendants, allege as follows:

## INTRODUCTION

1.      Plaintiffs bring this action to prevent enforcement of a new Florida state law,

2005 Fla. Laws 277 §§ 2, 7 (codified at Fla. Stat. §§ 97.021(36), 97.0575), that severely burdens

their efforts to encourage civic engagement by registering citizens to vote.  The new law, which

went into effect on January 1, 2006, imposes potentially ruinous fines and burdensome reporting

requirements on all organizations registering voters—unless they happen to be Florida's political

parties, which are entirely exempt from the onerous new rules.  The law has forced the League of

Women Voters and other plaintiffs to shut down their nonpartisan voter registration activities in Florida. Meanwhile, the Surfers Party of America, among other Florida political parties, remains as free as ever to engage in partisan voter registration. Plaintiffs challenge this law as discriminatory and as suppressive of their speech and associational rights.

2.      The challenged law imposes civil fines of $250 for *each* voter registration application submitted more than ten days after it is collected, $500 for *each* application submitted after any voter registration deadline, and $5,000 for *each* application not submitted. Plaintiffs are strictly liable for these fines, even if their inability to meet the statutory deadlines results from events beyond their control, such as the destruction of applications in a hurricane. The law not only fines the organization responsible for collecting the applications but also holds personally, and jointly and severally, liable: (i) the individual volunteer, member or employee who collected the applications; (ii) the group's registered agent; and (iii) any person in the organization responsible for the group's day-to-day operations, including officers and board members. These fines may be reduced, but not eliminated, only if groups submit to a strict regimen of state registration and reporting, from which political parties are also exempt.

3.      Because this new law imposes serious fines for even minor errors beyond an organization's or an individual's control, it creates enormous financial risk for nonpartisan voter registration in Florida. Individuals and groups with low incomes and modest budgets simply cannot afford the potentially bankrupting costs of engaging in such political speech and association. The League of Women Voters' entire annual budget of $80,000 would be decimated if only sixteen voter registration applications collected by its volunteers were lost in a flood, or if its volunteers took eleven days to submit the few hundred applications they often collect during

one day's work.  In addition, many volunteers and low-income workers cannot afford the risk of large fines for innocent errors.

4.      By impairing plaintiffs' efforts to register new voters, the new law not only interferes with plaintiffs' constitutional rights to speech and association but also disproportionately harms the low-income, minority, disabled, and other marginalized citizens in Florida who rely on plaintiffs and similar groups to help them overcome barriers to registering to vote and to participating in the political process.  The potential impact is staggering:  current estimates indicate that nearly half of the registrants added to Florida's voter rolls during the last presidential election were registered by nonpartisan groups.

5.      Unless the challenged law is enjoined, the amount of constitutionally protected political speech and activity that will occur in Florida will be dramatically reduced.  Plaintiffs, as well as many other individuals and groups, will be forced to communicate fewer political messages and to refrain from engaging in associational activity important to advancing their missions and beliefs.  The public will receive less information about current political issues and have fewer opportunities to associate with plaintiffs in meaningful political activities.

6.      Moreover, unless the challenged law is enjoined, a significant number of Florida citizens will not be registered to vote in the upcoming elections.  This harm will fall disproportionately on senior citizens, people with disabilities, members of rural, low-income, and predominantly minority communities, and others who find it difficult either to travel to a government office to register or to obtain a registration application on-line.  Florida ranks 39th in the nation in terms of voter registration rates; only 76.6% of its voting-age citizens are registered to vote.  The new law will exacerbate this problem by hobbling voter registration groups that strengthen democracy by increasing voter registration and participation.

7.     Nothing justifies the severe and discriminatory burdens imposed by the new law. Nonpartisan voter registration groups have enabled hundreds of thousands of Floridians to exercise their fundamental right to vote, and only a *de minimis* number of voter registration applications—including applications submitted by Florida's political parties—purportedly have been collected before but submitted after a voter registration deadline. Nonpartisan groups and individuals are no more likely than political parties to mishandle voter registration applications or to submit them in an untimely manner. There is simply no reason to privilege political parties over nonpartisan groups and individuals when regulating the registration of voters.

8.     Consequently, plaintiffs respectfully request that the Court declare the challenged law unconstitutional under the First and Fourteenth Amendments, enjoin defendants from enforcing it, and award such other relief as the Court deems just and proper.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction of the subject matter of this action under 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), 1367(a), 2201, and 2202, and 42 U.S.C. § 1983.

10.     Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), on the ground that a substantial part of the events or omissions giving rise to the claims alleged herein occurred, and will continue to occur, in this district.

## PARTIES

## I. PLAINTIFFS

11.     Plaintiffs are private groups (the "organizational plaintiffs") and an individual member of the League of Women Voters (the "member plaintiff") who are engaged in the political process and want to engage other people by registering them to vote. Plaintiffs wish to conduct nonpartisan voter registration drives because those drives are a uniquely effective way to

communicate political messages important to plaintiffs' organizational missions and individual

beliefs, and to associate with fellow citizens—including members of plaintiffs' organizations—

to advance those missions and beliefs. In addition, plaintiffs include Florida citizens, represented

by John and Jane Does (the "registrant plaintiffs"), who will not be registered to vote absent the

efforts of plaintiffs and other private voter registration groups. The registrant plaintiffs include

senior citizens, people with disabilities, and members of rural, low-income, and predominantly

minority communities, for whom it is difficult either to travel to a government office to register

to vote or to obtain an application on-line.

### A. Organizational Plaintiffs

### *1. League of Women Voters*

12.     Plaintiff League of Women Voters of Florida (the "League of Women Voters" or

"League") is the Florida affiliate of the national League of Women Voters (the "national

League"). The League is a nonpartisan, not-for-profit corporation organized under the laws of

Florida, and a tax-exempt charity pursuant to section 501(c)(4) of the Internal Revenue Code. Its

mission is to promote political responsibility by encouraging informed and active citizen

participation in government, including by registering citizens to vote and influencing public

policy through education and advocacy.

13.     The national League has conducted voter registration nationwide since 1920, and

the League has conducted voter registration in Florida since before 1939. In the past, the League

has conducted voter registration drives through the auspices of 27 local Leagues located in cities

and counties throughout Florida, including Miami-Dade County. The League has been forced to

shut down this year's voter registration efforts because of the potentially ruinous fines and the

administrative costs and burdens of reporting imposed by the challenged law. To protect the

organization and its members, the League's board of directors voted unanimously to impose a moratorium on voter registration activities sponsored by the 27 local Leagues in Florida.

14.     The League has imposed a moratorium on its voter registration activities because it cannot afford to risk paying the severe and potentially ruinous fines threatened by the challenged law. A small number of mishandled forms could bankrupt the organization. Moreover, the League cannot afford to indemnify itself and its members, volunteers, employees, directors, president, and vice-president against personal, and joint and several, liability for the threatened fines. League members have likewise been forced by the challenged law to refrain from participating in voter registration drives out of fear of personal financial liability. The League relies exclusively on volunteers to staff its voter registration drives. The League simply does not have sufficient resources and staff to supervise more closely the activities of its 27 local Leagues in order to eliminate or reduce the risk that the League would be fined for missing the challenged law's deadlines. In addition, the League does not have sufficient resources and staff to collect and compile from each of its 27 local Leagues the information necessary to provide quarterly reports to the state about its voter registration activities, as required by the challenged law.

### *2. PACT*

15.     Plaintiff People Acting for Community Together ("PACT") is a not-for-profit community-based coalition in Miami-Dade County made up of 38 member churches, synagogues, public school parent associations, and other community-based organizations, representing approximately 100,000 individual members. PACT organizes its members to take action on a range of different issues, including improving public education, increasing access to health care, and reforming immigration laws. As part of this organizing, PACT seeks to register

to vote all eligible members of its constituent organizations. PACT conducted voter registration drives in 2004, 2002, and 2000.

16.    PACT has decided not to conduct voter registration drives this year, in part because of the burdens imposed by the new law. PACT's voter registration drives are run by volunteers in each member organization and those volunteers, like the communities PACT serves, are predominantly low-income. PACT cannot afford to be subject to the law's fines and it cannot expose its low-income volunteers to that risk. PACT usually conducts voter registration drives that last several weeks, during which volunteers gather voter registration applications after several weekly church services. At the end of each drive, a PACT staff member collects the applications from the volunteers and delivers them to the Miami-Dade Supervisor of Elections. PACT cannot afford to spend additional staff time and resources collecting applications each week from its 38 member groups.

### 3. AFL-CIO

17.    Plaintiff Florida AFL-CIO (the "AFL-CIO") is a voluntary association of unions in Florida. It comprises approximately 450 affiliated local unions throughout the state and represents more than 500,000 active and retired Florida workers living in the state. Its mission is to improve the lives of working families. It accomplishes that mission by, among other things, encouraging workers to register and vote, to exercise their full rights and responsibilities of citizenship, and to perform their rightful part in the political life of their local, state and national communities.

18.    The AFL-CIO conducts nonpartisan voter registration drives each year intended to increase by 10% the number of its members registered to vote. Since the challenged law went into effect, the AFL-CIO has been forced by the law to abandon its efforts to register its

members to vote for the upcoming elections, out of fear that the potential fines under the law could cripple, if not bankrupt, the organization. The AFL-CIO's voter registration drives are conducted through its 450 local unions, many of which have no computers or offices. As a result, the AFL-CIO has also determined that it would be extraordinarily burdensome for it to gather quarterly the information necessary to comply with the new law's reporting requirements.

### 4. AFSCME

19.     Plaintiff American Federation of State, County and Municipal Employees ("AFSCME") Council 79 is the Florida council of AFSCME International. Council 79 is a separately incorporated nonprofit 501(c)(4) organization. More than 80 local unions are affiliated with Council 79, representing over 250,000 public employees throughout the state. A central function of AFSCME is to engage in collective bargaining with local governments on behalf of its members. The power and political clout that AFSCME exercises during such bargaining derives in large measure from the number of AFSCME members that vote in local elections. Consequently, registering its members to vote is a key part of AFSCME's mission and organizing strategy.

20.     AFSCME has traditionally conducted member-to-member voter registration drives through its local unions during each election cycle. These drives involve AFSCME members from each of its local unions volunteering to register fellow members. AFSCME has drastically reduced this member-to-member registration activity as a result of the new law. Because these drives are run separately by each of its 80 locals, monitoring all of its drives to ensure perfect compliance with the law would take more resources than AFSCME can afford.

21.     AFSCME has also in the past run "Operation Big Vote," a nonpartisan voter registration effort aimed at certain low-income communities and communities of color in

Florida. As a result of the challenged law, AFSCME will not engage in Operation Big Vote on a similar scale in this and future election years, and it is considering stopping the program entirely in Florida.

### 5. SEIU Florida Healthcare Union

22. Plaintiff SEIU Florida Healthcare Union ("SEIU FHU") represents approximately 13,000 private sector healthcare workers in 89 healthcare facilities across the state of Florida. Its mission is to represent the economic, social, and political interests of Florida's healthcare workers. SEIU FHU conducts annual voter registration drives among its members because healthcare is heavily funded and regulated by political bodies that can be influenced by SEIU FHU members who participate in the political process.

23. SEIU FHU conducts voter registration each year by recruiting members to volunteer to register their co-workers. SEIU FHU has been forced by the new law to stop registering its members to vote because it cannot afford the risk that it and its members will have to pay the severe fines threatened by the new law. SEIU FHU has a core group of at least 300 volunteers who help register voters at each of 89 healthcare facilities and, thus, there is a substantial likelihood that SEIU FHU will be fined because applications may not be submitted in the manner prescribed by the new law.

### B. Member Plaintiff

24. Marilynn Wills is a Florida resident who has been a member of the Tallahassee League of Women Voters for about thirty years. She is currently the president of the Tallahassee League and a vice president of the state League. She has been registering voters since she joined the League in the late 1960's or early 1970's. In the past, she registered voters with the Tallahassee League at the mall, the city's Fourth of July celebrations, and at the Tallahassee

Saturday downtown market. She is not, however, registering voters in 2006 because she is afraid that she will be personally subject to serious fines, as a result of either her own voter registration activities or her leadership roles in the League. In particular, Ms. Wills is afraid that she could be fined hundreds or thousands of dollars because of some mistake or accidental delay. She also knows of other League members who have registered voters in the past but who have stopped registering voters out of concern about the fines threatened by the new law.

### C. Registrant Plaintiffs

25.     Plaintiffs John and Jane Doe are over 18 years of age, United States citizens, and residents of Florida eligible to vote, but not registered to vote. They will want to vote in the upcoming federal and state elections but will not register to vote, or will find it extremely difficult to do so, but for the efforts of plaintiffs and other voter registration groups.

## II. DEFENDANTS

26.     Defendant Sue M. Cobb is the Secretary of State for the State of Florida. She is Florida's chief elections officer. Fla. Stat. § 97.012. Her responsibilities include "[o]btain[ing] and maintain[ing] uniformity in the interpretation and implementation of the election laws," and "[p]rovid[ing] uniform standards for the proper and equitable implementation of the registration laws." *Id.* Defendant Cobb has designated defendant Dawn Roberts as Director of the Division of Elections of the Florida Department of State.

27.     Defendant Dawn Roberts is the Director of the Division of Elections. The challenged law provides the Division of Elections with authority to investigate violations of the law, assess civil fines under the law, enforce the fines through legal proceedings, and adopt rules to administer the law, among other things. Fla. Stat. § 95.0575.

28.    Defendants are authorized and required by Florida law to interpret and enforce the challenged law.

## FACTS

### I.  VOTER REGISTRATION IN FLORIDA

29.    Voter registration in Florida, like that in other states, is conducted by a variety of government offices, individual citizens, and private groups. Federal and state law require Florida election officials to provide voter registration applications by mail and at the following locations: Department of Highway Safety and Motor Vehicles offices, armed forces recruitment offices, qualifying educational institutions, public assistance offices, public libraries, agencies that serve persons with disabilities, centers for independent living, and supervisors of elections offices.

30.    Since the enactment of the Florida Voter Registration Act in 1995, which was designed to make it easier for eligible citizens to register to vote, more than 7.4 million voters have been added to Florida's voter registration rolls, while more than 3.6 million voters have been purged. In January 2006, the most recent month for which data is available on the website of the Division of Elections, Florida added approximately 45,000 voters to the rolls, while more than 5,700 voters were purged. This brought the total number of Florida citizens registered to vote to approximately 10.4 million. In total, the number of registered voters in Florida has increased by more than 2.3 million over the past ten years.

### A.  Voter Registration By Non-Party Groups and Individuals

31.    A significant number of Florida citizens who register to vote each year are registered by individual citizens and private groups, including both plaintiffs and Florida's political parties.

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 3111 STIRLING ROAD • FORT LAUDERDALE, FL 33312-6525
TELEPHONE (954) 987-7550

32.     For plaintiffs and other individuals and groups, voter registration is a uniquely effective means to communicate political messages and to associate with fellow citizens to effect political change.

33.     Plaintiffs have conducted, and would like to continue conducting, nonpartisan voter registration drives not only to strengthen American democracy, expand the franchise, and promote civic participation generally, but also to: (i) increase the political power of certain communities or groups in Florida, such as union members in the case of the AFL-CIO; (ii) inform other citizens about their views on social and political issues and engage other citizens in discussions about those issues, including issues presented on election ballots; and (iii) urge other citizens to associate with plaintiffs by registering to vote and engaging in meaningful collective action to advance shared political objectives, such as improved public transportation in Miami–Dade County in the case of PACT.

34.     The collective action that plaintiffs promote through voter registration and related activities takes a variety of forms, each of which is protected by the First Amendment. It includes citizens joining together to register to vote and cast ballots for candidates based not on party affiliation but rather on candidates' support for certain issues. Additionally, it includes citizens joining together to register to vote and sign ballot initiative petitions in support of a state constitutional amendment (which only registered voters may do under Florida law) and then voting for the amendment. It also includes citizens joining together to register to vote and then contacting elected officials in an effort to convince those officials to support certain policies. Each of these activities is either impossible or significantly less effective when conducted by a group of people who are not registered to vote.

35.     Each year, in order to advance these First Amendment objectives, plaintiffs persuade thousands of Florida citizens to register to vote.  They do so almost exclusively by talking to potential voters in face-to-face interactions in diverse communities across the state. These conversations occur at community events, religious services, workplaces, schools, malls, bus stops, and other places where citizens congregate.  They also occur on citizens' front porches and in their living rooms when plaintiffs and others like them send members, volunteers, and employees door-to-door to register voters in residential communities.

36.     Plaintiffs' success in registering new voters depends not only on their ability to persuade others of the importance of registering to vote.  It also depends on their ability to assist others to properly fill in applications, to collect the applications, to deliver them to the appropriate state offices, and, in some cases, to follow up and ensure that the state properly adds the new voters to the rolls.  Merely distributing voter registration applications is insufficient to ensure the success of a voter registration drive.  If plaintiffs merely distributed applications to members of the public, citizens would be far less likely to properly complete the applications and have them delivered to a supervisor of elections.

**B.  Non-party Groups and Individuals Register Significant Numbers of Florida Voters**

37.     Non-party groups and individuals register significant numbers of citizens to vote in Florida.  Indeed, a substantial percentage of registered voters in Florida were registered by plaintiffs and other nonpartisan groups.

38.     Voter registration statistics from the 2004 general elections in Florida illustrate the importance of the efforts by plaintiffs and other private, non-party groups to register Florida voters.

39.     On information and belief, more than 524,000 Florida citizens were registered to vote in 2004 by a coalition of non-profit groups that conducted nonpartisan voter registration activities in Florida. *See* The Center for Civic Participation, Florida-Workspace, http://centerforcivicparticipation.org/states/FL/workspace.html (last visited Apr. 20, 2006).

40.     In addition, according to an October 2004 report published by the Florida Division of Elections, the state received 1,137,281 voter registration applications from organized voter registration drives and in-person registrations at the offices of supervisors of elections in 2004. Div. of Elections, Fla. Dep't of State, Voter Registration Year to Date Report (Oct. 2004), *available at* http://election.dos.state.fl.us/voterreg/vrReportArchives/2004/ October/YTDTotal.pdf. This figure represents 43% of the total applications received by Florida in the ten months prior to the November 2004 general election. The remaining applications were received through the mail and at various governmental offices.

41.     On information and belief, a significant number of these 1,137,281 applications were submitted by private groups like plaintiffs and by Florida's political parties.

42.     Florida citizens who live in predominantly low-income communities rely more heavily on plaintiffs' voter registration activities than do members of more affluent communities. These citizens will be disproportionately harmed by the burdens imposed on plaintiffs by the new law.

43.     Voter registration rates for low-income citizens, who are disproportionately people of color, are dramatically lower than the rates for more affluent citizens. According to a recent report by the United States Census Bureau, "[c]itizens with higher incomes were more likely to register and to vote. The voting rate among citizens living in families with annual incomes of $50,000 or more was 77 percent, compared with 48 percent for citizens living in

families with incomes under $20,000." *See* U.S. Census Bureau, Voting and Registration in the Election of November 2004 (Mar. 2006), *available at* http://www.census.gov/prod/2006pubs/ p20-556.pdf.

44.     This disparity arises, in part, because low-income citizens change addresses more frequently, visit state motor vehicles offices less frequently (where many other Florida citizens register to vote), have lower literacy rates, less internet access (and thus less ability to register to vote on-line), and are more dependent on public transportation (which makes it more difficult to travel to register at a local supervisor of elections' office).

45.     Plaintiffs' efforts to register these and other voters in prior years, and their desire to register voters this year, are consistent with the goals of the federal National Voter Registration Act of 1993 ("NVRA"). The NVRA was enacted by Congress to "increase the number of eligible citizens who register to vote in elections for Federal office," 42 U.S.C. § 1973gg(b)(1), and the Eleventh Circuit has recognized that it "impliedly encourages" private voter registration drives like those conducted by plaintiffs.

46.     Plaintiffs' efforts are also consistent with the purposes of the Florida Voter Registration Act. *See* Fla. Stat. § 97.052(b)(2) (requiring the Department of State to provide copies of voter registration applications to "[i]ndividuals or groups conducting voter registration programs"); *id.* § 97.053(1) (requiring certain state offices to accept voter registration applications hand-delivered by "a third party during the hours that office is open").

47.     Plaintiffs' prior voter registration efforts, along with similar efforts by other individuals and private groups, have resulted in a significant expansion of the franchise in Florida and a strengthening of the state's and the nation's democracy. The success of these

efforts underscores the harm imposed by the challenged law not only to plaintiffs' constitutional rights but also to the public interest.

### C.  Voter Registration By Florida's Political Parties

48.     Florida's political parties also engage in voter registration activities.  The political parties conduct voter registration drives primarily to increase the number of registered voters likely to vote for their chosen candidates.

49.     The former chairman of the Republican Party of Florida stated a few months before the 2004 elections:

> The more voters we register, the more Republicans will win. . . .
> That is why the Republican Party is making registering to vote
> easier than ever.  Not only will volunteers be calling prospective
> voters and going door-to-door to register as many Republicans as
> possible, voters can now register online by visiting
> http://www.rpof.org and downloading their voter registration form.

Press release, Republican Party of Florida, Florida Republican Leaders Join Chairman Jordan To Launch Unprecedented Voter Registration Effort (Mar. 5, 2004), *available at* http://www.rpof.org/press/2004030501.php.

50.     Similarly, the current chair of the Florida Democratic Party has stated that her top 2006 New Year's resolution for Florida Democrats is to volunteer to participate in "voter registration" and "party-building" activities in anticipation of the upcoming elections.  Karen Thurman, New Year's Resolutions for 2006, http://www.fladems.com/ (last visited Mar. 22, 2006).  This is consistent with the provision in the charter of the Florida Democratic Party that "[t]he Florida Democratic Party, at all levels, shall encourage voter registration without discrimination . . . ."  Florida Democratic Party, About the FDP, http://www.fladems.com/AboutFDP.php (last visited Apr. 20, 2006).

51.     The Green Party of Florida publicizes the following statement regarding voter

registration on its website:

> *Please consider changing your voting registration to list*
> *you as a Green Party voter. That will send a loud signal to*
> *Politicians that an increasing amount of people support our Key*
> *Values and our Green Party Platform.*
>
> You may change your voting registration by filling out the
> tiny form on the reverse side of your voting card (if your voting
> cards has one), or by filling out a new voter registration form,
> available at most post offices, and specifying Green Party under
> Party Affiliation. A person can re-register and change their voter
> registration as many times as they like, but some time limits exist
> for voting in primaries. *Most of our Local Green Party organizers*
> *keep voter registrations available, to help with voter registration*
> *drives.*

Green Party of Florida, Frequently Asked Questions, *at* http://www.floridagreens.org/

modules.php?op=modload&name=FAQ&file=index&myfaq=yes&id_cat=4 (last visited Apr.

20, 2006) (emphases added).

52.     In 2004, Florida law permitted all individuals and private groups—including

plaintiffs and the political parties—to collect and submit completed voter registration

applications, without restrictions, beyond the general prohibitions against fraud and election

misconduct.

53.     On information and belief, prior to the enactment of the challenged law, plaintiffs'

practices for submitting voter registration applications were not materially different, and may

have been better, than those of Florida's political parties.

54.     Nonpartisan groups and individuals are no more likely than political parties to

mishandle voter registration applications or to submit them in an untimely manner.

55.     In 2004, certain political parties in Florida collected some completed voter

registration applications before the October 4, 2004 voter registration deadline for the November

general election, but submitted those applications after this deadline.  For example, 18 days after

the voter registration deadline, the Republican Party of Florida delivered to the Supervisor of

Elections' office in Tallahassee a box containing about twelve to fifteen voter registration

applications completed before the deadline.  In addition, the Florida Department of State has

stated that in 2004 the political parties sometimes collected completed applications before the

voter registration deadline but submitted them after the deadline.

## II.  THE CHALLENGED LAW

56.     2005 Fla. Laws 277 (codified at Fla. Stat. §§ 97.021(36), 97.0575) an act relating

to elections and containing amendments to the Florida Voter Registration Act, generally took

effect on January 1, 2006.  The Secretary of State issued a proposed rule implementing the law

on or about February 21, 2006, and held a public hearing on that rule on March 13, 2006, but has

not yet issued a final rule.

### A.  Discriminatory Applicability

57.     Sections 2 and 7 of 2005 Fla. Laws 277 facially discriminate against plaintiffs by

singling them out for severe and burdensome financial penalties related to their nonpartisan

efforts to register new voters, while entirely exempting Florida's political parties from all fines

and all similar regulation of their voter registration activities under these sections.

58.     The provisions of 2005 Fla. Laws 277 regulating voter registration activity apply

only to "third-party voter registration organizations."  Section 2 of 2005 Fla. Laws 277 defines a

third-party voter registration organization as "any person, entity, or organization soliciting or

collecting voter registration applications."  Fla. Stat. § 97.021(36).  By its terms, this definition

includes individuals as well as groups.  The law further provides that a "third-party voter

registration organization does not include: (a) A political party." *Id.* § 97.021(36)(a). Thus, it expressly—and discriminatorily—exempts Florida's political parties from its regulation.

59.     Section 2 also exempts two additional categories of persons from its definition of third-party voter registration organization: (1) individuals who seek to collect voter registration applications only from their spouses, children or parents; and (2) persons collecting applications as an employee or agent of certain government agencies. *Id.* § 97.021(36)(b), (c). Plaintiffs do not challenge the new law on the basis of these additional exemptions.

## B. Severe Fines and Restrictions

60.     Section 7 imposes severe fines when third-party voter registration organizations do not submit applications within an unnecessarily restrictive ten-day period or within the other periods prescribed by the law. In addition, it holds a variety of individuals personally, and jointly and severally, liable for the law's fines.

61.     In particular, section 7 imposes the following mandatory fines on third-party voter registration organizations:

> (a) A fine in the amount of $250 for *each* application received by the division or the supervisor of elections more than 10 days after the applicant delivered the completed voter-registration application to the third-party voter registration organization or any person, entity, or agent acting on its behalf.
>
> (b) A fine in the amount of $500 for *each* application collected by a third-party voter registration organization or any person, entity, or agent acting on its behalf, prior to book closing for any given election for federal or state office and received by the division or the supervisor of elections after the book closing deadline for such election.
>
> (c) A fine in the amount of $5,000 for *each* application collected by a third-party voter registration organization or any person, entity, or agent acting on its behalf, which is not submitted to the division or supervisor of elections.

*Id.* § 97.0575(3)(a), (b), (c) (emphases added).

62.    Section 7 further provides that "[i]f a voter-registration application collected by a third-party voter registration organization is not delivered to the division or supervisor of elections" within the prescribed time periods, then the following individuals "shall be personally and jointly and severally liable" for all fines imposed under the law:

> the individual collecting the voter-registration application, the registered agent, and those individuals responsible for the day-to-day operation of the third-party voter registration organization, including, if applicable, the entity's board of directors, president, vice president, managing partner, or such other individuals engaged in similar duties or functions.

*Id.* § 95.0575(3).

## C. Strict Liability

63.    Section 7 of 2005 Fla. Laws 277 holds all third-party voter registration organizations strictly liable for meeting its deadlines as to each voter registration application.

64.    If a third-party voter registration organization does not deliver a voter registration application to the state within the manner prescribed by the law, the Division of Elections must impose fines.  Fla. Stat. § 97.0575(3).  The law provides no exceptions, even for a third-party voter registration organization that has exercised all reasonable care in collecting and delivering voter registration applications or whose failure to comply with the law resulted from no fault of its own.

65.    The Department of State has publicly stated that even "if some situation arises beyond the control of [an] organization" that results in applications not being submitted within the manner prescribed by the law, the third-party voter registration organization will be fined under the challenged law.

66.     Because the law imposes large fines for each individual application submitted other than in the prescribed time periods, the potential liability for even minor delays or mistakes by an individual or group engaged in voter registration is enormous.

67.     Section 7 reduces by three-fourths any fines imposed on a third-party voter registration organization that has pre-registered with the state and timely submitted quarterly reports disclosing their prior voter registration activities. *Id.* § 95.0575(1). This fine reduction is not available if a third-party voter registration organization has not submitted a timely quarterly report.

68.     On or about February 21, 2006, the Department of State and the Division of Elections issued proposed Rule 1S-2.042. The purpose of the proposed rule is to implement the provisions of sections 2 and 7 of 2005 Fla. Laws 277.

69.     Among other things, the proposed rule indicates that third-party voter registration organizations, in addition to the individuals listed in section 7 of 2005 Fla. Laws 277, are jointly and severally liable for any fines imposed under the law. Additionally, it provides that the date a voter registration application is postmarked is the date it is considered received by a supervisor of elections or the Division of Elections.

## D.  Burdensome Registration and Reporting Requirements

70.     Section 7 of the new law requires each third-party voter registration organization—including individuals and groups alike—to:  (i) submit quarterly reports to the state "providing the date and location of any organized voter-registration drives conducted by the organization in the prior calendar quarter"; (ii) register with the state prior to engaging in any voter registration activities; (iii) name a registered agent in the state; and (iv) submit to the state the names of the registered agent and "of those individuals responsible for the day-to-day

operation of the third-party voter registration organization." Fla. Stat. § 95.0575(1). The individuals named in the registration materials submitted to the state are subject to liability for fines imposed under the new law. *Id.* § 97.0575(3).

71.     While failure to pre-register does not subject third-party voter registration groups to penalties, *id.* § 97.0575(2), individuals and organizations that seek to encourage civic participation by registering citizens to vote, but do not first register with the state and submit quarterly reports on all their voter registration activities, are subject to fines four times the size of those imposed on individuals and organizations that submit to preregistration and reporting requirements.

72.     As set forth below, these registration and reporting requirements impose additional financial and administrative burdens on plaintiffs.

**E.  The Challenged Law Does Not Serve a Compelling or Legitimate State Interest**

73.     There is no legitimate, much less compelling, state interest in imposing restrictions on the voter registration activities of third-party voter registration organizations while exempting political parties that engage in the same or similar activities.

74.     There is no legitimate, much less compelling, state interest in restricting the voter registration and related speech and associational activities of plaintiffs and other third-party voter registration organizations in the manner provided in 2005 Fla. Laws 277. The new law burdens far more speech and associational activity than is necessary to accomplish any legitimate government interest.

75.     The challenged law is not necessary to address voter registration fraud. Section 76 of 2005 Fla. Laws 277 separately imposes criminal penalties on persons who "knowingly destroy, mutilate, or deface a voter registration form or election ballot or *obstruct or delay the*

*delivery of a voter registration form* or election ballot." Fla. Stat. § 104.0615(4) (emphases added). A person who violates this section commits a felony of the third degree, *id.* § 104.0615(5), and may be punished by up to five years in jail, a $5,000 fine, or both. *Id.* §§ 775.082(3)(d), 775.083(1)(d).

76. The original version of House Bill No. 1567 that was introduced in the Florida House of Representatives on or about March 8, 2005, and that was eventually enacted in amended form as 2005 Fla. Laws 277, defined third-party voter registration organizations to include political parties. The Florida House of Representatives later amended the definition to exempt Florida's political parties.

77. Nothing in the legislative history presents a legitimate, let alone compelling, reason for exempting the political parties from the definition of third-party voter registration organizations.

78. In support of the amendment exempting political parties, the amendment's sponsor, Representative Ron Reagan, explained during a committee meeting: "This amendment removes political parties from the definition of third-party registration organizations. And primarily, political parties are already subject to extensive provisions under chapter 103."

79. Fla. Stat. ch. 103 contains no provision expressly regulating the voter registration activities of political parties. Chapter 103 generally governs the choosing of presidential electors, requires political parties to be represented by a state executive committee, and regulates the composition, procedures, powers, and duties of political parties' executive committees.

80. The legislative history of 2005 Fla. Laws 277 offers no other explanation for the exemption of political parties from the definition of third-party voter registration organizations.

### III. THE LAW'S DISCRIMINATORY AND BURDENSOME IMPACT

81.     As described above, the challenged law discriminates unlawfully against plaintiffs' voter registration activities as compared to the voter registration activities of Florida's similarly situated political parties.

82.     Further, the challenged law chills and severely burden plaintiffs' exercise of their constitutional rights.  The challenged law has forced each of the organizational and member plaintiffs to abandon altogether their voter registration activities or seriously to limit those activities.

### A. The Threat of Fines Chills Plaintiffs' Exercise of Their Constitutional Rights

83.     Each of the organizational and member plaintiffs has restricted its speech and associational activities because the challenged law's imposition of strict liability, severe and escalating fines, and personal and joint and several liability, holds them to a standard of absolute perfection when registering voters on pain of serious financial injury, if not complete ruin.

#### *1. Strict Liability*

84.     The challenged law's strict liability provision requires the Division of Elections to fine plaintiffs and other third-party voter registration organizations even when they have acted reasonably and have a valid excuse for not submitting a voter registration application in the manner prescribed by the law.  It holds plaintiffs strictly liable for innocent mistakes, a third party's malicious acts (including those of disgruntled employees or political opponents), and potentially the state's mishandling or loss of applications.  It also holds plaintiffs strictly liable for other events beyond their control, such as the destruction of applications due to a hurricane, flood, or other natural disaster.

85.     The law's strict liability makes plaintiffs liable for other people's conduct. It also makes them liable when they have no knowledge that the law has been violated. For example, an organizational plaintiff that exercises all reasonable care in operating a voter registration drive will not always know if a volunteer or employee has not submitted an application within the manner prescribed by law. Conversely, a member plaintiff that exercises all reasonable care in collecting applications and giving them to an organizational plaintiff will not always know if the organization submitted the applications within the manner prescribed by law. In addition, plaintiffs will not always know whether a supervisor of elections or the Division of Elections has properly recorded and processed an application, leaving plaintiffs unfairly exposed to public charges and civil fines for the state's misconduct.

86.     The law's strict liability provisions will not prevent reasonably careful individuals and organizations from making innocent mistakes, and therefore it threatens to penalize plaintiffs merely for registering others to vote.

### 2. Severe Fines and Personal Liability

87.     The fines imposed by the challenged law are severe and threaten to impose massive and potentially ruinous liability on the member and organizational plaintiffs. The law's respective $250, $500, and $5,000 fines are multiplied by each voter registration application that is not submitted within the manner prescribed by the law. In 2004, plaintiffs and other third-party voter registration organizations collected and submitted anywhere between an estimated 500,000 and more than 1,000,000 voter registration applications. If a mere 1% of those applications were collected today and mistakenly submitted before a voter registration deadline but after the new law's unnecessary and unjustified 10-day deadline, the Division of Elections would impose mandatory fines on third-party voter registration groups not registered with the

state ranging between $1.25 million and $2.5 million. If a mere 1% of those applications were destroyed by a hurricane, the fines would skyrocket to an unbelievable $25 million to $50 million.

88.     If, by innocent mistake and through no fault of its own, a single plaintiff unable to comply with the law's quarterly reporting requirements were to submit a mere 100 applications before a voter registration deadline but on the eleventh day after the applications were completed and signed, the plaintiff would be subject to a massive $25,000 fine. Similarly, if that plaintiff were to submit 1,000 applications on the eleventh day but before a voter registration deadline, it would be subject to a potentially ruinous $250,000 fine.

89.     The organizational plaintiffs are each non-profit organizations with limited budgets. They cannot afford to risk such severe fines, which would drain a substantial portion of their finances, if not bankrupt them. Even if an organizational plaintiff pre-registered with the state and was able to meet the law's quarterly reporting requirements, it would still be liable for serious and costly fines of $6,250 and $62,500, respectively, if it were to submit either 100 or 1,000 applications on the eleventh day after the applications were collected.

90.     The fines are even more threatening to individuals liable under the law, including the member plaintiff, who risks enormous personal financial liability if she registers voters or if she merely act as a director or officer of a third-party voter registration organization.

91.     This personal liability especially threatens low-income volunteers, members, directors, officers, and employees of third-party voter registration organizations.

92.     The law's chilling effect on the member plaintiffs and on the organizational plaintiffs' other members, volunteers, directors, officers, and employees, has harmed the organizational plaintiffs by reducing the number of people willing to register voters on their

behalf. Consequently, it has reduced the organizational plaintiffs' capacity to engage in First Amendment-protected speech and activity.

### B. The Challenged Law Severely Burdens Plaintiffs' Exercise of Their Constitutional Rights

93.     The challenged law burdens plaintiffs by forcing them either to abandon or severely to limit their voter registration activities.

94.     Fines imposed under the challenged law will severely and unjustifiably burden plaintiffs' exercise of their First and Fourteenth Amendment rights to engage in political speech and associational activities. These fines will force plaintiffs to divert scarce resources away from registering voters and will reduce commensurately the amount of First Amendment-protected speech and related activity that they can engage in. They could even bankrupt plaintiffs.

95.     For those plaintiffs that continue to register voters, the challenged law forces them to devote additional money, as well as staff and volunteer time, to attempting to ensure strict compliance with the law's unnecessarily restrictive 10-day deadline. This is particularly burdensome for third-party voter registration organizations, like plaintiffs League of Women Voters, AFL-CIO, SEIU FHU, and AFSCME, that conduct statewide voter registration drives and that rely on dozens, if not hundreds, of volunteers during the course of these drives.

96.     In addition, compiling detailed and accurate quarterly reports—particularly for groups that conduct statewide voter registration drives—imposes unwarranted burdens on the organizational plaintiffs, each of which have limited budgets and few staff. For example, the League of Women Voters has 27 local Leagues scattered across the state from which it would have to collect information, but only one full-time and one part-time staff person. Likewise, the AFL-CIO would have to collect quarterly reports from more than 450 local unions across the state—many of which have no offices or computers and can be reached only by phone—but only

eight employees. In addition, each of the 27 volunteer-staffed local Leagues and 450 local AFL-CIO union representatives would have to regularly maintain records of their voter registration activities.

## C. The Challenged Law Severely Burdens the Right to Vote

97.     The challenged law severely burdens the registrant plaintiffs' right to vote and to participate in the political process.

98.     The registrant plaintiffs include senior citizens, people with disabilities, and members of rural, low-income, or predominantly minority communities, for whom it is difficult to travel to a government office to register to vote or to obtain an application on-line.

99.     The registrant plaintiffs want to vote in the upcoming federal and state elections but will not register to vote, or will find it difficult to register, but for plaintiffs' efforts to help them register. Merely distributing applications to the registrant plaintiffs is an inadequate substitute for collecting applications from them, since the registrant plaintiffs—like other citizens—are far less likely to be able to complete applications and have them delivered to the state if the organizational and member plaintiffs do not assist them.

100.    As a result of the law's chilling effect and the severe burdens it places on the organizational and member plaintiffs, the registrant plaintiffs will be deterred from registering to vote and they will be unable to exercise their constitutionally protected rights to vote and to participate in the political process.

101.    A significant number of Florida citizens will be affected by the law. According to the report of the 2004 Election Day Survey conducted for the U.S. Election Assistance Commission, in 2004 Florida ranked 39th among the states in voter registration rates; only 76.6% of Florida's voting-age citizens were reported to be registered to vote. Kimball W. Brace & Dr.

Michael P. McDonald, *Final Report of the 2004 Election Day Survey* 2-14, tbl. 2c (Sept. 2005), *available at* http://www.eac.gov/election_survey_2004/pdf/EDS-Full_Report_wTables.pdf. In the past, the organizational and member plaintiffs have assisted a substantial number of Florida citizens to register to vote.

## IV.  IMPACT OF THE LAW ON EACH ORGANIZATIONAL PLAINTIFF

### A.  League of Women Voters

102.    The challenged law has forced the board of directors of the League of Women Voters to vote unanimously to impose a moratorium on voter registration activities sponsored by the 27 local Leagues in Florida.

103.    The League has imposed a moratorium on its voter registration activities because it cannot afford to risk paying the severe and potentially ruinous fines threatened by the challenged law.  The League's budget for 2006 is merely $80,000.  These funds are already dedicated to paying staff salaries, office expenses, and the costs of the League's voter registration activities, educational programs, and publications.  The League cannot afford to risk paying the severe fines threatened by the law, because the fines could bankrupt the organization.

104.    Moreover, the League cannot afford to indemnify itself and its members, volunteers, employees, directors, president, and vice-president against personal, and joint and several, liability for the threatened fines.  In the past, the League and several of its local chapters sought to obtain "directors and officers" liability insurance but could not afford it.  The League is equally unable to afford insurance to cover any fines that may be imposed under the challenged law.

105.    The League cannot afford to hire additional staff to supervise more closely the activities of its 27 local chapters in order to eliminate or reduce the risk that the League would be

fined for missing a 10-day deadline or any of the other deadlines, either by honest mistake or otherwise through no fault of its own.

106.    Some League members who registered voters in previous years, and who would like to register voters in 2006, have been forced by the challenged law to refrain from participating in the League's voter registration activities out of fear of personal financial liability. This has reduced the amount of First Amendment-protected speech and activity the League can engage in.

107.    The League has determined that it cannot register with the state and provide quarterly reports under the new law because it does not have sufficient staff and resources to collect and compile the necessary information from each of the 27 local Leagues.

### B. People Acting for Community Together (PACT)

108.    PACT relies on volunteers from its member churches to run internal voter registration drives at those churches. While those volunteers are trained and supervised by paid PACT staff members, the actual registration is done by volunteers.

109.    Because PACT relies on volunteers, many of whom are low-income individuals, it is extremely difficult for them to conduct voter registration under the new law. It is hard to convince volunteers to risk potentially ruinous fines in order to engage in this form of political speech. PACT does not want to subject its volunteers to the risk of large fines or to risk such fines itself.

110.    For example, when PACT runs voter registration drives in its member churches, typically volunteers collect the applications each week after services, and at the end of a multi-week drive, a PACT staff member collects all the applications and delivers them to the county elections office. Under the new law, staff members would each week have to visit each of

PACT's 38 member organizations to collect applications and go to the county elections office to drop them off. This additional staff time is considerable, and PACT cannot afford to spend it on voter registration.

111.    PACT's congregation-based voter registration drives also present difficult reporting problems: often, church members collect voter registration applications at meetings in one another's homes or at other locations besides the church. Maintaining precise records of the date and address of each of those meetings, as required by the new laws, would be nearly impossible for its volunteers.

112.    These financial and administrative burdens have been a significant contributing factor to PACT's decision not to engage in voter registration this year. The law will continue to have a negative effect on PACT's plans to register voters in the future.

## C. AFL-CIO

113.    The AFL-CIO has traditionally conducted voter registration drives among its members. It would like to register an additional 10% of its members—or 50,000 members—in 2006. But if a mere 1% of the applications collected for these 50,000 members were submitted before a voter registration deadline but on the eleventh day after they were signed, the AFL-CIO would be fined $125,000: $250 x 500 applications. If a mere 1% of the applications collected were destroyed by a hurricane or flood, the AFL-CIO would be fined $2.5 million: $5,000 x 500 applications. Such massive fines would cripple—if not bankrupt—the AFL-CIO. Because it cannot afford the risks imposed by the law, of AFL-CIO has stopped its voter registration activities in 2006.

114.    The AFL-CIO has determined that it would be severely burdensome and extraordinarily costly to divert one or more of its employees away from their current

responsibilities to contacting each of its more than 450 local unions every quarter to compile an accurate and detailed report providing the date and location of every voter registration drive across the state. Many of the AFL-CIO's local unions have no computers or offices. In order to collect this information, AFL-CIO staff would have to spend days making hundreds of phone calls and leaving countless voicemail messages for volunteers across the state.

### D. AFSCME

115.    AFSCME directly engages in two kinds of voter registration drives that are affected by the new law: member-to member registration efforts and Operation Big Vote, a nonpartisan voter registration effort aimed at registering new voters from traditionally disenfranchised communities, including low-income communities and communities of color.

116.    Member-to-member voter registration is a key part of AFSCME's labor organizing, because AFSCME represents government employees whose workplace conditions are governed by elected officials. AFSCME seeks to ensure that between 75% and 85% of the members of its bargaining unit are registered to vote.

117.    In past years, AFSCME has engaged in extensive member-to-member voter registration drives to try to meet this goal. Using data files of unregistered members, the Florida Council focuses its registration efforts on members in particular local unions and regions of the state. The Council trains local volunteers, who are dues-paying members of AFSCME, in the legal and technical rules of voter registration, and encourages them to transmit the message to their fellow workers that voting is a key way to have a voice in the workplace.

118.    Once volunteers are trained, AFSCME allows them significant autonomy in doing voter registration. Volunteers target unregistered members by mail, phone, at work sites, and in

one-on-one visits. They regularly submit completed applications to election supervisors and send copies to AFSCME to ensure accurate records of the registration status of its members.

119. Because of the new law, AFSCME has greatly reduced its member-to-member voter registration this year. Some of AFSCME's locals are associations of state employees over a multi-county region that meet only on a monthly basis. At each monthly meeting of AFSCME members, a voter registration coordinator might collect voter registration applications that have been completed and given to an AFSCME member more than ten days before the meeting. Moreover, once the coordinator receives the applications, they have to be sorted by county and turned into the proper elections supervisor, whose office may be far away. AFSCME encourages its volunteers to personally return forms to the supervisor to guarantee their receipt. Instead of systematic targeting of unregistered members across the state, which it has done in the past, AFSCME is encouraging only dynamic locals or those located in dense urban areas to do voter registration, where collection and return of applications is less difficult. Currently, AFSCME is only involved in member-to-member voter registration in three places, out of over 80 locals: the city of Jacksonville, the city of Miami, and Chattahoochee, where the local associated with the State Hospital of Florida is located. AFSCME is no longer engaged in statewide member-to-member voter registration efforts because it cannot supervise its more than 80 local unions to guarantee perfect compliance.

120. In Operation Big Vote, AFSCME registers traditionally disenfranchised voters in the public at large, focusing on low-income individuals and communities of color. Each election cycle, AFSCME targets particular locations. In 2002 and 2004, AFSCME ran voter registration drives in Gadsden, Orland, Osceola, Seminole, Orange, Hillsborough, and Volusia counties.

121. Operation Big Vote is usually run in each county by one or two paid AFSCME temporary staff members. They participate in a three-day training program and receive day-to-day support and oversight from the Florida AFSCME Council, and in turn themselves oversee unpaid volunteers.

122. Because of the potentially huge fines under the new law, AFSCME will no longer engage in Operation Big Vote on the same scale as past years, and it is considering abandoning the program in Florida if the new law remains in effect. For instance, in 2004 AFSCME set a goal of registering 5,000-10,000 new voters in the rural Hispanic communities of Gadsden County on a budget of $30,000. Had the challenged law been in effect during that drive, and if one of AFSCME's staff members got sick and turned in a mere 120 applications one day after the 10-day deadline, this would have depleted the entire budget for the drive.

123. Because of the scale of and geographic scope of Operation Big Vote, it would also be very difficult for AFSCME to comply with the new law's registration and reporting requirements.

## E. SEIU FHU

124. In past years, SEIU FHU volunteers conducted voter registration drives with assistance from union staff. The union's approximately 300 volunteer leaders engaged in one-on-one communications with their co-workers to encourage them to register to vote and to become politically involved. Each volunteer leader was responsible for collecting voter registration applications from his or her co-workers and delivering the applications to the SEIU FHU headquarters in Miami. The SEIU FHU staff would then update its membership database with the registration information, ensure that applications were properly filled in, and deliver the applications to the supervisor of elections.

125.    The SEIU FHU conducted voter registration training for its volunteer leaders in prior years.  The trainings explained the information required by Florida's voter registration application and showed volunteer leaders how to properly fill in the application.  The training also consisted of role-playing to make the volunteer leaders comfortable and prepared to register co-workers.  In addition, it included discussions about the link between workers' issues (e.g., healthcare funding, staffing, workers' right to organize), community issues (e.g., education, healthcare access, immigration rights) and political participation by union members, especially by those who are registered to vote.

126.    Volunteer leaders often conducted voter registration in conjunction with efforts to educate members about legislative issues of concern to the SEIU FHU.  Volunteers explained how members can affect how legislators would vote on these issues if members registered to vote and communicated their views to their elected representatives.  For example, in the past volunteer leaders encouraged members to participate in the political system by registering to vote and contacting their legislators to support increased state funding and staffing for Florida's nursing homes.

127.    The SEIU FHU has been forced by the new law to stop registering its members to vote because it cannot afford the risk that the SEIU FHU and its members will have to pay the severe fines threatened by the new law.  Each of its volunteers who coordinate voter registration drives is responsible for collecting applications and delivering them to the SEIU FHU, which in turn delivers them to the state.  Because the union's voter registration efforts are decentralized and based upon a large number of dispersed volunteer leaders, there is a high likelihood that some of these applications will not be submitted in the manner prescribed by the new law, including before the 10-day deadline.

128.    The SEIU FHU believes that it will not be eligible for a three-fourths reduction of any fines under the new law because it will likely be unable to comply with the requisite quarterly reporting provisions.  It would be costly and burdensome for the SEIU FHU to divert one or more of its employees away from their current responsibilities to compile an accurate and detailed quarterly report providing the date and location of the voter registration activities of 300 volunteers at 89 facilities across the state.  In addition, each of its volunteers would have to maintain records of every date and location where they registered voters.  This is severely burdensome for volunteers and it would discourage union members from registering their colleagues.

## CAUSES OF ACTION

## COUNT I

### Violation of the First and Fourteenth Amendments
### (Speech Discrimination)

129.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 128 as if fully set forth herein.

130.    The challenged law unduly interferes with plaintiffs' exercise of their rights to engage in core political speech and association, while unjustifiably favoring the speech and association of political parties.

131.    The challenged law places severe burdens on individuals and private, non-party groups that register voters in Florida and it threatens them with severe and potentially ruinous fines.  At the same time, it entirely exempts from its restrictions Florida's political parties, which also engage in voter registration activities.

132.     The challenged law's disfavored treatment of plaintiffs' voter registration activities discriminates based on the content of plaintiffs' speech and associational activities, in violation of the First and Fourteenth Amendments.

133.     The challenged law's disfavored treatment of third-party voter registration groups discriminates on the basis of plaintiffs' non-association with political parties, in violation of the First and Fourteenth Amendments.

134.     There is no reasonable, much less compelling, reason for imposing restrictions on the voter registration activities of third-party voter registration organizations while exempting political parties that engage in the same or similar activities.

135.     The challenged law is underinclusive because it fails to regulate the substantially similar speech and associational activities of Florida's political parties.  The law's underinclusiveness undermines the state's purported rationale for restricting speech and demonstrates the state's attempt to favor the political parties' political speech and activities over that of third-party voter registration organizations.

136.     By reason of the foregoing, defendants, acting under color of state law, have deprived and will deprive plaintiffs of the rights, privileges, and immunities secured to them by the First and Fourteenth Amendments to the United States Constitution and protected by 42 U.S.C. § 1983.

## COUNT II

### Violation of the Fourteenth Amendment
### (Denial of Equal Protection)

137.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 128 as if fully set forth herein.

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 3111 STIRLING ROAD • FORT LAUDERDALE, FL  33312-6525
TELEPHONE (954) 987-7550

138.    The challenged law places severe burdens on individuals and private, non-party groups that register voters in Florida and threatens them with severe and potentially ruinous fines.  At the same time, it entirely exempts from its restrictions Florida's political parties, which also engage in voter registration.

139.    There is no reasonable, much less compelling, justification for imposing restrictions on the voter registration activities of third-party voter registration organizations while exempting political parties that engage in the same or similar activities.

140.    As a result, the challenged law denies plaintiffs equal protection of the law because it discriminates between plaintiffs and Florida's political parties in the regulation of their fundamental right to engage in free speech and associational activities.

141.    By reason of the foregoing, defendants, acting under color of state law, have deprived and will deprive plaintiffs of the rights, privileges, and immunities secured to them by the Fourteenth Amendment to the United States Constitution and protected by 42 U.S.C. § 1983.

## COUNT III

### Violation of the First and Fourteenth Amendments
### (Burden on the Rights of Free Speech and Political Association)

142.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 128 as if fully set forth herein.

143.    The challenged law imposes strict liability, holds plaintiffs personally, and jointly and severally, liable for steep and escalating fines based on each voter registration application that is not submitted in the manner prescribed by the law.  In addition, the challenged law imposes severe financial and administrative burdens on plaintiffs.

144.    The challenged law chills the exercise of First Amendment rights by the member and the organizational plaintiffs by holding them strictly liable when a voter registration

application is not submitted in the manner prescribed by law, even if they had no knowledge of the violation, exercised all reasonable care, and the violation arose through no fault of their own.

145.     The challenged law chills and severely burdens plaintiffs' exercise of their First Amendment right to engage in core political speech.

146.     The challenged law chills and severely burdens plaintiffs' exercise of their First Amendment rights to speak and associate with others whom they wish to encourage to participate in the political process.

147.     The challenged law chills and severely burdens the organizational plaintiffs' exercise of their First Amendment rights to speak and associate with their members.

148.     As a result of this chilling effect and of these burdens, a significant number of Florida citizens will not be registered to vote in the upcoming elections.  Moreover, the amount of First Amendment-protected political speech and activity that will occur in Florida will be dramatically reduced.  Plaintiffs will be forced to communicate fewer political messages and to refrain from engaging in certain kinds of associational activities important to advancing their missions and beliefs.  In addition, the public will receive less information about current political issues and have fewer opportunities to associate with plaintiffs and others in meaningful efforts to affect governmental decision making about those issues.

149.     Defendants have no important, much less compelling, interest that justifies the severe and unequal burdens imposed by the challenged law on plaintiffs' constitutionally protected speech and associational activities.

150.     By reason of the foregoing, defendants, acting under color of state law, have deprived and will deprive plaintiffs of the rights, privileges, and immunities secured to them by

the First and Fourteenth Amendments to the United States Constitution, and protected by 42 U.S.C. § 1983.

## COUNT IV

### Violation of the First and Fourteenth Amendments
### (Burden on the Rights to Vote and to Participate in the Political Process)

151.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 128 as if fully set forth herein.

152.    The First and Fourteenth Amendments protect the right to vote as a fundamental right.  The First Amendment's guarantees of freedom of speech and association protect the right to vote and to participate in the political process.

153.    Each of the registrant plaintiffs would not be able to register to vote but for the voter registration efforts of third-party voter registration organizations.

154.    The challenged law will prevent the registrant plaintiffs from exercising their right to vote and to participate in the political process by forcing third-party groups to stop registering voters, or seriously to limit their voter registration activities.

155.    As a result, the registrant plaintiffs' fundamental right to vote and to participate in the political process is severely burdened by the challenged law.

156.    Defendants have no compelling interest that justifies this severe and unequal burden on the fundamental rights of the registrant plaintiffs and of the organizational plaintiffs' members.

157.    By reason of the foregoing, defendants, acting under color of state law, have deprived and will deprive plaintiffs of the rights, privileges, and immunities secured to them by the First and Fourteenth Amendments to the United States Constitution, and protected by 42 U.S.C. § 1983.

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 3111 STIRLING ROAD • FORT LAUDERDALE, FL 33312-6525
TELEPHONE (954) 987-7550

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request this Court to:

(1)     enter judgment declaring and determining that the provisions of 2005 Fla. Laws 277 regulating the voter registration activities of third-party voter registration organizations, which provisions are codified at Fla. Stat. §§ 97.021(36) and 97.0575, and the rules promulgated by the Department of State and the Division of Elections implementing these provisions, violate the United States Constitution, specifically the First and Fourteenth Amendments thereto, both facially and as applied to plaintiffs;

(2)     grant appropriate preliminary, and permanent, equitable relief enjoining defendants from enforcing these provisions of 2005 Fla. Laws 277, and the rules promulgated by the Department of State and the Division of Elections implementing these provisions;

(3)     award nominal damages;

(4)     grant such other and further relief as the Court shall deem proper, including the award of costs and disbursements associated with the filing and maintenance of this action, and an award of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

Dated:  May 18, 2006

Gary C. Rosen
BECKER& POLIAKOFF, P.A.
3111 Stirling Road
Ft. Lauderdale, Florida 33312
Tel: (954) 985-4133

By:_____
       Gary C. Rosen, Esq.
       Florida Bar No. 310107

Wendy R. Weiser*
Renée Paradis**
BRENNAN CENTER FOR JUSTICE AT
   NYU SCHOOL OF LAW
161 Avenue of the Americas, 12th Floor
New York, N.Y. 10013
Tel: (212) 998-6730

Elizabeth S. Westfall*
Jennifer Maranzano
Estelle H. Rogers
ADVANCEMENT PROJECT
1730 M. Street, N.W., Suite 910
Washington, D.C. 20036
Tel: (202) 728-9557

Eric A. Tirschwell*
Craig L. Siegel*
KRAMER LEVIN NAFTALIS &
  FRANKEL LLP
1177 Avenue of the Americas
New York, N.Y. 10036
Tel: (212) 715-9100

*Attorneys for Plaintiffs*

\* Applying to appear *pro hac vice.*
\*\* On the papers.  Not yet admitted to practice law.

FTL_DB: 984433_1

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I (a) PLAINTIFFS | DEFENDANTS |
| --- | --- |
| LEAGUE OF WOMEN VOTERS OF FLORIDA, PEOPLE ACTING FOR COMMUNITY TOGETHER (PACT) et al. | SUE M. COBB, individually and in her official capacity as Secretary of State for the State of Florida, and DAWN ROBERTS, individually and in her official capacity |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Leon
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Leon County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
(954-985-4133)
Gary C. Rosen, Esq. /Becker & Poliakoff
3111 Stirling Rd., Ft. Lauderdale 33312

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:
DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

**II. BASIS OF JURISDICTION** (PLACE AN X IN ONE BOX ONLY)

- ☐ 1. U.S. Government Plaintiff
- ☒ 3. Federal Question (U.S. Government Not a Party)
- ☐ 2. U.S. Government Defendant
- ☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (For Diversity Cases Only) (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
| --- | --- | --- | --- | --- | --- |
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

**IVa.** _____ days estimated (for both sides) to try entire case

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)
- ☒ 1. Original Proceeding
- ☐ 2. Removed From State Court
- ☐ 3. Remanded from Appellate Court
- ☐ 4. Reinstated
- ☐ 5. Transferred from another district (specify)
- ☐ 6. Multidistrict Litigation
- ☐ 7. Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT**
CHECK IF THIS IS A  CLASS ACTION
☐ UNDER F.R.C.P. 23
DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE _____  DOCKET NUMBER _____

DATE  5/18/06
SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT
S/F I-2
REV. 9/94

FOR OFFICE USE ONLY: Receipt No. 940310   Amount $ 350.00
M/fp: _____
Date Paid: _____  05/18/06