UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-21265-CIV-JORDAN

FILED BY

2006 JUN -5  P 3: 08

-------------------------------------------------------------------------   x

LEAGUE OF WOMEN VOTERS OF FLORIDA, PEOPLE
ACTING FOR COMMUNITY TOGETHER (PACT),
FLORIDA AFL-CIO, AMERICAN FEDERATION OF
STATE, COUNTY AND MUNICIPAL EMPLOYEES,
COUNCIL    79    (AFSCME),    SEIU    FLORIDA
HEALTHCARE    UNION,    as    organizations    and    as
representatives of their members; MARILYNN WILLS; and
JOHN and JANE DOES 1-100,

Plaintiffs,

v.

SUE M. COBB, individually and in her official capacity as
Secretary of State for the State of Florida, and DAWN
ROBERTS, individually and in her official capacity as
Director of the Division of Elections within the Department
of State for the State of Florida,

Defendants.

-------------------------------------------------------------------------

: : : : : : : : : : : : : : : : : : : : : :    x

**PLAINTIFFS'
MOTION FOR
PERMISSION TO
FILE A BRIEF IN
EXCESS OF TWENTY
PAGES**

Pursuant to S.D. Fla. L.R. 7.1.C.2, Plaintiffs League of Women Voters of Florida,

People Acting for Community Together (PACT), Florida AFL-CIO, American

Federation of State, County and Municipal Employees, Council 79 (AFSCME), SEIU

Florida Healthcare Union, as organizations and as representatives of their members;

Marilynn Wills; and John and Jane Does 1-100 (collectively "Plaintiffs"), respectfully

move this Court to enter an Order permitting Plaintiffs to serve a memorandum of law in

support of their motion for a preliminary injunction that exceeds twenty pages.  As good

cause for granting the motion, Plaintiffs submit as follows:



CASE NO. 06-21265-CIV-JORDAN

1.      Despite Plaintiffs' best efforts to abide by the twenty-page limit as set forth in S.D. Fla. L.R. 7.1.C.2, Plaintiffs seek permission to file a memorandum no longer than 35 pages.

2.      Plaintiffs' request is reasonable under the circumstances because their memorandum addresses complex issues of federal constitutional law arising under the First and Fourteenth Amendments, and Plaintiffs' extended memorandum will assist the Court in resolving these issues.

3.      Attached hereto as Exhibits A, B and C, respectively, are Plaintiffs' (1) Motion for Preliminary Injunction; (2) Declaration of Beth Thomas and attached Exhibits; and (3) Notice of Filing and attached Plaintiff-Declarations.

4.      Attached hereto as Exhibit D is a proposed Order.

WHEREFORE, Plaintiffs respectfully request that the Court enter an Order, in substantially the same form as the proposed Order attached hereto, granting Plaintiffs permission to file and serve their memorandum in excess of the applicable page limitations.

Dated: June 6th, 2006

Gary C. Rosen
BECKER& POLIAKOFF, P.A.
3111 Stirling Road
Ft. Lauderdale, Florida 33312
Tel: (954) 985-4133

By: _____

Gary C. Rosen
Florida Bar No. 310107

Wendy R. Weiser*
BRENNAN CENTER FOR JUSTICE AT
    NYU SCHOOL OF LAW
161 Avenue of the Americas, 12th Floor
New York, N.Y. 10013
Tel: (212) 998-6730

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 3111 STIRLING ROAD • FORT LAUDERDALE, FL  33312-6525
TELEPHONE (954) 987-7550

CASE NO. 06-21265-CIV-JORDAN

Elizabeth S. Westfall*
ADVANCEMENT PROJECT
1730 M. Street, N.W., Suite 910
Washington, D.C. 20036
Tel: (202) 728-9557

Eric A. Tirschwell*
Craig L. Siegel*
KRAMER LEVIN NAFTALIS &
    FRANKEL LLP
1177 Avenue of the Americas
New York, N.Y. 10036
Tel: (212) 715-9100

*Attorneys for Plaintiffs*

*Applying to appear pro hac vice

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and

foregoing document was served by regular United States mail, postage prepaid, on the

6th ___ day of June, 2006, upon the following:

Peter Antonacci, Esq.
GrayRobinson, P.A.
301 S. Bronough Street, Suite 600
Post Office Box 11189
Tallahassee, FL 32302-3189

Gary C. Rosen

FTL_DB: 987231_1

**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-21265-CIV-JORDAN

```
------------------------------------------------------------   x
LEAGUE OF WOMEN VOTERS OF FLORIDA, PEOPLE           :
ACTING FOR COMMUNITY TOGETHER (PACT),               :
FLORIDA AFL-CIO, AMERICAN FEDERATION OF             :
STATE, COUNTY AND MUNICIPAL EMPLOYEES,              :
COUNCIL 79 (AFSCME), SEIU FLORIDA                   :
HEALTHCARE UNION, as organizations and as           :
representatives of their members; MARILYNN WILLS;   :
and JOHN and JANE DOES 1-100,                       :
                                                    :
            Plaintiffs,                             :
                                                    :
                  v.                                :
                                                    :
SUE M. COBB, individually and in her official capacity as  :
Secretary of State for the State of Florida, and DAWN      :
ROBERTS, individually and in her official capacity as      :
Director of the Division of Elections within the Department :
of State for the State of Florida,                         :
                                                    :
            Defendants.                             :
------------------------------------------------------------   x
```

**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCUTION AND INCORPORATED MEMORANDUM OF LAW**

## PRELIMINARY STATEMENT

Plaintiffs file this emergency motion to enjoin the Secretary of State and Director of Elections of Florida from enforcing a new Florida law, Fla. Stat. §§ 97.0575 and 97.021(36), that unlawfully and discriminatorily interferes with their rights to encourage civic engagement by registering citizens to vote.

This new law, which went into effect in 2006, imposes potentially ruinous fines and other burdensome requirements on all organizations registering voters—unless they happen to be Florida's political parties, which are entirely exempt from the onerous new rules. The law has forced the League of Women Voters and other plaintiffs to shut down their nonpartisan voter registration activities in Florida. Meanwhile, the Surfers Party of America, among other Florida political parties, remains as free as ever to engage in partisan voter registration. There is no

legitimate, much less compelling, reason to privilege political parties over nonpartisan groups and individuals when regulating the registration of voters. Neither the First Amendment nor the Equal Protection Clause tolerates such blatant discrimination in the regulation of political speech and association.

Plaintiffs' voter registration activities involve the kinds of core political speech and association that are fundamental to American democracy. The challenged law deters plaintiffs and other non-party groups from engaging in this vital civic activity, and invaluable means of communicating political messages and associating with fellow citizens to effect political change. It imposes burdens on plaintiffs' rights to speech and association that are so severe that it has forced all of the plaintiffs to abandon or dramatically curtail their voter registration activities.

Specifically, the law subjects non-party voter registration groups and their volunteers to fines of $250 for *each* voter registration application submitted more than ten days after it is collected, $500 for *each* application submitted after any voter registration deadline, and $5,000 for *each* application not submitted. Plaintiffs and their volunteers are strictly liable for these fines, even if their inability to meet the statutory deadlines results from innocent errors or events beyond their control, such as a family illness or the destruction of applications in a hurricane.

Because the law imposes crippling fines for even minor errors beyond an organization's or an individual's control, it creates enormous financial risk for nonpartisan voter registration in Florida. For example, the League of Women Voters' entire annual budget of $80,000 would be decimated if only sixteen applications collected by its volunteers were lost in a flood or if its volunteers took eleven days to submit the few hundred applications they often collect during one day's work. Individuals and groups with low incomes and modest budgets simply cannot afford the potentially bankrupting costs of engaging in such political speech and association.

The burdens this law imposes on the speech and association of non-party groups and individuals go far beyond what is necessary to meet any legitimate government interest, and they are certainly not narrowly tailored to meet a compelling state interest, as required by the case law. No other state imposes such burdensome requirements on groups and individuals who help

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 3111 STIRLING ROAD • FORT LAUDERDALE, FL 33312-6525
TELEPHONE (954) 987-7550

register voters.  The new law harshly punishes groups and individuals exercising all reasonable

care for honest mistakes and events beyond their control.  What is more, the law's restrictions are

completely unnecessary because other provisions of Florida law provide criminal penalties for

both voter registration fraud and intentional obstruction of or delay in turning in voter

registration forms.  The law's burdens simply cannot be justified under the First Amendment.

Unless the challenged law is enjoined, the amount of constitutionally protected political

speech and activity that will occur in Florida will be dramatically reduced.  Plaintiffs, as well as

many other individuals and groups, will be forced to communicate fewer political messages and

to refrain from engaging in associational activity important to advancing their missions and

beliefs.  The public will receive less information about current political issues and have fewer

opportunities to associate with plaintiffs in meaningful political activities.

By impairing plaintiffs' efforts to register new voters, the new law also unconstitutionally

interferes with the right to vote of those citizens who rely on plaintiffs and other groups to help

them overcome barriers to registering to vote and to participating in the political process.

Plaintiffs have assisted hundreds of thousands of Florida citizens to register to vote.  Unless the

challenged law is enjoined, a significant number of Florida citizens will not be registered to vote

in the upcoming elections.  This harm will fall disproportionately on senior citizens, people with

disabilities, members of rural, low-income, and predominantly minority communities, and others

who find it difficult either to travel to a government office during business hours or to obtain a

registration application on-line.

Accordingly, plaintiffs respectfully request that the Court enjoin defendants from

enforcing Fla. Stat. §§ 97.0575 and 97.021(36).  Plaintiffs request immediate relief to enable

them to conduct voter registration drives before the registration deadlines of August 7, 2006 for

the upcoming primary elections and October 10, 2006 for the upcoming general elections.

## STATEMENT OF THE CASE

Plaintiffs are non-party, nonprofit groups and a Florida citizen, Marilynn Wills, who are

engaged in the political process and want to engage other Florida citizens by registering them to

vote.[1]  The challenged law has forced these plaintiffs to suspend altogether or curtail dramatically their voter registration activities.  Plaintiffs also include Florida citizens, represented by John and Jane Does (the "registrant plaintiffs"), who will not be registered to vote absent the efforts of third-party voter registration groups.

**Plaintiffs' Nonpartisan Voter Registration Activities**

Before 2006, each of the plaintiffs conducted or participated in nonpartisan voter registration drives in Florida.  Plaintiffs wish to continue their voter registration drives because they are a uniquely effective way both to communicate political messages important to plaintiffs' organizational missions and to associate with fellow citizens—including members of their own organizations—to advance those missions.  (Dorfman Decl. ¶¶ 17, 26; Ewart Decl. ¶ 8; Giliotti Decl. ¶¶ 9, 12; Gonzalez Decl. ¶ 11; Hall Decl. ¶ 4; Wills Decl. ¶ 11.)  By registering voters, plaintiffs seek to encourage civic participation; engage citizens in discussions about current political issues, including proposed state legislation and constitutional amendments, and encourage citizens to support those issues; and increase the political effectiveness of their members and of certain groups and communities in Florida, such as low-income citizens, senior citizens, workers, and people of color.  (Dorfman Decl. ¶¶ 16-17, 19; Ewart Decl. ¶¶ 4, 8; Giliotti Decl. ¶¶ 11-12, 17; Gonzalez Decl. ¶¶ 7, 17-18; Hall Decl. ¶¶ 4, 10-12; Wills Decl. ¶¶ 8-11.)

Plaintiffs' voter registration drives involve a range of speech and associational activities that are fundamental to American democracy.  As part of those drives, plaintiffs typically communicate a variety of nonpartisan reasons for Florida's citizens to register and vote.  For example, the League of Women Voters (the "League") and Ms. Wills have communicated that citizens should register to vote to keep government accountable.  (Giliotti Decl. ¶ 15; Wills Decl. ¶ 11.)  Other plaintiffs have communicated that their members should register to vote to demonstrate support for certain policy proposals or ballot initiatives, including proposals for increased state funding for health care in the case of the SEIU Florida Health Care Union ("SEIU FHU") (Ewart Decl. ¶ 8), and for improved public transportation in Miami-Dade County in the

---

[1] Except where noted, "plaintiffs" refers to the non-profit group plaintiffs and Ms. Wills.

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 3111 STIRLING ROAD • FORT LAUDERDALE, FL  33312-6525
TELEPHONE (954) 987-7550

case of People Acting for Community Together ("PACT") (Dorfman Decl. ¶¶ 9, 15-16).  And most plaintiffs have communicated that registering to vote increases the political power of their members or communities, including low-income Hispanic and African-American families in the case of PACT (*id.* ¶ 19), and workers in the case of American Federation of State, County and Municipal Employees ("AFSCME"), SEIU FHU, and the AFL-CIO (Gonzalez Decl. ¶¶ 4, 7; Ewart Decl. ¶ 7; Hall Decl. ¶ 10).

When plaintiffs register voters to advance these objectives, they talk to potential voters face-to-face at community events, religious services, workplaces, schools, malls, bus stops, and other places where citizens congregate.  Ms. Wills, for example, has registered voters at Tallahassee's shopping malls, Fourth of July celebrations, and Saturday Downtown Market (Wills Decl. ¶ 7); PACT has registered voters at houses of worship throughout Miami-Dade County (Dorfman Decl. ¶¶ 4, 24, 26); and the unions have registered voters in workplaces across the state (Ewart Decl. ¶¶ 5-6; Hall Decl. ¶¶ 8-9; Gonzalez Decl. ¶ 11).  Several of the plaintiffs also conduct voter registration drives by talking to potential voters door-to-door in their communities (Gonzalez Decl. ¶ 19) or at one another's homes (Dorfman Decl. ¶ 30).

In prior years, plaintiffs have succeeded in registering hundreds of thousands of new voters in Florida by convincing them that it is important to take time to register to vote, and by assisting them to complete applications properly, collecting applications, delivering applications to the appropriate state offices and, at times, verifying that election officials correctly added the new voters to the rolls.  If plaintiffs had merely distributed and not collected voter registration applications, their drives would not have been as successful, and significantly fewer voters would have been added to the rolls.  (Giliotti Decl. ¶ 18.)

Absent the efforts of plaintiffs and other nonpartisan groups, thousands of eligible Florida citizens who are now registered to vote would not be registered.  Florida ranks thirty-ninth in the nation in terms of voter registration rates; only 76.6% of its voting-age population is registered to vote.  (Thomas Decl. Exh. A at 2-14 tbl. 2c.)  Third-party voter registration is a major avenue for voter registration in the state.  In 2004, for example, over half a million voter

registration applications were submitted through third-party groups associated with the Center for Civic Participation (*see* Thomas Decl. Exh. B at 2), and even more through other nonpartisan groups. This is a substantial percentage of the total applications submitted that year. (*See* Thomas Decl. Exh. C at 4.)  Plaintiffs' voter registration drives have especially benefited senior citizens, people with disabilities, members of rural, low-income, and minority communities, and others who find it difficult either to travel to a government office during business hours or to obtain a voter registration application online. (Dorfman Decl. ¶¶ 17, 19; Giliotti Decl. ¶ 12; Gonzalez Decl. ¶¶ 17-18.)

## The Political Parties' Voter Registration Activities

Florida's political parties conduct voter registration to communicate partisan political messages and to increase the number of people likely to cast votes for their chosen candidates. For example, in 2004, the chairman of the Republican Party of Florida announced:  "The more voters we register, the more Republicans will win." (Thomas Decl. Exh. D at 1.)  Similarly, the current chair of the Florida Democratic Party recently declared that her top New Year's resolution for 2006 was for more Democrats to participate in "voter registration" and other "party-building" activities. (Thomas Decl. Exh. E at 14.)  The Green Party of Florida's current web site, in a section dealing with the party's voter registration activities, implores:  "Please consider changing your voting registration to list you as a Green Party voter." (Thomas Decl. Exh. F at 2.)  These messages are different from those communicated by plaintiffs and other nonpartisan groups.

## Florida's New Voter Registration Law

Florida's new voter registration law, which became effective this year,[2] imposes a severely burdensome and discriminatory system of punitive regulations and fines on non-party groups and individuals who engage in voter registration. *See* Fla. Stat. § 97.0575.  The law applies to "third-party voter registration organization[s]," which it defines as "any person, entity,

---

[2] The Florida Secretary of State issued a proposed rule implementing the new law on or about February 24, 2006, and held a public hearing concerning the proposed rule on March 13, 2006. The Secretary has not yet issued a final rule.

or organization soliciting or collecting voter registration applications." *Id.* § 97.021(36).
Although political parties also solicit and collect voter registration applications, the law
expressly excludes all "political part[ies]" from its coverage. *Id.*

> The law imposes the following mandatory fines on third-party voter registration groups:
>
> (a) A fine in the amount of $250 for *each* application received by the division or the
> supervisor of elections more than 10 days after the applicant delivered the completed
> voter registration application to the third-party voter registration organization or any
> person, entity, or agent acting on its behalf.
>
> (b) A fine in the amount of $500 for *each* application collected by a third-party voter
> registration organization or any person, entity, or agent acting on its behalf, prior to book
> closing for any given election for federal or state office and received by the division or
> the supervisor of elections after the book closing deadline for such election.
>
> (c) A fine in the amount of $5,000 for *each* application collected by a third-party voter
> registration organization or any person, entity, or agent acting on its behalf, which is not
> submitted to the division or supervisor of elections.

*Id.* § 97.0575(3) (emphases added).

It provides also that the following individuals "shall be personally and jointly and
severally liable" for all fines imposed under the law:

> the individual collecting the voter-registration application, the [organization's] registered
> agent, and those individuals responsible for the day-to-day operation of the third-party
> voter registration organization, including, if applicable, the entity's board of directors,
> president, vice president, managing partner, or such other individuals engaged in similar
> duties or functions.

*Id.*

The law holds all third-party voter registration groups strictly liable for meeting its
deadlines. *Id.* It allows for no exceptions, even for groups or individuals that have exercised all
reasonable care in collecting and delivering voter registration applications, or whose failure to
comply with the law results from no fault of their own.[3]

The law provides that its fines may be reduced by three-fourths, but not eliminated, only
if groups submit to a strict regimen of state registration and quarterly reporting. In particular, the
law requires that third-party voter registration groups must: (i) pre-register with the state; (ii)

---

[3] Maria I. Matthews, counsel to the Department of State, has publicly stated that third-party groups will be fined
even "if some situation arises beyond the control of [an] organization." (Thomas Decl. Exh.G.).

submit timely quarterly reports "providing the date and location of any organized voter registration drives;" (iii) provide the name of a registered agent in the state; and (iv) submit the names "of those individuals responsible for the day-to-day operation of the third-party voter registration organization." *Id.* § 97.0575(1). Although there is no penalty for failure to register with and report to the state, *id.* § 97.0575(2), groups that do not do so are subject to fines four times greater than groups that do, *id.* § 97.0575(3).

Voter registration fraud is separately proscribed by Fla. Stat. §§ 104.011, 104.012, and 104.0615, which plaintiffs do not challenge in this suit. The latter provision makes it a third-degree felony to "knowingly . . . obstruct or delay the delivery of a voter registration form." *Id.* § 104.0615.[4]

### The Impact of the Challenged Law on Plaintiffs

#### 1. Plaintiffs Have Stopped or Seriously Curbed Their Voter Registration Activities

Florida's new voter registration law has caused all of the plaintiffs either to abandon completely or seriously curtail their voter registration and related speech and association activities. After registering voters in Florida for almost seventy years, on March 19, 2006, the League imposed a moratorium on all of its nonpartisan voter registration drives as a result of the challenged law. (Giliotti Decl. ¶¶ 6, 19.) Because of that law, Marilyn Wills, President of the Tallahassee League, has also stopped registering voters for the first time in over three decades. (Wills Decl. ¶¶ 5-6.) Similarly, the AFL-CIO and SEIU FHU are no longer registering their members to vote because of the new law—even though the AFL-CIO has an annual goal of increasing the number of its 500,000 members who are registered by 10%, and even though registering its members is an important part of SEIU FHU's strategy to advocate for an improved healthcare system on behalf of 13,000 private sector healthcare workers. (Hall Decl. ¶¶ 7, 14; Ewart Decl. ¶¶ 4, 8-9.) PACT, a coalition of 38 churches, synagogues, and other community-based groups in Miami-Dade County, has also suspended its nonpartisan voter registration drives among its predominantly low-income and minority constituents, largely because of the burdens

---

[4] A person who violates this section may be punished by up to five years in jail, a $5,000 fine, or both. Fla. Stat. §§ 775.082(3)(d), 775.083(1)(c).

imposed by the new law. (Dorfman Decl. ¶¶ 2, 19, 27.) And although registering its 250,000 public employee members to vote is vitally important to AFSCME's collective bargaining strategy, AFSCME has determined that it too must dramatically curtail its nonpartisan voter registration activities because of the new law; it has discouraged voter registration by the vast majority of its locals. (Gonzalez Decl. ¶¶ 13, 15.)   The new law has also forced AFSCME to scale back—and consider abandoning—its participation in the "Operation Big Vote" program. (*Id.* ¶ 25.)

At this time of the year, most of the plaintiffs would already be actively engaged or preparing to engage in the political process by registering their fellow citizens to vote. But because of the challenged law, their voter registration activity has virtually ground to a halt.

### 2. *The Law's Fines and Strict Liability Provisions Make Voter Registration Too Risky*

There are several reasons why the challenged law has so severely chilled plaintiffs' speech and association that they have shut down or drastically curbed their voter registration drives. First and foremost, the combination of the law's large fines and its strict liability provisions makes voter registration extremely risky, especially for organizations and individuals with limited budgets. The law's fines are assessed for *each* voter registration application that is not submitted in accordance with its strictures; as a result, a group or individual could face huge fines based on only one incident. What is more, the fines are mandatory; the law punishes groups and individuals exercising all reasonable care for even honest mistakes or events beyond their control.

Thus, for example, if just sixteen applications were lost by accident, or if just one volunteer inadvertently took eleven days to submit even one box of applications, the League's annual budget of $80,000 would be decimated by the resulting fines. (Giliotti Decl. ¶ 26.) Similarly, if a mere 1% of the applications collected for the AFL-CIO's target of 50,000 newly registered members were submitted before a voter registration deadline but on the eleventh day after they were collected, the AFL-CIO would be fined $125,000 ($250 x 500 applications). If a mere 1% of the applications collected were destroyed by a flood or hurricane, the AFL-CIO

would be fined a staggering $2.5 million ($5,000 x 500 applications).  Such massive fines would either cripple or bankrupt the AFL-CIO, whose annual budget is approximately $1.4 million. (Hall Decl. ¶¶ 6, 18-19; *see also* Gonzalez Decl. ¶¶ 20-21 (describing potential effect of law's fines on program to register new voters in rural Hispanic communities in Gadsen County).)

The challenged law holds third-party voter registration groups to a standard of perfect compliance with the law's deadlines—including its arbitrary ten-day deadline—on pain of severe and potentially ruinous penalties.  Even if those groups altered their time-tested methods to conform to the strictures of the challenged law, it is impossible even for the most conscientious of voter registration drive organizers—whether in a nonprofit group, a political party, or the government—to guard against every possible delay or contingency.  Illness, family hardship, or inclement weather could delay a single box of applications and bankrupt an organization or individual.[5]  The law's strict liability will neither prevent careful volunteers and organizations from making innocent mistakes nor enable them to avoid events beyond their control.  Thus, it serves only to penalize plaintiffs for registering others to vote.

### 3. It is Extremely Difficult for Plaintiffs To Ensure Perfect Compliance With the Law By Their Volunteers

The law's strict liability provisions require perfect compliance to avoid its fines.  This is extremely difficult for plaintiffs, because their voter registration drives are staffed primarily by volunteers in diverse locations across the state, because they have only a small number of full-time staff members, and because voter registration is only one of many activities they undertake.

The League relies exclusively on volunteers to register voters in drives organized by its 27 local chapters across the state; with only 1.5 paid employees, it cannot fully oversee the activities of all its volunteers.  (Giliotti Decl. ¶ 23.)  PACT's voter registration drives are run by low-income volunteers who typically register fellow congregants after weekly religious services

---

[5] For example, the current president of the League of Women Voters once received a call from the sister of a 94-year-old League member who had recently died.  A few weeks after the member died, the sister discovered signed petitions for a ballot initiative that the deceased had circulated for the League.  The League submitted the petitions before the relevant deadline, but would have missed a ten-day deadline through no fault of the League or of its circulator.  (Giliotti Decl. ¶ 25.)

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 3111 STIRLING ROAD • FORT LAUDERDALE, FL  33312-6525
TELEPHONE (954) 987-7550

at 38 separate locations as well as at other gatherings of its constituents; it has only a handful of employees with many other duties. (Dorfman Decl. ¶¶ 7, 22-24.) The AFL-CIO, which has 500,000 active and retired members in Florida and only ten full-time employees, relies on volunteers and retirees at 450 local unions throughout the state to run its nonpartisan voter registration drives. (Hall Decl. ¶¶ 6, 8, 16-17.) AFSCME's voter registration drives are similarly organized by volunteer members at 90 local unions across the state. (Gonzalez Decl. ¶ 4, 10.) As a result of the decentralized nature of its voter registration drives run by 300 volunteers at 89 healthcare facilities across Florida, SEIU FHU also cannot ensure full compliance with the law. (Ewart Decl. ¶¶ 4, 10-11.)

### 4. *The Arbitrary Ten-Day Deadline Is Particularly Burdensome To Plaintiffs*

The law's arbitrary new ten-day deadline makes it especially difficult for some plaintiffs to continue registering voters. For example, as part of its past voter registration drives, PACT's staff would visit monthly those of its 38 member groups running drives to collect completed applications and deliver them to the county elections office. (Dorfman Decl. ¶ 29.) The new law would require PACT's staff to collect applications more frequently, imposing a burden PACT is unable to afford. (*Id.*) AFSCME similarly would find it difficult to meet the ten-day deadline, particularly with respect to the drives conducted by those of its 90 locals whose members are dispersed over a multi-county region. (Gonzalez Decl. ¶¶ 4, 14.) These locals typically hold monthly regional meetings and, during meetings held in past years, AFSCME coordinators would collect completed applications that had been previously circulated among employees at various state offices. (*Id.* ¶ 14.) The ten-day deadline effectively bars AFSCME from continuing to register its members this way. (*Id.* ¶¶ 13-15; *see also* Giliotti Decl. ¶ 25 (describing difficulties of complying with ten-day deadline for elderly members of the League).)

The ten-day deadline also makes it difficult for third-party groups to review the forms they collect before submitting them to the appropriate state office. Such reviews prevent inaccurate or incomplete applications from clogging up local elections offices, improve the operations of voter registration drives by allowing organizers to review the work of circulators,

and enable third-party groups to follow up with election officials to ensure that applicants have been properly added to the voter rolls.  (*E.g.*, Ewart Decl. ¶ 6; Gonzalez Decl. ¶ 12.)

### 5. *The Law's Personal and Joint and Several Liability Chills Individuals' Speech*

Because the law imposes personal, joint and several liability on each individual who registers voters or is responsible for a group's voter registration operations, many individuals who want to register voters are unwilling to do so out of fear of the potentially huge fines.  For example, Ms. Wills cannot afford the risk that she will be personally liable for significant fines under the new law, either as a result of her own voter registration activities or in her roles as president of the Tallahassee League and a member of the state board.  (Wills Decl. ¶¶ 11-12.) Other League members who have registered voters in the past have also stopped doing so out of fear of being personally fined.  (*Id.* ¶ 13.)  PACT's low-income volunteers similarly cannot afford to be subject to the risk of large fines threatened by the new law (Dorfman Decl. ¶ 28), nor can those who volunteer with the other plaintiffs.  (*E.g.*, Giliotti Decl. ¶ 29; Hall Decl. ¶ 22)

As a result, the challenged law not only chills Ms. Wills' speech and association but also deters individuals from associating with plaintiffs and other nonpartisan groups to engage in voter registration.  (*E.g.*, Gonzalez Decl. ¶ 22; Wills Decl. ¶ 18.)

### 6. *Plaintiffs Cannot Meet the Law's Quarterly Reporting Requirements*

Each of the organizational plaintiffs has determined that it is unable to satisfy the new law's quarterly reporting requirements and thus that it will be ineligible for a reduction in any fines imposed under the new law.  It would be enormously burdensome if the plaintiff organizations had to assign staff or volunteers every quarter to collect and compile the required information about hundreds of voter registration drives across the state.  In addition, it would be equally burdensome for all of the group plaintiffs' volunteers—who already sacrifice their personal time to register others—to shoulder the additional responsibility of carefully maintaining accurate records of their daily voter registration activities.

For example, the League has only 1.5 full-time staff but would have to collect information from 27 volunteer-run local Leagues to file quarterly reports about its voter

registration drives.  It simply does not have sufficient staff or resources to collect and compile this information and to ensure its accuracy and completeness. (Giliotti Decl. ¶¶ 23, 28.)   The AFL-CIO has only eight employees but 450 local unions, many of which do not have offices or computers.  To collect the information required by the new law each quarter, AFL-CIO staff would have to spend days making hundreds of phone calls and leaving countless voicemail messages for volunteers across the state.  The record-keeping would also be burdensome for its volunteers who register members at multiple locations and on multiple dates throughout Florida's cities and counties.  (Hall Decl. ¶¶ 20-21.)  The other plaintiffs similarly have determined that it would be too costly and burdensome for them to divert their few staff members from their current responsibilities in order to monitor and keep records of the dates and locations of all their volunteer-run voter registration drives.  (Dorfman Decl. ¶ 30; Gonzalez Decl. ¶¶ 16, 23; Ewart Decl. ¶¶ 12-13.)

## ARGUMENT

I.   **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS THAT FLORIDA'S NEW VOTER REGISTRATION LAW VIOLATES THEIR FIRST AMENDMENT RIGHTS TO SPEECH AND ASSOCIATION BECAUSE IT IS DISCRIMINATORY**

Plaintiffs' voter registration activities, which involve the kinds of speech and association that are fundamental to American democracy, are protected by the First Amendment.  Plaintiffs engage in nonpartisan voter registration to communicate messages of political engagement and reform and to associate with their fellow citizens to participate in the political process.  Through their voter registration activities, plaintiffs communicate not only their views about the importance of political participation generally, but also their views on particular issues affected by elections and on the need for particular communities and groups to join together for meaningful political action.  For example, plaintiffs have linked their voter registration drives to particular ballot initiatives (*e.g.*, Dorfman Decl. ¶ 13; Giliotti Decl. ¶ 17); to efforts to educate their members about particular legislative issues (*e.g.*, Ewart Decl. ¶ 8); and to campaigns to increase the political power of particular communities and groups to advance shared objectives (*e.g.*, Dorfman Decl. ¶ 17; Hall Decl. ¶ 10).  When plaintiffs register voters, they engage other

13

citizens in discussions about these issues and urge them to support these issues at the ballot box and to associate with plaintiffs to further their shared goals.

This kind of "'interactive communication concerning political change'" is "'core political speech,'" accorded the highest level of First Amendment protection. *Buckley v. Am. Const. Law Found.*, 525 U.S. 182, 186-87 (1999) (quoting *Meyer v. Grant*, 486 U.S. 414, 422 (1988)). The Supreme Court recognized in *Buckley* and *Meyer*, both of which struck down restrictions on the circulation of state ballot initiative petitions, that individuals and organizations have a right under the First Amendment to enlist the public in electoral participation, including through the use of state electoral procedures. *See also Biddulph v. Mortham*, 89 F.3d 1491, 1498 (11th Cir. 1996) ("[T]he circulation of initiative petitions and the concomitant exchange of ideas constitutes 'core political speech.'" (quoting *Meyer*, 486 U.S. at 422)). The First Amendment similarly protects plaintiffs' right to communicate and associate with their fellow citizens to assist them in registering to vote. *See Monterey County Dem. Cent. Comm. v. U.S. Postal Serv.*, 812 F.2d 1194, 1196 (9th Cir. 1987) ("The parties do not dispute that voter registration is speech protected by the First Amendment."); *cf. Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997) ("The First Amendment protects the right of citizens to associate . . . for the advancement of common political goals and ideas."); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.").

Florida's new voter registration law directly interferes with plaintiffs' voter registration activities and drastically curbs their political speech and association. At the same time, the law exempts political parties from its coverage, leaving parties free to engage in voter registration activity as before. Fla. Stat. § 97.021(36)(a). This kind of discrimination in the regulation of election-related speech and association is blatantly unconstitutional under Supreme Court precedents for four independent reasons. *First*, as a restriction on core political speech, the challenged law is subject to strict scrutiny, which it cannot survive because there is no rational

basis, much less a compelling justification, for regulating the voter registration efforts only of nonpartisan groups. *Second*, because it distinguishes between certain messages and speakers in its regulation of voter registration activity, the challenged law is an unconstitutional content-based restriction of speech. *Third*, the challenged law unlawfully discriminates against plaintiffs based on their non-association with political parties. *Fourth*, even if the challenged law is viewed as a regulation of elections that only incidentally burdens speech and association, it fails the Supreme Court's balancing test for assessing such regulations because its burdens are unjustifiably discriminatory.

A.   **The Challenged Law Is Unconstitutional Because It Discriminatorily Restricts Plaintiffs' Core Political Speech and Association**

1.   *The Challenged Law Is Subject To Strict Scrutiny Because It Hampers Core Political Speech and Association*

Like initiative-petition circulation, plaintiffs' voter registration activity is "core political speech" involving "interactive communication concerning political change." *Meyer*, 486 U.S. at 422, 425; *see Buckley*, 525 U.S. at 186-87. And like the regulations struck down in *Buckley* and *Meyer*, Florida's new voter registration law "decreases the pool" of voter registration circulators, "'limits the number of voices who will convey'" plaintiffs' messages, and cuts down "'the size of the audience [plaintiffs] can reach.'" *Buckley*, 525 U.S. at 194-95 (quoting *Meyer*, 486 U.S. at 422-23). Specifically, because the law imposes steep fines for each voter registration form submitted more than ten days after it is collected, and even steeper fines for each form submitted after the voter registration deadline or lost, and because it makes third-party voter registration groups and associated individuals strictly liable for these fines even if their failure to meet the statutory deadlines results from events beyond their control, on its face, the law makes it much more difficult for non-party groups and individuals to engage in voter registration and related speech and association. Indeed, each of the plaintiffs has been forced to abandon or seriously curtail their voter registration efforts. *See supra* p. 8.

The Supreme Court has held that restrictions that interfere with core political speech, like those at issue here, must be assessed under strict scrutiny. *See McIntyre v. Ohio Elections*

15

Comm'n, 514 U.S. 334, 345-47 (1995); Meyer, 486 U.S. at 420-22; see also Weaver v. Bonner, 309 F.3d 1312, 1319 (11th Cir. 2002); R.I. Minority Caucus v. Baronian, 590 F.2d 372, 376 (1st Cir. 1979) (A state "may not abridge fundamental first amendment rights of speech and association" in connection with laws regulating voter registration "without establishing that such an infringement is necessary to achieve a vital state interest.").

The law at issue here is no mere election regulation; it "directly" regulates and limits plaintiffs' communication and association with other citizens. See McIntyre, 514 U.S. at 345-46 (differentiating between laws regulating ballot access and voting processes and those regulating election-related speech). Unlike ballot access laws, Florida's new law "does not control the mechanics of the electoral process," id. at 345, but instead restricts the ability of plaintiffs to go into their communities and associate with potential voters to affect political change. As a result, it is subject to strict scrutiny, rather than the balancing test used for election laws that deal primarily with the state's administration of elections and only incidentally burden speech. Id. at 345-46; see also Campbell v. Buckley, 203 F.3d 738, 745 (10th Cir. 2000) (canvassing Supreme Court cases involving election-related speech and concluding that "strict scrutiny is applied where the government restricts the overall quantum of speech available to the election or voting process"); cf. Buckley v. Valeo, 424 U.S. 1, 39 (1976) (applying strict scrutiny to campaign expenditure limits in part because their "primary effect . . . is to restrict the quantity of campaign speech by individuals, groups, and candidates").[6]

Thus, for example, while a state may generally require registrants to submit their applications a set number of days before an upcoming election in order for the state to process them by the election, see, e.g., Dunn v. Blumstein, 405 U.S. 330, 346-49 (1972), it cannot, absent a compelling justification, regulate the manner in which individuals and groups associate and speak in connection with voters' efforts to register before that deadline or interfere with plaintiffs' speech-related voter registration activities. As the Eleventh Circuit explained in the analogous context of petition circulation, "a state, though generally free to regulate its own

---

[6] As discussed infra, the challenged law also fails under the balancing test applied to laws regulating the mechanics of elections.

initiative process, is limited in the extent to which it can permissibly burden the communication of ideas about the political change at issue in an initiative proposal that occurs during petition circulation." *Biddulph v. Mortham*, 89 F.3d 1491, 1498 (11th Cir. 1996) (citing *Meyer*, 486 U.S. at 423-27); *cf. Taxpayers United for Assess. Cuts v. Austin*, 994 F.2d 291, 297 (6th Cir. 1993) (differentiating election regulations from those that "restrict the means that the plaintiffs can use to advocate their proposal"). The same holds true for voter registration. In order to justify the law's discriminatory treatment of plaintiffs, therefore, defendants must demonstrate a compelling state interest to which the law's restrictions are narrowly tailored. *See, e.g., McIntyre*, 514 U.S. at 347 ("exacting scrutiny" required for "law burden[ing] core political speech" (internal quotation marks omitted)); *Weaver*, 309 F.3d at 1319.

## 2. *The Challenged Law Fails Strict Scrutiny Because There Is No Rational Basis, Much Less a Compelling Justification, For Its Discriminatory Application*

The Constitution requires that statutes regulating speech apply their prohibitions "evenhandedly." *Florida Star v. B. J. F.*, 491 U.S. 524, 540 (1989). Florida's new voter registration law runs afoul of this basic constitutional requirement.

To justify the challenged law under strict scrutiny, defendants must establish not only a compelling interest in regulating voter registration drives in this way, but also a compelling interest in differentiating between political parties and nonpartisan groups and individuals with respect to such regulation. *See, e.g., Buckley*, 525 U.S. at 204 (invalidating regulation because it discriminated between paid and unpaid petition circulators). But no interest that defendants could possibly assert would justify the law's discrimination between political parties and plaintiffs.[7] Whatever the state's asserted interest in regulating plaintiffs' voter registration activities, that interest is necessarily also threatened by the voter registration activities of political parties. There is simply no legitimate reason to distinguish between the Surfers Party of America (officially recognized by Florida as a minor political party) and the League of Women Voters in regulating their speech and association.

---

[7] Although this section addresses only the discriminatory aspects of the law, as set forth *infra*, the challenged law does not, in fact, serve any legitimate government interest.

17

Indeed, no such reason is provided in the legislative history.  The legislative history of
HB 1567 (later enacted as 2005 Fla. Laws 277) contains no mention of the relative merits of non-
partisan and partisan voter registration efforts, let alone evidence sufficient to justify the
discriminatory law.  (*See* Thomas Decl. Exhs. H, I.)  Further, there is simply no logical
relationship between the formation of a political party and the improvement of voter registration
drive operations.  Nor is there any regulatory reason for the law's special treatment of political
parties' voter registration activities; Florida law does not elsewhere regulate the voter registration
activities of political parties.  *See generally* Fla. Stat. § 103.091 *et seq.* (regulating political
parties but not their voter registration).[8]

Because it exempts political parties from its restrictions, the challenged law is "woefully
underinclusive" with respect to any state interest.  *See Republican Party of Minn. v. White*, 536
U.S. 765, 780 (2002).  The Supreme Court has repeatedly held that the underinclusiveness of a
law both casts doubt on the state's purpose in enacting it and undermines the strength of that
purpose.  *Id.* (underinclusiveness of law regulating judicial campaign speech "render[s] belief in
[the state's asserted] purpose a challenge to the credulous"); *see also City of Ladue v. Gilleo*, 512
U.S. 43, 52-53 (1994); *Florida Star*, 491 U.S. at 540-41 ("facial underinclusiveness" of Florida
statute "raises serious doubts about whether Florida is, in fact, serving, with this statute, the
significant interests" invoked in support of it); *Republican Party of Minn v. White*, 416 F.3d 738,
757 (8th Cir. 2005) (en banc) (underinclusiveness "belies" ostensible purpose of regulation).  By
leaving the voter registration activities of political parties unregulated, Florida's new law makes
clear that either it could not have been intended to further any state interests in regulating voter
registration, or that its purpose is not important, let alone compelling.  *See id.* at 756-63

---

[8] Although a showing that political parties conduct better voter registration drives than non-partisan groups would
not save the law's discriminatory regulation of speech and association, it bears noting that nonpartisan groups and
individuals that engage in voter registration are no more likely than political parties to submit voter registration
forms outside of the statutory deadlines. *See* Compl. ¶¶ 53-55.  What is more, in order to justify the challenged law
under strict scrutiny, the state must provide evidence that political parties "actually" perform voter registration in a
manner "appreciably different" from nonpartisan groups with respect to the aims of the law so as to justify the
discriminatory regulation. *Cf. Midrash Sephardi v. Town of Surfside*, 366 F.3d 1214, 1234-35 (11th Cir. 2004)
(zoning regulations that treated religious institutions differently than private clubs and lodges invalid under federal
law requiring strict scrutiny).  Such evidence would have to establish a basis for regulating the League of Women
Voters and not the Surfers Party of America.

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 3111 STIRLING ROAD • FORT LAUDERDALE, FL 33312-6525
TELEPHONE (954) 987-7550

(invalidating canon that penalized judicial candidates for associating with political parties but not with non-partisan groups).

The underinclusiveness of Florida's new law also demonstrates that it is not narrowly tailored to any purpose, whether compelling or not. In *Bourgeois v. Peters*, 387 F.3d 1303 (11th Cir. 2004), for example, the Eleventh Circuit held that where a municipal policy restricts certain speakers but not others who also pose dangers to the government's purported interest, it is "not narrowly tailored to serve" that interest. *Id.* at 1322; *see also White*, 416 F.3d at 755-56. Similarly, because Florida's new law exempts political parties which also engage in voter registration and thus present similar threats as nonpartisan voter registration groups, it is not narrowly tailored to any state interest.

In short, because the challenged law discriminatorily regulates core political speech and "significantly inhibits communication with voters about proposed political change," and because its discriminatory classification is "not warranted by" or tailored to any state interest, let alone a compelling one, it violates the First Amendment and should be enjoined. *See Buckley*, 525 U.S. at 192.

**B.**     **The Challenged Law Is an Unconstitutional Content-Based Regulation of Speech**

The challenged law's distinction between political parties and other third-party voter registration groups is also an unconstitutional content-based discrimination between different types of political speech and speakers. The law allows Florida's political parties freely to register voters while encouraging support for the parties' candidates, but threatens plaintiffs, who communicate nonpartisan reasons to register, with severe penalties.

The Eleventh Circuit has held that where speech regulations "favor certain speech based on the speaker, rather than the content of the message," they are nonetheless "content based." *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1265 (11th Cir. 2005); *see also First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784-85 (1978) ("[T]he legislature is constitutionally disqualified from dictating . . . the speakers who may address a public issue."); *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) (condemning "discrimination among

19

different users of the same medium for expression"). Because the challenged law contains an exemption based solely on the identity of the speaker—that is, whether or not the speaker is a political party— and because it therefore treats certain messages more favorably than others, it is a content-based restriction.

Content-based restrictions on speech are "presumed invalid," and the state "bear[s] the burden of showing their constitutionality." *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004); *cf. Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 124 (1991) (Kennedy, J., concurring) (content-based restrictions on speech are *per se* unconstitutional, regardless of the purported government interest); *Solantic*, 410 F.3d at 1267 (applying strict scrutiny to law with exemptions based on identity of speaker).

Here, the state cannot meet its burden of demonstrating that the Florida law, with its political-party exemption, is the least restrictive means of achieving a compelling state interest, for the reasons articulated last year by the Eleventh Circuit in *Solantic* and by the Supreme Court in its seminal *Mosley* decision. Both cases struck down laws regulating speech on the grounds that they exempted certain speakers. *See Mosley*, 408 U.S. at 94-102; *Solantic*, 410 F.3d at 1264-67. Even if the state could articulate an interest to justify its regulations, no such interest can be served "by its content-based exemptions from those regulations." *Id.* at 1267 (citing *Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1570 (11th Cir.1993)). No interest can justify privileging the speech of political parties over that of non-partisan groups and individuals. Moreover, because its exemption allows political parties to engage in the conduct proscribed by the law, the challenged law cannot be narrowly tailored to any state interest. *See Mosley*, 408 U.S. at 101-102. Accordingly, this Court should enjoin enforcement of the challenged law because it is an unconstitutional content-based regulation of speech.

**C.    The Challenged Law Violates the First Amendment Because It Discriminates Against Plaintiffs Based on Their Non-Association With Political Parties**

Florida's new voter registration law is also unconstitutional because it penalizes plaintiffs for their non-association with a political party. "[T]he First Amendment protects the freedom to join together in furtherance of common political beliefs." *Cal. Democratic Party v. Jones*, 530

U.S. 567, 574 (2000) (internal quotation marks omitted). That right includes the right to associate or not to associate with a political party.

The Supreme Court has repeatedly held that the denial of government benefits on the basis of speech or association violates the First Amendment. *See, e.g., Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *Speiser v. Randall*, 357 U.S. 513, 526 (1958). The Court has specifically held that patronage hiring is unconstitutional because it discriminates on the basis of non-association with particular political parties. *See Rutan v. Rep. Party of Ill.*, 497 U.S. 62 (1990); *Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality opinion).

This line of cases has been applied to hold that the appointment of volunteer voter registrars cannot be predicated on membership in particular groups. *See Baronian*, 590 F.2d at 376-77 (holding that plaintiffs had a substantial likelihood of success on their merits that system of selecting deputy registrars only from among persons recommended by the two major political parties or the League of Women Voters violated their First Amendment rights). Although "there is no right, in the abstract, to be appointed to a public office such as that of voter registrar," the First Amendment does protect "the right to be considered for such positions unhampered by invidiously discriminatory qualifications." *Id.* at 376; *cf. Morse v. Martineau*, 685 F. Supp. 860, 870 (D.N.H. 1988) (right of free association would be implicated if state deputizes only persons from certain groups as volunteer registrars). Association with a political party is among those discriminatory qualifications prohibited by the First Amendment. *Baronian*, 590 F.2d at 376.

Plaintiffs in this case, like those in *Baronian*, should not be penalized "simply because they choose not to associate" with political parties in registering voters. *Id.* Plaintiffs' speech and association interests are even more compelling here, because unlike the state law at issue in *Baronian*, Florida law does not (and cannot, consistent with federal law) make voter registration a government function performed only by state officials and their deputies, but rather allows non-governmental entities and individuals to engage in voter registration.[9] In doing so, it cannot

---

[9] Since passage of the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. § 1973gg *et seq.*, the state can no longer limit voter registration to state officials. *See Charles H. Wesley Educ. Found. v. Cox*, 408 F.3d 1349, 1353 (11th Cir. 2005) (NVRA "impliedly encourages" voter registration drives (citing § 1973gg-4(b), which

discriminate among those entities and individuals based on their association or non-association with political parties.

**D.    Even If the Challenged Law Is a Regulation of Elections, It Is Unconstitutional Because Its Burdens Are Unjustifiably Discriminatory**

Even if Florida's new voter registration law is an election regulation (as opposed to a regulation of core political speech and association), the law nonetheless also fails under the Supreme Court's test for assessing the constitutionality of laws regulating the mechanics of elections. Where states seek to regulate "parties, elections, and ballots" in a way that incidentally burdens First Amendment rights, the Supreme Court has directed courts to weigh "the character and magnitude of the burden the State's rule imposes on plaintiffs' [speech and associational] rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons*, 520 U.S. at 358 (internal quotation marks omitted). Under this balancing test, first set forth in *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983), "[r]egulations imposing severe burden on plaintiffs' rights" are subject to strict scrutiny, whereas "reasonable, nondiscriminatory restrictions" can be justified by "a State's important regulatory interests." *Timmons*, 520 U.S. at 358; *see also Fulani v. Krivanek*, 973 F.2d 1539, 1542-44 (11th Cir. 1992) (explaining *Anderson* balancing test); *Hernandez v. Woodard*, 714 F. Supp 963, 972-73 (N.D. Ill. 1989) (applying *Anderson* balancing test to assess law regulating voter registration).

For the purposes of assessing the discriminatory application of law, the Court need not determine whether the law's burdens are severe (though, as discussed *infra*, they undoubtedly are). Under the Supreme Court's balancing test, even where the burden is not severe, the state's "important regulatory interests" can justify only "reasonable, *nondiscriminatory* restrictions." *Anderson*, 460 U.S. at 788 (emphasis added); *see also Reform Party of Allegheny County v. Allegheny County Dep't of Elections*, 174 F.3d 305, 312 (3d Cir. 1999) (even where burdens are

---

requires states to make federal voter registration forms available, especially for "organized voter registration drives")).

minimal, courts still require "that the restrictions be reasonable and nondiscriminatory" (citing *Timmons*, 520 U.S. at 358)).

There is no question that the challenged law burdens plaintiffs' speech and association rights: on its face, the law restricts plaintiffs' voter registration activities and subjects them to serious fines for failure to meet its deadlines. What is more, the law burdens plaintiffs by disfavoring their political speech and association relative to that of political parties. A "burden that falls unequally" on political parties and nonpartisan groups "impinges, by its very nature, on associational choices protected by the First Amendment." *Anderson*, 460 U.S. at 793; *Fulani*, 973 F.2d at 1544 (quoting same).

The state therefore bears the burden of "put[ting] forward the precise interests" justifying "the burden imposed by" the challenged law. *Id.* at 1544 (internal quotations omitted). As the Eleventh Circuit made clear in *Fulani*, under the *Anderson* test, the state must also "explain how its asserted interests justify the discriminatory classification" between political parties and nonpartisan groups, even if the underlying burden would be justifiable if applied equally. *Id.* at 1541. In other words, the state bears the burden of justifying "the discriminatory classification" itself, asserting interests to which that classification "is necessary," and explaining "the relationship between [those] interests and the classification." *Id.* at 1544. *Fulani* requires this Court rigorously to examine "the boilerplate interests put forward by the state" to justify its discriminatory classification and to consider "the extent to which" those interests "make it necessary to burden" plaintiffs' rights. *Id.* at 1543, 1547. But, as explained above, no state interest can justify the discriminatory classification in this case.

Applying the *Anderson* test, courts have routinely found discriminatory regulations of the sort at issue here to be unjustified by important regulatory interests, much less narrowly tailored to serve compelling interests. Instead, courts have made clear that election laws that explicitly condition access to the political process on party affiliation are almost never constitutional: "[I]t is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular . . . associational preference," such

as those "whose political preferences lie outside the existing political parties." *Anderson*, 460 U.S. at 793-4; *Fulani*, 973 at 1544 (quoting same); *Iowa Socialist Party v. Slockett*, 604 F. Supp. 1391, 1396 (S.D. Iowa 1985) (citing *Anderson*).[10] Regulations that restrict political activity and access based on non-membership in a political party are especially disfavored because, "[b]y limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce diversity and competition in the marketplace of ideas." *Anderson*, 460 U.S. at 794.

At least one court has applied the *Anderson* balancing test to invalidate discriminatory restrictions on who may perform voter registration. In *Slockett*, the court considered a statute which effectively limited the selection of deputy voter registrars to members of the Democratic and Republican parties. The court invalidated the statute, finding that the state had not demonstrated the necessity of burdening plaintiffs' rights to speech and association. *Slockett*, 604 F. Supp. at 1397-98. Here, as in *Slockett*, the challenged law discriminatorily favors the voter registration activities of political parties. And here, as in *Slockett*, there is "no reason to believe" that plaintiffs "would be more likely than members of major [or minor] parties to abuse" the voter registration process. *Id.* at 1393; *cf. White*, 416 F.3d at 761-62 (state did not meet "its heavy burden of showing that association with a political party is so much greater a threat than similar association with" nonpartisan groups). Thus, Florida's voter registration law is unconstitutional for the same reasons Iowa's statute failed.

In short, laws that discriminate between political parties and nonpartisan groups in connection with election-related speech and association activities, like Florida's new law, are highly disfavored and rarely, if ever, upheld. The challenged law is no exception. Since the law

---

[10] *See also Storer v. Brown*, 415 U.S. 724, 745 (1974) ("[T]he political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other."); *Goldman-Frankie v. Austin*, 727 F.2d 603, 605-06 (6th Cir. 1984) ("[T]he Supreme Court has expressly recognized . . . that the State cannot establish, as a condition precedent to [access to the political process] the membership in or formation of a political party."); *Libertarian Party of Ind. v. Marion County Bd. of Voter Reg.*, 778 F. Supp. 1458, 1463 (S.D. Ind. 1991) (restrictions on the ability of some political parties to use voter registration lists unconstitutionally "impinges upon . . . the members' freedom to associate to express their views to the voters"); *Socialist Workers' Party v. Rockefeller*, 314 F. Supp. 984, 995 (S.D.N.Y. 1970) (state showed "no compelling state interest nor even a justifiable purpose" for charging independents and minor political parties fees for copies of voter registration list while providing copies free of charge to major political parties).

is discriminatory on its face, and since its classification is neither reasonable nor necessary to serve any important state interest, it violates plaintiffs' rights under the First and Fourteenth Amendments and should be enjoined.

**II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM THAT THE CHALLENGED LAW VIOLATES THE EQUAL PROTECTION CLAUSE BECAUSE IT DISCRIMINATES AGAINST PLAINTIFFS AND FAVORS POLITICAL PARTIES**

The Equal Protection Clause of the Fourteenth Amendment provides an independent basis for invalidating Florida's discriminatory law. Specifically, the law's arbitrary classification between political parties and non-political parties violates Plaintiffs' constitutional right to equal protection under the law.

Because Florida's voter registration law "treats some [speakers] differently from others" in restricting the fundamental rights of speech and association, it is subject to strict scrutiny under the Equal Protection Clause. *Mosley*, 408 U.S. at 94, 99; *see also Shapiro v. Thompson*, 394 U.S. 618, 634 (1969) ("[A]ny classification which serves to penalize the exercise of [a constitutional] right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional" under the Equal Protection Clause.). As discussed above, there is no genuine interest, compelling or otherwise, that could justify the law's discrimination in regulating plaintiffs' fundamental right to engage in political speech and association.

Even if plaintiffs' Equal Protection claims were subject to the *Anderson* balancing test used in ballot access cases, the discriminatory Florida law creates a constitutionally impermissible classification. In *Fulani*, the Eleventh Circuit applied the *Anderson* balancing test to an equal protection challenge to a state ballot access law. 973 F.2d at 1543-44. Under this test, the court found that a Florida statutory provision that prohibited minor parties from waiving burdensome signature verification fees but allowed major parties to waive those same fees "violate[d] appellants' right to equal protection." *Id.* at 1544.[11]

---

[11] Although the Eleventh Circuit considers equal protection challenges to state ballot access laws under the *Anderson* balancing test, this case does not involve a ballot access law but rather a discriminatory law regulating political speech in the context of voter registration. In such circumstances, the appropriate standard is strict scrutiny. *Cf. Fulani*, 973 F.2d at 1541 (noting that the Supreme Court might use "strict scrutiny analysis . . . when considering an equal protection challenge to a state election law," but finding that *Anderson* test applies in ballot access cases).

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 3111 STIRLING ROAD • FORT LAUDERDALE, FL 33312-6525
TELEPHONE (954) 987-7550

Similarly, the district court in *Libertarian Party of Indiana v. Marion County Board of Voter Registration*, 778 F. Supp. 1458 (S.D. Ind. 1991), struck down an Indiana law that discriminated between major political parties and other groups and individuals with respect to access to the state's voter registration list. That law provided free, computerized copies of the list to the Republican and Democratic parties, but allowed other members of the public only to inspect paper copies of the list. Although plaintiffs were not completely denied access to the list, they would have had "to expend significant amounts of labor and money to have the list in a usable form, a burden not imposed on the major political parties." *Id.* at 1463. The court found that the additional administrative and financial burdens on county election officials from allowing organizations other than the two major political parties the same access to the voter registration list was "not sufficiently important . . . to justify the unnecessary impingement upon the . . . equal protection rights" of the plaintiffs. *Id.* at 1464.

Here, as in *Libertarian Party*, the plaintiffs "seek equal access to voters, meaning that significant advantages may not be accorded to two major political parties and arbitrarily denied to others." *Id.* at 1463. And as in *Fulani*, they also seek equal ability to exercise their rights to speak and associate with others freely, unhampered by discriminatory restrictions on access to political participation. Because the state cannot point to any legitimate interest served by discriminating between plaintiffs and the political parties in regulating voter registration, the Florida voter registration restrictions similarly violates plaintiffs' right to equal protection.

## III. EVEN WITHOUT ITS DISCRIMINATORY CLASSIFICATION, PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS THAT THE CHALLENGED LAW UNCONSTITUTIONALLY BURDENS THEIR FIRST AMENDMENT RIGHTS

Although the patently discriminatory nature of Florida's law requires its invalidation, the law would still be unconstitutional even if the burdens it imposed on plaintiffs were also imposed on political parties. Four aspects of the law—its arbitrary ten-day deadline, its large fines, its strict liability, and its personal liability provisions—impose severe burdens on the exercise of plaintiffs' rights of speech and association. These burdens, which have forced plaintiffs to abandon or curtail their voter registration activities, render the law unconstitutional for three

reasons.  First, the Constitution does not countenance strict liability for activity protected by the First Amendment.  Second, the law's burdens cannot be justified under the strict scrutiny applied to laws restricting core political speech and association.  Third, the burdens are also unjustifiable under the balancing test applied to laws regulating the mechanics of elections.

A. **The Challenged Law Is Unconstitutional Because It Imposes Strict Liability for Activity Protected by the First Amendment**

The challenged law fines, under a strict liability regime, third-party voter registration groups, their officers, and their volunteers or staff members who submit voter registration forms after any of the law's three deadlines.  Even if a group demonstrates a reasonable excuse, such as a hurricane or the illness of a volunteer, for missing the law's deadlines by only one day or with respect to only a handful of forms, it is still subject to the law's hefty fines.  Courts have long recognized that the imposition of civil fines or criminal penalties on a strict liability basis can unconstitutionally chill speech and association protected by the First Amendment.  *See, e.g., Hustler v. Falwell*, 485 U.S. 46, 52 (1988) ("[A] rule that would impose strict liability on a publisher . . . would have an undoubted 'chilling' effect on speech."); *Smith v. California*, 361 U.S. 147, 152-53 (1960) (finding a strict liability municipal obscenity ordinance to violate the First Amendment); *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992); *United States v. U.S. Dist. Court*, 858 F.2d 534, 540 (9th Cir. 1988) ("[T]he First Amendment does not permit the imposition of criminal sanctions on the basis of strict liability where doing so would seriously chill protected speech.").  This is true whether the scheme is civil or criminal. *Video Software Dealers*, 968 F.2d at 690 (finding challenged statute quasi-criminal because it imposed fines of "up to $200," but noting "[i]n any event" that "any statute" is subject to rule invalidating strict liability laws).  At least one court has recognized the chilling effect strict liability schemes have on the analogous speech activity of petition circulators and held such a scheme unconstitutional. *Idaho Coal. United for Bears v. Cenarrusa*, 234 F. Supp. 2d 1159, 1166-67 (D. Idaho 2001).

If the strict liability component of a law "chills the exercise of First Amendment rights," it is almost always unconstitutional, except in limited circumstances not applicable here. *Am.-*

*Arab Anti-Discrim. Comm. v. City of Dearborn*, 418 F.3d 600, 611 (6th Cir. 2005). Here, the strict liability scheme has already "chilled" plaintiffs' speech: they have shut down or severely curtailed their voter registration activities out of fear of accidentally violating the law's strict deadlines. Even if plaintiffs were able to comply with the law's deadlines with respect to most forms, their fear of being fined for violating the law on a strict liability basis makes them unwilling to risk collecting any forms at all. *See supra* pp. 9-10. This chilling effect renders the law unconstitutional and requires that it be enjoined.

**B.      The Challenged Law's Burdens on Plaintiffs' Core Political Speech Cannot Survive Strict Scrutiny**

The challenged law is subject to strict scrutiny because it regulates core political speech and association. *See supra* Part I.A. To withstand such scrutiny, the law's burdens "must be narrowly tailored to promote a compelling Government interest, and if a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000). The state "bears the burden of proving the constitutionality of its actions." *Id.* at 816. The state cannot meet that burden here.

Because of the burdens imposed by the new law, plaintiffs have been forced to shut down or severely limit their efforts to engage others in the political process and communicate messages of political change through their voter registration efforts. This severe restriction on speech and association is wildly disproportionate to any countervailing interest the state might assert.

Although the state may have a legitimate interest in ensuring that registration forms are returned in time for the state to add voters to the rolls before the next election, there is no important interest served by the burdens the new law imposes on plaintiffs—including its arbitrary ten-day deadline, its large fines, and its strict and personal liability provisions. What is more, the state, by imposing a thirty-day book closing deadline, *see* Fla. Stat. § 97.055, has made clear that it needs no more than thirty days to process voter registration forms and place voters on the rolls;[12] thus, from the standpoint of election administration, the state need not impose an additional ten-day deadline on third-party groups. Even in the unlikely event that defendants can establish that the new law will reduce its costs by requiring a subset of voter registration forms to be submitted in a staggered manner, "the possibility of future increases in the cost of administering the election system is not a sufficient basis here for infringing plaintiffs' First Amendment rights." *Tashjian v. Republican Rep. Party of Conn.*, 479 U.S. 208, 218 (1986).

---

[12] While the NVRA requires all states to accept voter registrations up to 30 days before an election, *see* 42 U.S.C. § 1973gg-6, Florida law had a 30-day book-closing deadline for at least two decades prior to the NVRA. *See* Fla. Stat. § 98.051; *Hinnant v. Sebesta*, 363 F. Supp. 398 (M.D. Fla. 1973).

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 3111 STIRLING ROAD • FORT LAUDERDALE, FL 33312-6525
TELEPHONE (954) 987-7550

The interest in staggering forms only if they are submitted by third-party voter registration groups is neither important nor compelling.

Nor is the challenged law "the least restrictive means" possible to achieve the interests in regulating voter registration. *See Playboy Entm't*, 529 U.S. at 813.  Any possible state interests in the challenged law are more than adequately served by Fla. Stat. § 104.0615(4), which provides criminal penalties for persons who "knowingly destroy, mutilate, or deface, . . . or obstruct or delay the delivery of a voter registration form."  By imposing large fines, strict liability, and an arbitrarily short ten-day turnaround time, challenged law suppresses far more speech than necessary to achieve any legitimate goals.  It should therefore be enjoined.

### C.   Even Under the *Anderson* Balancing Test, the Challenged Law Is Unconstitutional Because It Severely Burdens Plaintiffs' Speech and Association

The challenged law unquestionably imposes a severe burden on plaintiffs' rights to speech and association: its strict liability, unreasonably short deadlines, and excessive fines operate together to burden plaintiffs' voter registration activity so much that they have ceased it altogether.[13]  "Where groups, formal or informal, seek to advance their goals through the electoral process, regulations preventing their members from [engaging in voter registration] impair their ability effectively to organize and make their voices heard." *Hernandez v. Woodard*, 714 F. Supp. 963, 973 (N.D. Ill. 1989) (citation omitted).  The First Amendment requires the Court "to guard against undue hindrances to political conversations and the exchange of ideas." *Buckley*, 525 U.S. at 192.

Because the challenged law severely burdens plaintiffs' First Amendment rights, it is subject to strict scrutiny. *Burdick*, 504 U.S. at 434.[14]  As discussed above, the law serves no compelling state interest, much less an interest that could justify its extraordinary burdens.

---

[13] Those groups that choose to conduct voter registration drives despite the substantial financial risks imposed by the law must expend substantial resources, and divert those resources from other speech and associational activities, to ensure compliance with the law. *See supra* pp. 8-11. The Eleventh Circuit has found the burden of being "forced to part with funds that are needed for an effective campaign" sufficient to invalidate an election law that discriminated in favor of political parties. *Fulani*, 973 F.2d at 1545.

[14] Even if the burdens imposed by the challenged law on plaintiffs' speech and association rights were less than severe, that would not relieve the State of its obligation to offer a justification that outweighs those burdens. The

Even if the state could show compelling interests, that would not end the inquiry. The court is still required to consider "the extent to which" those interests "make it necessary to burden" plaintiffs' rights, as well as the extent to which the state's interests can be "adequately furthered" by less burdensome measures. *Fulani*, 973 F.2d at 1543, 1547; *see also Slockett*, 604 F. Supp. at 1397 (even where burdens are minor, "at a minimum, the State must show that it would be impractical to institute some other procedure less burdensome to plaintiffs' rights").

It is hard to imagine an interest that makes it "necessary" to squelch plaintiffs' voter registration activities. No other state imposes such burdensome restrictions on groups and individuals who engage in voter registration. Moreover, there are ample ways to achieve any state interest in regulating voter registration drives that are less burdensome than the law at issue here. Indeed, the state's interest in preventing the intentional obstruction or destruction of voter registration applications is already well-served by the law's criminal prohibitions. *See supra* p. 6. The state's administrative interest is minimal, especially in light of Florida's policy that thirty days is sufficient time to process voter registration applications before an election. The additional "administrative convenience" provided by the new law is of little import when weighed against plaintiffs' freedom of speech and association. *Tashjian*, 479 U.S. at 551.

## IV. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM THAT THE CHALLENGED LAW VIOLATES THE REGISTRANT PLAINTIFFS' RIGHT TO VOTE

The First and Fourteenth Amendments protect the right to vote as a fundamental right. *See, e.g.*, *Burdick* v. *Takushi*, 504 U.S. 428, 433 (1992) ("It is beyond cavil that voting is of the most fundamental significance under our constitutional structure.") (internal quotation marks omitted). As the Supreme Court has repeatedly made clear, "[n]o right is more precious in a free

---

Supreme Court has indicated that the assessment of any election regulation requires a *balancing* of the interest of voters against the interests of the state and an evaluation of "the extent to which those interests make it necessary to burden the plaintiffs' rights." *Burdick*, 504 U.S. at 434. In assessing laws whose burdens on voters are not "severe," courts do not simply apply the deferential "rational basis" test applied to economic legislation; balancing is still required. As the Fourth Circuit noted, "a regulation which imposes only moderate burdens could well fail the [Supreme Court's] balancing test when the interests that it serves are minor, notwithstanding that the regulation is rational." *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 n.6 (4th Cir. 1995). Regulations, like the law at issue here, that impose burdens disproportionate to the state's interests will be struck down. *See, e.g.*, *New Alliance Party v. Hand*, 933 F.2d 1568, 1576 (11th Cir. 1991) (finding burdens of law less than severe but striking it down "because the interests put forth by the defendant do not adequately justify the restriction imposed.").

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 3111 STIRLING ROAD • FORT LAUDERDALE, FL 33312-6525
TELEPHONE (954) 987-7550

country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). The right to vote extends to all phases of the voting process, from registering, to placing one's vote in the ballot box, and to having that vote actually counted. *See Ex parte Yarbrough*, 110 U.S. 651 (1884); *Ass'n of Cmty. Orgs. For Reform Now v. Miller*, 129 F.3d 833, 834-35 (6th Cir. 1997) (unconstitutional election regulations include "restrictive or prohibitively inconvenient voter registration requirements that discourage or prevent qualified voters from registering and participating in elections"); *Condon v. Reno*, 913 F. Supp. 946, 949 (D.S.C. 1995) ("[R]egistration, rather than being simply a mechanism to facilitate orderly elections, [may be] in fact a significant barrier to voting."); *Bishop v. Lomenzo*, 350 F. Supp. 576, 587 (E.D.N.Y. 1972) ("The state may not deny a voter the right to register (and hence to vote) because of clerical deficiencies.").

To assess restrictions on voter registration that affect the right to vote, courts apply the *Anderson* balancing test. *See, e.g., Hernandez*, 714 F. Supp. at 972. Florida's new law fails that test for two independent reasons: it imposes severe and unjustifiable burdens on registrant plaintiffs' ability to register and vote, and it is discriminatory.

*First*, the challenged law unconstitutionally burdens the registrant plaintiffs' right to vote, regardless of its discriminatory application. Nonpartisan voter registration groups like plaintiffs have assisted, and would like to continue to assist, hundreds of thousands of Florida citizens to register to vote. *See supra* p. 3. But for the efforts of nonpartisan groups, many of those citizens would not be registered or able to vote. Indeed, third-party voter registration is a major avenue for voter registration in Florida. Of the 2.6 million voter registration forms submitted in 2004, at least a fifth were submitted through one coalition of third-party groups, and even more through other nonpartisan groups. *See supra* pp. 3-4. The challenged law, which has already caused almost all plaintiffs to abandon their voter registration activities, threatens to shut down this important registration method sanctioned by Congress. *See* 42 U.S.C. § 1973gg-4(b) (chief State election official "shall make [voter registration] forms available for distribution through

governmental and *private entities, with particular emphasis on making them available for voter registration programs*") (emphasis added)).  This will result in a severe burden on the registrant plaintiffs' right to vote.

The law's restriction of third-party voter registration will hit hardest those citizens, served by the organizational plaintiffs, who are least able to register to vote through other means: low-income citizens who cannot access the internet or take time off work to visit a government office during business hours; senior citizens and disabled individuals who have mobility difficulties; citizens with limited English proficiency; and citizens who may be disengaged from the political process absent an affirmative message of the benefits of voting from others in their community.  Third-party voter registration groups "help ease the[] burdens" of voter registration by making registration easier and more accessible.  *Hernandez*, 714 F. Supp. at 972.

Limitations on voter registration groups "stand as obstacles to the ability of eligible voters to participate in the political process" and can withstand constitutional scrutiny only if outweighed by a sufficiently important government interest.  *Id.* at 972-73 (holding that group seeking to register Hispanic citizens could maintain claim that law limiting number of deputy registrars violated rights of Hispanic voters).  Since the challenged law imposes a severe burden on the registrant plaintiffs' ability to register and vote, it must be narrowly tailored to meet a compelling state interest.  *Burdick*, 504 U.S. at 434.  As discussed above, the challenged law is not narrowly tailored to any interests, let alone compelling ones; this is even more true when the purported interests are weighed against the fundamental rights of citizens to register and vote.

Even if the restrictions on third-party voter registration create "lesser" burdens on the right to vote, they still fail under the *Anderson* balancing test.  "[R]egulation[s] which impose[] only moderate burdens could well fail . . . when the interests [served] are minor."  *McLaughlin*, 65 F.3d at 1221 n.6.  The only possible legitimate state interests underlying the challenged law are to ensure that voters are properly added to the rolls and to ease the state's administrative burdens.  But these interests do not justify the challenged regulation.  It is irrational to shut down third-party voter registration in order to protect the rights of registrants.  And "[s]tates may not

casually deprive a class of individuals of the vote because of some remote administrative benefit to the State." *Carrington v. Rash*, 380 U.S. 89, 96 (1965).

*Second*, Florida's new voter registration law unconstitutionally interferes with the registrant plaintiffs' right to vote because it discriminatorily targets those organizations which provide opportunities for those plaintiffs to register to vote.

Limitations on voter registration cannot be applied in a discriminatory manner absent a sufficiently important justification. *Hernandez*, 714 F. Supp. at 973. There is no reasonable justification, let alone a compelling one, for favoring the voters targeted by political parties over those targeted by nonpartisan groups. Nor is there a justification for requiring voters to associate with political parties in order to receive the benefits offered by voter registration drives. In essence, Florida's new voter registration law serves to protect certain entrenched interests— namely, the major political parties—by limiting the ability of groups outside the partisan system to enfranchise voters. In the end, it is those citizens who register through nonpartisan groups that are most disadvantaged by Florida's discriminatory law.

## V.    PLAINTIFFS MEET THE OTHER REQUIREMENTS FOR A PRELIMINARY INJUNCTION

### A.    <u>Plaintiffs Will Be Irreparably Harmed Absent Injunctive Relief</u>

Plaintiffs have suffered and will continue to suffer irreparable harm unless the Court enjoins the challenged statute. Already, this discriminatory law has deterred voter registration activity by third party registration groups, an injury that the Eleventh Circuit has expressly stated "warrant[s] immediate injunctive relief." *Siegel v. Lepore*, 234 F.3d 1163, 1177 (11th Cir. 2000). This law also chills free speech and association, the loss of which "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (U.S. 1976). Moreover, this law threatens rights of the franchise, which this Circuit has squarely decided constitutes irreparable harm. *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005).

The challenged law creates an "actual and imminent" injury that monetary compensation and further legal remedies cannot adequately address. No monetary damages can compensate for

the fact that the challenged law is chilling and burdening plaintiffs' speech and association. *Ne. Fla. Ch. of Ass'n of Gen'l Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (holding that ongoing First Amendment violations constitute irreparable injury because monetary damages cannot compensate for chilled free speech), *rev'd on other grounds*, 508 U.S. 656 (1993); *accord Cunningham v. Adams*, 808 F.2d 815, 822 (11th Cir. 1987) ("[T]he very violation of certain fundamental constitutional rights [such as First Amendment rights] can satisfy the irreparable harm requirement in obtaining preliminary injunctive relief" because such violations "could not be compensated by monetary damages or by prevailing in the litigation."). Nor can monetary damages compensate for the loss of registrant Plaintiffs' right to vote, a right that the Supreme Court has consistently declared a "fundamental political right, preservative of all rights.' *See, e.g., Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 (1969).

Plaintiffs' injuries are neither remote nor speculative. All of the plaintiffs have halted or significantly scaled back their voter registration operations and are losing valuable time to engage in core political speech and association and to add new registrants to Florida's voter rolls. New Florida voters must register on or before August 7, 2006 to be able to vote in the September 5, 2006 primary election and on or before October 10, 2006 to be able to vote in the November 7, 2006 general election. Absent a preliminary injunction, plaintiffs will be prevented from engaging in a uniquely effective manner of communication, and tens of thousands of Florida residents, especially low-income and minority citizens, will not be registered to vote.

**B.    The Balance of Hardships Favors Injunctive Relief**

The balance of hardships overwhelmingly favors granting injunctive relief. Absent a preliminary injunction, plaintiffs will lose their right to free speech and association and the registrant plaintiffs will lose their right to vote. By contrast, defendants have little to lose except perhaps income from the fines this law imposes and a speculative and insubstantial increase in administrative convenience. Defendants' potential injury pales in comparison to the injury to plaintiffs' fundamental rights absent an injunction.

An injunction, if granted, would not only protect core political speech and association rights but also the right of many Florida citizens to vote. *See supra* p. 3. When balancing administrative or monetary harms to the government against harms to citizens, the Eleventh Circuit favors protecting individual rights. *See, e.g., Johnson v. U.S. Dep't of Agric.*, 734 F.2d 774, 788-89 (11th Cir. 1984) (holding that when comparing the "monetary burden" on the government to the plaintiff mortgagors' harm of potentially wrongful evictions, the "relative harm to the government from granting a preliminary injunction pales when compared to the serious injury class members suffer when they are forced from their homes"). Where, as here, a new and unnecessary law drastically chills core political speech and association and burdens the fundamental right to vote, the balance of hardships clearly favors injunctive relief.

### C.    The Public Interest Weighs in Favor of an Injunction

A preliminary injunction would significantly advance the public interest. Without the full-scale efforts of third-party voter registration groups, thousands of individuals, especially those who experience the greatest barriers to registration, will not register to vote and will be unable to participate in future elections. Protecting an individual's right to vote is "without question in the public interest." *Charles H. Wesley Educ. Found.*, 408 F.3d at 1355; *see also Common Cause/Ga. v. Billups*, 406 F. Supp. 2d 1326, 1376 (N.D. Ga. 2005) ("Because the right to vote is a fundamental right, removing the undue burdens on that right imposed by the [state law] serves the public interest."); *Fla. Dem. Party v. Hood*, 342 F. Supp. 2d 1073, 1082 (N.D. Fla. 2004) (holding that it is in the public interest to allow voters to cast provisional ballots to ensure that "the right to vote will not be lost" for those voters ultimately determined to be eligible).

Furthermore, absent injunctive relief, the amount of First Amendment-protected political speech and activity that will occur in Florida will be dramatically reduced. The public will receive less information about current political issues and have fewer opportunities to associate with plaintiffs in meaningful efforts to participate in the political process. Safeguarding speech and association rights is undoubtedly in the public interest. *See Sammartano v. First Jud. Dist.*

*Court*, 303 F.3d 959, 974 (9th Cir. 2002) (noting the "significant public interest in upholding First Amendment principles" in preliminary injunction cases); *United Food & Comm. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 363 (6th Cir. 1998) (same); *Iowa Right to Life Comm. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999) (same).

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that this Court enter an order prohibiting defendants from enforcing Fla. Stat. §§ 97.0575 and 97.021(36).

Dated: June ____, 2006

Gary C. Rosen
BECKER& POLIAKOFF, P.A.
3111 Stirling Road
Ft. Lauderdale, Florida 33312
Tel: (954) 985-4133

By: _____
    for Gary C. Rosen
    Florida Bar No. 310107

Elizabeth S. Westfall*
ADVANCEMENT PROJECT
1730 M. Street, N.W., Suite 910
Washington, D.C. 20036
Tel: (202) 728-9557

Wendy R. Weiser*
BRENNAN CENTER FOR JUSTICE AT
   NYU SCHOOL OF LAW
161 Avenue of the Americas, 12th Floor
New York, N.Y. 10013
Tel: (212) 998-6730

Eric A. Tirschwell*
Craig L. Siegel*
KRAMER LEVIN NAFTALIS &
   FRANKEL LLP
1177 Avenue of the Americas
New York, N.Y. 10036
Tel: (212) 715-9100

*Attorneys for Plaintiffs*

*Applying to appear pro hac vice

FTL_DB: 987370_1

**EXHIBIT B**

# UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 06-21265-CIV-JORDAN

---------------------------------------------------------------- x

LEAGUE OF WOMEN VOTERS OF FLORIDA, :
PEOPLE ACTING FOR COMMUNITY TOGETHER :
(PACT), FLORIDA AFL-CIO, AMERICAN :
FEDERATION OF STATE, COUNTY AND :
MUNICIPAL EMPLOYEES, COUNCIL 79 :
(AFSCME), SEIU FLORIDA HEALTHCARE UNION, :
as organizations and as representatives of their :
members; MARILYNN WILLS; and JOHN and JANE :
DOES 1-100, :

                Plaintiffs, :

                v. :

SUE M. COBB, individually and in her official capacity :
as Secretary of State for the State of Florida, and DAWN :
ROBERTS, individually and in her official capacity as :
Director of the Division of Elections within the :
Department of State for the State of Florida, :

                Defendants. :

---------------------------------------------------------------- x

**DECLARATION OF BETH THOMAS IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## DECLARATION OF BETH THOMAS

Pursuant to 28 U.S.C. § 1746 the undersigned declares under penalty of perjury that all of the foregoing is true and correct:

1.     I am over the age of eighteen years and make the statements herein based on personal knowledge.

2.     I am a litigation paralegal employed by the law firm of Becker & Poliakoff, P.A.

3.     I have been a practicing litigation paralegal for approximately 23 years.

4.      I respectfully submit this declaration in support of Plaintiffs' motion for injunctive relief, pursuant to the First and Fourteenth Amendments to the U.S. Constitution, solely to place before the Court additional documents relevant to the resolution of that motion.

5.      Attached to this declaration are true and correct copies of the following documents:

| Exhibit | Description |
| --- | --- |
| A | Kimball W. Brace & Dr. Michael P. McDonald, *Final Report of the 2004 Election Day Survey*, p. 2-14, tbl. 2c (Sept. 2005), *available at* http://www.eac.gov/election_survey_2004/pdf/EDS-Full_Report_wTables.pdf |
| B | The Center for Civic Participation Florida Workspace webpage, *at* http://centerforcivicparticipation.org/states/FL/workspace.html |
| C | Florida Dep't of State, Div. of Elections, Voter Registration Year to Date Report, Oct. 2004, *at* http://election.dos.state.fl.us/voterreg/vrReportArchives/2004/October/YTDTotal.pdf |
| D | March 5, 2004 press release of the Republican Party of Florida, from the Webpage of the Republican Party of Florida, *at* http://www.rpof.org/2004030501.php |
| E | Karen Thurman, Democratic Party of Florida New Year's Resolutions for 2006, *at* http://72.14.203.104/search?q=cache:fv9ujmeypvkj:www.redistrictflorida.org/index.php+fladems+new+year+resolution+thurman&hi=en&gl=us&ct=clnk&cd=24 (last visited Apr. 20, 2006). |
| F | Green Party of Florida webpage, Frequently Asked Questions, *at* http://www.floridagreens.org/modules.php?op=modload&name=FAQ&file=index&myfaq=yes&id_cat=4 |
| G | Declaration of Sandra Wong, dated May 30, 2006, attaching Transcribed Portion of Audiotape Provided By the Florida Department of State of the Public Hearing Held On March 13, 2006, Concerning Proposed Rule No. IS-2.042, Governing Third Party Voter Registration Organizations. |

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 3111 STIRLING ROAD • FORT LAUDERDALE, FL 33312-6525
TELEPHONE (954) 987-7550

H        **Declaration of Sandra Wong, dated May 31, 2006, attaching Transcribed Portion of Compact Disc Recording Meeting Held By State Administration Council, Florida House of Representatives, on April 20, 2005.**

I        **Fla. House of Reps., House of Representatives Staff Analysis, HB 1567 CS (Apr. 20, 2005).**

6.      I declare under penalty of perjury that the foregoing is true and correct.

**Dated: June 6, 2006**

_Beth Thomas_

**BETH THOMAS**

FTL_DB: 987332_1

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 3111 STIRLING ROAD • FORT LAUDERDALE, FL 33312-6525
TELEPHONE (954) 987-7550

**Exhibit A**

# FINAL REPORT OF THE
# 2004 ELECTION DAY SURVEY

Submitted to the
U.S. Election Assistance Commission

Kimball W. Brace, Principal Investigator
Dr. Michael P. McDonald, Consultant

EAC Survey Analysis Support (EAC 0524)

September 27, 2005

Election Data Services, Inc.
*2004 Election Day Survey Report, Part 2 Survey Results*
Voter Registration, Page 2-14                              September 27, 2005

## Table 2c. State Rankings for Registration Calculations

| Ranking | State | Percent Total Registration of Voting Age | State | Percent Active Registration of Voters | State | Percent Total Register of Citizen Voting | State | Percent Active Register of Citizen Voting |
|---|---|---|---|---|---|---|---|---|
| 1 | Alaska | 100.5 | Alaska | 100.5 | Alaska | 103.8 | Alaska | 103.8 |
| 2 | North Dakota | 100.0 | Maine | 98.8 | Wisconsin | 102.2 | Maine | 100.3 |
| 3 | Wisconsin | 99.8 | Michigan | 94.1 | North Dakota | 101.2 | Michigan | 97.2 |
| 4 | Maine | 98.8 | Indiana | 92.7 | Iowa | 100.6 | District of Colum | 94.8 |
| 5 | Iowa | 98.3 | Iowa | 91.9 | Maine | 100.3 | Indiana | 94.8 |
| 6 | Missouri | 96.5 | Vermont | 91.1 | Missouri | 98.4 | Iowa | 94.0 |
| 7 | New Hampshire | 95.0 | Kentucky | 88.5 | New Hampshire | 97.5 | Vermont | 92.9 |
| 8 | | 94.1 | | 88.1 | Michigan | 97.2 | Nebraska | 91.2 |
| 9 | | 92.7 | South Dakota | 87.2 | Colorado | 95.9 | Rhode Island | 90.1 |
| 10 | Ohio | 91.8 | Pennsylvania | 87.0 | District of Colum | 94.8 | Kentucky | 89.8 |
| 11 | | 91.1 | | 85.5 | Indiana | 94.8 | | 89.0 |
| 12 | | 89.7 | | 85.1 | Ohio | 93.3 | South Dakota | 88.2 |
| 13 | | 89.3 | | 84.9 | Vermont | 92.9 | Delaware | 87.9 |
| 14 | | 89.2 | Idaho | 84.6 | Idaho | 92.8 | New Hampshire | 87.8 |
| 15 | | 88.5 | New York | 83.9 | | 91.6 | Wisconsin | 87.6 |
| 16 | | 88.1 | | 83.8 | Delaware | 91.4 | Illinois | 85.5 |
| 17 | Delaware | 88.1 | Nebraska | 83.0 | Nebraska | 91.2 | Missouri | 85.4 |
| 18 | Louisiana | 87.3 | Texas | 81.7 | | 90.7 | Florida | 85.3 |
| 19 | South Dakota | 87.2 | | 80.2 | North Carolina | 90.2 | Mississippi | 83.8 |
| 20 | Pennsylvania | 87.0 | Rhode Island | 79.7 | Rhode Island | 90.1 | Utah | 82.6 |
| 21 | North Carolina | 86.2 | Illinois | 78.0 | | 90.0 | Oregon | 82.5 |
| 22 | District of Colum | 85.1 | Idaho | 77.8 | Kentucky | 89.8 | New York | 82.3 |
| 23 | Rhode Island | 83.9 | Utah | 77.7 | | 89.5 | West Virginia | 82.2 |
| 24 | Mississippi | 83.0 | North Carolina | 77.7 | | 89.0 | Louisiana | 81.5 |
| 25 | Tennessee | 83.0 | Oregon | 77.4 | Louisiana | 88.7 | North Carolina | 81.3 |
| 26 | Kansas | 82.7 | Kansas | 77.2 | | 88.2 | Ohio | 81.1 |
| 27 | Massachusetts | 82.7 | Minnesota | 76.9 | Kansas | 85.9 | Idaho | 80.9 |
| 28 | Arkansas | 82.1 | Florida | 76.6 | Illinois | 85.5 | Massachusetts | 80.6 |
| 29 | West Virginia | 81.7 | Alabama | 75.8 | New Mexico | 85.4 | Kansas | 80.2 |
| 30 | Texas | 80.5 | Massachusetts | 74.4 | New Jersey | 85.4 | Minnesota | 79.7 |
| 31 | Oklahoma | 80.5 | Tennessee | 74.2 | | 85.3 | Washington | 79.5 |
| 32 | New York | 80.0 | Washington | 74.1 | | 84.7 | New Jersey | 79.1 |
| 33 | Virginia | 79.3 | Maryland | 73.9 | | 84.0 | Maryland | 78.8 |
| 34 | New Mexico | 79.1 | Virginia | 73.4 | | 83.8 | New Mexico | 78.5 |
| 35 | Illinois | 78.0 | South Carolina | 73.0 | | 83.8 | Virginia | 77.6 |
| 36 | Utah | 77.7 | Montana | 72.7 | | 82.8 | Alabama | 76.9 |
| 37 | Oregon | 77.4 | New Mexico | 72.7 | Utah | 82.6 | California | 76.8 |
| 38 | Minnesota | 76.9 | Arkansas | 72.3 | | 82.5 | Texas | 76.2 |
| 39 | Florida | 76.6 | New York | 71.9 | West Virginia | 82.2 | Tennessee | 75.8 |
| 40 | New Jersey | 76.2 | New Jersey | 70.6 | | 79.7 | South Carolina | 74.6 |
| 41 | Alabama | 75.8 | Colorado | 69.6 | | 79.5 | Colorado | 74.4 |
| 42 | Washington | 74.1 | Oklahoma | 69.1 | | 78.8 | Arizona | 73.9 |
| 43 | Maryland | 73.9 | Connecticut | 68.2 | | 76.9 | Montana | 73.3 |
| 44 | South Carolina | 73.0 | Texas | 67.6 | California | 76.8 | Connecticut | 72.9 |
| 45 | Wyoming | 70.9 | Georgia | 65.0 | South Carolina | 74.6 | Oklahoma | 71.1 |
| 46 | Connecticut | 68.2 | Arizona | 63.0 | Connecticut | 72.9 | Arizona | 70.1 |
| 47 | Hawaii | 66.0 | California | 62.5 | Wyoming | 72.0 | Nevada | 69.9 |
| 48 | Georgia | 65.0 | Nevada | 61.8 | Hawaii | 71.9 | Georgia | 69.0 |
| 49 | Arizona | 63.0 | Wyoming | 60.2 | Arizona | 70.1 | Hawaii | 64.4 |
| 50 | California | 62.5 | Hawaii | 59.2 | Nevada | 69.9 | Wyoming | 61.1 |
| 51 | Nevada | 61.8 | North Dakota | | Georgia | 69.0 | North Dakota | |
| 52 | American Samoa | | American Samoa | | American Samoa | | American Samoa | |
| 53 | Guam | | Guam | | Guam | | Guam | |
| 54 | Puerto Rico | | Puerto Rico | | Puerto Rico | | Puerto Rico | |
| 55 | Virgin Islands | | Virgin Islands | | Virgin Islands | | Virgin Islands | |
| | Total | 79.5 | Total | 74.9 | Total | 84.1 | Total | 81.2 |
| | Maximum | 100.5 | Maximum | 100.5 | Maximum | 103.8 | Maximum | 103.8 |
| | Average | 82.7 | Average | 77.9 | Average | 86.6 | Average | 82.6 |
| | Minimum | 61.8 | Minimum | 59.2 | Minimum | 69.0 | Minimum | 61.1 |

**Exhibit B**

The Center for Civic Participation » States » Workspace

Home | Login

| MatchMaker | Resources | Organizing | The Lab | search | » |

**National Plan** :»

Utilizing talented free agents' in the field to conve ie, support, coordinate, and collaborate...more »

**OTHER STATES**



| Your State | ▾ |

Use this dropdown menu to view resources in any U.S. state.

**Support CCP's Work** »

Help us increase civic participation and strengthen our democratic institutions.

**Using This Site** »

Learn to use the tools and resources available to you.

## Florida - Workspace

« Florida

State Calendar »

Voter Projects »

State Races »

Secretary of State »

Workspace »

Calendar »

**The next meeting of the Florida State Table will be in June, 2005. For more information, contact Bob Schaeffer.**

This is a very important meeting: we will begin planning for the 2005-2006 electoral cycles assisted by senior staff from Grassroots Solutions, a consulting firm with offices in Minneapolis, Washington and Portland, that has been engaged by the Center for Civic Participation to help state tables with research and constituency targeting.

Here's a tentative agenda:

- Brief updates on current Civic Engagement work in Florida by participating groups

- Planning for 2006 and beyond - Research Needs discussion with Grassroots Solutions -- questions to answer and assumptions to test - 2005 Florida Local Races -- Tests and Models - Relationship with Likely 2006 Ballot Campaigns (e.g. Redistricting, Constitutional Amendment Supermajority, and Gay Marriage Ban) - Preparing for 2006 State Legislative Session - Voter Registration Expectations - Missing Pieces/Next Steps - Tasks and Timelines

The Center for Civic Participation » States » Workspace

Page 2 of 3

- Future Table Meetings - Date(s)/Location(s) - Agenda Topics - Potential Additional Participants

More than three dozen national and statewide c3 organizations engaged in non-partisan voter registration, voter education and Get Out the Vote campaigns in Florida began working together in 2004 through National Voice's civic engagement "Table." Their collaboration is expanding in 2005-2006 under the auspices of the Center for Civic Participation (CCP).

Despite four devastating hurricanes, floods and widespread power blackouts, the staff and volunteers from participating 'Table' groups registered more than 524,000 new voters in Florida in 2004. A series of precinct prioritization meetings then identified the lead groups responsible for GOTV efforts in the 1100 precincts with more than 50% African American or Hispanic population. Overlapping efforts focused on turnout in the state's reproductive rights, student, environmental and gay communities. An aggressive "November 2" public education campaign in the month leading up to Election Day, included radio ads, billboards, and bus posters as well as thousands of tee-shirts and bumper strips. All these efforts were meshed with Election/Ballot Protection campaigns led by American Families United and the People for the American Way Foundation.

With the 2006 electoral cycle featuring top-of-the-ticket races in Florida for Governor, U.S. Senator, Attorney General and state Chief Financial Officer, as well as controversial ballot questions on redistricting, same-sex marriage and term limits, the groups have already begun planning meetings. The "Table" agenda includes analyzing and evaluating 2004 activities to identify lessons learned and best practices, researching demographic and turnout trends to better target resources, developing training packages, designing collaborative campaigns around issues that will shape the 2006 ballot, and raising funds. An active list serve and periodic conference calls are used to communicate information among more than 120 organizational leaders.

Among the groups participating in the Florida "Table" are: ACORN, Advancement Project, American Families United, Clean Water Fund, Earth Day Network, Equality Florida, Florida Association of Planned Parenthood Affiliates, Florida Conservation Alliance Institute, Florida Consumer Action Network Foundation, Florida Public Interest Research Group, Mi Familia Vota, NAACP Florida State Conference, NAACP National Voter Fund, People for the American Way Foundation, Power ON! Campaign, Sanctify Seven, Sierra Club Foundation, South Asian American Voting Youth, Southwest Voter Registration Project, and Voting is Power.

- Field

© 2005 The Center for Civic Participation

5/16/2006

**Exhibit C**

Page 1
Prepared by Florida Department of State - Division of Elections
# Voter Registration Year To Date Report
## October 2004

1/10/2005

| COUNTY | PARTY AFFILIATION | | | | County Totals | VOTER REGISTRATIONS | | FINAL NOTICES | |
|---|---|---|---|---|---|---|---|---|---|
| | REPUBLICAN | DEMOCRATIC | MINOR | NONE | | NEW VALID | DELETED | MAILED | RESPONSES |
| ALACHUA | 39,684 | 72,142 | 3,524 | 27,323 | 142,673 | 29,961 | 6,920 | 2,751 | 200 |
| BAKER | 3,126 | 8,924 | 154 | 683 | 12,887 | 1,434 | 515 | 416 | 16 |
| BAY | 45,103 | 39,919 | 3,005 | 14,088 | 102,115 | 13,455 | 3,176 | 2,664 | 372 |
| BRADFORD | 4,214 | 9,051 | 220 | 1,312 | 14,797 | 1,689 | 791 | 50 | 8 |
| BREVARD | 151,988 | 123,979 | 12,353 | 51,110 | 339,430 | 35,786 | 11,688 | 3,496 | 775 |
| BROWARD | 285,052 | 537,640 | 9,134 | 233,908 | 1,065,734 | 134,796 | 33,606 | 31,558 | 3,851 |
| CALHOUN | 992 | 6,879 | 114 | 364 | 8,349 | 831 | 384 | 20 | 9 |
| CHARLOTTE | 50,906 | 36,159 | 6,133 | 20,264 | 113,462 | 12,416 | 5,725 | 1,010 | 121 |
| CITRUS | 37,847 | 35,484 | 2,157 | 15,813 | 91,301 | 10,455 | 3,832 | 361 | 44 |
| CLAY | 60,574 | 27,464 | 2,853 | 16,326 | 107,217 | 17,780 | 4,332 | 967 | 109 |
| COLLIER | 89,362 | 40,958 | 6,262 | 31,704 | 168,286 | 21,108 | 8,264 | 11,499 | 2,650 |
| COLUMBIA | 10,763 | 19,370 | 1,022 | 3,190 | 34,345 | 4,487 | 1,894 | 1,235 | 193 |
| DESOTO | 3,793 | 8,883 | 384 | 1,898 | 14,958 | 1,639 | 1,028 | 68 | 1 |
| DIXIE | 467 | 7,514 | 170 | 561 | 9,712 | 1,060 | 456 | 24 | 3 |
| DUVAL | 190,430 | 238,227 | 16,515 | 70,564 | 515,736 | 78,734 | 14,062 | 1,988 | 546 |
| ESCAMBIA | 85,383 | 77,346 | 5,270 | 24,225 | 190,224 | 23,194 | 7,430 | 1,135 | 262 |
| FLAGLER | 19,116 | 17,909 | 926 | 9,029 | 46,980 | 8,181 | 1,815 | 79 | 13 |
| FRANKLIN | 1,218 | 5,892 | 76 | 439 | 7,625 | 967 | 485 | 895 | 53 |
| GADSDEN | 3,027 | 22,367 | 273 | 1,335 | 27,002 | 3,232 | 1,040 | 2,058 | 98 |
| GILCHRIST | 2,810 | 5,326 | 177 | 831 | 9,144 | 1,318 | 371 | 112 | 0 |
| GLADES | 1,616 | 4,194 | 594 | 160 | 6,564 | 709 | 192 | 0 | 0 |
| GULF | 2,546 | 6,452 | 114 | 490 | 9,602 | 951 | 536 | 50 | 2 |
| HAMILTON | 1,138 | 6,036 | 160 | 321 | 7,655 | 691 | 480 | 22 | 0 |
| HARDEE | 2,774 | 6,627 | 176 | 821 | 10,398 | 950 | 483 | 631 | 4 |
| HENDRY | 5,271 | 9,682 | 473 | 1,701 | 17,127 | 1,807 | 699 | 249 | 8 |
| HERNANDO | 45,217 | 42,504 | 3,415 | 18,399 | 109,535 | 12,088 | 5,391 | 19 | 5 |
| HIGHLANDS | 26,716 | 23,901 | 1,571 | 7,907 | 60,095 | 5,719 | 2,846 | 44 | 7 |
| HILLSBOROUGH | 221,255 | 262,768 | 18,935 | 128,657 | 631,615 | 142,595 | 24,565 | 46,887 | 6,436 |
| HOLMES | 2,340 | 7,983 | 109 | 542 | 10,974 | 1,088 | 366 | 99 | 1 |
| INDIAN RIVER | 41,858 | 24,530 | 2,571 | 12,710 | 81,669 | 9,129 | 2,644 | 1,366 | 255 |
| JACKSON | 5,989 | 19,445 | 291 | 1,487 | 27,212 | 2,537 | 1,133 | 1,231 | 42 |
| JEFFERSON | 1,932 | 6,724 | 139 | 508 | 9,303 | 1,104 | 427 | 59 | 12 |
| LAFAYETTE | 570 | 3,559 | 45 | 124 | 4,298 | 488 | 237 | 1 | 0 |
| LAKE | 76,784 | 55,486 | 6,322 | 23,624 | 162,216 | 24,753 | 7,119 | 796 | 190 |

Page 2

Prepared by Florida Department of State - Division of Elections

# Voter Registration Year To Date Report
## October 2004

1/10/2005

| COUNTY | PARTY AFFILIATION | | | | | VOTER REGISTRATIONS | | FINAL NOTICES | |
|---|---|---|---|---|---|---|---|---|---|
| | REPUBLICAN | DEMOCRATIC | MINOR | NONE | County Totals | NEW VALID | DELETED | MAILED | RESPONSES |
| LEE | 146,633 | 92,050 | 8,334 | 62,247 | 309,264 | 40,189 | 12,612 | 26,645 | 6,243 |
| LEON | 45,737 | 97,755 | 3,893 | 24,122 | 171,507 | 36,261 | 9,463 | 6,314 | 951 |
| LEVY | 6,284 | 13,548 | 896 | 1,998 | 22,726 | 3,174 | 1,092 | 7 | 9 |
| LIBERTY | 322 | 3,594 | 27 | 130 | 4,073 | 423 | 192 | 3 | 0 |
| MADISON | 1,666 | 9,036 | 142 | 482 | 11,326 | 1,132 | 410 | 94 | 8 |
| MANATEE | 85,068 | 63,562 | 12,670 | 30,991 | 192,291 | 22,215 | 8,925 | 1,502 | 794 |
| MARION | 79,704 | 73,327 | 8,301 | 23,324 | 184,656 | 24,446 | 7,552 | 7,110 | 6,314 |
| MARTIN | 51,889 | 27,261 | 4,918 | 14,943 | 99,011 | 10,817 | 5,276 | 1,740 | 612 |
| MIAMI-DADE | 368,334 | 453,631 | 12,360 | 224,476 | 1,058,801 | 157,257 | 28,846 | 57,522 | 5,586 |
| MONROE | 19,977 | 18,656 | 1,962 | 11,103 | 51,698 | 7,464 | 1,530 | 6,868 | 5 |
| NASSAU | 20,427 | 15,294 | 1,152 | 4,742 | 41,615 | 5,569 | 1,510 | 167 | 47 |
| OKALOOSA | 73,037 | 31,562 | 942 | 22,212 | 127,753 | 13,111 | 5,914 | 2,507 | 1,297 |
| OKEECHOBEE | 5,542 | 10,894 | 421 | 1,788 | 18,645 | 2,258 | 815 | 174 | 36 |
| ORANGE | 187,034 | 214,882 | 14,095 | 117,990 | 534,001 | 108,289 | 29,629 | 51,269 | 11,038 |
| OSCEOLA | 42,585 | 52,191 | 5,058 | 30,048 | 129,882 | 26,207 | 6,132 | 2,579 | 619 |
| PALM BEACH | 233,475 | 336,118 | 25,001 | 148,659 | 748,253 | 79,537 | 11,210 | 6,876 | 5,102 |
| PASCO | 103,986 | 99,608 | 17,970 | 42,457 | 267,021 | 36,188 | 22,896 | 4,581 | 1,595 |
| PINELLAS | 231,883 | 224,293 | 23,976 | 112,175 | 592,327 | 72,127 | 37,354 | 27,151 | 7,127 |
| POLK | 122,938 | 134,582 | 9,340 | 49,967 | 316,827 | 37,748 | 10,383 | 0 | 2 |
| PUTNAM | 12,718 | 26,158 | 1,416 | 5,017 | 45,309 | 4,718 | 1,541 | 770 | 92 |
| SANTA ROSA | 50,782 | 27,037 | 2,844 | 12,607 | 96,270 | 11,917 | 2,961 | 8 | 0 |
| SARASOTA | 115,703 | 75,285 | 5,834 | 44,950 | 241,772 | 27,913 | 12,285 | 5,955 | 2,951 |
| SEMINOLE | 108,017 | 78,318 | 7,149 | 48,921 | 242,405 | 47,677 | 9,694 | 474 | 120 |
| ST. JOHNS | 55,175 | 31,354 | 3,972 | 16,464 | 110,965 | 18,153 | 5,633 | 441 | 163 |
| ST. LUCIE | 50,597 | 57,344 | 5,098 | 25,385 | 138,424 | 18,006 | 6,897 | 983 | 383 |
| SUMTER | 17,593 | 16,534 | 1,103 | 5,227 | 40,457 | 6,139 | 1,628 | 158 | 270 |
| SUWANNEE | 5,905 | 13,933 | 977 | 1,146 | 21,961 | 2,389 | 1,107 | 127 | 16 |
| TAYLOR | 2,189 | 8,705 | 199 | 431 | 11,524 | 1,155 | 541 | 106 | 0 |
| UNION | 1,301 | 5,324 | 69 | 371 | 7,065 | 866 | 208 | 0 | 0 |
| VOLUSIA | 111,522 | 126,599 | 9,552 | 62,783 | 310,456 | 41,858 | 10,117 | 3,561 | 377 |
| WAKULLA | 3,725 | 10,243 | 361 | 1,014 | 15,343 | 2,052 | 813 | 53 | 6 |
| WALTON | 16,485 | 12,084 | 718 | 3,616 | 32,903 | 4,535 | 1,273 | 459 | 87 |
| WASHINGTON | 3,694 | 9,683 | 225 | 873 | 14,475 | 1,763 | 606 | 171 | 0 |
| TOTALS | 3,917,788 | 4,291,769 | 286,612 | 1,875,077 | 10,381,246 | 1,480,685 | 411,977 | 330,215 | 68,136 |

Prepared By Florida Department of State - Division of Elections

# Voter Registration Year To Date Report

## October 2004

| COUNTY | DHSMV | | MAIL | | TOTAL APPLICATIONS RECEIVED | | | | | | | | | | COUNTY TOTALS |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | PUBLIC ASSISTANCE | | DISABILITY | | RECRUITERS | | PUB. LIB./C.I.I. | | OTHER | | |
| ALACHUA | 8,580 | 19% | 12,554 | 28% | 934 | 2% | 32 | 0% | 1 | 0% | 1,205 | 3% | 22,187 | 49% | 45,493 |
| BAKER | 422 | 21% | 180 | 9% | 10 | 1% | 0 | 0% | 2 | 0% | 1 | 0% | 1,364 | 69% | 1,979 |
| BAY | 10,092 | 42% | 5,954 | 25% | 432 | 2% | 93 | 0% | 0 | 0% | 23 | 0% | 7,574 | 31% | 24,168 |
| BRADFORD | 1,200 | 43% | 423 | 15% | 91 | 3% | 1 | 0% | 0 | 0% | 9 | 0% | 1,091 | 39% | 2,815 |
| BREVARD | 21,068 | 33% | 18,283 | 29% | 801 | 1% | 2 | 0% | 0 | 0% | 1,070 | 2% | 22,072 | 35% | 63,396 |
| BROWARD | 42,707 | 17% | 74,314 | 30% | 3,140 | 1% | 233 | 0% | 10 | 0% | 5,468 | 2% | 120,726 | 49% | 246,598 |
| CALHOUN | 556 | 44% | 91 | 7% | 34 | 3% | 0 | 0% | 2 | 0% | 40 | 3% | 527 | 42% | 1,250 |
| CHARLOTTE | 8,624 | 49% | 4,036 | 23% | 169 | 1% | 0 | 0% | 2 | 0% | 56 | 0% | 4,881 | 27% | 17,768 |
| CITRUS | 7,086 | 45% | 3,877 | 25% | 180 | 1% | 0 | 0% | 0 | 0% | 310 | 2% | 4,248 | 27% | 15,701 |
| CLAY | 9,286 | 33% | 8,191 | 29% | 147 | 1% | 3 | 0% | 0 | 0% | 834 | 3% | 9,423 | 34% | 27,884 |
| COLLIER | 18,124 | 54% | 8,807 | 26% | 37 | 0% | 0 | 0% | 2 | 0% | 925 | 3% | 5,694 | 17% | 33,589 |
| COLUMBIA | 4,793 | 34% | 5,644 | 40% | 209 | 1% | 0 | 0% | 0 | 0% | 96 | 1% | 3,487 | 25% | 14,229 |
| DESOTO | 1,124 | 47% | 358 | 15% | 51 | 2% | 0 | 0% | 0 | 0% | 9 | 0% | 831 | 35% | 2,373 |
| DIXIE | 555 | 40% | 69 | 5% | 54 | 4% | 2 | 0% | 4 | 0% | 1 | 0% | 720 | 51% | 1,405 |
| DUVAL | 38,989 | 26% | 27,683 | 18% | 1,408 | 1% | 56 | 0% | 3 | 0% | 4,460 | 3% | 78,529 | 52% | 151,128 |
| ESCAMBIA | 14,309 | 34% | 10,686 | 25% | 797 | 2% | 24 | 0% | 4 | 0% | 45 | 0% | 16,347 | 39% | 42,212 |
| FLAGLER | 3,538 | 34% | 2,644 | 26% | 183 | 2% | 0 | 0% | 1 | 0% | 796 | 8% | 3,176 | 31% | 10,338 |
| FRANKLIN | 344 | 20% | 243 | 14% | 19 | 1% | 0 | 0% | 2 | 0% | 0 | 0% | 1,155 | 66% | 1,763 |
| GADSDEN | 935 | 15% | 970 | 15% | 124 | 2% | 131 | 2% | 2 | 0% | 1 | 0% | 4,251 | 66% | 6,412 |
| GILCHRIST | 430 | 29% | 274 | 18% | 38 | 3% | 0 | 0% | 0 | 0% | 1 | 0% | 744 | 50% | 1,487 |
| GLADES | 180 | 4% | 141 | 3% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 3,796 | 92% | 4,117 |
| GULF | 537 | 26% | 465 | 23% | 39 | 2% | 7 | 0% | 0 | 0% | 1 | 0% | 1,017 | 49% | 2,066 |
| HAMILTON | 326 | 36% | 63 | 7% | 16 | 2% | 1 | 0% | 8 | 1% | 3 | 0% | 491 | 54% | 908 |
| HARDEE | 313 | 25% | 125 | 10% | 37 | 3% | 1 | 0% | 9 | 1% | 0 | 0% | 757 | 61% | 1,242 |
| HENDRY | 738 | 21% | 830 | 24% | 121 | 3% | 1 | 0% | 1 | 0% | 0 | 0% | 1,778 | 51% | 3,468 |
| HERNANDO | 9,536 | 50% | 4,001 | 21% | 208 | 1% | 1 | 0% | 2 | 0% | 156 | 1% | 5,149 | 27% | 19,053 |
| HIGHLANDS | 4,429 | 44% | 2,507 | 25% | 98 | 1% | 0 | 0% | 81 | 1% | 1 | 0% | 3,015 | 30% | 10,131 |
| HILLSBOROUGH | 56,577 | 28% | 31,170 | 15% | 1,523 | 1% | 284 | 0% | 0 | 0% | 4,007 | 2% | 108,416 | 54% | 201,977 |
| HOLMES | 555 | 38% | 179 | 12% | 36 | 2% | 29 | 2% | 16 | 1% | 0 | 0% | 641 | 44% | 1,456 |
| INDIAN RIVER | 5,169 | 32% | 5,058 | 31% | 468 | 3% | 1 | 0% | 0 | 0% | 3 | 0% | 5,463 | 34% | 16,162 |
| JACKSON | 1,573 | 37% | 740 | 17% | 110 | 3% | 7 | 0% | 2 | 0% | 18 | 0% | 1,782 | 42% | 4,232 |
| JEFFERSON | 460 | 28% | 152 | 9% | 25 | 2% | 0 | 0% | 23 | 1% | 2 | 0% | 989 | 60% | 1,651 |
| LAFAYETTE | 77 | 16% | 10 | 2% | 2 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 406 | 82% | 495 |
| LAKE | 13,610 | 39% | 12,439 | 35% | 139 | 0% | 0 | 0% | 2 | 0% | 271 | 1% | 8,842 | 25% | 35,303 |

1/10/2005

Page 4

Prepared by Florida Department of State - Division of Elections

1/10/2005

# Voter Registration Year To Date Report

## October 2004

### TOTAL APPLICATIONS RECEIVED

| COUNTY | DHSMV | | MAIL | | PUBLIC ASSISTANCE | | DISABILITY | | RECRUITERS | | PUB. LIB./C.I.L. | | OTHER | | COUNTY TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LEE | 22,835 | 41% | 15,035 | 27% | 640 | 1% | 0 | 0% | 932 | 2% | 1,158 | 2% | 15,035 | 27% | 55,635 |
| LEON | 13,153 | 20% | 8,450 | 13% | 470 | 1% | 15 | 0% | 1 | 0% | 610 | 1% | 43,583 | 66% | 66,282 |
| LEVY | 2,000 | 43% | 995 | 22% | 38 | 1% | 2 | 0% | 61 | 1% | 4 | 0% | 1,526 | 33% | 4,626 |
| LIBERTY | 188 | 35% | 65 | 12% | 37 | 7% | 0 | 0% | 0 | 0% | 0 | 0% | 247 | 46% | 537 |
| MADISON | 642 | 27% | 54 | 2% | 49 | 2% | 0 | 0% | 1 | 0% | 0 | 0% | 1,626 | 69% | 2,372 |
| MANATEE | 19,519 | 48% | 11,004 | 27% | 180 | 0% | 2 | 0% | 32 | 0% | 166 | 0% | 9,592 | 24% | 40,495 |
| MARION | 19,708 | 55% | 8,698 | 24% | 899 | 2% | 2 | 0% | 0 | 0% | 285 | 1% | 6,503 | 18% | 36,095 |
| MARTIN | 7,081 | 45% | 4,594 | 29% | 85 | 1% | 1 | 0% | 0 | 0% | 121 | 1% | 3,903 | 25% | 15,785 |
| MIAMI-DADE | 41,375 | 11% | 99,751 | 26% | 2,815 | 1% | 246 | 0% | 1,014 | 0% | 6,234 | 2% | 230,127 | 60% | 381,562 |
| MONROE | 5,092 | 21% | 10,598 | 44% | 100 | 0% | 0 | 0% | 0 | 0% | 18 | 0% | 8,356 | 35% | 24,164 |
| NASSAU | 3,392 | 34% | 2,917 | 29% | 92 | 1% | 0 | 0% | 0 | 0% | 174 | 2% | 3,393 | 34% | 9,968 |
| OKALOOSA | 6,796 | 48% | 3,579 | 25% | 206 | 1% | 9 | 0% | 0 | 0% | 127 | 1% | 3,525 | 25% | 14,242 |
| OKEECHOBEE | 1,568 | 40% | 592 | 15% | 196 | 5% | 0 | 0% | 0 | 0% | 0 | 0% | 1,607 | 41% | 3,963 |
| ORANGE | 36,295 | 20% | 44,468 | 25% | 2,124 | 1% | 356 | 0% | 0 | 0% | 5,103 | 3% | 89,521 | 50% | 177,867 |
| OSCEOLA | 15,682 | 34% | 7,068 | 15% | 312 | 1% | 128 | 0% | 0 | 0% | 584 | 1% | 22,582 | 49% | 46,356 |
| PALM BEACH | 39,988 | 26% | 67,398 | 44% | 1,495 | 1% | 72 | 0% | 0 | 0% | 1,359 | 1% | 41,955 | 28% | 152,267 |
| PASCO | 30,502 | 52% | 12,975 | 22% | 498 | 1% | 34 | 0% | 0 | 0% | 914 | 2% | 13,662 | 23% | 58,585 |
| PINELLAS | 52,673 | 40% | 30,978 | 23% | 1,152 | 1% | 15 | 0% | 4 | 0% | 4,683 | 4% | 42,654 | 32% | 132,159 |
| POLK | 21,133 | 27% | 15,830 | 20% | 1,665 | 2% | 8 | 0% | 557 | 1% | 73 | 0% | 39,325 | 50% | 78,591 |
| PUTNAM | 994 | 29% | 895 | 26% | 55 | 2% | 0 | 0% | 0 | 0% | 1 | 0% | 1,437 | 42% | 3,382 |
| SANTA ROSA | 8,241 | 42% | 5,811 | 30% | 340 | 2% | 39 | 0% | 65 | 0% | 9 | 0% | 5,151 | 26% | 19,656 |
| SARASOTA | 17,125 | 37% | 13,207 | 29% | 406 | 1% | 8 | 0% | 3 | 0% | 306 | 1% | 14,717 | 32% | 45,772 |
| SEMINOLE | 16,356 | 23% | 27,855 | 40% | 347 | 0% | 1 | 0% | 0 | 0% | 2,845 | 4% | 22,565 | 32% | 69,969 |
| ST. JOHNS | 15,239 | 44% | 7,750 | 23% | 194 | 1% | 0 | 0% | 577 | 2% | 558 | 2% | 9,966 | 29% | 34,284 |
| ST. LUCIE | 9,763 | 30% | 7,972 | 25% | 457 | 1% | 0 | 0% | 5 | 0% | 24 | 0% | 14,157 | 44% | 32,378 |
| SUMTER | 3,544 | 43% | 973 | 12% | 73 | 1% | 0 | 0% | 0 | 0% | 0 | 0% | 3,687 | 45% | 8,277 |
| SUWANNEE | 1,605 | 43% | 713 | 19% | 90 | 2% | 0 | 0% | 9 | 0% | 0 | 0% | 1,313 | 35% | 3,730 |
| TAYLOR | 509 | 40% | 93 | 7% | 13 | 1% | 6 | 1% | 2 | 0% | 2 | 0% | 659 | 52% | 1,278 |
| UNION | 100 | 10% | 45 | 5% | 5 | 1% | 1 | 0% | 5 | 1% | 8 | 1% | 814 | 83% | 983 |
| VOLUSIA | 20,719 | 30% | 18,032 | 26% | 1,605 | 2% | 1 | 0% | 1 | 0% | 2,603 | 4% | 25,995 | 38% | 68,956 |
| WAKULLA | 1,078 | 35% | 632 | 21% | 6 | 0% | 1 | 0% | 0 | 0% | 7 | 0% | 1,337 | 44% | 3,061 |
| WALTON | 2,996 | 33% | 2,078 | 23% | 138 | 2% | 0 | 0% | 0 | 0% | 0 | 0% | 3,823 | 42% | 9,035 |
| WASHINGTON | 616 | 28% | 165 | 8% | 38 | 2% | 1 | 0% | 3 | 0% | 3 | 0% | 1,369 | 62% | 2,195 |
| TOTALS | 725,349 | 28% | 674,431 | 26% | 28,500 | 1% | 1,855 | 0% | 3,449 | 0% | 47,791 | 2% | 137,281 | 43% | 2,618,656 |

Page 5

Prepared by Florida Department of State - Division of Elections

# Voter Registration Year To Date Report

## October 2004

1/10/2005

| COUNTY | DHSMV | | MAIL | | PUBLIC ASSISTANCE | | DISABILITY | | RECRUITERS | | PUB. LIB./C.I.L | | OTHER | | COUNTY TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | TOTAL DUPLICATES RECEIVED | | | | | | | | | | |
| ALACHUA | 52 | 6% | 184 | 21% | 12 | 1% | 1 | 0% | 0 | 0% | 12 | 1% | 602 | 70% | 863 |
| BAKER | 2 | 40% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 3 | 60% | 5 |
| BAY | 239 | 49% | 59 | 12% | 5 | 1% | 20 | 4% | 0 | 0% | 2 | 0% | 162 | 33% | 487 |
| BRADFORD | 7 | 70% | 2 | 20% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 10% | 10 |
| BREVARD | 104 | 13% | 447 | 58% | 28 | 4% | 0 | 0% | 0 | 0% | 14 | 2% | 184 | 24% | 777 |
| BROWARD | 416 | 5% | 1,932 | 25% | 61 | 1% | 3 | 0% | 0 | 0% | 112 | 1% | 5,327 | 68% | 7,851 |
| CALHOUN | 2 | 67% | 1 | 33% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 3 |
| CHARLOTTE | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 |
| CITRUS | 67 | 35% | 69 | 36% | 3 | 2% | 0 | 0% | 0 | 0% | 6 | 3% | 47 | 24% | 192 |
| CLAY | 24 | 13% | 69 | 38% | 0 | 0% | 0 | 0% | 0 | 0% | 3 | 2% | 86 | 47% | 182 |
| COLLIER | 1 | 100% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 |
| COLUMBIA | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 |
| DESOTO | 20 | 51% | 7 | 18% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 12 | 31% | 39 |
| DIXIE | 14 | 45% | 2 | 6% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 15 | 48% | 31 |
| DUVAL | 418 | 11% | 439 | 11% | 34 | 1% | 1 | 0% | 0 | 0% | 100 | 3% | 2,961 | 75% | 3,953 |
| ESCAMBIA | 106 | 15% | 117 | 16% | 15 | 2% | 0 | 0% | 0 | 0% | 0 | 0% | 488 | 67% | 726 |
| FLAGLER | 38 | 15% | 115 | 45% | 9 | 4% | 0 | 0% | 0 | 0% | 13 | 5% | 79 | 31% | 254 |
| FRANKLIN | 5 | 22% | 8 | 35% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 10 | 43% | 23 |
| GADSDEN | 0 | 0% | 1 | 33% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 2 | 67% | 3 |
| GILCHRIST | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 2 | 100% | 2 |
| GLADES | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 |
| GULF | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 100% | 1 |
| HAMILTON | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 |
| HARDEE | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 |
| HENDRY | 1 | 13% | 4 | 50% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 3 | 38% | 8 |
| HERNANDO | 1 | 20% | 4 | 80% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 5 |
| HIGHLANDS | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 |
| HILLSBOROUGH | 220 | 6% | 172 | 5% | 7 | 0% | 2 | 0% | 0 | 0% | 29 | 1% | 3,034 | 88% | 3,464 |
| HOLMES | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 |
| INDIAN RIVER | 3 | 25% | 5 | 42% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 4 | 33% | 12 |
| JACKSON | 31 | 31% | 28 | 28% | 4 | 4% | 0 | 0% | 0 | 0% | 3 | 3% | 33 | 33% | 99 |
| JEFFERSON | 25 | 24% | 5 | 5% | 2 | 2% | 0 | 0% | 0 | 0% | 0 | 0% | 74 | 70% | 106 |
| LAFAYETTE | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 100% | 1 |
| LAKE | 58 | 37% | 53 | 34% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 46 | 29% | 157 |

1/10/2005

Page 6
Prepared by Florida Department of State - Division of Elections

# Voter Registration Year To Date Report

## October 2004

| COUNTY | DHSMV | | MAIL | | PUBLIC ASSISTANCE | | DISABILITY | | RECRUITERS | | PUB. LIB./C.I.I. | | OTHER | | COUNTY TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LEE | 197 | 24% | 348 | 42% | 11 | 1% | 0 | 0% | 0 | 0% | 25 | 3% | 254 | 30% | 835 |
| LEON | 103 | 3% | 162 | 5% | 2 | 0% | 0 | 0% | 0 | 0% | 9 | 0% | 3,096 | 92% | 3,372 |
| LEVY | 14 | 25% | 17 | 30% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 26 | 46% | 57 |
| LIBERTY | 0 | 0% | 0 | 0% | 1 | 50% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 50% | 2 |
| MADISON | 6 | 13% | 1 | 2% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 38 | 84% | 45 |
| MANATEE | 106 | 44% | 53 | 22% | 1 | 0% | 0 | 0% | 0 | 0% | 3 | 1% | 80 | 33% | 243 |
| MARION | 716 | 37% | 630 | 33% | 100 | 5% | 0 | 0% | 0 | 0% | 13 | 1% | 477 | 25% | 1,936 |
| MARTIN | 21 | 38% | 18 | 32% | 1 | 2% | 0 | 0% | 0 | 0% | 2 | 4% | 14 | 25% | 56 |
| MIAMI-DADE | 30 | 6% | 154 | 30% | 1 | 0% | 0 | 0% | 2 | 0% | 4 | 1% | 314 | 62% | 505 |
| MONROE | 0 | 0% | 14 | 1% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 0% | 1,659 | 99% | 1,674 |
| NASSAU | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 |
| OKALOOSA | 268 | 42% | 213 | 33% | 28 | 4% | 0 | 0% | 0 | 0% | 3 | 0% | 129 | 20% | 641 |
| OKEECHOBEE | 1 | 11% | 2 | 22% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 6 | 67% | 9 |
| ORANGE | 738 | 9% | 1,496 | 19% | 149 | 2% | 12 | 0% | 0 | 0% | 185 | 2% | 5,234 | 67% | 7,814 |
| OSCEOLA | 26 | 21% | 12 | 10% | 1 | 1% | 0 | 0% | 0 | 0% | 15 | 12% | 70 | 56% | 124 |
| PALM BEACH | 1,222 | 20% | 2,636 | 43% | 100 | 2% | 2 | 0% | 0 | 0% | 78 | 1% | 2,097 | 34% | 6,135 |
| PASCO | 829 | 44% | 552 | 29% | 41 | 2% | 2 | 0% | 0 | 0% | 25 | 1% | 440 | 23% | 1,889 |
| PINELLAS | 468 | 13% | 629 | 18% | 24 | 1% | 1 | 0% | 0 | 0% | 98 | 3% | 2,372 | 66% | 3,592 |
| POLK | 153 | 40% | 75 | 20% | 13 | 3% | 0 | 0% | 0 | 0% | 0 | 0% | 140 | 37% | 381 |
| PUTNAM | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 100% | 1 |
| SANTA ROSA | 1 | 33% | 0 | 0% | 1 | 33% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 33% | 3 |
| SARASOTA | 405 | 27% | 593 | 40% | 12 | 1% | 0 | 0% | 1 | 0% | 23 | 2% | 465 | 31% | 1,499 |
| SEMINOLE | 427 | 16% | 893 | 34% | 11 | 0% | 0 | 0% | 0 | 0% | 55 | 2% | 1,265 | 48% | 2,651 |
| ST. JOHNS | 6 | 27% | 8 | 36% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 8 | 36% | 22 |
| ST. LUCIE | 1 | 100% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 |
| SUMTER | 43 | 27% | 22 | 14% | 2 | 1% | 0 | 0% | 0 | 0% | 0 | 0% | 93 | 58% | 160 |
| SUWANNEE | 1 | 100% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 |
| TAYLOR | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 |
| UNION | 0 | 0% | 1 | 50% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 50% | 2 |
| VOLUSIA | 88 | 12% | 136 | 18% | 20 | 3% | 0 | 0% | 0 | 0% | 29 | 4% | 484 | 64% | 757 |
| WAKULLA | 0 | 0% | 1 | 100% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 |
| WALTON | 17 | 63% | 4 | 15% | 1 | 4% | 0 | 0% | 0 | 0% | 0 | 0% | 5 | 19% | 27 |
| WASHINGTON | 10 | 50% | 3 | 15% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 7 | 35% | 20 |
| TOTALS | 7,751 | 14% | 12,398 | 23% | 700 | 1% | 44 | 0% | 3 | 0% | 862 | 2% | 31,954 | 59% | 53,710 |

**Exhibit D**

**REPUBLICAN PARTY OF FLORIDA**



News Center:

- News
- Press Releases
- Radio Actualities
- Gallery

# Press Release

For Immediate Release: March 5, 2004

## Florida Republican Leaders Join Chairman Jordan To Launch Unprecedented Voter Registration Effort

Contact: Joseph Agostini
(850) 222-7920 x520

*Lieutenant Governor Toni Jennings and Chief Financial Officer Tom Gallagher joined Chairman Jordan for kickoff*

TALLAHASSEE - Republican Party of Florida Chairman Carole Jean Jordan was joined by Lieutenant Governor Toni Jennings and Chief Financial Officer Tom Gallagher today to mark the beginning of National Voter Registration Week. The weeklong drive begins March 6 and concludes March 13, 2004.

In January, the Republican National Committee (RNC) designated March 6-13 as National Voter Registration Week as a part of its commitment to register three million new voters nationwide by Election Day 2004. This is the largest voter registration drive in the history of the Republican Party.

"Our highest priority is reaching out to new voters and growing our Party at the grassroots level, one voter at a time," said Chairman Jordan. "By expanding our party, we will ensure that we have the grassroots network in place to elect Republican candidates from the courthouse to the White House on Election Day 2004. The more voters we register, the more Republicans will win."

"As the 2000 election demonstrated, every single vote counts," continued Chairman Jordan. "That is why the Republican Party is making registering to vote easier than ever. Not only will volunteers be calling prospective voters and going door-to-door to register as many Republicans as possible, voters can now register online by visiting

http://www.rpof.org> and downloading their voter registration form."

---

420 E. Jefferson Street, PO Box 311, Tallahassee, FL 32301   Phone: 850.222.7920   Fax: 850.681.0184

Paid for by the Republican Party of Florida.

Not authorized by any candidate or candidate committee. www.rpof.org

Copyright © 2004 Republican Party of Florida | Privacy Policy | Legal Disclaimer

**Exhibit E**

This is G o o g l e's cache of http://www.redistrictflorida.org/index.php as retrieved on Mar 19, 2006 08:39:23 GMT.
G o o g l e's cache is the snapshot that we took of the page as we crawled the web.
The page may have changed since that time. Click here for the current page without highlighting.
This cached page may reference images which are no longer available. Click here for the cached text only.
To link to or bookmark this page, use the following url: http://www.google.com/search?
q=cache:fV9uJMEYpVkJ:www.redistrictflorida.org/index.php+fladems+new+year+resolution+thurman&hl=en&gl=us&ct=clnk&cd=24

*Google is neither affiliated with the authors of this page nor responsible for its content.*

These search terms have been highlighted: **fladems new year thurman**
These terms only appear in links pointing to this page: **resolution**



FLORIDA DEMOCRATIC PARTY

★

I look forward to a future in which our country will match its military strength with our moral restraint, its wealth with our wisdom, its power with our purpose.
*- President John F. Kennedy*

## FLADEMS.COM

About the FDP
Calendar & Events
FDP Leadership
Outreach Caucuses
County Parties/Clubs
Elected Democrats
Senate Victory
House Victory
Small Counties
Coalition
Young Democrats
College Democrats
FDP Staff
Why I Am A Democrat

## AMBASSADOR JOSEPH WILSON TO SPEAK IN TALLAHASSEE

Former U.S. Ambassador Joseph Wilson will speak in Ruby Diamond Auditorium, on the Florida State University Campus, at 8:00 PM Monday, March 20. He will discuss the contents of his best-selling book, **The Politics of Truth: Inside the Lies that Led to War and Betrayed My Wife's CIA Identity**, which chronicles the events that led up to the current war in Iraq and the ensuing professional and personal impact on him and his family.

Admission is free to the public. Doors will open at 7:00 p.m. Copies of The Politics of Truth will be available for purchase, and a book signing will follow the main presentation.

There will also be a "Meet and Greet" with Ambassador Wilson preceding the lecture in Beth Moor Lounge at 6:00 p.m. Everyone is welcome to come and meet him personally.

This program is sponsored by the Student Government Lecture Series, with co-sponsorships by the FSU College

**HOT BOX**
Palm Beach Post: Bush Misleads, Gore Says

Boyd points finger at GOP for too

Contact   Donate   Volunteer   Home

## NEW YEAR'S RESOLUTIONS FOR 2006

2006 will be a critical election **year** in Florida. The Governor's Mansion and the Cabinet are at stake and US Senator Bill Nelson will be defending his seat. 100 seats in the Florida Legislature will also be decided, along with our entire US House of Representatives delegation and many county and local offices. The Republican Party has been faltering badly since the re-election of George W. Bush. Some Republican errors -- such as supporting offshore oil and gas drilling in Florida, and the growing scandal over lobbyist Jack Abramoff -- have changed the political climate here in Florida. 2006 will be a priceless opportunity for a sweeping victory by the Florida Democratic Party, taking Florida back for the people!

Victory will not be easy, however, nor will it be cheap. As the Chair of the Florida Democratic Party, I have four **New Year's** Resolutions for Florida Democrats:

1. Connect with your local Democratic Executive Committee and Democratic Clubs. Find out what they are doing and become part of it. Even though the election is in November, party-building, voter registration, planning and fundraising are in full swing already. Our volunteers are the backbone of our campaigns.

2. Learn about the Democratic candidates running in your community and join a campaign. Every hour of time you can give is precious.

3. Speak out for your Party! Our website has links to your local Letters to the Editor pages and to your local talk radio shows. *You know why you're a Democrat -- tell your community what we stand for, and why!*

4. Finally, money always matters. The Florida Democratic Party relies on many generous donors to fund our work. Do your part by making a donation today, or, better yet, join our **new M.I.N.D.** program -- short for **"Monthly Investment for New Democracy." M.I.N.D.** donors pledge to give a small amount each month, which can be automatically charged to a credit card account if you so desire. In a few days, we will send out an email to the 145,000 addresses on our email list asking our Florida Democrats to join **M.I.N.D.** If you can't wait, call us at 1-800-925-3411 and we'll sign you up over the phone. As your Party Chair, I strongly urge you to join **M.I.N.D.** As Democrats, we build from the grassroots up. If 6000 Florida Democrats pledged just $50 per month, we would have $300,000 coming in each month!. *Despite what you read about Big Money in politics today, small donations do count.* Please take a few minutes and show your support for the Democratic Party by joining **M.I.N.D.**

*Karen Thurman, Florida Democratic Party Chair*

## OBAMA BRINGS DOWN THE HOUSE WITH CALL TO ACTION FOR FLORIDA DEMOCRATS:



Exhibit F



Member Login

# Green Party of Florida

About Us :: News :: Events :: Forums :: Links :: Downloads :: Search

## MAIN MENU

- Home
- Platform
- Contacts
- Join
- Donate
- Bylaws

---

## EVENTS

**Sat, June 10 2006**

9:00AM Annual Green Party of Florida Meeting

**Sun, June 11 2006**

9:00AM Annual Green Party of Florida Meeting

---

## NEWS

- Protester mom arrested outside White House (Sep 29, 2005)
- GREENS IN SOLIDARITY WITH GLTB Community (Jun 25, 2005)
- Broward Green attends L & A Testing watch the video (Jun 25, 2005)
- Coordinated Campaign Committee Call for Candidates (Jun 02, 2005)
- Lauderdale officials, business owners not too

### Green Party of Florida FAQ (Frequently Asked Questions)

Category: Main -> 3. Join the Green Party

## Question

- **Join The Green Party!**

## Answer

- **Join The Green Party!**

The Green Party of Florida Needs Your Help!

If you want to join, first try to find a Local Green Party group near you.

You will find the current list of them under Contacts, or just Click Here.

Send an Email to them with your name, address, county (all as listed on your voter registration, if registered), and phone number and precinct (if you know it).

*Call them* to introduce yourself.. especially since each person checks email at different intervals. Check out their website and any announcement email list they may have. Find out where they meet and when.

If you can find no coordinator for your area, please consider becoming a Local Green Party Coordinator for that area. A local coordinator helps keep track of the people interested in the Green Party in that area, so that they may begin meeting, and organizing a local party. Whether or not you want to be a coordinator, you can contact our Outreach Committee, or our Spokespersons.

If you do not have email, you may also mail your information to the Green Party of Florida.

Green Party of Florida ::

thrilled about global conference (Apr 28, 2005)
• Anti-war protesters in Lake Worth mark 2nd year of Iraq conflict (Mar 23, 2005)
• Republican National Convention - Green Actions (Jul 04, 2004)
• The Green Party of Florida Retains ACLU (Jun 18, 2004)
• The Ballots Are In! (Jun 15, 2004)
• Camejo for VP to Nader (Jun 04, 2004)

Please consider changing your voting registration to list you as a Green Party voter. That will send a loud signal to Politicians that an increasing amount of people support our Key Values and our Green Party Platform.

You may change your voting registration by filling out the tiny form on the reverse side of your voting card (if your voting cards has one), or by filling out a new voter registration form, available at most post offices, and specifying Green Party under Party Affiliation. A person can re-register and change their voter registration as many times as they like, but some time limits exist for voting in primaries. Most of our Local Green Party organizers keep voter registrations available, to help with voter registration drives.

Be sure to come back here often to check out the News and Events, or subscribe to our email list newsletter.

Welcome to the Green Party!

Back to top

---

[ FAQ index ]

Your Account :: About Us :: News :: Events :: Forums :: Links :: Downloads :: Search

This web site was made with PostNuke, released under the GNU/GPL license.
You can syndicate our news using the file backend.php

**Exhibit G**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

-------------------------------------------------------------------- x

LEAGUE OF WOMEN VOTERS OF FLORIDA, :
PEOPLE ACTING FOR COMMUNITY TOGETHER :
(PACT),   FLORIDA   AFL-CIO,   AMERICAN :
FEDERATION   OF   STATE,   COUNTY   AND :
MUNICIPAL   EMPLOYEES,   COUNCIL   79 :
(AFSCME), SEIU FLORIDA HEALTHCARE UNION, :
as organizations and as representatives of their members; :
MARILYNN WILLS; and JOHN and JANE DOES 1- :
100, :

              Plaintiffs, :

              v. :

SUE M. COBB, individually and in her official capacity :
as Secretary of State for the State of Florida, and DAWN :
ROBERTS, individually and in her official capacity as :
Director  of  the  Division  of  Elections  within  the :
Department of State for the State of Florida, :

              Defendants. :
-------------------------------------------------------------------- x

**06-21265-CIV-JORDAN**

**DECLARATION OF
SANDRA WONG IN
SUPPORT OF
PLAINTIFFS' MOTION
FOR A PRELIMINARY
INJUNCTION**

      SANDRA WONG, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

      1.     I am a paralegal at the law firm of Kramer Levin Naftalis & Frankel LLP.

      2.     I have carefully listened to an audiotape provided by the Florida

Department of State (the "Department") of the public hearing held by the Department on

March 13, 2006, concerning proposed Rule No. IS-2.042, governing third party voter

registration organizations.

1

3.      I have accurately transcribed a portion of the recording which is a
statement made during the hearing by Maria I. Matthews, Assistant General Counsel,
Florida Department of State.  I attach this transcribed portion to my declaration.


I declare under penalty of perjury that the foregoing is true and correct.


Dated: New York, New York
       May 3o, 2006

                                    _____
                                    Sandra Wong

*Transcribed Portion of Audiotape Provided By the Florida Department of State of the Public Hearing Held On March 13, 2006, Concerning Proposed Rule No. IS-2.042, Governing Third Party Voter Registration Organizations*

Statement by Maria I. Matthews, Assistant General Counsel, Florida Department of State:

"If an organization does register with the State, and recognize the law the way it is written is quite odd, it says that they shall register but there is no enforcement if they don't, but the incentive for registering obviously is that if some situation arises beyond the control of the organization, but they are going to be responsible for the action of someone who registered somebody that they didn't turn in something on time or they didn't turn it in at all, there's a fine imposed, that the fine will be reduced."

**Exhibit H**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

------------------------------------------------------------------------- x

LEAGUE OF WOMEN VOTERS OF FLORIDA, PEOPLE   :
ACTING FOR COMMUNITY TOGETHER (PACT),   :
FLORIDA AFL-CIO, AMERICAN FEDERATION OF STATE,   :
COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 79   :
(AFSCME), SEIU FLORIDA HEALTHCARE UNION, as   :
organizations and as representatives of their members;   :   **06-21265-CIV-JORDAN**
MARILYNN WILLS; and JOHN and JANE DOES 1-100,   :
   :   **DECLARATION OF**
   Plaintiffs,   :   **SANDRA WONG IN**
   :   **SUPPORT OF**
   v.   :   **PLAINTIFFS' MOTION**
   :   **FOR A PRELIMINARY**
   :   **INJUNCTION**
SUE M. COBB, individually and in her official capacity as   :
Secretary of State for the State of Florida, and DAWN   :
ROBERTS, individually and in her official capacity as Director   :
of the Division of Elections within the Department of State for   :
the State of Florida,   :
   :
   Defendants.   :

------------------------------------------------------------------------- x

SANDRA WONG, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.    I am a paralegal at the law firm of Kramer Levin Naftalis & Frankel LLP.

2.    My colleague Parthena Psyllos and I reviewed compact discs, provided to us by Florida state legislature containing an audio recording of the meeting held by the State Administration Council, Florida House of Representatives, on April 20, 2005, concerning HB 1567.

3.    I have accurately transcribed a portion of the recording which is colloquy between the Chairperson of the Council and Representative Reagan, regarding an amendment to HB 1567. I attach this transcribed portion to my declaration.

4.    The attached transcription is the only reference on the recording to the exemption for the political parties to the definition of third party voter registration organizations.

1

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      May 31, 2006

_____
Sandra Wong

*Transcribed Portion of Compact Disc Recording Meeting Held By State*
*Administration Council, Florida House of Representatives, on April 20, 2005*

(minute 11:55 – 12:30 of 1st CD, Track02.cda)


**Chairperson:**  Representative Reagan, you are recognized on Amendment number 1 [to HB 1567].

**Rep. Reagan:**  Thank you Mr. Chairman.  Amendment number 1.  This Amendment removes political parties from the definition of third-party registration organizations.  And primarily, political parties are already subject to extensive provisions under Chapter 103.

**Chairperson:**  Members, you have heard an explanation of Amendment number 1.  Is there any, are there any, questions?  Is there any public testimony on Amendment number 1?  Is there any debate?  Is there objection?  Without objection, so Amendment number 1 adopted.  Representative Reagan, you can now move to Amendment number 2.



**Exhibit I**

## HOUSE OF REPRESENTATIVES STAFF ANALYSIS

**BILL #:**   HB 1567 CS          Elections
**SPONSOR(S):** Reagan
**TIED BILLS:**                         **IDEN./SIM. BILLS:** SB 2650

| REFERENCE | ACTION | ANALYST | STAFF DIRECTOR |
|---|---|---|---|
| 1) Ethics & Elections Committee | 7 Y, 3 N, w/CS | Mitchell | Mitchell |
| 2) Transportation & Economic Development Appropriations Committee | Withdrawn | | |
| 3) State Administration Council | 7 Y, 1 N, w/CS | Mitchell | Bussey |
| 4) | | | |
| 5) | | | |

## SUMMARY ANALYSIS

The Florida Legislature has made a number of changes to the Florida Election Code (Code)[1] since the 2000 Presidential Election.  A number of election provisions have lost their usefulness or application following these changes.  To that end, the bill makes conforming, technical and clarifying changes that have been recommended by the Division of Elections (Division).

It also makes a number of substantive changes to the Code that are designed to address problems that occurred during the 2004 elections. The changes are proposed in the following areas:

Definitions of election-related terms;
Directives issued by the Division;
Voter Registration Application;
Candidate petition process;
Instruction cards placed in polling places;
Poll watchers;
Information on constitutional amendments in precincts;
Candidate withdrawal and printing a candidate's name on the ballot;
Election boards for precincts;
Canvassing board duties;
Early voting;
Expanded "no solicitation" zone for election day and early voting sites; and
Submission of written requests for absentee ballots.

HB 1567 is effective January 1, 2006.


**A SERIES OF AMENDMENTS WAS ADOPTED BY THE COMMITTEE ON ETHICS AND ELECTIONS ON APRIL 6, 2005, AND BY THE STATE ADMINISTRATION COUNCIL ON APRIL 20, 2005.  SEE AMENDMENTS SECTION BELOW FOR AN EXPLANATION.**

---

[1]   chapters 97-106, F.S.

**This document does not reflect the intent or official position of the bill sponsor or House of Representatives.**
**STORAGE NAME:**   h1567e.SAC.doc
**DATE:**              4/20/2005

**FULL ANALYSIS**

**I. SUBSTANTIVE ANALYSIS**

A.  HOUSE PRINCIPLES ANALYSIS:

**Promote personal responsibility** – Several provisions in the bill promote personal responsibility. The bill requires a voter who wishes to have an absentee ballot mailed to him or her to have the request in to the supervisor no later than 5 p.m. on the 6th day prior to the election.  All such requests must be honored by the supervisor with an absentee ballot mailed out by the 4th day prior to the election.

The bill imposes sanctions on third party voter registration groups who fail to turn in completed voter registration applications by certain deadlines.  Sanctions are imposed in the form of fines collected by the Division of Elections and set aside for enforcement and voter education.  Such groups are also required to name a registered agent in the state and submit a report outlining the date and location of any organized voter registration drives.  Failure to file such reports does not subject the group to any civil or criminal penalties.

B.  EFFECT OF PROPOSED CHANGES:

Binding Directives (REMOVED FROM BILL BY AMENDMENT; SEE AMENDMENTS SECTION BELOW.)

Section 97.012, F.S., is amended to authorize the Secretary of State to issue binding directives to the county supervisors of elections and county canvassing boards to assure uniformity in the application, operation, or interpretation of the election laws.  The Division may issue advisory opinions to supervisors of elections, candidates, local officers having election-related duties, political committees, committees of continuous existence (CCE's), political parties and other organizations engaged in political activity under s. 106.23, F.S., but such opinions are only binding on the person who sought the opinion and do not have general applicability.

The Secretary of State sees a need for binding directives in order to bring more uniformity in the application and operation of Florida's election laws.  There were a number of examples of disparate treatment of ballots, voters and registrants during the 2004 elections:

- Voter Challenges:  The election code requires voter challenges to be handled by the Election Board (precinct clerks and inspectors, i.e. poll workers), which by statute must make the initial determination of whether to sustain a challenge.  When it became evident that voter challenges were likely to occur, the Division of Elections sent a memorandum to all supervisors discussing the statutory process and provided suggested procedures to ensure uniformity.  Several counties established their own hybrid challenge process: one decided challenges by a subset of the Election Board; one used the precinct clerk and the supervisor of elections to make the determination, rather than the Election Board; and one county even advised the Division they would not implement the procedures outlined in the memorandum and stated, "[t]he Division does not have the authority to mandate it" and that, "[t]hey will follow procedures as they interpret them."

- Early Voting:  During the primary, one south Florida county permitted 16 hours of early voting on the weekend (only 8 total hours are permitted under current law) and, while most counties permitted voters in line at the close of early voting to cast their ballots, some counties forced voters to leave and return another day.

- Voter Registration Applications:  Notwithstanding clear language in the statute and legislative history, five counties accepted incomplete voter registration applications in

which the voter failed to mark the citizenship check box, as required by law. The other counties followed the Division's interpretation of the law and treated such applications as incomplete.

- Book Closing:  One county permitted changes to incomplete voter registration applications after the book closing date.

- Removal of Ineligible Voters:  One north Florida county has steadfastly refused to follow the process outlined in statute regarding the removal of felons from the voter registration rolls.

Supervisors and members of the canvassing board are subject to a $5,000 fine, to be paid from personal funds, if they are found to have willfully failed to follow a binding directive. The Secretary is the only party who may file a complaint with the Florida Elections Commission alleging such a violation, pursuant to a new subsection in s.104.051, F.S.

Binding directives are exempt from the definition of an agency rule in s. 120.52, F.S.


Early Voting (AMENDED; SEE AMENDMENTS SECTION BELOW.)

Currently, early voting must be provided by supervisors of elections beginning 15 days before an election, ending on the Monday immediately prior to the election. Early voting can be provided in a main or branch office of the supervisor and at select city halls and public libraries. The use of public libraries for early voting did not work well for many supervisors during the 2004 elections - there were problems with space and the hours of operation (many of the libraries are not open on Sundays). Supervisors have requested that alternative sites for early voting be considered.

Early voting proved to be popular among voters in the 2004 election cycle. Statewide, 18.7% of all voters voted early in the November 2 General Election.[2]  Early voting was plagued, however, by chronic long lines and wait times that sometimes stretched to four hours in urban parts of the state. This was a particular problem on the Monday before the election, when many voters in line at poll closing time were permitted to remain in line until they voted. This meant, in some instances, voters were in line until 8 p.m. or 9 p.m. Supervisors and their staffs then had to shut down the early voting centers, secure the voting machines, and prepare for county-wide precinct voting that began at 7 a.m. the next morning. The resulting logistical difficulties and staff fatigue have prompted requests from many supervisors for more time between the end of early voting and Election Day.

Section 101.657, F.S., is amended to do the following:

- Clarifies that early voting is a convenience, not a right.
- Removes the requirement that early voting be allowed only at main and branch offices, public libraries and city halls and allows early voting at the main and branch offices and other sites adequate for the efficient conduct of early voting activities.
- Requires the supervisor to consider square footage, parking and population density when designating early voting sites.
- Requires the supervisor of elections to designate early voting sites no later than 30 days prior to the election and does not allow a change in the sites thereafter except upon approval of the Division.
- Requires early voting to end on the 2nd day before the election (Sunday), rather than the day before the election.  This should eliminate some of the concerns expressed above.

---

[2]  "Analysis and Report of Overvotes and Undervotes for the 2004 General Election," Florida Department of State, Division of Elections, January 31, 2005.

- Specifies that early voting be conducted for 8 hours each weekday instead of *at least* 8 hours and allows voters in line at the closing of an early voting site to vote.
- Requires all early voting sites to be open on the same days and for the same amount of time at each site. This provides a supervisor some flexibility, if for example, one site cannot open until 10 a.m., but another is available at 8 a.m.
- Creates an exemption from the 15-day early voting requirements for municipalities and special district elections that are not held in conjunction with state and county elections. These local governments do not need the long periods of early voting nor do they have the staff or resources to conduct early voting when the number of voters in these elections may not exceed a few thousand people.

In addition, s. 102.031, F.S., is amended to include early voting sites in the "no solicitation" provisions. See discussion of "Solicitation at the Polls" below.


Solicitation at the Polls

Presently, s. 102.031, F.S., restricts solicitation within 50 feet of the entrance to any polling place, or polling room where the polling place is also a polling room. However, this section also provides a number of exceptions to the restriction. The restriction does not apply if the solicitation of voters is occurring in a marked area that does not disturb, hinder, impede, obstruct or interfere with voter access to the polling place, and the solicitation activities and subject matter are easily identifiable by the voters as an activity in which they may voluntarily participate. In addition, the restriction does not apply if the solicitation activity is conducted at a residence, an established business, private property, a sidewalk, a park or property traditionally utilized as a public area for discussion within the 50-foot zone.

The various exceptions to the 50-foot no-solicitation zone have created a lot of confusion and makes the zone difficult, if not impossible, to apply. First, the exceptions are so numerous that there is almost no area or activity that can be restricted. Second, the law contains conflicting provisions. For example, while paragraph (3)(c)1.c., states that solicitation on a sidewalk cannot be restricted, paragraph (3)(c)2. provides that solicitation on the sidewalk can be restricted if it is determined that the solicitation is impeding, obstructing or interfering with voter access to the polling place or room. This leaves a lot of discretion in the hands of the poll workers and has the potential to be applied inconsistently and in an arbitrary manner.

The State of Florida has a vital interest in preserving the integrity of the election process. The solicitation of voters in close proximity to polling places leads to voter intimidation and interferes with the maintenance of order at the polls. Supervisors of elections have complained that the current law does not give them the adequate authority to restrict solicitation around polling locations. They have also noted that many voters have objected to the proximity and intensity of solicitors, finding the practice intimidating and coercive, and a disincentive to vote.

The bill prohibits solicitation of voters inside the polling place or within 100 feet of the entrance to a polling place. It also removes the exemptions which have proved to be unworkable and difficult to enforce.

The set-back/no solicitation statute, s. 102.031, F.S., does not apply to early voting sites under current law.  HB 1567 expands the designation of the 100-foot "no solicitation zone" to each early voting site (See "Drafting Issues or other Comments" below). Finally, the bill prohibits any person from bringing a camera into a polling room or early voting area.


Absentee Ballot Requests (AMENDED; SEE AMENDMENTS SECTION BELOW.)

Since the comprehensive election reforms of 2001, voting by absentee ballot continues to be very popular with Florida voters.  Even larger numbers of voters will likely continue to request absentee ballots in future elections.  *There is no deadline in current law for a voter to request an absentee ballot or for the mailing of that ballot.*  However, in order to be counted, an absentee ballot must be received by the supervisor of elections by 7 p.m. on the day of the election.

The Legislature eliminated the witness requirement for absentee ballots in 2004 (CS/SB 2566), making it easier for people to cast an absentee ballot and have it count.  The "for cause" requirements for voting an absentee ballot were removed in 2001 (CS/SB 1118).

HB 1567 makes several changes to the absentee ballot process.  The bill:

- requires a voter who wishes an absentee ballot be mailed to him or her to have the request in to the supervisor no later than *5 p.m. on the 6th day prior to the election*;
- requires the supervisor of elections to track when the ballot was delivered to the voter or the voter's designee or when the ballot was delivered to the post office;
- clarifies that advance ballots for overseas voters need only be mailed if the regular ballots are not ready by the date overseas ballots are required to be mailed; and
- clarifies that an absentee ballot may be *personally* given to a voter up to 7 p.m. election day.


Challenged Voters/Provisional Ballots (AMENDED; SEE AMENDMENTS SECTION BELOW.)

Under current law, a voter or poll watcher may challenge any voter by filing a written oath with the Clerk or inspector at the polling place, who then must make a determination of eligibility based upon this oath and an oath that is completed by the voter in response to the challenge.  s. 101.111, F.S.  If the challenged voter refuses to complete the responsive oath or poll workers doubt the voter's eligibility to vote, the challenged voter is permitted to vote a provisional ballot.

The bill amends s. 101.111, F.S., to require any voter who is challenged to vote a provisional ballot.  This will simplify the process and place what is often a hurried and tense decision of whether to count a person's vote in the hands of the canvassing board when it canvasses the provisional ballots.  The bill also revises the "Oath of Person Entering Challenge" and eliminates the "Oath of Person Challenged" as unnecessary.  Finally, the bill makes a frivolous challenge punishable as a first degree misdemeanor.


Poll Watchers

Under current law, each political party and candidate may have one poll watcher in each polling room during the election.  The bill amends s. 101.131, F.S., to allow poll watchers for early voting areas and sets deadlines for appointment and approval of poll watchers.  Designation of poll watchers must be submitted to supervisors of elections no later than 14 days before early voting begins.  The bill allows political committees registered to support or oppose an issue on the ballot to have one watcher in each polling place and early voting area.  It also prohibits poll watchers from interacting with voters and requires poll watchers to pose any questions regarding polling place procedures to the clerk of the polling place.


Vacancies in Nomination and Candidate Withdrawal

Section 100.101, F.S., is amended to remove the requirement to conduct a special election if a vacancy occurs in nomination. Vacancies in nomination resulting from death will be filled by the political party. Those vacancies shall be filled exclusively by the political party. If a vacancy occurs because of death, the party is notified by the Department and the party must submit a new nominee within seven days of notification. Section 100.111, F.S., is amended to remove the process for calling a special election when a vacancy occurs in nomination before September 15. Under the bill, vacancies in nomination from other causes such as resignation, withdrawal or removal shall not be filled. If the name of the new party nominee is submitted after the certification of results of the preceding primary, the ballots will not be changed and any votes cast for the former party nominee will be counted for the new nominee.

Under current law, s. 101.253, F.S., permits a candidate to withdraw from a race up to the 42nd day before an election. The candidate's name would be removed from the ballot if submitted no later than 21 days before an election. After the 42nd day before an election, the Department has discretion to allow a candidate to withdraw. This discretion resulted in a lawsuit being filed against the Department in 2004.

In the case of *Department of State v. Martin* (1st DCA; 1D04-4517), Democratic candidate Jim Stork, citing health reasons, attempted to withdraw from a race after the 42nd day before the primary election. The Department refused to allow him to withdraw in accordance with s. 101.253, F.S. The Circuit Court ruled that the Democratic Party could find another candidate to replace Mr. Stork. The First DCA upheld the Circuit Court decision, ruling that "the statute supplied no criteria for the exercise of the discretion delegated to the Department." Because of the lateness of the decision, votes for Mr. Stork were counted as votes for the replacement nominee because the ballots had been printed and mailed out to many voters.

Consistent with the changes to s. 100.111, F.S., above, the bill proposes to repeal s. 101.253, F.S. After the qualifying period has ended, no candidates would be allowed to withdraw from a race.

Voter Registration (AMENDED; SEE AMENDMENTS SECTION BELOW.)

HB 1567 amends several sections in ch. 97, F.S., relating to voter registration.

The bill amends s. 97.051, F.S., to modify the oath a person must take upon registering to be consistent with the oath in the Constitution and providing that all information in the application is true.

The bill amends s. 97.052, F.S., to:

- specifically provide that the voter registration application can be used for a signature update;
- remove the reference to homestead exemption on the voter registration application;
- clarify the questions on the application relating to citizenship, felon status, and mental competency; and
- add to the application an optional submission of a voter's e-mail address.

The bill also attempts to address some problems with voter registration in 2004. There were accounts of some supervisors of election accepting applications with certain boxes unchecked. Other supervisors however, treated similar applications as incomplete. Section 97.053, F.S., is amended to do the following:

- clarify that voter registration applications must be complete at the time of book closing for the applicant to be eligible to vote in the upcoming election;
- clarify that the postmark provision relating to the registration date of an applicant is the postmark when mailed to a drivers license office, a voter registration agency, an armed forces recruitment office, the division or any supervisor of elections in the state;
- clarify that a mark must be in the checkbox confirming the questions relating to citizenship, felon status, and mental competency; and

- clarify that the application must include an original signature and not a copy of a signature.

Finally, the bill amends s. 97.055, F.S., to clarify that while the books are closed for an election, only the voter's name, address and signature may be updated for purposes of the upcoming election.

Candidates Qualifying by Petition

The alternative method for candidates to qualify has been completely reworked. The term "alternative method" is being replaced with "petition method." Section 99.095, F.S., has been reworded so that it applies to all candidates and the redundant requirements in s. 99.0955, F.S., (candidates with no party affiliation) and s. 99.096, F.S., (minor party candidates), have been deleted. The most significant change to s. 99.095, F.S., is the removal of the restriction on not being able to circulate petitions prior to the first Tuesday after the first Monday in January of the election year. Instead, a candidate will be able to collect signatures after a campaign treasurer is appointed. For additional changes see section 14 in the "Section Directory" below.

C.  SECTION DIRECTORY:

Section 1.  Section 97.012, F.S., is amended to do the following:

- Authorize the Secretary of State to issue binding directives to the supervisors of elections and/or county canvassing boards to assure uniformity in the application, operation, or interpretation of the election laws.
- Allow voter education activities of the Department of State or the department in conjunction with the supervisors of elections to be exempt from the competitive solicitation requirements.
- Provide that it is the responsibility of the Secretary of State to conduct preliminary investigations into irregularities or fraud involving voter registration, voting, or candidate or issue petition activities. Findings would be reported to the statewide prosecutor or the state attorney.

Section 2.  Section 97.021, F.S., is amended to do the following:

- Redefine "paper ballots" as "marksense ballots."
- Define "early voting area."
- Define "third party voter registration organization."

Section 3.  Section 97.029, F.S., is created to do the following:

- Provide for an award of attorney's fees and costs to the prevailing party in any court or administrative proceeding challenging the application, interpretation, or constitutionality of any election law.

Section 4.  Section 97.051, F.S., is amended to do the following:

- Modify the oath a person must take upon registering to mirror the oath in the Constitution and providing that all information in the application is true.

Section 5.  Section 97.052, F.S., is amended to do the following:

- Specifically provide that the voter registration application can be used for a signature update.
- Remove the reference to homestead exemption on the voter registration application.
- Clarify the questions on the application relating to citizenship, felon status, and mental competency.
- Add to the application an optional submission by the voter of an e-mail address.

Section 6.  Section 97.053, F.S., is amended to do the following:

- Clarify that voter registration applications must be complete at the time of book closing for the applicant to be eligible to vote in the upcoming election.
- Clarify that the postmark provision relating to the registration date of an applicant is the postmark when mailed to a driver license office, a voter registration agency, an armed forces recruitment office, the division or any supervisor of elections in the state.
- Clarify that a mark must be in the checkbox confirming the questions relating to citizenship, felon status, and mental competency.
- Clarify that the application must include an original signature, not a copy.

Section 7.  Section 97.055, F.S., is amended to do the following:

- Clarify that while the books are closed for an election, only the voter's name, address and signature may be updated for purposes of the upcoming election.  Those changes must be made pursuant to ss. 98.077 and 101.045.

Section 8.  Section 97.0575, F.S., is amended to do the following:

- Create a new section dealing with third party voter registration organizations.
- Place monetary penalties on a third party voter registration organization's board of directors, president, vice president, managing partner or other individuals engaged in similar duties or functions for not timely submitting voter registration applications that the organization has collected.
- Violation may be investigated by the division and civil fines may be assessed by the division.
- Provide reduced penalties if the third party voter registration organization has registered with the division.

Section 9.  Section 98.045, F.S., is amended to do the following:

- Delete a reference to s. 98.095, F.S., which is being repealed.

Section 10.  Section 98.077, F.S., is amended to do the following:

- Require signature updates for use in verifying absentee and provisional ballots to be received by the appropriate supervisor of elections by 5 p.m. of the fifth day prior to the election.

Section 11.  Section 99.061, F.S., is amended to do the following:

- Change references from alternative method to petition process to comport with changes made in s. 99.095, F.S.
- Codify in the election code an ethics code provision that allows a public officer who has filed his or her financial disclosure statement with the Commission on Ethics or the supervisor of elections to file a copy of that disclosure at the time of qualifying.
- Allow a qualifying officer to accept and hold qualifying papers submitted no more than 14 days prior to the beginning of the qualifying period to be processed and filed during the qualifying period.

Section 12.  Section 99.063, F.S., is amended to do the following:

- Conform the disclosure requirement to candidates for Lt. Governor so that such candidates may file a copy of the full and public disclosure that was filed with the Commission on Ethics, if applicable.

Section 13.  Section 99.092, F.S., is amended to do the following:

- Change references from alternative method to petition process to comport with changes made in s. 99.095

Section 14.  Section 99.095, F.S., is substantially amended to do the following:

Rework the alternative method for candidates to qualify. Section 99.095, F.S., has been reworded so that it applies to all candidates. The redundant requirements in ss. 99.0955 and 99.096, F.S., were then removed.  Section 105.031, F.S., relating to judicial candidates is amended to conform to these changes.  The following changes were made to the process:

- requirement for the candidate to file the oath indicating that he or she was going to qualify by the petition method has been removed.
- the restriction on not being able to circulate petitions prior to the first Tuesday after the first Monday in January of the election year has been removed and replaced with the requirement that signatures may not be obtained until the campaign treasurer is appointed.
- date for submission of petitions to supervisors for verification moved up one week.
- date for supervisors to certify number of valid petitions moved up one week.

Sections 15-17.  Sections 99.0955, 99.096, and 99.09651, F.S., are amended to do the following:

- Remove redundant provisions that are addressed in substantial amendment to s. 99.095, F.S. (see s. 99.095, F.S., for details).

Section 18.  Section 100.011, F.S., is amended to do the following:

- Clarify that if you are in line at the time the polls close, you are allowed to vote.  Although this has been the practice, it was never stated in the Code.

Section 19.  Section 100.101, F.S., is amended to do the following:

- Remove the requirement to conduct a special election if a vacancy occurs in nomination. Vacancies in nomination resulting from death will be filled by the political party.

Section 20.  Section 100.111, F.S., is amended to do the following:

- Remove the process for calling a special election when a vacancy occurs in nomination before September 15.
- Provide that the political party will fill a vacancy in nomination in the case of death.  Vacancies in nomination from other causes will not be filled.
- If the name of the new party nominee is submitted after the certification of results of the preceding primary, the ballots will not be changed and any votes cast for the former party nominee will be counted for the new nominee.
- Remove the restriction on filling vacancies if the person was a qualified candidate for the election, even if the person had withdrawn or been eliminated.  This is no longer needed since the only reason for filling vacancies will be due to death of the nominee.

Section 21.  Section 100.141, F.S., is amended to do the following:

- Conforming changes.

Section 22.  Section 101.031, F.S., is amended to do the following:

- Revise the Voter's Bill of Rights to remove the provision that the voter can prove his or her identity by signing an affidavit.  (see revisions to s. 101.043).

Section 23.  Section 101.043, F.S., is amended to do the following:

- Remove the provision allowing a voter to sign an affidavit if his or her identity is in question. Instead, it requires the voter to vote a provisional ballot.

Section 24.  Section 101.048, F.S., is amended to do the following:

- Clarify that any person who an election official asserts is not eligible may vote a provisional ballot.
- Allow a person casting a provisional ballot to present written evidence supporting his or her eligibility to the supervisor no later than 5 p.m. on the third day following the election.  Requires the written instructions given to the provisional voter to provide information on this right.
- Require the county canvassing board to consider the information provided in the Voter's Certificate and Affirmation, written evidence provided by the person, and any other evidence presented by the supervisor of elections in determining whether to count a provisional ballot.   Establishes a preponderance of the evidence standard for determining whether to count a provisional ballot.
- Modify the Voter's Certificate and Affirmation
- Require a provisional ballot to be provided on electronic machines for voters with disabilities  ( see also s. 101.049, F.S.)

Section 25.  Section 101.049, F.S., is amended to do the following:

- Include persons with disabilities within the special circumstances under which provisional ballots shall be cast.

Section 26.  Section 101.051, F.S., is amended to do the following:

- Prohibit anyone from soliciting a voter at a polling place, early voting site, or within 100 feet of such locations, in an effort to provide the voter with assistance in casting their vote.
- Require persons assisting a voter to subscribe to an oath.

Section 27.  Section 101.111, F.S., is amended to do the following:

- Require a voter who is challenged to vote a provisional ballot.
- Revise Oath of Person Entering Challenge; eliminates Oath of Person Challenged.
- Provide a penalty for a voter or poll worker who files a frivolous challenge.

Section 28.  Section 101.131, F.S., is amended to do the following:

- Allow one poll watcher for each polling place rather than each precinct.
- Allow poll watchers for early voting areas and sets deadlines for appointment and approval.
- Allow political committees registered to support or oppose an issue on the ballot to have one watcher in each polling place and early voting area.
- Prohibit poll watchers from interacting with voters and requires poll watchers to pose any questions regarding polling place procedures to the clerk of the polling place.

Section 29.  Section 101.151, F.S., is amended to do the following:

- Technical changes to change terminology and require ballots to meet specifications for the voting system.

Section 30.  Section 101.171, F.S., is amended to do the following:

- Allow a copy of the constitutional amendments to be either in poster or booklet form at the polls.

Section 31.  Section 101.294, F.S., is amended to do the following:

- Prohibit vendors of voting equipment from providing any uncertified voting system, voting system component, or voting system upgrade in this state.  Requires certification by vendor to county.

Section 32.  Section 101.295, F.S., is amended to do the following:

- Provide a 3rd degree felony penalty for any vendor who provides uncertified voting equipment in the state.

Section 33.  Section 101.49, F.S., is amended to do the following:

- Require a voter to affirm his or her identity if the poll worker doubts that the signature on the identification provided by the voter is the same as the signature affixed by the voter to the precinct register.
- Amend Affirmation.
- Allow a voter who fails to fill out the affirmation but asserts his or her eligibility to vote a provisional ballot.

Section 34.  Section 101.51, F.S., is amended to do the following:

- Clarify that voters may not speak with anyone while in the voting booth.

Sections 35-36.  Sections 101.5606 and 101.5608, F.S., are amended to do the following:

- Change references from "paper ballot" to "marksense ballot."

Section 37.  Section 101.5612, F.S., is amended to do the following:

- Allow a supervisor of elections to have a second logic and accuracy test if needed because the polling place ballots did not arrive in time to be tested during the first test.

Section 38.  Section 101.5614, F.S., is amended to do the following:

- Remove a reference to statutory subsection.

Section 39.  Section 101.572, F.S., is amended to do the following:

- Clarify that the supervisor of elections needs to contact candidates who names appear on the ballots only if the ballots are being examined prior to the end of the contest period.

Section 40.  Section 101.58, F.S., is amended to do the following:

- Authorize employees of the Department of State to have access to premises, records, equipment and staff of the supervisor of elections, upon written direction of the Secretary of State.

Section 41.  Section 101.595, F.S., is amended to do the following:

- Require supervisors of elections to provide information to the department on the number of overvotes and undervotes on either the Presidential race or the governor's race, rather than the first race appearing on the ballot.

Section 42.  Section 101.6103, F.S., is amended to do the following:

- Allow the canvassing board to begin processing ballots from mail ballot elections on the 4th day before the election, provided no results are released until 7 p.m. on election day.

Section 43.  Section 101.62, F.S., is amended to do the following:

- Require a voter who wishes an absentee ballot to be mailed to him or her to have the request in to the supervisor no later than 5 p.m. on the 6th day prior to the election.
- Require the supervisor of elections to track when the ballot was delivered to the voter or the voter's designee or when the ballot was delivered to the post office.
- Clarify that advance ballots for overseas voters need only be mailed if the regular ballots are not ready by the date overseas ballot are required to be mailed.
- Clarify that an absentee ballot may be personally given to a voter up to 7 p.m. election day.

Section 44.  Section 101.64, F.S., is amended to do the following:

- Require the supervisor to provide the standard oath required by federal law to voters voting absentee under the Uniformed and Overseas Citizens Absentee Voting Act.

Section 45.  Section 101.657, F.S., is amended to do the following:

- Clarify that early voting is a convenience, not a right.
- Remove the requirement that early voting be allowed only at main and branch offices, public libraries and city halls and allows early voting at the main and branch offices and other sites adequate for the efficient conduct of early voting activities.
- Require the supervisor to consider square footage, parking and population density in designating early voting sites.
- Require the supervisor of elections to designate early voting sites no later than 30 days prior to the election and does not allow a change in the sites thereafter except upon approval of the division.
- Require early voting to end on the 2nd day before the election, rather than the day before the election.
- Specify that early voting be conducted for 8 hours each weekday instead of *at least* 8 hours and allows voters in line at the closing of an early voting site to vote.
- Require all early voting sites to be open on the same days and for the same amount of time at each site.  This provides a supervisor some flexibility if a designated site cannot open until 10 a.m., but another opens at 8 a.m.
- Create an exemption from the 15-day early voting requirements for municipalities and special district elections that are not held in conjunction with state and county elections.

Section 46.  Section 101.663, F.S., is amended to do the following:

- Allow a voter who has moved from Florida to vote absentee for President and Vice President if he has moved to another state after the registration books in the other state have closed.

Section 47.  Section 101.68, F.S., is amended to do the following:

- Clarify that once an absentee ballot is received by the supervisor, it is deemed cast and no changes or additions shall be made to the Voter's Certificate.

Section 48.  Section 101.69, F.S., is amended to do the following:

- Clarify that if a voter has returned an absentee ballot to the supervisor, the voter is not entitled to vote another ballot or have a provisional ballot counted.
- Allow a voter to return an absentee ballot to the precinct or an early voting site, have the absentee ballot marked "canceled," and vote a regular ballot.

Section 49.  Section 101.6923, F.S., is amended to do the following:

- Allow the instructions to certain voters to be in "substantially" the form required by statute to allow for the instructions to be specific to the equipment used by the county.

Section 50.  Section 101.694, F.S., is amended to do the following:

- Delete the specifications for envelopes being sent to absent electors overseas.  This is replaced with a requirement that the envelopes meet the specifications determined by the Federal Voting Assistance Program and the United States Postal Service.

Section 51.  Section 101.697, F.S., is amended to do the following:

- Clarify that the Division will make the determination of which means of electronic transmission of absentee ballots are secure prior to adopting a rule allowing the electronic transmittal of these ballots to and from overseas voters.

Section 52.  Section 102.012, F.S., is amended to do the following:

- Remove reference to two election boards being appointed for each election.  This is an obsolete provision that is no longer needed.
- Clarify that a list of registered voters for the precinct will be provided at the polls, rather than the registration books.

Section 53.  Section 102.014, F.S., is amended to do the following:

- Require the Division of Elections to develop a statewide uniform training curriculum for poll workers and requires each supervisor to use such curriculum.
- Remove references to election day, which has the effect of requiring the polling place manual to be available at early voting sites.

Section 54.  Section 102.031, F.S., is amended to do the following:

- Apply the solicitation requirements to early voting sites.
- Prohibit solicitation of voters inside the polling place or within 100 feet of the entrance to a polling place.  Removes all exemptions.  Requires designation of the 100-foot no solicitation zone at each precinct or early voting site.
- Prohibit any person from bringing a camera into a polling room or early voting area.

Section 55.  Section 102.071, F.S., is amended to do the following:

- Remove the requirement for triplicate certificates of results to be provided from each precinct.

Section 56.  Section 102.111, F.S., is amended to do the following:

- Allow a county to correct a typographical error in the official returns of the county if discovered within 5 days of the certification by the Elections Canvassing Commission.

Section 57.  Section 102.112, F.S., is amended to do the following:

- Require the county canvassing board to certify at the time they submit official returns that the board has reconciled the number of persons who voted with the number of ballots counted and that the certification includes all valid votes cast in the election.
- Give the Department the authority to correct typographical errors on returns submitted by counties.

Section 58.  Section 102.141, F.S., is amended to do the following:

- Change the deadline for the first unofficial returns from Thursday noon to Friday noon for a primary election and from Thursday noon to Sunday noon for a general election. Requires the returns to include all results except provisional ballots, which will be submitted on the official returns.
- Clarify that the Elections Canvassing Commission is the board responsible for ordering federal, state and multicounty recounts.
- Change the deadline for reporting results of machine recounts from noon on Friday after the election until 3 p.m. on Sunday for primary elections and 3 p.m. on Wednesday for general elections.
- Modify information required to be reported on the conduct of election report.
- Require the supervisor to file a copy of or an export file from the results database of the county's voting system and other statistical information required by the Department, the Legislature or the Election Assistance Commission.

Section 59. Section 102.166, F.S., is amended to do the following:

- Prohibit a manual recount from being ordered if the number of overvotes, undervotes and provisional ballots is fewer than the number of votes needed to change the outcome of the election.
- Remove the provision allowing a candidate who was defeated by between one-quarter and one-half of one percent of the votes from requesting a manual recount. Applies same standard to issues.

Section 60. Section 102.168, F.S., is amended to do the following:

- Clarify the contest of election section regarding when the contest must be filed and who the proper party defendants are.

Section 61. Section 103.021, F.S., is amended to do the following:

- Require the state executive committee of each political party to designate presidential electors by resolution and to deliver a certified copy to the Governor prior to September 1 of the election year. (This provision was moved from s. 103.121, F.S.)
- Define "national party" and "national convention" for purposes of minor parties designating their candidates for President and Vice President. This change is a result of a Florida Supreme Court case involving the presidential candidacy of Ralph Nader in 2004.

Section 62 & 63. Sections 103.051 and 103.061, F.S., are amended to do the following:

- Remove the requirement that presidential electors meet at noon and allows the Governor to set the time for the meeting.

Section 64. Section 103.121, F.S., is amended to do the following:

- Remove provisions relating to bonds and endorsements for executive committees which have been declared unconstitutional.

Section 65. Section 104.051, F.S., is amended to do the following:

- Provide a civil penalty of $5,000 for any supervisor of elections or member of a county canvassing board who fails to follow a binding directive of the Secretary of State.

Section 66. Section 105.031, F.S., is amended to do the following:

- Clarify terminology relating to the candidate petition process.
- Correct a provision relating to write-in candidates for school board.

- Codify in the election code an ethics code provision that allows a public officer who has filed his or her financial disclosure statement with the Commission on Ethics or the supervisor of elections to file a copy of that disclosure at the time of qualifying.
- Allow a qualifying officer to accept and hold qualifying papers submitted no more than 14 days prior to the beginning of the qualifying period to be processed and filed during the qualifying period.

Section 67.  Section 105.035, F.S., is amended to do the following:

- Modify the petition process for judicial and school board candidates to comport with changes made in s. 99.095.

Section 68.  Section 106.22, F.S., is amended to do the following:

- Delete provisions relating to duties of the Division of Elections regarding investigations into fraud allegations.  The fraud investigation provisions have been moved to s. 97.012, F.S.

Section 69.  Section 106.24, F.S., is amended to do the following:

- Conforming change to make reference to the shift of fraud investigations to s. 97.012.

Section 70.  Section 16.56, F.S., is amended to do the following:

- Allow the statewide prosecutor to investigate and prosecute crimes involving voter registration, voting or candidate or issue petition activities.

Section 71.  Section 119.07, F.S., is amended to do the following:

- Conform language relating to inspection of ballots following the elections.

Section 72.  Section 120.52, F.S., is amended to do the following:

- Exempt advisory opinions issued by the division and directives issued by the Secretary of State from the definition of "rule."

Section 73.  Section 145.09, F.S., is amended to do the following:

- Require the Department of State to promulgate rules establishing certification requirements for supervisors of elections.

Section 74.  Repeals ss. 98.095, 98.0979, 98.181, 98.481, 101.253, 101.635, 102.061, 106.085, and 106.144.

- Sections 98.095 and 98.0979, F.S., relate to the voter registration records and who may receive copies of those records.
- Section 98.0979, F.S., dealing with the central voter database at the state level has been ruled unconstitutional. Anyone may access the records, other than the records with specific exemptions (social security number, signatures, etc.).  Therefore, the Department is recommending that s. 98.095, F.S., which relates to the county records, also be made public.
- Section 106.085, relating to prior notice requirements for independent expenditures and s. 106.144, F.S., requiring notice for groups doing endorsements have been ruled unconstitutional.
- Sections 98.181, 101.635 and 102.061, F.S., are obsolete.  Section 101.253, F.S., provides for the withdrawal of candidates.  The Department is recommending that this section be repealed and that once qualifying is over, no candidates be allowed to withdraw.

Section 75.  Provides an effective date of January 1, 2006.

## II. FISCAL ANALYSIS & ECONOMIC IMPACT STATEMENT

A. FISCAL IMPACT ON STATE GOVERNMENT:

   1. Revenues:

   The bill provides for the collection of fines from third party registration groups when voter applications are submitted after certain deadlines. Such fines are to be set aside in a trust fund to be used for enforcement of the section regulating such groups and for voter education. The amount of such fines is indeterminate at this time.

   2. Expenditures:

   According to the Department, the bill has no adverse fiscal impact on state government.

B. FISCAL IMPACT ON LOCAL GOVERNMENTS:

   1. Revenues:
   None.

   2. Expenditures:
   None.

C. DIRECT ECONOMIC IMPACT ON PRIVATE SECTOR:


D. FISCAL COMMENTS:


## III. COMMENTS

A. CONSTITUTIONAL ISSUES:

   1. Applicability of Municipality/County Mandates Provision:


   2. Other:

   Authorizing the Department to issue binding directives may raise concerns about the separation of powers among the branches of government. The bill appears to give the Department the ability to exercise its discretion to determine what the law is, a task which should fall to the judicial branch when a case or controversy exists.

   The Department may intend for the directives to provide a quick resolution to a problem in the face of impending elections. In reality, it may slow the process down and increase election-related litigation.

   Finally, it is unclear what protections would be afforded to a supervisor or canvassing board if they follow a binding directive of the Department, but are then sued by an affected party such as a voter or group of voters who are deemed to be ineligible to vote.

B. RULE-MAKING AUTHORITY:

C.  DRAFTING ISSUES OR OTHER COMMENTS:

In 1992 the United States Supreme Court upheld a Tennessee statute that created a 100-foot "campaign-free zone." A plurality of the Supreme Court in *Burson v. Freeman*, 112 S.Ct. 1846 (1992), held that while this zone clearly affected fundamental first amendment rights, Tennessee's interest in protecting against voter intimidation and election fraud was sufficiently compelling and that the law was sufficiently narrowly tailored to achieve this objective. The Court went into great detail analyzing the state's interests in creating no solicitation zones and determined that, "[t]he only way to preserve the secrecy of the ballot is to limit access to the area around the voter." *Burson*, 112 S.Ct. at 1856. With respect to the choice of making the zone 100 feet, the Court did not employ a litmus paper test that separated valid from invalid restrictions. The Court did note, however, that "the state of Tennessee has decided that the last 15 seconds before its citizens enter the polling place should be their own, as free from interference as possible. We do not find that this is an unconstitutional choice." *Burson*, 112 S.Ct. at 1857.

The *Burson* case demonstrates that a state may legitimately create a no-solicitation zone provided: there is in fact a compelling reason to do so and the statute is narrowly tailored to serve that objective. Given the problems regarding solicitation at the polls that have been reported by the supervisors of elections, it appears that Florida has a compelling interest in creating a no-solicitation zone that can be uniformly applied. Utilizing the same geographic restriction as in *Burson* (100-foot restricted zone) supports the proposition that a court would view the statute as narrowly tailored to serve the state's compelling interests.


### IV.  AMENDMENTS/COMMITTEE SUBSTITUTE & COMBINED BILL CHANGES

A SERIES OF AMENDMENTS WAS ADOPTED IN THE ETHICS AND ELECTIONS COMMITTEE ON APRIL 6, 2005, THAT ACCOMPLISHES THE FOLLOWING:

➢ Requires each Supervisor of Elections to track, make publicly available and report to the Division of Elections information on absentee and early voters.

➢ Create a process for electors or pollwatchers to pre-challenge a voter that they believe is not a legal voter.  The challenge process follows the same procedure as an election day challenge as prescribed in the bill.  Such a process makes it easier to challenge potentially ineligible voters who vote early.

➢ Removes the e-mail address as an optional item submitted on a voter registration application.  (Conforms to HB 1589).

➢ Returns early voting sites to current law (main or branch offices of SOE, city halls and public libraries), but requires branch offices and public libraries to be permanent.

➢ Requires each Supervisor of Elections who receives a request for an absentee ballot by the sixth day before an election, to mail out the ballot by the fourth day before the election.

➢ Removes the authority in s. 97.012 for the Secretary of State to issue binding directives and makes conforming changes.

A SERIES OF AMENDMENTS WAS ADOPTED IN THE STATE ADMINISTRATION COUNCIL COMMITTEE ON APRIL 20, 2005, THAT ACCOMPLISHES THE FOLLOWING:

- remove political parties from the definition of third-party registration organizations.

- ensure that provisional ballots "shall" be counted (rather than "should") unless by a preponderance of the evidence the person casting the ballot is not entitled to vote (technical amendment).

- require that the employees of the Secretary of State who have access to county supervisors' offices and equipment, pursuant to written direction of the Secretary, have expertise in the matter of concern.

- clarify in current law that early voting is allowed for 8 hours in the aggregate during each weekend and provides that the 8 hours of early voting must occur between 7 am and 7 pm each day.

- prohibit photography, rather than cameras, at polling places and early voting sites.

- clarify the type of information on absentee voting and early voting that must be made available by the supervisors.  The amendments remove the requirement that absentee ballot and early voting numbers be posted to a Internet site.  It requires that supervisors report such information by noon each day and in an electronic format to the Division of Elections.

**EXHIBIT C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 06-21265-CIV-JORDAN

------------------------------------------------------------------ x

LEAGUE OF WOMEN VOTERS OF FLORIDA, PEOPLE : 
ACTING FOR COMMUNITY TOGETHER (PACT), :
FLORIDA AFL-CIO, AMERICAN FEDERATION OF :
STATE, COUNTY AND MUNICIPAL EMPLOYEES, :
COUNCIL 79 (AFSCME), SEIU FLORIDA :
HEALTHCARE UNION, as organizations and as :
representatives of their members; MARILYNN WILLS; and :
JOHN and JANE DOES 1-100, :

              Plaintiffs, :

            v. :

SUE M. COBB, individually and in her official capacity as :
Secretary of State for the State of Florida, and DAWN :
ROBERTS, individually and in her official capacity as :
Director of the Division of Elections within the Department :
of State for the State of Florida, :

            Defendants. :

------------------------------------------------------------------ x

**NOTICE OF FILING PLAINTIFFS' DECLARATIONS**

PLAINTIFFS, League of Women Voters of Florida, People Acting for Community Together (PACT), Florida AFL-CIO, American Federation of State, County and Municipal Employees, Council 79 (AFSCME), SEIU Florida Healthcare Union, as organizations and as representatives of their members; Marilynn Wills; and John and Jane Does 1-100 (collectively "Plaintiffs"), by and through its undersigned counsel, hereby file the following Declarations in support of Plaintiffs' Motion for a Preliminary Injunction:

1.     Aaron Dorfman, Executive Director of People Acting for Community Together ("PACT").

2.     Dale Ewart, Vice-President of the Service Employees International Union ("SEIU") Florida Healthcare Union ("FHU").

3.     Cynthia Hall, President of the Florida AFL-CIO.

4.     Marilynn Wills, member of the League of Women Voters of Florida (the "League" of the "state League"), President of the Tallahassee League and the First Vice-President of the state League.

5.     Dianne Wheatley Giliotti, President of the League of Women Voters of Florida.

6.     Alma Gonzalez, Special Counsel to Council 79 of the American Federation of State, County and Municipal Employees ("AFSCME"), the Florida Council of AFSCME International.

Dated: June 6, 2006

Gary C. Rosen
BECKER& POLIAKOFF, P.A.
3111 Stirling Road
Ft. Lauderdale, Florida 33312
Tel: (954) 985-4133

By: _____
      for Gary C. Rosen
         Florida Bar No. 310107

Elizabeth S. Westfall*
ADVANCEMENT PROJECT
1730 M. Street, N.W., Suite 910
Washington, D.C. 20036
Tel: (202) 728-9557

Wendy R. Weiser*
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
161 Avenue of the Americas, 12th Floor
New York, N.Y. 10013
Tel: (212) 998-6730

Eric A. Tirschwell*
Craig L. Siegel*
KRAMER LEVIN NAFTALIS &
  FRANKEL LLP
1177 Avenue of the Americas
New York, N.Y. 10036
Tel: (212) 715-9100

*Applying to appear pro hac vice*

*Attorneys for Plaintiffs*

*Applying to appear pro hac vice

- 2 -

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was served by regular United States mail, postage prepaid, on the 6th day of June, 2006, upon the following:

> Peter Antonacci, Esq.
> GrayRobinson, P.A.
> 301 S. Bronough Street, Suite 600
> Post Office Box 11189
> Tallahassee, FL 32302-3189

_____
Gary O. Rosen

FTL_DB: 987647_1

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 3111 STIRLING ROAD • FORT LAUDERDALE, FL 33312-6525
TELEPHONE (954) 987-7550

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF FLORIDA, PEOPLE ACTING FOR COMMUNITY TOGETHER (PACT), FLORIDA AFL-CIO, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 79 (AFSCME), SEIU FLORIDA HEALTHCARE UNION, as organizations and as representatives of their members; MARILYNN WILLS; and JOHN and JANE DOES 1-100, | ) ) ) ) ) ) ) ) ) | Case 06-21265-CIV-JORDAN |
| Plaintiffs, | ) ) ) | **DECLARATION OF AARON DORFMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | ) ) ) | |
| SUE M. COBB, individually and in her official capacity as Secretary of State for the State of Florida, and DAWN ROBERTS, individually and in her official capacity as Director of the Division of Elections within the Department of State for the State of Florida, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

I, Aaron Dorfman, hereby declare as follows:

1. I am the Executive Director of People Acting for Community Together ("PACT"), a 501(c)(3) organization located at 250 Northeast 17th Terrace, Miami, Florida 33132.

**Background on People Acting for Community Together**

2. PACT is a grassroots community-based coalition made up of 38 member churches, synagogues, public school parent associations, and other community-based organizations. PACT was founded in 1988; I have been Executive Director since 1997.

3. Our coalition includes twelve Catholic churches, sixteen Protestant churches, three Jewish synagogues, five public school parent groups, and two other community-based organizations. Together, our member institutions represent over 100,000 individuals.

4. PACT's mission is to unite, organize, and train leaders from diverse congregations, schools and community groups to build a powerful community voice. Individually

and collectively, we empower ourselves, hold officials accountable to their constituents, work to achieve systemic change to improve life for our community members, and promote fairness, justice and democracy in Miami-Dade County.

5.  We encourage our members to become registered and to vote because when they do, public officials will take our communities more seriously, and our issues will be heard.

6.  PACT serves primarily low-income communities, as well as communities of color and immigrant communities.  Of the individuals represented by our member institutions, about half are Hispanic, and one third are African-American, non-Hispanic.

7.  We have six paid staff members: myself, four community organizers, and an administrative assistant.  Each of our member institutions works with a particular staff organizer.

8.  PACT's organizing efforts currently focus on improving public education, reforming immigration laws, making housing affordable, and improving access to health care.

**Past Organizing Efforts**

9.  In 2001, PACT initiated an advocacy campaign to increase public transportation in Miami-Dade County.  We felt this was an important issue for our low-income members, who depend on local public transportation to take them to work, and that the Miami-Dade bus system was overburdened and not meeting their needs.

10.  In March 2001, PACT organized a 1000-person community action meeting to ask the county mayor, Alex Penelas, to commit to double the county bus fleet.

11.  The mayor initially refused to commit to our request.  In response, we attended periodic meetings with County Commissioners and other officials, brought fifty to one hundred people to a meeting of the Metropolitan Planning Organization (MPO), met with other community leaders to build support for our campaign and to identify potential allies for our campaign.  To guarantee our members could attend MPO meetings, which were originally held during working hours, we filed a Title VI complaint with the Office of Civil Rights of the Federal Highway Administration, which resulted in the MPO moving some of its meetings to evening hours.

12.  As a direct result of this organizing, combined with growing community pressure generally on this issue, the mayor announced a new comprehensive transportation initiative.  PACT brought 200 people to a transportation summit organized by Mayor Penelas to advocate for bus transit as part of the overall transportation plan.

13.  PACT's voter registration efforts were an essential component of our organizing strategy to improve public transportation for our members and directly contributed to the success of the ballot initiative.  In July 2002, PACT brought 50 people to the County Commission meeting where the Commissioners voted 10-3 in favor of the

"People's Transportation Plan," which included PACT's demand to double the bus fleet in three years. The County Commission also put a ballot initiative on the November 2002 ballot proposing a ½ cent sales tax to pay for the plan ("ballot initiative").

14. PACT continued its fight for transportation by reaching over 100,000 people with our "Vote Yes" on the ballot initiative message through 140 churches and synagogues in the area.

15. Concurrently, PACT registered voters and encouraged registrants to vote in favor of the ballot initiative. The initiative passed by a two to one margin, resulting in hundreds of new busses and thousands of new jobs for Miami-Dade County.

16. PACT's voter registration efforts were an essential component of our organizing strategy to improve public transportation for our members and directly contributed to the success of the ballot initiative.

**PACT's Voter Registration Activities**

17. PACT does community organizing with our member institutions on a range of different issues. As part of this organizing, we believe it is important that all eligible constituents of our member institutions are registered to vote. Voter registration is a vital part of our overall mission. Because the majority of our members are low-income, they are less likely to be registered to vote, making our registration efforts particularly necessary. When more of our members are registered, it is easier to achieve our mission because elected officials are more likely to take PACT and its issues seriously.

18. PACT has engaged in voter registration drives since at least 1997, when I joined the organization and may have organized voter registration drives before 1997.

19. In 2004, we registered 1,341 of our constituent members, from predominantly Hispanic, Caribbean, and African-American congregations and parent-teacher groups. We registered about 500 members in 2000.

20. Due primarily to Florida's recently enacted restrictions on third-party voter registration activities, PACT will not register voters in 2006.

**Voter Registration Drives**

21. Our voter registration drives follow a typical format. First, at our staff meetings, I train our paid community organizers in voter registration procedures. I ensure they know how to fill out a voter registration form and where to turn in the forms.

22. The organizer assigned to a particular congregation then meets with several leaders of a congregation and plans a voter registration drive. The organizer trains the

congregation leaders in how to fill out a voter registration form, and when and where to turn in the forms.

23. The organizer provides the voter registration forms to the leaders and helps them plan out the logistics of the drive. Among other things, the organizer assists in planning, where in the church they should set up a table for voter registration, whether the pastor will announce the drive from the pulpit, and how long the drive will last.

24. Typically, the volunteers from the congregation will then set up a voter registration area after church services for a few weeks. During that period, members of the congregation complete the voter registration forms at the tables set up in the churches and give them to the drive volunteers.

25. At the end of the voter registration drive, the church group, or PACT organizer, submits the forms to the elections office. Because these drives generally take place over the course of several weeks, in past years PACT and its member organizations regularly turned in forms more than ten days after their completion, but before the registration deadline.

26. Because our voter registration drives are congregation-based, the volunteers for each drive know the people they are registering personally. They encourage their fellow parishioners to register and vote to advance issues of common concern to the congregation. These direct registration efforts not only foster conversations about important political issues and political engagement by our members, but we believe that they are also a more effective way of encouraging our low-income members to register and vote.

**Effect of the New Law on PACT**

27. PACT has no plans to conduct voter registration drives in 2006. The new law's impact has contributed significantly to our decision not to conduct voter registration this year; the burdens created by the new law have made voter registration too costly for PACT. If the new law remains in effect, it is unlikely that we will do voter registration in 2008

28. The new law will be particularly burdensome on the volunteers who run PACT's voter registration drives. In a volunteer-driven system, the compliance demanded by the new law is too rigid and the penalties for inadvertent mistake are too severe. Most of our volunteers are low-income individuals, and cannot bear the potential liability for the law's fines. For someone without means, even one late form could be disastrously expensive.

29. In addition, we do not want to risk those fines for our organization. As described above, PACT voter registration drives usually take many weeks, and forms are turned in at the end of the drive. Under the new law, in order to guarantee perfect compliance with the ten-day deadlines, PACT staff members would each week have to visit each of PACT's 38 member organizations to collect forms and go to the county elections office to return them. We cannot afford to devote the time and resources that those activities would entail, under our limited budget.

30. The new law's registration requirements are similarly burdensome. Just keeping track of drives at 38 churches, synagogues, and community organizations is a significant burden. In addition, some small groups of our member churches meet in people's homes. At those meetings, voter registration applicants complete the voter registration forms and provide them to a church volunteer. No records are kept of when those meetings occur or the address of those meetings. Because PACT does not have the resources to implement new record keeping procedures along with its voter registration activities, PACT would be unable to comply with the new law's registration requirements, and would not be eligible for the reduced fines.

I declare under penalty of perjury the foregoing is true and correct.


Executed this 13 day of May 2006, in Miami, Florida

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

---------------------------------------------------------------------  x

LEAGUE OF WOMEN VOTERS OF FLORIDA,
PEOPLE ACTING FOR COMMUNITY TOGETHER
(PACT), FLORIDA AFL-CIO, AMERICAN
FEDERATION OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES, COUNCIL 79
(AFSCME), SEIU FLORIDA HEALTHCARE UNION,
as organizations and as representatives of their members;
MARILYNN WILLS; and JOHN and JANE DOES 1-
100,

               Plaintiffs,

               v.

SUE M. COBB, individually and in her official capacity
as Secretary of State for the State of Florida, and DAWN
ROBERTS, individually and in her official capacity as
Director of the Division of Elections within the
Department of State for the State of Florida,

               Defendants.

---------------------------------------------------------------------  x

:
:
:
:
:
:  Case 06-21265-CIV-JORDAN
:
:
:  **DECLARATION OF**
:  **DALE EWART IN**
:  **SUPPORT OF**
:  **PLAINTIFFS' MOTION**
:  **FOR A PRELIMINARY**
:  **INJUNCTION**
:
:
:
:
:
:
:

I, DALE EWART, declare:

       1.     I am a resident and citizen of the United States and of the State of
Florida.   I reside at 10723 Lenox Road, Cooper City, Florida 33026.   I submit this
declaration in support of plaintiffs' motion for declaratory and injunctive relief.

       2.     I am the Vice President of the SEIU Florida Healthcare Union
("FHU"), a plaintiff in the above-captioned action, and a local affiliate of the Service
Employees International Union, or SEIU.

1

3.     The SEIU is a plaintiff in the above-captioned action because it seeks to prevent enforcement of Fla. Laws 2005-277 §§ 2 and 7, which have forced the SEIU to stop registering its members to vote out of fear that the SEIU and its members, employees, directors and officers will be unfairly and discriminatorily subject to severe and potentially ruinous fines as a result of their efforts to register the union's members to vote.

### The FHU

4.     The FHU is one of the six Florida local unions affiliated with the SEIU.   It represents approximately 13,000 private sector healthcare workers in 89 healthcare facilities across the state of Florida.  Its mission is to represent the economic, social and political interests of Florida healthcare workers.  FHU conducts annual voter registration drives among its members because healthcare is heavily funded and regulated by political bodies that can be influenced by FHU members that participate in the political process, and because our ability to address our members' concerns as parents and community members about issues like education and immigration are tied directly to our members' engagement in the political process.

### The FHU's Voter Registration Activities

5.     The FHU conducts voter registration drives each year by recruiting members to be volunteer leaders that register co-workers.   The volunteer leaders are chosen by their co-workers in each represented facility.  With assistance from union staff, our volunteer leaders engage in one-on-one communication with their co-workers and encourage them to become politically involved.

2

6.     Each volunteer leader is responsible for collecting voter registration applications from his or her co-workers and delivering the applications to the FHU headquarters located at 1525 NW 167th Street, Suite 300 Miami, FL 33169.  The FHU staff updates our membership database with the registration information, ensures that applications are properly completed, and delivers the applications to the Supervisor of Elections.

7.     The FHU conducts voter registration training for its volunteer leaders every year.  FHU's training includes explaining the information required by Florida's voter registration application and showing volunteer leaders how to properly fill in the application.  We remind our volunteer leaders to make sure that every box is checked.  The training also consists of role-playing to make the volunteer leaders comfortable and prepared to register co-workers.  Training also includes discussions about the link between workers' issues (healthcare funding, staffing, worker's right to organize, etc), community issues (education, healthcare access, immigration rights) and political participation by union members, especially by those that are registered to vote.

8.     Volunteer leaders often conduct voter registration in conjunction with efforts to educate our members about legislative issues of concern to union members.  Our leaders explain these issues to members and how these issues affect them. They also explain that members can affect how legislators vote on these issues if members register to vote and communicate their views on these issues by calling, writing or visiting their elected representatives.  For example, in the past we had our volunteer leaders encourage members to participate in the political system by registering to vote

3

and contacting their legislators to support increased state funding and staffing for Florida's nursing homes, which employ members of FHU.

**The New Law Has Forced the FHU to Stop Registering Its Members to Vote**

9.    The FHU has been forced by the new law to stop registering its members to vote because it cannot afford the risk that the FHU and its members, employees, directors and officers will have to pay the severe fines threatened by the new law.

10.    The FHU faces a substantial risk that it will be fined under the new law because it conducts voter registration drives each year and encourages its leaders to register co-workers year-round.  Each of the members who coordinate these drives is responsible for collecting voter registration applications and delivering them to the FHU, which in turn delivers them to the state.  Because our voter registration efforts are decentralized and based upon a large number of volunteer leaders, there is a high likelihood that some of these applications will not be submitted in the manner prescribed by the new law, including before the 10-day deadline.

11.    As a result, the FHU and its members, officers, directors and employees each face a serious risk of being held personally, and joint and severally liable, for fines based on the activities of approximately 300 volunteer leaders.

12.    The FHU believes that it will not be eligible for a three-fourths reduction of any fines under the new law because it will probably not be able to comply with the requisite quarterly reporting provisions.  It would be severely burdensome and

4

extraordinarily costly for the FHU to divert one or more of its employees away from their current responsibilities to compile an accurate and detailed report providing the date and location of every voter registration drive across the state.

13.     In order to collect the information required by the new law, FHU staff would have to contact approximately 300 volunteers across the state every quarter. This would be an enormous waste of time and of the FHU's limited resources and staff. In addition, each of our volunteers would have to maintain records of every date and location where they registered voters.  This is severely burdensome for volunteers and it would discourage union members from volunteering to register their colleagues.

14.     The new law has imposed a severe burden on the FHU's voter registration activities and has chilled the willingness of the FHU, and many of its members, to register new voters.

KL3:2518689.1

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _July 15_, 2006

Dale Ewart

KL3:2518689.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

------------------------------------------------------------------- x

LEAGUE OF WOMEN VOTERS OF FLORIDA,
PEOPLE ACTING FOR COMMUNITY TOGETHER
(PACT), FLORIDA AFL-CIO, AMERICAN
FEDERATION OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES, COUNCIL 79
(AFSCME), SEIU FLORIDA HEALTHCARE UNION,
as organizations and as representatives of their members;
MARILYNN WILLS; and JOHN and JANE DOES 1-
100,

                  Plaintiffs,

                  v.

SUE M. COBB, individually and in her official capacity
as Secretary of State for the State of Florida, and DAWN
ROBERTS, individually and in her official capacity as
Director of the Division of Elections within the
Department of State for the State of Florida,

                  Defendants.

------------------------------------------------------------------- x

Case 06-21265-CIV-JORDAN

**DECLARATION OF
CYNTHIA HALL IN
SUPPORT OF
PLAINTIFFS' MOTION
FOR A PRELIMINARY
INJUNCTION**

I, CYNTHIA HALL, declare:

      1.      I am a resident and citizen of the United States and of the State of

Florida.  I reside at 2053 Wildridge Drive, Tallahassee, Florida 32303.  I submit this

declaration in support of plaintiffs' motion for declaratory and injunctive relief.

      2.      I am the president of the Florida AFL-CIO ("AFL-CIO"), a

plaintiff in the above-captioned action.

      3.      The AFL-CIO is a plaintiff in the above-captioned action because

it seeks to prevent enforcement of Fla. Laws 2005-277 §§ 2 and 7, which have forced the

AFL-CIO to stop registering its members to vote out of fear that the AFL-CIO and its members, employees, directors and officers will be unfairly and discriminatorily subject to severe and potentially ruinous fines as a result of their efforts to register the union's members to vote.

### The AFL-CIO

4.      The AFL-CIO of Florida is a voluntary association of unions in Florida. It comprises approximately 450 affiliated local unions throughout the state and represents more than 500,000 active and retired Florida workers living in the state. Its mission is to improve the lives of working families. It accomplishes that mission by, among other things, encouraging workers to register and vote, to exercise their full rights and responsibilities of citizenship, and to perform their rightful part in the political life of their local, state and national communities.

5.      The AFL-CIO's local unions represent members of the building trades, service employees, airline employees and public employees, including teachers.

6.      For fiscal year 2006, the AFL-CIO's budget allots approximately $200,000 for program expenses. These expenses included registering our members to vote, an annual legislative conference, and various organizing and educational programs. The remaining $1.2 million in the AFL-CIO's fiscal year 2006 budget pays salaries and benefits for ten full-time and two part-time employees, statewide travel costs, and the general operating expenses for our large, statewide union. The AFL-CIO's employees are responsible for providing services to 500,000 members across the state, including by

2

supporting union organizing efforts, issue advocacy campaigns, and other efforts to protect the rights of workers and working families.

### The AFL-CIO's Voter Registration Activities

7.      The AFL-CIO conducts non-partisan voter registration drives each year intended to increase by at least 10% the number of its members registered to vote. These drives are typically active all year long.   Each year in or about January, the AFL-CIO conducts a workshop for the leadership of each local union on how to register voters.

8.      The AFL-CIO conducts its voter registration drives through its local unions.  These drives are decentralized.  Each of our more than 450 local unions identifies one member – usually a volunteer or retiree – to coordinate that local union's drive.

9.      Each local union decides the most effective way to register its members.   The local unions' voter registration methods vary based on the type of workforce represented by each union.  For example, the most effective way for a building trades union to register its members is to send their coordinator to work sites scattered around a city or county where their members are employed.

10.      Each local union's coordinator will encourage members to register to vote by explaining how decisions made by elected officials at all levels of government affect working families and union jobs.  For example, coordinators will explain to public sector employees that local and state elected officials have enormous influence over collective bargaining and the funding for government entities, such as

3

schools, that employ thousands of union workers.  Moreover, they will explain that the more union members that register and vote, the more influence the union – and the individual members – will have over the policy decisions made by elected officials that affect working families and union jobs.

11.     Coordinators will often conduct voter registration in conjunction with efforts to educate our members about particular legislative issues.  Coordinators will explain these legislative issues to members and how the issues affect working families. They will explain that members can have an impact on how legislators vote on these issues if members register to vote and communicate with their legislators, including by writing letters, making phone calls and meeting with legislators.

12.     For example, our local unions recently had their volunteer coordinators speak to our members about Fair Share Health Care legislation, which would require certain employers to spend a percentage of their payroll to provide health care benefits for their employees, or pay into a state Fair Share Health Care Fund.  The coordinators encouraged members to contact their state legislators and express support for the legislation.  However, unlike during prior legislative sessions, the coordinators did not also register our members to vote because of the fines threatened by the new law.

13.     Each local union and its coordinator is responsible for collecting voter registration applications from members and delivering the applications to a county Supervisor of Elections.

**The New Law Has Forced the AFL-CIO to Stop Registering Its Members to Vote**

14.     The AFL-CIO has been forced by the new law to stop registering its members to vote in 2006 because it cannot afford the risk that the AFL-CIO and its members, employees, directors and officers will have to pay the severe fines threatened by the new law.

15.     In addition, as a result of the challenged law, the AFL-CIO did not conduct a voter registration training, as it had planned, in January 2006.

16.     The AFL-CIO faces a substantial risk that it will be fined under the new law because its local unions conduct more than 450 decentralized voter registration drives each year.  Each of the local union members who coordinate these drives are responsible for collecting voter registration applications and delivering them to the state in the manner prescribed by the new law.  There is a high likelihood that some of these coordinators – through honest mistake and through no fault of their own – will not submit some applications in the manner prescribed by the new law, including before the unnecessary and unjustified 10-day deadline.  There is also a high likelihood that due to circumstances beyond a members' control – including a hurricane, tornado or flood – some applications will be destroyed and not submitted.

17.     As a result, the AFL-CIO and its members, officers, directors and employees each face a serious risk of being held personally, and joint and severally liable, for fines based on the activities of more than 450 mostly volunteer coordinators registering voters throughout the state.

18.     The AFL-CIO would like to register an additional 10% of its members – or 50,000 members – in 2006. If a mere 1% of the applications collected for these 50,000 members were submitted before a voter registration deadline but on the eleventh day after they were signed, the AFL-CIO would be fined $125,000: $250 x 500 applications. If a mere 1% of the applications collected were destroyed by a hurricane or flood, the AFL-CIO would be fined $2,500,000: $5,000 x 500 applications.

19.     Such massive fines would deal a serious blow to – if not bankrupt – the union.

20.     The AFL-CIO has determined that it will not be eligible for a three-fourths reduction of any fines under the new law because it will not be able to comply with the requisite quarterly reporting provisions.   It would be severely burdensome and extraordinarily costly for the AFL-CIO to divert one or more of its ten employees away from their current responsibilities to contacting each of our more than 450 local unions every quarter to compile an accurate and detailed report providing the date and location of every voter registration drive across the state.

21.     Many of the AFL-CIO's local unions have no computers or offices.  AFL-CIO staff members are able to keep in contact with these local unions primarily by mail, phone and personal visits.  In order to collect the information required by the new law, AFL-CIO staff would have to spend days making hundreds of phone calls and leaving countless voicemail messages for volunteers across the state.  This would be an enormous waste of time and of the AFL-CIO's resources and staff.  In addition, hundreds of volunteers would have to maintain records of every date and

location where they registered voters.   This is severely burdensome for volunteers, including members of our building trades unions who, for example, register members at multiple locations and on multiple dates throughout Florida's cities and counties.

22.     I and other members of the AFL-CIO, including members of the board of directors, have been forced by the challenged law to personally refrain from registering voters.   We have also been forced to tell the AFL-CIO's local unions that they cannot register their members to vote, out of fear that both we and the AFL-CIO will be personally liable for any fines levied against the AFL-CIO.

23.     I have already denied requests in 2006 by local unions to conduct voter registration drives because of the potential financial liability for the AFL-CIO and its members, staff, officers and directors.

24.     In sum, the new law has imposed a severe burden on the AFL-CIO's voter registration activities and has chilled the willingness of the AFL-CIO, and of many of its members, to register new voters.   The law is seriously hampering the ability of AFL-CIO members to organize together to engage in effective political speech and action.

KL3:2514059.5

25.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 16, 2006

_____
Cynthia Hall

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

------------------------------------------------------------------ x

LEAGUE OF WOMEN VOTERS OF FLORIDA,       :
PEOPLE ACTING FOR COMMUNITY TOGETHER     :
(PACT),   FLORIDA   AFL-CIO,   AMERICAN  :
FEDERATION   OF   STATE,   COUNTY   AND   :
MUNICIPAL   EMPLOYEES,   COUNCIL   79     :   Case 06-21265-CIV-JORDAN
(AFSCME), SEIU FLORIDA HEALTHCARE UNION,  :
as organizations and as representatives of their members; :
MARILYNN WILLS; and JOHN and JANE DOES 1- :
100,                                      :
                                          :   **DECLARATION OF**
          Plaintiffs,                     :   **MARILYNN WILLS**
                                          :   **IN   SUPPORT   OF**
          v.                              :   **PLAINTIFFS'**
                                          :   **MOTION   FOR   A**
                                          :   **PRELIMINARY**
SUE M. COBB, individually and in her official capacity :   **INJUNCTION**
as Secretary of State for the State of Florida, and DAWN :
ROBERTS, individually and in her official capacity as :
Director   of   the   Division   of   Elections   within   the :
Department of State for the State of Florida, :
                                          :
          Defendants.                     :
------------------------------------------------------------------ x

I, MARILYNN WILLS, declare:

     1.     I am a resident and citizen of the United States and of the State of

Florida who resides at 2326 Kilkenny Drive West, Tallahassee, Florida 32309-3156.  I

submit this declaration in support of plaintiffs' motion for declaratory and injunctive

relief.

     2.     I am a registered voter in the state of Florida.

     3.     For about 30 years, I have been a member of the League of

Women Voters of Florida ("the League" or "the state League"), a plaintiff in this case.  I

am also the President of the Tallahassee League and the First Vice President of the state League.

4.     Fla. Laws 2005-277 §§ 2 and 7, which became effective in January 2006, has imposed a severe burden on my personal voter registration activities and has caused me to stop registering new voters.  Additionally, this law has placed a serious burden on the Tallahassee League and chilled the willingness of its members to engage in voter registration activities.

5.     The new law has caused me to stop registering voters because I am afraid that I personally may be subject to large fines, either as a result of my own voter registration activities or in my leadership roles at the local and state levels of the League.

6.     I have been registering voters since I joined the League in the late 1960's or early 1970's.  The Tallahassee League has been registering voters since its founding.

7.     In the past, I have registered voters with the Tallahassee League at shopping malls, the city's Fourth of July celebrations, and the Tallahassee Saturday Downtown Market.

8.     The Tallahassee League usually registers voters in conjunction with our other activities.  For example, the state League publishes a special edition of the State Voter, an informational brochure explaining all amendments to the state constitution.  Our local League had a table at the Downtown Market every Saturday for several months before the 2004 election.  We passed out the information about the

2

amendments, gave out information about membership in the League, and also provided voter registration forms to prospective voters.

9.     After the 2004 election, the Tallahassee League gathered signatures for a petition for a redistricting amendment.  Again, we gathered signatures at the Saturday Market.  We also collected voter registrations, distributed information on early voting, and a local "Know Your Public Officials Brochure," as well as information about government and voting in English and Spanish.

10.     The Tallahassee League also held a petition drive seeking to change the time of a city commission election from the spring to fall.  We sought signatures at various locations, including libraries, health food stores and universities. We also registered new voters when we spoke with them about this petition.

11.     I would like to register new voters this year and in the future because I know that voting is crucial to our form of government.  It cannot survive without an informed, voting electorate.  I am no longer registering voters, due to my concerns about the serious fines imposed by this new law.

12.     Although I have never had a problem submitting voter registration forms before the registration deadline, I am afraid that some mistake or accidental delay may result in my being fined hundreds or thousands of dollars.

13.     I know other individuals who have registered voters in the past that have also stopped doing so, out of concern about these fines.

KL3 2514948 2

14.     The Tallahassee League has also stopped registering voters because of the potentially severe fines that could result from mistakes or events beyond the control of the League.  For instance, if a volunteer responsible for mailing the voter registration forms gets into a car accident on the way to mail them or gets sick and is hospitalized, the forms might be submitted after the 10-day deadline in the law.  If that were to occur, the Tallahassee League could face hundreds or thousands of dollars in fines.

15.     The Tallahassee League has no staff and is comprised entirely of volunteers.  Our annual income is approximately $4500-5000, derived mostly from members' dues.  We use these funds to pay our membership in the state League and to print and mail voter information brochures that describe local, state and national issues.  We also publish a brochure listing the contact information of commission members, school board members, our state representatives, senators, judiciary and other government officials.  Even the smallest fines under this law would be quite harmful.

16.     The Tallahassee League has not had any problems turning in voter registration forms before the registration deadline.  However, it would be impossible to prepare for every possible accident that could happen.  The severe fines under this law pose too much risk for me or the Tallahassee League to bear.

17.     I know that the new law allows a reduction in fines for organizations that register with the state.  However, the paperwork and supervision required for the registration and reporting required by the law would be burdensome for the Tallahassee League.  Because we have no paid staff, our volunteers would need to

4

undertake this additional work and in doing so would forego their other League activities. Furthermore, because our local budget is so limited, even the reduced fines would be burdensome.

18.     The new law has imposed a severe burden on my personal voter registration activities and has caused me to stop registering new voters. Additionally, this law has placed a serious burden on the Tallahassee League and chilled the willingness of its members to engage in voter registration activities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _5/12/06_, 2006

_Marilynn Wills_
**Marilynn Wills**

KL3:2514948.2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

------------------------------------------------------------------- x

LEAGUE OF WOMEN VOTERS OF FLORIDA,
PEOPLE ACTING FOR COMMUNITY TOGETHER
(PACT), FLORIDA AFL-CIO, AMERICAN
FEDERATION OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES, COUNCIL 79
(AFSCME), SEIU FLORIDA HEALTHCARE UNION,
as organizations and as representatives of their members;
MARILYNN WILLS; and JOHN and JANE DOES 1-
100,

                       Plaintiffs,

                       v.

SUE M. COBB, individually and in her official capacity
as Secretary of State for the State of Florida, and DAWN
ROBERTS, individually and in her official capacity as
Director of the Division of Elections within the
Department of State for the State of Florida,

                    Defendants.

------------------------------------------------------------------- x

:
:
:
:
:
:
Case 06-21265-CIV-JORDAN
:
:
**DECLARATION OF**
**DIANNE WHEATLEY**
**GILIOTTI IN**
**SUPPORT OF**
**PLAINTIFFS'**
**MOTION FOR A**
**PRELIMINARY**
**INJUNCTION**
:
:
:
:
:

I, DIANNE WHEATLEY GILIOTTI, declare:

      1.     I am a resident and citizen of the United States and of the State of
Florida who resides at 2842 Country Woods Lane, Palm Harbor, Florida 34683. I submit
this declaration in support of plaintiffs' motion for declaratory and injunctive relief.

      2.     I am the president of the League of Women Voters of Florida (the
"League of Women Voters" or "League"), a plaintiff in the above-captioned action.

      3.     The League of Women Voters is a plaintiff in the above-captioned
action because it seeks to prevent enforcement of Fla. Laws 2005-277 §§ 2 and 7, which
became effective on or about January 1, 2006, and which have forced the League to stop

1

registering voters out of fear that the League and its members, employees, directors and officers will be unfairly and discriminatorily subject to severe and potentially ruinous fines as a result of the League's efforts to register new voters.

### The League of Women Voters

4.     The national League of Women Voters ("national League") was founded by Carrie Chapman Catt in 1920 during the convention of the National American Woman Suffrage Association.  The convention was held just six months before the 19th amendment to the U.S. Constitution was ratified, giving women the right to vote after a 57-year struggle.

5.     The national League began as a "mighty political experiment" designed to help 20 million women carry out their new responsibilities as voters.  It encouraged them to use their new power to participate in shaping public policy.  From the beginning, the national League was an activist, grassroots organization whose leaders believed that citizens should play a critical role in advocacy.  It was then, and is now, a nonpartisan organization.   National League founders believed that maintaining a nonpartisan stance would protect the fledgling organization from becoming mired in the party politics of the day.  However, national League members were encouraged to be political themselves, by educating citizens about, and lobbying for, government and social reform legislation

6.     The League of Women Voters of Florida is a non-partisan, not-for-profit corporation organized under the laws of Florida.  It was founded in Florida in 1939 and has more than 2,800 members in Florida.  Its only office is located at 40 Beverly

Court, Tallahassee, Florida, 32301-2506.   Its mission is to promote political accountability through informed and active participation of citizens in government.  It is a 501(c)(4) tax exempt charity pursuant to the Internal Revenue Code.

7.     The League currently has 27 local Leagues located in the following cities and counties throughout Florida:    Miami-Dade County, Alachua County, Jacksonville/First Coast, the St. Petersburg Area, Polk County, Orange County, North Pinellas County, Lee County, Seminole County, Hillsborough County, Pensacola Bay Area, Volusia County, St. Lucie County, Broward County, Tallahassee, the Space Coast, Palm Beach County, Manatee County, Sarasota County, Okaloosa County, Lake County, Collier County, Bay County, Martin County, Indian River County, Citrus County, and Flagler County.

8.     Local Leagues are community-based and organized and run solely by member volunteers.

9.     The League encourages the informed and active participation of citizens in government and influences public policy through education and advocacy. One of the League's primary goals is to promote effective voter participation in government.  The League accomplishes this goal by: (1) conducting voter registration drives throughout the state, (2) holding educational forums and candidate debates open to the public, (3) publishing a quarterly newsletter and hosting a website, (4) distributing both a non-partisan bi-annual election guide to candidates for statewide office, and objective information regarding proposed constitutional amendments in Florida, and (5)

KL3:2510362.4

distributing information on topics ranging from government reform, education, natural resources, social policy and fiscal policy.

10.     For fiscal year 2006-2007, the League has a budget of approximately $80,000. These funds have been budgeted to pay for: (1) 60% of the cost of one full-time and one part-time employee who manage the League's office, handle correspondence (via phone, mail and email), service local Leagues, support board of directors meetings and member meetings, prepare reports, and receive funds; (2) office expenses; (3) transportation and costs for statewide board meetings, an annual legislative seminar, and an annual local League conclave; and (4) events and publications, and (5) advocacy efforts in the state legislature.

### The League's Voter Registration Activities

11.     The League conducts annual voter registration drives through its 27 local Leagues. These drives occur throughout the year, but are especially active in the summer and fall months immediately prior to voter registration deadlines for fall primary and general elections.

12.     Registering new voters is an important part of accomplishing the League's mission of promoting political responsibility through an informed and active citizenry. It is also an important part of accomplishing the Leagues' goal of increasing political participation by women, youth, and citizens in traditionally underrepresented and disenfranchised communities, particularly residents of low income, African American and Hispanic communities.

KL3:2510362.4

13.     Each local League that conducts voter registration relies solely on members and other volunteers to register new voters.

14.     Typically, local Leagues will register new voters by attending community events or talking to citizens at institutions and high-traffic areas, such as malls, schools or nursing homes. League voter registration volunteers often set up tables and encourage passers-by to stop and fill-in a voter registration application. They also walk around with applications on clipboards and ask individuals if they would be willing to register to vote. Volunteers also hand out pamphlets and other materials discussing the importance of registering to vote, providing information about voting, and informing new voters about how they can contact their elected officials. For example, League volunteers provide new voters with a palm card entitled "5 Things to Know," which contains tips for successfully voting, such as taking their voter ID card to their polling place.

15.     During the course of our voter registration drives, League volunteers are instructed to explain to potential new voters that the League believes it is important for all eligible citizens to register to vote in order to keep government accountable.

16.     Local League volunteers assist applicants in properly filling in voter registration applications. The volunteers are responsible for collecting each completed application and either mailing them or delivering them in-person to a Supervisor of Elections.

17.     The League sometimes conducts voter registration in conjunction with efforts to collect signatures from registered voters for ballot initiative petitions.

5

Florida law permits only registered voters to sign initiative petitions. During such petition drives, if a potential signatory is not registered to vote, a League volunteer will encourage them to register to vote so they can later sign an initiative petition and vote for the initiative. For example, the League recently collected initiative petitions in support of a constitutional amendment that would create an independent commission to draw congressional and state legislative districts following each federal census.

18.    The success of the League's voter registration drives depends upon our ability to know that a prospective voter filled out a completed application. In my 33 years of experience registering voters, I know that the vast majority of people we speak to will not necessarily properly complete and submit applications without assistance.

**The League's Moratorium on Voter Registration**

19.    On March 19, 2006, for the first time ever, the League's board of directors voted unanimously to impose a moratorium on voter registration activities sponsored by all local Leagues in Florida because of the financial liabilities threatened by Florida's new law restricting the activities of third party voter registration organizations, Fla. Laws 2005-277 §§ 2 and 7.

20.    Prior to the board's decision, several local Leagues had already begun collecting voter registration applications in 2006, after the new law went into effect. Although the League does not keep records of the number of applications each of its local Leagues collect, I estimate that local Leagues probably collected a couple thousand applications in 2006 before the moratorium. I derived this estimation based

KL3:2510362.4

upon reading the newsletters of the various local Leagues and having conversations with local League leaders at statewide events.

21.     The League has advised all local Leagues to stop their voter registration activities because the League cannot afford the risk that it and its volunteers, members, employees, directors and officers will have to pay the severe fines threatened by the new law.

22.     But for the moratorium, I estimate that the local Leagues would collect at least several thousand voter registration applications statewide before the voter registration deadline for the upcoming primary and general elections.

23.     The League faces a serious risk of being fined under the new law in part because it relies on volunteers dispersed throughout the state to collect applications over the course of the entire year.  The League cannot, with its limited budget and the equivalent of only 1.5 full-time employees, daily or even weekly monitor the voter registration activities of each of its 27 local Leagues and their countless volunteers.  Particularly given the law's imposition of strict liability and an unnecessary and unjustified 10-day deadline for submitting completed voter registration applications, there is a high likelihood that some League volunteers may not submit applications within the 10-day time period, and the League will be liable for severe fines.

24.     A League volunteer could miss the deadlines in the new law by honest mistake and through no fault of her or his own.  For example, she or he might leave completed applications in a local office, mistakenly believing that arrangements had been made for another volunteer to deliver the applications to a Supervisor of

7

Elections' office. Or the applications could get damaged or destroyed as a result of a rainstorm, flood or hurricane, as is frequently experienced in Florida.

25.     In addition, many of our volunteers are elderly, including residents of nursing homes, and they may have a particularly hard time meeting the 10-day deadline. I once received a call from a woman who reported that her 94-year-old sister, a League member, had recently died and that she had found—a couple of weeks after her sister's death—signed petitions for a ballot initiative that the League had circulated. The petitions were submitted before the relevant deadline, but if the petitions were voter registration applications and the new voter registration law had been in effect, the League would have been liable for mandatory fines.

26.     Given the League's modest $80,000 budget, fines of even a few hundred or a few thousand dollars would drain a significant portion of the organization's finances. If League volunteers do not submit a mere 100 applications within the 10-day time period, the League would be liable for up to a $25,000 fine – approximately one-third of our annual budget.

27.     The League cannot avoid this risk by indemnifying itself and its 2,800 members against any fines imposed under the new law. The League included in its budget for fiscal year 2005-2006 a $1,200 line item for "directors and officers" liability insurance for its state board members only, but was unable to raise sufficient funds to pay for the insurance. The fiscal year 2006-2007 budget retains the same line item, and the League does not yet know if it will be able to raise sufficient funds to pay for the insurance. The League would have equal difficulty attempting to afford additional

insurance—even if it were available—to cover the additional risk of fines under the new law and to expand coverage to all of its members.

28.     The League has determined that it will not be eligible for a three-fourths reduction of any fines under the new law because it will not be able to comply with the requisite quarterly reporting provisions.  The League cannot afford for its already over-extended full-time and part-time staff to be diverted from their existing responsibilities to spend the time necessary to prepare and submit the requisite reports to the state.  Such reporting would take a considerable amount of time each year because it would require a staff member to contact each of the 27 local Leagues and collect and compile information about where hundreds of volunteers collected applications every quarter.  In addition, the volunteers who run our local Leagues have already committed to being responsible for substantive League-related work – including registering voters – and requiring them to keep close track of where every volunteer registers voters would add appreciably to their work.

29.     I and other members of the League, including members of the board of directors, have been forced by the new law to personally refrain from registering voters, and from permitting the League to register voters, out of fear of personal financial liability for any fines levied against the League.

30.     In sum, the new law has imposed a severe burden on the League's voter registration activities and has chilled the willingness of the League, and of many of its members, to register new voters.

9

31.    I declare under penalty of perjury that the foregoing is true and
correct.

Executed on May _23_, 2006

Dianne Wheatley Giliotti

10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

---

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF FLORIDA, PEOPLE ACTING FOR COMMUNITY TOGETHER (PACT), FLORIDA AFL-CIO, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 79 (AFSCME), SEIU FLORIDA HEALTHCARE UNION, as organizations and as representatives of their members; MARILYNN WILLS; and JOHN and JANE DOES 1-100, <br><br> Plaintiffs, <br><br> v. <br><br> SUE M. COBB, individually and in her official capacity as Secretary of State for the State of Florida, and DAWN ROBERTS, individually and in her official capacity as Director of the Division of Elections within the Department of State for the State of Florida, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   Case 06-21265-CIV-JORDAN <br><br>   DECLARATION OF ALMA <br>   GONZALEZ |

---

I, Alma Gonzalez, hereby declare as follows:

1.  I am Special Counsel to Council 79 of the American Federation of State, County and Municipal Employees ("AFSCME"), the Florida Council of AFSCME International. I am a citizen and resident of Florida and reside at 1105 High Meadow Drive, Tallahassee, Florida 32311. I submit this declaration in support of plaintiffs' motion for a preliminary injunction.

2.  AFSCME is a labor union representing government employees. Council 79 is a separately incorporated nonprofit 501(c)(5) organization.

3.  AFSCME's primary mission is to advocate for the members of its bargaining unit in labor negotiations in the workplace. We also organize for social and economic justice in the workplace and through political action and legislative advocacy.

4.  Through 90 local unions in the state, AFSCME Florida represents approximately 250,000 employees in bargaining units, and has more than 20,000 dues-paying members. AFSCME has seven offices statewide, including our Tallahassee headquarters, offices in Miami, Orlando, Tampa, and Jacksonville, and satellite

offices in Daytona Beach and Gainesville. We have 36 paid permanent staff statewide.

5. At the direction of the president of AFSCME Florida, I oversee, coordinate, and facilitate the day-to-day operations of AFSCME Florida, including our voter registration activities. I have worked for AFSCME since 1999, in much the same capacity.

**Member-to-Member Voter Registration**

6. AFSCME Florida has conducted voter registration in the state at least for the past twenty-five years.

7. Because AFSCME's members are government employees, most of the workplace issues our members care about are eventually resolved by elected officials. Electoral participation of our members is vital to our mission.

8. AFSCME Florida's goal is that at least 75% to 85% of our bargaining unit is registered to vote.

9. In past years, our member-to-member voter registration efforts have begun with AFSCME International producing a data file listing members of our bargaining unit who are not registered to vote. The Florida Council then decides which members to target for voter registration.

10. Our member-to-member voter registration drives are run by volunteer voter registration coordinators who are members of AFSCME. Paid AFSCME staff, including me, train those coordinators, typically in Tallahassee, before the drives begin. Coordinators are trained on legal rules, voter registration techniques, including the messages we communicate to our members in connection with registering and voting, and the technical component of voter registration, including how to complete voter registration forms where to turn them in. This training typically takes three hours. Coordinators then provide the same training to regional volunteers in the field.

11. In order to register members of our bargaining unit to vote, our drive volunteers often visit a union workplace to do voter registration. When registering other members of the bargaining unit to vote, we encourage our volunteers to talk about the importance of voting as part of our struggle to have a voice in our workplaces.

12. When we register members, we photocopy their voter registration forms so we can update our membership database to reflect the fact that they are now registered to vote. We also review the forms to guarantee that they are completely and accurately filled out, to guarantee that each member gets on the voter rolls. We also follow up with local elections officials to ensure that each member registered by AFSCME is added to the rolls.

**Effect of the New Law on Member-to-Member Voter Registration**

13.   This year, we have drastically cut back on our member-to-member voter registration efforts because of the new law. Because our member-based registration is conducted largely by autonomous local unions without much direct oversight from our Council headquarters other than the initial training, it would be difficult for us to keep track of their efforts and guarantee perfect compliance with the new law.

14.   For instance, some of our local unions that represent state employees may have members who live in different counties. Those unions may have meetings only once a month. When individual members engage in one-on-one voter registration with others in their bargaining unit, they may only turn over their forms to a coordinator once a month, well after ten days have passed. Once the coordinator receives all those forms, they must sort them by county, process them, and then drive to each county to turn in those forms to election supervisors. We encourage our volunteers to personally deliver forms by hand to each of the appropriate election supervisors to ensure the forms reach the supervisors.

15.   As a result of the difficulty of complying with the new law, we have to date this year approved member-to-member voter registration only in the cities of Jacksonville and Miami and by the local union serving the employees of the State Hospital in Chattahoochee. These locals are dynamic or large unions or are located in more urban concentrated areas, and so we expect that they will more easily be able to ensure that forms are turned in within the new law's deadlines.

16.   We have not, however, registered as a "third-party voter registration organization" with the state under the new law, because the autonomous nature of our local unions makes it very difficult to monitor the exact time and address of each member-to-member voter registration drive.

**Operation Big Vote**

17.   In addition to our member-to-member voter registration drives, AFSCME has encouraged voter registration in Florida in the past by supporting a program called "Operation Big Vote." Through the program, AFSCME provides funding and volunteers to voter registration drives organized and run by local nonprofit organizations in Florida. These drives focus on registering members of the public who come from traditionally disenfranchised communities, including low-income communities and communities of color.

18.   The local organizations running Operation Big Vote typically choose particular communities to focus on that have large numbers of citizens who are neither registered nor engaged in the political process. For example, in 2002 and 2004, Operation Big Vote ran voter registration drives in the following counties: Gadsden, Seminole, Orange, Volusia, Miami-Dade, and Duval.

19.  Operation Big Vote's registration drives are supervised by one or two temporary staff members hired by the local nonprofit organization. These supervisors are trained by AFSCME Florida and national Operation Big Vote staff in a three-day training session. These paid supervisors oversee unpaid volunteers. Supervisors provide volunteers in each county with precinct lists of registered voters, and the volunteers go door-to-door to register new voters.

**Effect of the New Law on Operation Big Vote**

20.  By relying on volunteers, Operation Big Vote is able to register significant numbers of new voters with relatively limited funds. For example, in 2004 in Gadsden County, Operation Big Vote had a budget of approximately $19,000 that allowed it to register approximately 2,000 new voters from low-income, minority communities.

21.  If the challenged law had been in effect in 2004, and if just 76 applications from Gadsden County had been turned in by a volunteer more than ten days after they were collected, either due to illness, accident or some other event beyond the volunteer's control, the entire $19,000 budget for that voter registration drive would have been wiped out by the fine of $250 per form.

22.  Neither AFSCME as a local funder of Operation Big Vote, nor the local nonprofits that operate the program, have the resources to pay such fines, and the volunteers and paid staff, many of whom have low and moderate incomes themselves, certainly do not the ability to pay such fines.

23.  It would be extremely difficult to meet the registration and reporting requirements of the new law given the scale and geographic scope of Operation Big Vote. The time and resources spent gathering and recording the information demanded by the state's regulations—the address and date of each "voter registration drive"—would be immense.

24.  Even if Operation Big Vote were able to comply with the registration requirements, even the reduced fines would make voter registration significantly more expensive. By diverting funds away from registering voters and towards paying fines, Operation Big Vote would be forced to register fewer voters and engage in less voter registration-related speech and associational activities.

25.  AFSCME will not be able to support Operation Big Vote on anything approaching the same scale as in past years if the new law remains in effect, and it may be forced to abandon the program altogether. As a result, thousands of citizens will remain unregistered, disenfranchised, and disengaged from the political process.

26.   I declare under penalty of perjury that the foregoing is true and correct.


Executed this 26th day of May 2006, in Tallahassee, Florida


ALMA GONZALEZ

**EXHIBIT D**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-21265-CIV-JORDAN

------------------------------------------------------------------- x
LEAGUE OF WOMEN VOTERS OF FLORIDA, PEOPLE    :
ACTING FOR COMMUNITY TOGETHER (PACT),        :
FLORIDA AFL-CIO, AMERICAN FEDERATION OF      :
STATE, COUNTY AND MUNICIPAL EMPLOYEES,       :
COUNCIL   79   (AFSCME),   SEIU   FLORIDA    :
HEALTHCARE   UNION,   as   organizations   and   as   :
representatives of their members; MARILYNN WILLS; and   :
JOHN and JANE DOES 1-100,                    :
                                             :
            Plaintiffs,                      :
                                             :
                v.                           :
                                             :
SUE M. COBB, individually and in her official capacity as   :
Secretary of State for the State of Florida, and DAWN   :
ROBERTS, individually and in her official capacity as   :
Director of the Division of Elections within the Department   :
of State for the State of Florida,           :
                                             :
            Defendants.                      :
------------------------------------------------------------------- x

**ORDER**

THIS CAUSE having come before the Court upon the Motion of Plaintiffs League of

Women Voters of Florida, People Acting for Community Together (PACT), Florida AFL-CIO,

American Federation of State, County and Municipal Employees, Council 79 (AFSCME), SEIU

Florida Healthcare Union, as organizations and as representatives of their members; Marilynn

Wills; and John and Jane Does 1-100 (collectively "Plaintiffs"), for permission to file a

memorandum of law in support of their motion for a preliminary injunction that exceeds the

twenty-page limit as set forth in S.D. Fla. L.R. 7.1.C.2. The Court having reviewed the motion

and being otherwise fully advised in the premises, it is hereby:

ORDERED AND ADJUDGED that Plaintiffs' motion is granted, and the Exhibits attached to Plaintiff's motion are hereby deemed filed by the Court.

DONE AND ORDERED this _____ day of June, 2006 at Miami-Dade County, Florida.

_____
Adalberto Jordan
UNITED STATES DISTRICT JUDGE

Copies furnished to:
All counsel of record

FTL_DB: 987237_1