

FILED by ___ D.C.
ELECTRONIC

**Jun 21 2006**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION
### CASE NO. 06-21265-CIV-JORDAN

LEAGUE OF WOMEN VOTERS OF FLORIDA;
PEOPLE ACTING FOR COMMUNITY TOGETHER
(PACT); FLORIDA ALF–CIO; AMERICAN
FEDERATION OF STATE, COUNTY AND LOCAL
EMPLOYEES, COUNCIL 79 (AFSCME); SEIU
FLORIDA HEALTHCARE UNION, as organizations
and as representatives of their members; MARILYN
WILLS; and JOHN and JANE DOES 1–100,

       Plaintiffs,

v.

SUE M. COBB, individually and in her official capacity as
Secretary of State for the State of Florida; and DAWN
ROBERTS, individually and in her official capacity as
Director of the Division of Elections within the Department
of State for the State of Florida,

       Defendants.

_____

## DEFENDANTS' UNOPPOSED MOTION FOR PERMISSION
## TO FILE RESPONSE THAT EXCEEDS TWENTY PAGES

Pursuant to S.D. Fla. L.R. 7.1(C)(2), Defendants Sue M. Cobb, individually and in her

official capacity as Secretary of State for the State of Florida, and Dawn Roberts, individually and in

her official capacity as Director of the Division of Elections within the Department of State for the

State of Florida ("Defendants"), respectfully move this Court for an order permitting them to file a

Response to the Plaintiffs' Motion for a Preliminary Injunction which exceeds twenty (20) pages.

As good cause for granting the motion, Defendants state:

1. On June 6, 2006, Plaintiffs filed their Motion for a Preliminary Injunction totaling 37 pages and concurrently filed a motion seeking permission to exceed the 20–page limitation imposed by S.D. Fla. L.R. 7.1(C)(2).

2. On June 8, 2006, this Court granted the Plaintiffs motion.

3. Despite their best efforts, Defendants must exceed the twenty–page limit in order to adequately respond to the Motion which raises several complex issues of federal constitutional law. A full briefing of those issues by both the Plaintiffs and the Defendants will assist the Court in resolving those issues.

4. The Defendants' response, filed concurrently herewith, is 37 pages.

5. Counsel for Defendants has conferred with Plaintiffs' counsel regarding this motion and is authorized to represent that the Plaintiffs consent to this motion.

WHEREFORE, Defendants respectfully request that the Court enter an order, in substantially the same form as the proposed order attached hereto, granting Defendants permission to file a response to the Plaintiffs' Motion for a Preliminary Injunction that exceeds the 20–page limit.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing has been served by electronic mail and First Class Mail this 21st day of June, 2006, to the following:

Gary C. Rosen
Becker & Poliakoff, P.A.
3111 Stirling Road
Fort Lauderdale, FL 33312
 Phone: (954) 985–4133
 Email: grosen@becker-poliakoff.com

Wendy R. Weiser
Renee Paradis
Brennan Center for Justice/NYU School of Law
161 Avenue of the Americas, 12th Floor
New York, NY 10013
 Phone: (212) 998–6730
 Email: wendy.weiser@nyu.edu

Elizabeth S. Westfall
Jennifer Maranzano
Estelle H. Rogers
Advancement Project
1730 M. Street, NW, Suite 910
Washington, DC  20036
 Phone:  (202) 728-9557
 Fax:  (202) 728-9558
 Email:  ewestfall@advancementproject.org

Eric A. Tirschwell
Craig L. Siegel
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
 Phone:  (212) 715–9100
 Email:  csiegel@KRAMERLEVIN.com

/s/ Peter Antonacci

PETER ANTONACCI*
Florida Bar No. 280690
ALLEN C. WINSOR*
Florida Bar No. 016295
GEORGE N. MEROS, JR.
Florida Bar No. 263321
GRAYROBINSON, P.A.
Post Office Box 11189
Tallahassee, Florida  32302-3189
 Phone:  (850) 577-9090
 Fax:  (850) 577-3311
email:  pva@gray-robinson.com
        awinsor@gray–robinson.com
        gmeros@gray–robinson.com

Attorneys for Secretary of State and
Dawn Roberts

\* Appearing *pro hac vice*

Courtesy copy also provided to Magistrate Judge Klein

# 34039 v1

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO. 06-21265-CIV-JORDAN**

LEAGUE OF WOMEN VOTERS OF FLORIDA;
PEOPLE ACTING FOR COMMUNITY TOGETHER
(PACT); FLORIDA ALF–CIO; AMERICAN
FEDERATION OF STATE, COUNTY AND LOCAL
EMPLOYEES, COUNCIL 79 (AFSCME); SEIU
FLORIDA HEALTHCARE UNION, as organizations
and as representatives of their members; MARILYN
WILLS; and JOHN and JANE DOES 1–100,

       Plaintiffs,

v.

SUE M. COBB, individually and in her official capacity as
Secretary of State for the State of Florida; and DAWN
ROBERTS, individually and in her official capacity as
Director of the Division of Elections within the Department
of State for the State of Florida,

       Defendants.
_____

## ORDER

THIS CAUSE having come before the Court upon the Motion of the Defendants Sue M.

Cobb, individually and in her official capacity as Secretary of State for the State of Florida, and

Dawn Roberts, individually and in her official capacity as Director of the Division of Elections

within the Department of State for the State of Florida ("Defendants"), for permission to file a

response to the Plaintiffs' Motion for a Preliminary Injunction which exceeds the twenty–page limit

as set forth in S.D. Fla. L.R. 7.1(C)(2).  The Court having reviewed the motion and being otherwise

fully advised in the premises, it is hereby:

1

ORDERED AND ADJUDGED that the Defendants' motion is GRANTED, and the

Defendants' Response to the Plaintiffs' Motion for Preliminary Injunction is hereby deemed filed by

the Court.

DONE AND ORDERED in Chambers in Miami, Florida, this ____ day of June, 2006.


_____
Adalberto Jordan
United States District Judge

Copy to:        All counsel of record
                Magistrate Judge Klein

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Case No.: 1:06cv21265–JORDAN–KLEIN

LEAGUE OF WOMEN VOTERS OF FLORIDA, PEOPLE
ACTING FOR COMMUNITY TOGETHER, *et al.*

        Plaintiffs,

        v.

SUE M. COBB, individually and in her official capacity as
Secretary of State for the State of Florida, and DAWN
ROBERTS, individually and in her official capacity as
Director of the Division of Elections,

        Defendants.

_____/

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

        Defendants Sue M. Cobb, Secretary of State for the State of Florida, and Dawn Roberts, Director of the Division of Elections, submit this Memorandum of Law in response to Plaintiffs' Motion for a Preliminary Injunction, filed June 6, 2006.

## INTRODUCTION AND BACKGROUND

        The Florida Legislature recently enacted a law to regulate the handling and submission of voter registration applications by third-party organizations.  It did so to protect the citizens who surrender their voter registration applications to those organizations—citizens whose fundamental right to vote is threatened if their applications are not timely submitted to elections officials.  Claiming that this new regulation is inconsistent with the First and Fourteenth Amendments to the United States Constitution, the Plaintiffs initiated this action and now seek a preliminary injunction.

        On June 20, 2005, Governor Bush signed into law Chapter 2005-277, which holds third-party voter registration organizations responsible and accountable for the timely submission of

voter registration applications they collect.  On January 1, 2006, the law became effective.  On

May 18, 2006, the Plaintiffs initiated this action, alleging that the new law violates their

constitutional rights.  And on June 6, 2006—nearly one year after the challenged legislation

became law—the Plaintiffs filed their emergency motion, seeking "immediate relief" to enable

them to collect applications before the upcoming registration deadlines.  (Motion at 1, 3.)[1]

### Voter Registration Organizations in Florida

Each year, voter registration organizations seek to register thousands of new voters in

Florida.  These organizations play a generally positive role in the registration of Florida voters.

But the value of any effort to collect voter registration applications naturally depends on what

happens to the applications *after* they are collected from a prospective voter.  Accordingly, the

Florida Legislature enacted new legislation to promote the timely submission of these

applications to the proper officials.  The legislation requires voter registration organizations to

submit all applications they collect—and to do so in a timely manner.  The legislation also

introduces reporting requirements and civil fines to encourage accountability among these

organizations—accountability that is crucial to protect the rights of potential voters.

In enacting this new law, the Florida Legislature recognized that a person handing his

application over to a voter registration organization trusts that organization to properly submit

his application.  If the organization fails in this fundamental obligation, the applicant's ability to

vote will be delayed—and his ability to vote in a particular election could be lost forever.  An

individual applicant is in no position to control what happens to his application once he cedes

control of it.  But the Florida Legislature is.  The Legislature has made a policy decision to

---

[1] Concurrent with the filing of this Response, the Defendants have moved to dismiss the Plaintiffs' claims.  The Plaintiffs have failed to state a claim upon which relief can be granted, so this Court should deny the Motion and dismiss the claims.

regulate the handling of voter registration applications and to hold those collecting the applications accountable for delays or failures in the submission of applications to the proper officials.  Objecting to these new and reasonable accountability standards, the Plaintiffs challenge the constitutionality of the new legislation, alleging that it violates their rights under the First and Fourteenth Amendments of the United States Constitution.  They now seek an order preliminarily enjoining the legislation's enforcement.

### The Challenged Legislation

Under the new law, a third-party voter registration organization must deliver registration applications within ten days of their collection and before the book closing date for any given election.  § 97.0575(3)(a), (b), Fla. Stat.  A "third-party registration organization" is defined as "any person, entity, or organization soliciting or collecting voter registration applications." § 97.012(36), Fla. Stat.[2]  The definition expressly excludes political parties and individuals collecting applications only for their spouse, child, or parent.  *Id.*  The definition also excludes certain state officials, employees, and agents, who are responsible for voting registration activities.  *Id.*

A voter registration organization is liable for a $250 fine for each application submitted more than ten days after its collection or $500 for each application collected before but submitted after the book closing date.  *Id.*  If an application is collected but never submitted, the organization is liable for a $5,000 penalty. § 97.0575(3)(c), Fla. Stat.  These fines are subject to a seventy-five percent reduction if the organization has complied with Section 97.0575(1), which establishes certain reporting requirements.  § 97.0575(3), Fla. Stat.  Under that section, a third-

---

[2] The statutory definition of this type of "organization" thus includes individuals. Likewise, throughout this memorandum, the term "organization" will include those individuals governed by the challenged legislation.

party voter registration organization may not engage in any voter registration activity without first naming a registered agent and reporting those responsible for the organization's day-to-day operations.  § 97.0575(1), Fla. Stat.  The section also requires quarterly reports with the date and location of any organized voter registration drives conducted by the organization.  *Id.*  Although the reports are required by the statute, the seventy-five percent reduction in potential fines provides the sole incentive for compliance with the reporting requirements:

> The failure to submit the information required by subsection (1) does not subject the third-party voter registration organization to any civil or criminal penalties for such failure, and the failure to submit such information is not a basis for denying such third-party voter registration organization with copies of voter registration application forms.

§ 97.0575(2), Fla. Stat.  The legislation does not regulate the distribution of voter registration materials, nor does it limit anyone's ability to encourage or assist others in registering to vote. Its sole purpose is to ensure that voter registration applications that are submitted to the formerly unaccountable registration organizations are, in turn, timely submitted to the appropriate elections officials.

### The Plaintiffs and Their Claims

The Plaintiffs include two non-profit community organizations (Compl. ¶¶ 12, 15), three labor union organizations (Compl. ¶¶ 17, 19, 22), and one named individual, Marilynn Wills, who is a member of an organization affiliated with plaintiff League of Women Voters (Compl. ¶ 24.)  These organizational plaintiffs and Wills allege that they regularly participate in voter registration drives and that they will no longer be able to because of the challenged legislation. (Compl. ¶¶ 5, 13-14, 15-16, etc.)  They allege that they have First and Fourteenth Amendment rights to continue their registration efforts and that those rights are substantially burdened by the legislation.  (Compl. ¶¶ 132, 141, 148, 157.)  They do not allege that the legislation affects their or their members' rights to vote themselves.

In addition to Wills and the organizational plaintiffs (the "Actual Plaintiffs"), the Complaint alleges that there are additional unidentified plaintiffs who would like to register to vote, but who will have trouble doing so without the assistance of Wills and the organizational plaintiffs. (Compl. ¶ 25.) The Complaint does not identify these individuals—or even allege that they could be identified. It calls these plaintiffs John and Jane Doe (Compl. ¶ 25), and the Complaint is styled to include the Actual Plaintiffs as well as "John and Jane Does 1-100."

Plaintiffs include four separate counts. The first three allege constitutional violations and harm to the Actual Plaintiffs; the fourth alleges constitutional violations and harm to the Doe Plaintiffs. Although there is some overlap, the individual counts can fairly be broken down as follows: Count I alleges speech discrimination, claiming that the legislation unjustifiably discriminates in favor of political parties. (Compl. ¶¶ 130-131.) Count II alleges that the exclusion of political parties from the legislation's reach constitutes a violation of Fourteenth Amendment Equal Protection. (Compl. ¶¶ 140-141.) Count III alleges that the challenged legislation chills and burdens the Actual Plaintiffs' exercise of speech and free association protected by the First Amendment. (Compl. ¶¶ 145-148.)

The fourth and final count relates to the John and Jane Doe plaintiffs. Count IV alleges that the legislation violates the Does' fundamental right to vote. (Compl. ¶¶ 153.) It alleges that the Does could not register to vote without the assistance of the Actual Plaintiffs and others like them and that the Does will therefore suffer an abridgement of their fundamental right to vote. (Compl. ¶¶ 154-155.)

The Plaintiffs have failed to demonstrate that they have a substantial likelihood of success on the merits, that they will suffer irreparable harm absent the injunctive relief sought, that their purported threatened injury outweighs harm to the Defendants, or that the public

interest would be served by an injunction.  Accordingly, the Plaintiffs are not entitled to a preliminary injunction, and the Motion should be denied.

## ARGUMENT

The Plaintiffs seek to preliminarily enjoin the enforcement of a validly enacted legislative policy.  A plaintiff's burden to obtain a preliminary injunction is always significant, *see Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.,* 320 F.3d 1205, 1210 (11th Cir. 2003) ("[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites.") (marks omitted), but there is a particularly substantial burden when, as here, a plaintiff seeks to enjoin the enforcement of a legislative enactment:

> [P]reliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts.

*N.E. Fla. Ch. of the Ass'n of Gen. Contr. of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).  The Plaintiffs have not satisfied this substantial burden.

## I.    THE PLAINTIFFS HAVE NOT DEMONSTRATED A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

Before a court can issue a preliminary injunction, it must conclude that the plaintiffs have a "substantial likelihood of success on the merits."  *This That & the Other Gift & Tobacco, Inc. v. Cobb County*, 439 F.3d 1275, 1280 (11th Cir. 2006).  In this case, the Plaintiffs cannot succeed on the merits because they have failed to state a valid constitutional claim.  Furthermore, the Plaintiffs lack standing to pursue their claims relating to the fundamental right to vote.

A. **<u>The Plaintiffs Have Not Stated Cognizable Constitutional Claims.</u>**

The challenged legislation serves a valuable purpose, and it does so without implicating or threatening any constitutionally protected interest.  It includes no provisions that regulate speech, expressive conduct, or associational choices.  And there is no protected First Amendment right to collect and process the voter registration applications of others—much less a protected right to fail to timely submit them to election officials.  Because the unprotected conduct that the legislation *does* regulate is not inextricably connected to any First Amendment interest, the legislation does not violate the Constitution by limiting or chilling protected speech.  And because the legislation's different treatment of political parties and others is consistent with legitimate and recognizable differences among them, there is no improper discrimination or Equal Protection violation.  In making its policy decision, the Florida Legislature did not exceed the limits imposed on it by the United States Constitution, so enforcement of the legislation must not be enjoined.

1. ***Background on Florida Voter Registration.***

At the heart of this case is the novel legal proposition that the collection and submission of voter registration applications is a constitutionally protected activity.  It is not.  Historically, states have heavily regulated voting registration.  Until recently, for example, the collection of voter registration applications—in which the Plaintiffs now claim a First Amendment interest—was not even possible for third parties.  Before the adoption of the Florida Voter Registration Act in 1994, Florida law made no provision for the private distribution of voter registration applications.  *See generally* Chapter 98, Fla. Stat. (1993).  Instead, Florida law required applicants to appear personally before a supervisor of elections, deputy supervisor of elections, or volunteer deputy voter registrar.  *See* § 98.271, Fla. Stat. (1993); *Revitalizing Democracy in*

7

*Florida*, The Governor's Select Task Force on Election Procedures, Standards and Technology (2001), at 48.

The Florida Voter Registration Act was adopted to implement the National Voter Registration Act (NVRA) of 1993, which added certain requirements for states related to voter registration organizations.[3] The Florida Voter Registration Act greatly increased access to voter registration applications and provides that applications must be made available, upon request, to "[i]ndividuals or groups conducting voter registration programs." § 97.052(1)(b)(2), Fla. Stat. The Florida Legislature acted to comply with the federal policy enunciated by Congress through the NVRA. Thus, the recent liberalization of Florida's voter registration practices arose not from constitutional necessity, but from legislative policy.[4]

### 2. *The Challenged Legislation Serves a Valid Public Purpose.*

The right to vote is a fundamental right of critical importance to all Florida voters. When a voter registration organization convinces an applicant to register to vote, that organization has provided a valuable service. But when the organization takes the application—and thereby prevents the applicant from submitting it—Florida has an undeniable interest in ensuring that the application is properly and timely submitted. That is precisely what the challenged legislation is designed to do. The Florida Legislature made a reasonable and responsible policy decision to hold otherwise unregulated organizations accountable for the applications they collect. Other

---

[3] The Plaintiffs' Complaint does not include any claim based on the NVRA.

[4] Until the adoption of the NVRA, voter registration laws in states besides Florida were equally circumspect. Only thirty states accepted voter registration forms by mail, and only about half of states offered voter registration application through the driver's license application process. *See* H.R. Rep. 103-9, 1st Sess. (1993) at 130-31. Many states registered voters through deputized registrars, and regulations concerning the establishment of sites at which applications would be accepted were similarly guarded. *See* Deborah S. James, Voter Registration: A Restriction on the Fundamental Right to Vote, 96 Yale L.J. 1615, 1615-16 (1987).

states have recently made similar policy decisions—all for the purpose of ensuring timely submission of collected applications.  *See, e.g.,* Colo. Rev. Stat. § 1-2-701, et seq.; N.M. Stat. Ann. § 1-4-49; Va. Code Ann. § 24.2-1002.01; Wash. Rev. Code § 29A.08.115.

Logically, an applicant who surrenders his application to another party will assume that the other party will properly submit the application.  And there can be little doubt that the other party has an obligation to do so.  As the Legislature recognized, a "third-party voter registration organization that collects voter registration applications serves as a fiduciary to the applicant, ensuring that any voter registration application entrusted to the third-party voter registration organization, irrespective of party affiliation, race, ethnicity, or gender shall be promptly delivered to the division or the supervisor of elections." § 97.0575(2), Fla. Stat.  This is true of *all* applications entrusted to third-party registration organizations—not just those applications associated with individuals the organizers believe may support their views and political objectives.

By making voter registration organizations accountable based on their fiduciary obligation to applicants, the new legislation seeks to reduce the likelihood that individual applicants would not ultimately be registered.  An applicant who thinks he is registered because he submitted a valid application to a voter registration organization would not likely re-apply absent some knowledge that his earlier application had never been properly submitted.  That applicant could allow the book closing date to pass, thinking he was already registered.  In that instance, he would be denied his right to vote in that particular election because of the failure of the registration organization.  Through the new legislation, the Legislature seeks to reduce the likelihood of these types of difficulties.

Even if an application is eventually submitted—and submitted before the book closing date—any unnecessary delay in submission poses a problem for an individual whose application is incomplete.  Incomplete applications are returned to applicants for completion, § 97.052(6), Fla. Stat., and must be completed by the voter and resubmitted before the book closing deadline, § 97.053(2), Fla. Stat. ("If the applicant fails to complete his or her voter registration application prior to the date of book closing for an election, then such applicant shall not be eligible to vote in that election.").  An applicant who submits his application to a third-party voter registration organization well before the registration deadline—but whose application is not timely submitted—will necessarily have more difficulty completing his application in time to allow him to vote in the next election.  By requiring voter registration organizations to submit all applications within ten days of their collection, the challenged legislation reduces the likelihood that these problems will continue.

Equally significant is the legislation's anti-fraud purpose.  In enacting the NVRA, Congress was aware of the danger that relaxed requirements might open the door to fraud. Accordingly, "[t]he Committee [on House Administration] felt strongly that no legislative provision should be considered that did not at least maintain the current level of fraud prevention."  *See* H.R. Rep. 103-9, 1st Sess. (1993) at 109.  In fact, it expressly noted that "States are permitted to employ any other fraud protection procedures which are not inconsistent with this bill."  *See id*. at 114; *see also* Publius, Securing the Integrity of American Elections:  The Need for Change, 9 Tex. Rev. L. & Pol. (2005) ("third-party voter registration drives . . . resulted in thousands of fraudulent voter registrations in places like Florida and Georgia prior to the November election, showing a clear need to apply [HAVA's identification] requirements to all registrations using the mail-in form.").

# 33988 v3

10

Last, in addition to benefiting applicants and reducing fraud, the new legislation benefits election officials by promoting efficient administration of registration applications.  The new law requires voter registration organizations to submit the applications within ten days of their collection.  By prohibiting the organizations from "hoarding" applications and dumping large quantities all at once, the legislation aims to reduce the administrative burden on the officials who must process the applications and complete the registration process.  And it seeks to reduce the unavoidable errors that would accompany any increased administrative burdens.  In upholding registration deadlines, courts have recognized that state officials need time to process voter registration applications in advance of elections.  *See, e.g., Marston v. Lewis*, 410 U.S. 679, 680, 93 S. Ct. 1211, 1212 (1973) ("States have valid and sufficient interests in providing for some period of time—prior to an election—in order to prepare adequate voter records and protect its electoral processes from possible fraud."); *accord Burns v. Fortson*, 410 U.S. 686, 687, 93 S. Ct. 1209, 1209 (1973).

These are legitimate policies that are properly within the purview of the legislature, and they are sufficient to support the new regulation included in the challenged legislation.[5]  It is against this history and background that the Plaintiffs' constitutional claims must be considered.

### 3.   *The Challenged Legislation Does Not Affect the Fundamental Right to Vote.*

It is true that the right to vote is "of the most fundamental significance under our constitutional structure."  *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059, 2063 (1992). The Plaintiffs claim that the challenged legislation violates this fundamental and precious right.

---

[5] There clearly was no Legislative intent to deter or chill voting or voter registration activities.  As the Plaintiffs accurately allege, the Florida Legislature has recently enacted legislation "designed to make it easier for eligible citizens to register to vote."  (Compl. ¶ 30.)

(Motion at 31.)  Notwithstanding this claim, the legislation does not burden the right to vote, and, at any rate, no Plaintiff has standing to pursue such a claim.

      (a)      **The Plaintiffs lack standing to pursue claims based on the fundamental right to vote.**

Because the Plaintiffs lack standing to pursue claims based on the right to vote, this Court lacks jurisdiction to consider those claims.  *See Reynolds v. Butts*, 312 F.3d 1247, 1248 (11th Cir. 2002).  The Complaint alleges that the "registrant" plaintiffs (John and Jane Does) will not be able to vote unless they enjoy the assistance and convenience of third-party voter registration organizations.  But Wills and the organizational plaintiffs (the "Actual Plaintiffs") do not allege that the Does are—or ever will be—actually identifiable.  The Actual Plaintiffs lack standing to pursue claims based on the fundamental right to vote because they have not alleged that they or any of their members are not already registered to vote or are not able to register to vote.[6]  And the John and Jane Does lack standing because they are merely hypothetical, lacking any indication of actual existence.

The characterization of John and Jane Does 1-100 as parties to this action is an artless attempt by the Actual Plaintiffs to assert the rights of non-parties who are unidentified and who may not exist.  But a court should never "elevate form over substance in reviewing the pleadings of a case."  *Int'l Brotherhood of Electrical Workers, Local Union No. 323 v. Coral Electric Corp.*, 576 F. Supp. 1128, 1134 (S.D. Fla. 1983).  Although John and Jane Does 1-100 are plaintiffs in form, in substance they are non-parties whose rights and interests are asserted in their absence.  *See, e.g., Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096 (3rd Cir. 1996)

---

[6] By contrast, in the decision from the Northern District of Illinois, on which the Plaintiffs heavily rely for this claim, the actual plaintiffs included "at least one unregistered but eligible voter," and the court subsequently certified a class of Hispanic citizens.  *Hernandez v. Woodard*, 714 F. Supp. 963, 965 & n.1 (N.D. Ill. 1989).

(although nursing home developer included hypothetical future residents as "John Doe" co-plaintiffs, the court analyzed standing of John Does on the basis of third-party standing).  As a result, to assert the claims, if any, of John and Jane Does 1-100, Plaintiffs must satisfy the requirements of third-party standing—which they cannot do.

The doctrine of standing "asks whether a litigant is entitled to have a federal court resolve his grievance."  *Kowalski v. Tesmer*, 543 U.S. 125, 128, 125 S. Ct. 564, 567 (2004).  In general, each party must assert its own interests and not rely on the rights or interests of third parties.  *Id.* at 129, 128 S. Ct. at 567.  This rule "promotes the fundamental purpose of the standing requirement by ensuring that the courts hear only concrete disputes between interested litigants who will frame the issues properly."  *Harris v. Evans*, 20 F.3d 1118, 1121 (11th Cir. 1994).  Moreover, "[t]his is generally so even when the very same allegedly illegal act that affects the litigant also affects a third party."  *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720, 110 S. Ct. 1428, 1431 (1990) (citing *U.S. v. Payner*, 447 U.S. 727, 731-32, 100 S. Ct. 2439, 2444 (1980)).  It is well established that a party may only assert the rights of others in the exceptional circumstance that these three criteria are met:

> the litigant must have suffered an "injury-in-fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.

*Powers v. Ohio*, 499 U.S. 400, 411, 111 S. Ct. 1364, 1370-71 (1991).

Even accepting their allegations as true, the Plaintiffs do not meet this test.  First, the Actual Plaintiffs to this action have alleged no sufficient injury-in-fact from the non-registration of John and Jane Does 1-100.  "[T]he 'injury in fact' test requires more than an injury to a cognizable interest.  It requires that the party seeking review be himself among the injured."  *Sierra Club v. Morton*, 405 U.S. 727, 734–735, 92 S. Ct. 1361, 1366(1972).  In addition, the

litigant's "injury-in-fact" must consist of "specific present objective harm," *Laird v. Tatum*, 408 U.S. 1, 14, 92 S. Ct. 2318, 2326 (1978), "particular concrete injury," *U.S. v. Richardson*, 418 U.S. 166, 177, 94 S. Ct. 2940, 2946 (1974), or "discrete and palpable injury," *Warth v. Seldin*, 422 U.S. 490, 501, 95 S. Ct. 2197, 2206 (1975). The Plaintiffs allege the general harm that "unless the challenged law is enjoined, a significant number of Florida citizens will not be registered to vote in the upcoming elections." (Compl. ¶ 6.) This general harm, according to the Plaintiffs' own allegation, "will fall disproportionately on senior citizens, people with disabilities, members or rural, low-income, and predominantly minority communities, and others who find it difficult either to travel to a government office to register or to obtain a registration application on-line." *Id*. The alleged harm resulting from the non-registration of John and Jane Does 1-100 thus falls on John and Jane Does 1-100—not on the actual litigants to this action.[7]

In addition, the injury-in-fact must be imminent or real and immediate and not merely conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992). The assertion that any person will be precluded from registering to vote unless the Actual Plaintiffs or others seek them out is, on its face, mere conjecture and speculation. In Florida, voter registration applications are readily available through numerous channels to any person who wishes to register. Applications are available in many different locations, including drivers' license offices, public libraries, and on the Internet. They are even available by mail.

The registrant plaintiffs' asserted injury—that they will somehow be unable to register and vote—is purely speculative. That even the existence of these plaintiffs is speculative, of

---

[7] The Plaintiffs also argue that with fewer registered voters, their ability to advance their goals is impaired. *See, e.g.,* Dec. of A. Dorfman at 3 ("When more of our members are registered, it is easier to achieve our mission because elected officials are more likely to take PACT and its issues seriously."). But this speculative injury is insufficient to support third-party standing. Regardless, the Plaintiffs have failed to satisfy the other requirements for third-party standing.

course, is demonstrated by their being styled as John and Jane Does instead of actual, identifiable, individuals.  If their existence were certain, they would surely be among the Actual Plaintiffs.

Plaintiffs likewise fail to meet the second criterion to establish third-party standing because they have failed to allege a close relation between themselves and John and Jane Does 1-100.  In fact, it is doubtful whether third-party standing can *ever* be asserted with respect to unidentifiable plaintiffs.  Recently, in *Kowalski v. Tesmer*, 543 U.S. 125, 125 S. Ct. 564 (2004), two attorneys challenged a state law prohibiting the appointment of appellate counsel for indigents who plead guilty.  *Id*. at 128, 125 S. Ct. at 566.  The attorneys sought to "invoke the rights of hypothetical indigents" by "rely[ing] on a future attorney-client relationship with as yet unascertained . . . criminal defendants."  *Id*. at 127, 130, 125 S. Ct. at 566, 568.  The Court rejected the proposition that a litigant could have a close relation with an unknown person:  "The *existing* attorney-client relationship is, of course, quite distinct from the *hypothetical* attorney-client relationship posited here."  *Id*. at 131, 125 S. Ct. at 568 (emphasis in original).  The Court distinguished *Department of Labor v. Triplett*, 494 U.S. 715, 110 S. Ct. 1428 (1990), in which an attorney-client relationship was held sufficient:

> *Triplett* involved the representation of known claimants.  The attorneys before us do not have a "close relationship" with their alleged "clients"; indeed, they have *no relationship at all* . . .  [I]t would be a short step from the . . . grant of third-party standing in this case to a holding that lawyers generally have third-party standing to bring in court the claims of future unascertained clients.

*Id*. at 131, 134, 125 S. Ct. at 568, 570 (emphasis added).  Like the hypothetical indigents in *Kowalski*, John and Jane Does 1-100 are unknown and unascertainable.  The Actual Plaintiffs do not have a close relationship with the alleged prospective registrants because they have no relationship at all.

Finally, Plaintiffs have not sufficiently alleged that John and Jane Does 1-100 are unable to protect their own interests.  While the imaginary plaintiffs include "senior citizens, people with disabilities, members or rural, low-income, and predominantly minority communities," general demographic or poll-denominated characteristics are not the sort of "hindrance" that ordinarily justifies third-party standing.  In *Kowalski*, for example, the Court rejected the contention that "unsophisticated, *pro se* criminal defendants" are unable to protect their interests, concluding that "the lack of an attorney here is [not] the type of hindrance necessary to allow another to assert the indigent defendants' rights."  *Id*. at 132, 125 S. Ct. at 569.  In *Singleton v. Wulff*, 428 U.S. 106, 96 S. Ct. 2868 (1976), although the Court allowed two physicians to assert the claims of needy persons in opposition to a state law denying Medicaid coverage for certain abortions, it did so not because the third parties were indigent.  Rather, the Court concluded that third parties were hindered from asserting their own rights by their desire to protect their privacy and avoid publicity and by the "imminent mootness" of their claims.  *Id*. at 117, 96 S. Ct. at 2877; *see also Juvenile Matters Trial Lawyers Ass'n v. Judicial Dep't*, 363 F. Supp. 2d 239 (D. Conn. 2005) (concluding that legal aid association lacked third-party standing to challenge, on behalf of future clients, the rates paid to attorneys).

In *Rosario v. Rockefeller*, 410 U.S. 752, 93 S. Ct. 1245 (1973), Plaintiffs brought various constitutional challenges to a New York statute that limited the voters who could vote in primary elections.  *Id.* at 753, 93 S. Ct. at 1247.  One of their arguments was that the challenged statute's durational residency requirement violated the constitutional right to travel.  *Id.* at 759 n.9, 93 S. Ct. at 1250 n.9.  The Supreme Court rejected the claim because no plaintiff had alleged that he had recently moved.  "The petitioners cannot represent a class to which they do not belong."  *Id.* In this case, the Actual Plaintiff have not alleged that they or their members are not registered to

vote, are unable to vote, or will have difficulty voting.  Accordingly, they cannot pursue claims based on the fundamental right to vote.

**(b)     The legislation does not violate or impair the fundamental right to vote.**

Even if they had the required standing, the Plaintiffs have still failed to demonstrate that they are likely to succeed on the merits of this claim.  Notwithstanding the fundamental nature of the right to vote, states may require certain reasonable and even-handed qualifications and regulations on the exercise of the franchise without violating the Constitution.  *Lassiter v. Northampton County Bd. of Elections*, 360 U.S. 45, 50, 79 S. Ct. 985, 989 (1959).  These regulations play an integral and essential role in our democracy.  As the Supreme Court in *Storer v. Brown* recognized:

> [T]he States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, *the registration and qualifications of voters*, and the selection and qualification of candidate.

415 U.S. 724, 730, 94 S. Ct. 1274, 1279 (1974) (emphasis added).  The John and Jane Doe Plaintiffs do not allege that they will be legally precluded from voting—only that they might find it too difficult to register absent the help of the Actual Plaintiffs and others like them.  (Compl. ¶¶ 153-154.)  These allegations, even if true, fall far short of establishing a constitutional violation.  In *Rosario*, 410 U.S. 752, 93 S. Ct. 1245, the Supreme Court upheld a New York law that limited participation in a party primary.  The Court noted that the law affected the right to vote but did not "totally den[y] the electoral franchise to a particular class of residents."  *Id.* at 757, 93 S. Ct. at 1249.  Accordingly, the state needed only to show a legitimate policy reason for the regulation, which it was able to do.  *Id.*

In their Memorandum of Law, the Plaintiffs rely heavily on *Hernandez v. Woodard*, 714 F. Supp. 963 (N.D. Ill. 1989).  (Motion 31-33.)  In that case, a class of Hispanic voters, along with voter organizations, challenged the refusal of a voting registration official to appoint additional voting registrars who, the plaintiffs contended, would allow for additional registration of Hispanic voters.  *Id*. at 965.  That case included allegations of racial discrimination not present here, *id.* at 966, but it also included a First Amendment freedom of association claim, *id.* at 972. The plaintiffs claimed that their ability to associate for political purposes was impaired by their not being appointed registrars.  *Id.*

The *Hernandez* decision is not very helpful to the Plaintiffs.  It came before the NVRA at a time when, under Illinois law, "a person must register prior to election day either at a designated government office or with an appointed deputy registrar."  *Id.* at 966.  That is not the case in Florida today.  The new legislation does nothing to prevent the Plaintiffs from going door to door with a stack of voter registration applications (which are available to the Plaintiffs under the Florida Voter Registration Act, § 97.052(1)(b)(2)), distributing the applications, advocating for change through voter registration, assisting applicants, and encouraging applicants to submit their applications directly to the state.[8]  And nothing prohibits the Plaintiffs from collecting the applications and submitting them—the law requires only that if they collect the applications, they timely submit them.

---

[8] Among the Plaintiffs' objection to this procedure is that they would be precluded from collecting and utilizing the private, personal data of the applicants.  *See* Dec. of D. Ewart at 3 ("The FHU staff updates our membership database with registration information . . . ."); Dec. of A. Gonzalez at 2 ("When we register members, we photocopy their voter registration forms so we can update our membership database . . . .").  The Plaintiffs do not appear to argue, though, that this use of applicants' personal information (which may or may not be consensual) is entitled to constitutional protection.  Surely, it is not.

Even if the John and Jane Does prefer placing their applications in the hands of the Actual Plaintiffs rather than placing their applications in a mailbox, there is no constitutional right to have voting registration available in the most convenient (to a complaining Plaintiff) fashion possible. *See Coalition for Sensible & Humane Solutions v. Wamser*, 771 F.2d 395, 400 (8th Cir. 1985) ("[W]e cannot agree that there is a constitutional right to greater access to voter registration facilities per se."). Even according to the Complaint, thousands of citizens register to vote annually through the State's numerous mechanisms—without the assistance of a voter registration organization.[9] (Compl. ¶ 40.) By alleging only that they will have a difficult time utilizing the voter registration processes provided by the State, the John and Jane Doe Plaintiffs have failed to state a claim upon which relief can be granted.

Furthermore, even if the allegations stated a constitutional claim, the registrant plaintiffs have still failed to demonstrate a likelihood of success on the merits. Because the existence of the registrant plaintiffs is merely hypothetical, it is not surprising that they have not submitted declarations to this Court supporting their claims. Thus, this Court has no evidence that it would, in fact, be more difficult or less convenient for these hypothetical individuals to register to vote.

> **4.**     *Florida's Regulation of the Handling of Voter Registration Applications Does Not Implicate the First Amendment.*

The Plaintiffs allege that the challenged legislation burdens their First Amendment rights of free speech and association. (Motion at 14.) But the new law does not regulate speech or

---

[9] Under Florida law, voter registration forms "must be accepted in the office of any supervisor, the division [of elections], a driver license office, a voter registration agency, or an armed forces recruitment office." § 97.053(1), Fla. Stat. A "voter registration agency" includes "any office that provides public assistance, any office that serves persons with disabilities, any center for independent living, or any public library." § 97.021(40). In fact, an application must be accepted by a Supervisor even if the applicant is not resident in the Supervisor's county; the application would be forwarded to the correct Supervisor. § 97.503(7), Fla. Stat.

expressive conduct—it regulates the collection and submission of voter registration applications.[10]

> **(a)     The collection of voter registration applications is not core speech protected by the First Amendment.**

The Plaintiffs allege that the challenged legislation will force them and others to "communicate fewer political messages" and will lead to a reduction of constitutionally protected political speech. (Compl. ¶ 5.)  The communications Plaintiffs allege to currently engage in include:

> persuad[ing] thousands of Florida citizens to vote . . .by talking to potential voters in face-to-face interactions in diverse communities across the state.  These conversations occur at community events, religious services, workplaces, schools, malls, bus stops, and other places where citizens congregate.  They also occur on citizens' front porches and in their living rooms when plaintiffs and others like them send members, volunteers, and employees door-to-door to register voters in residential communities.

(Compl. ¶ 35.)  Similarly, through their declarations accompanying the Motion, the Plaintiffs claim the following:  "We encourage our members to become registered and to vote because

---

[10] The challenged legislation also includes certain reporting requirements for voter registration organizations to the extent they engage in "voter registration activities," a term not defined by the statute.  The context of Section 97.0575 suggests that the term is properly interpreted to include the collection of voter registration applications, but not the mere distribution of materials or encouraging or assisting others in their individual registrations.  That is the most logical interpretation that a Florida court would reach.  This is particularly true if an alternative interpretation were to render the statute constitutionally invalid.  Federal courts and Florida courts generally must, when possible, interpret statutes in a manner that will avoid a constitutional conflict.  *See Clark v. Martinez*, 543 U.S. 371, 381, 125 S. Ct. 716, 724 (2005); *DuFresne v. State*, 826 So. 2d 272, 274 (Fla. 2002).  Furthermore, even if the reporting requirement did implicate the First Amendment, it can impose no substantial burden.  As explained above, there are no consequences flowing from an organization's failure to comply with the reporting requirement.  § 97.0575(2), Fla. Stat. ("The failure to submit the information required by subsection (1) does not subject the third-party voter registration organization to any civil or criminal penalties for such failure, and the failure to submit such information is not a basis for denying such third-party voter registration organization with copies of voter registration application forms.").  In their Complaint and Motion, the Plaintiffs do not appear to contend that an unenforceable reporting requirement—without more—would be constitutionally invalid.

when they do, public officials will take our communities more seriously, and our issues will be heard." (Dec. of A. Dorfman at 2.) "With assistance from union staff, our volunteer leaders engage in one-on-one communication with their co-workers and encourage them to become politically involved." (Dec. of D. Ewart at 2.) "[I]n the past, we had our volunteer leaders encourage members to participate in the political system by registering to vote and contacting their legislators to support increased state funding and staffing for Florida's nursing homes. . . ." (*Id.* at 3-4.) "[C]oordinators will explain to public sector employees that local and state elected officials have enormous influence over collective bargaining and the funding for government entities . . . Moreover, they will explain that the more union members that register and vote, the more influence the union . . . will have . . . ." (Dec. of C. Hall at 3-4.) "[V]olunteers often set up tables and encourage passers-by to stop and fill-in (sic) a voter registration application. They also walk around with applications on clipboards and ask individuals if they would be willing to register to vote. Volunteers also hand out pamphlets and other materials discussing the importance of registering to vote, providing information about voting, and informing new voters about how they can contact their elected officials." (Dec. of D. W. Giliotti at 5.) "During . . . petition drives, if a potential signatory is not registered to vote, a League volunteer will encourage them to register to vote so they can later sign an initiative petition and vote for the initiative." (*Id.* at 6.)

The Plaintiffs allege that these types of activities and communications are restricted or chilled by the challenged legislation. But none of these activities is regulated by Florida law, and none has been affected by the new legislation. The legislation does not regulate advocacy, distribution, assistance, or even a volunteer's completing the form on behalf of an applicant. It

regulates only the submission of collected applications once a potential voter entrusts the third-party organization with his application.

The Plaintiffs then allege that they cannot achieve their objectives if they stop these activities and communications.  (Compl. ¶ 36.)  Indeed, they allege that the legislation will reduce "the amount of First Amendment-protected speech and related activity that they can engage in."  (Compl. ¶ 94.)  But that certain speech or conduct may be protected by the First Amendment does not automatically mean that "related activities" enjoy the same protection.  That is precisely the case here.  Although the Plaintiffs' efforts to persuade others to vote, express political preferences, or even assist others in registration may be protected by the First Amendment, that is not to say that the collection and submission of others' applications is.  That the Plaintiffs' collection of applications is "linked" to protected activities (Motion at 13) does not confer protected status on conduct not protected by the First Amendment.  Non-expressive conduct is not protected by the First Amendment freedom of speech, regardless of whether the conduct is related to an effort that also involves protected speech.  If the opposite were true, there would be precious little conduct not protected by the First Amendment.  *See United States v. O'Brien*, 391 U.S. 367, 376, 88 S. Ct. 1673, 1678 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.").

The *collection* of voter registration applications is not speech.  It is true that the freedom of speech guaranteed by the First Amendment extends beyond literal speech and protects expressive conduct.  *See Tex. v. Johnson*, 491 U.S. 397, 404, 109 S. Ct. 2533, 2540 (1989).  But not all conduct with any expressive component is protected.  "It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the

street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *Dallas v. Stanglin*, 490 U.S. 19, 25, 109 S. Ct. 1591, 1595 (1989).

The Plaintiffs' Complaint does not allege a communicative value in *collecting* registration applications.  Indeed, there is none—not even a kernel.  Nevertheless, in their Motion, the Plaintiffs claim they "engage in nonpartisan voter registration to communicate messages of political engagement and reform."  (Motion at 13.)  There is simply no speech value in collecting the application versus allowing the applicant to submit it himself.  The Supreme Court has said that "[i]n deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." *Johnson*, 491 U.S. at 404, 109 S. Ct. at 2539 (marks omitted).  Whatever specific message the Plaintiffs allege they intend to convey through their collection and submission of applications would surely be lost on any applicant—particularly one who has just heard the volunteer explain the importance of political engagement and voting.  There is no additional speech value in seizing control over an application.[11]  Accordingly, the collection cannot be considered core speech.

---

[11] This is not like those cases in which the conduct includes a communicative component. *See, e.g., Tx. v. Johnson*, 491 U.S. 397, 406, 109 S. Ct. 2533, 2540 (1989) (communication in burning flag); *Tinker v. Des Moines Ind. Comm. Sch. Dist.*, 393 U.S. 503, 504, 89 S. Ct. 733, 735 (1969) (communication in wearing black armbands to protest war in Vietnam); *Food Employees v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 313-14, 88 S. Ct. 1601, 1605 (1968) (picketing).

       **(b)**    **The collection of voter registration applications is substantially different from the circulation and collection of initiative petitions.**

Unlike the collection of voter registration applications, the circulation of initiative petitions is core political speech.  In *Meyer v. Grant*, 486 U.S. 414, 421-22, 108 S. Ct. 1886, 1891-92 (1988), the Supreme Court concluded that a Colorado statute prohibiting the use of paid circulators to gather signatures on an initiative petition violated the First and Fourteenth Amendments:

> Appellees seek by petition to achieve political change in Colorado; their right freely to engage in discussions concerning the need for that change is guarded by the First Amendment. . . . The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. . . . This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it.  Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as "core political speech."

*Id*.; *accord Buckley v. Am. Constitutional Law Found.,* 525 U.S. 182, 205, 119 S. Ct. 636, 648 (1999); *Biddulph v. Mortham*, 89 F.3d 1491, 1498 (11th Cir. 1996); *Delgado v. Smith*, 861 F.2d 1489, 1494 (11th Cir. 1988).  Not surprisingly, the Plaintiffs heavily rely on these decisions.  That reliance is misplaced, though, because the circulation of initiative petitions is entirely different from the *collection* of voter registration applications.  The challenged legislation does not regulate any circulation of petition initiatives.[12]

With voter registration, the state is a primary actor.  The state makes registration forms available, assists applicants in the process, and facilitates the ultimate registration of any voter.  Florida requires voter registration to promote orderly elections and to ensure that those who vote

---

[12] Furthermore, even the circulation of initiative petitions is not insulated from regulation. *See Buckley v. Am. Constitutional Law Found*., 525 U.S. 182, 192 n.11, 119 S. Ct. 636, 642 n.11 (1999) ("[C]irculators are subject to state regulation and are accountable to the State for compliance with legitimate controls . . . .").

are eligible to do so.  *Cf. Storer v. Brown*, 415 U.S. 724, 730-731, 94 S. Ct. 1274, 1279 (1974) ("[T]he State's interest was obviously sufficient to limit voting to residents, to require registration for voting, and to close the registration books at some point prior to the election, a deadline which every resident must meet if he is to cast his vote at the polls.").  The state has provided the avenue for registration, and it enjoys the benefit of having a registration system.

With initiative petitions, on the other hand, "[t]he state does not initiate the petition, does not draft the language of the petition, does not address the merits of the proposal and does not participate in any way in the circulation of the petition or in the collection of signatures." *Delgado*, 861 F.2d at 1497.  In other words, without individual citizens circulating petitions, no voter initiative could ever reach the ballot.  The circulation of the petitions is the sole responsibility of the political committee that sponsors it, and without that organizational advocate, there would be no circulation.  § 100.371(3), Fla. Stat. ("The sponsor of an initiative amendment shall, prior to obtaining any signatures, register as a political committee . . .").  Under state law, the initiative petitions must be submitted by the sponsoring political committee. § 100.371(3), Fla. Stat. ("The sponsor shall submit signed and dated forms to the appropriate supervisor of elections . . . .").

Without voter registration organizations *collecting* voter registration applications, on the other hand, applicants would nevertheless be free to register.[13]  In fact, as explained above, until relatively recently, voters were forced to register in person before a supervisor of elections,

---

[13] This same distinction relates to petitions circulated to place candidates on the ballot. *See Perez-Guzman v. Gracia*, 346 F.3d 229, 239 (1st Cir. 2003) ("We see no principled basis for distinguishing party-petition signature gatherers from the initiative-petition circulators in *Buckley*.  The common denominator is that 'both seek ballot access.'") (quoting *Buckley*, 525 U.S. at 191).

deputy supervisor of elections, or volunteer deputy voter registrar.  *See* § 98.271, Fla. Stat. (1993).

Even more importantly, voter registration applications are point-of-view neutral.  They merely show that the applicant has an intent to vote.  Applications do not commit the registrant to a candidate or cause.  The same form is used for everyone—regardless of the individual's views or political interests.  This is not true of initiative petitions, which of course draw the interest of only those supporting the particular cause.

Because of these fundamental differences, the Florida Legislature treats the two types of activities differently.  For example, current Florida law prohibits payments to those collecting voter registration applications when the payment is based on the number of forms collected. § 104.012(3), Fla. Stat.  There is no such restriction on payments for collection of initiative petitions, and the Supreme Court has held that states may not prohibit payments to initiative petition circulators, *Meyer*, 486 U.S. at 422-23, 108 S. Ct. at 1892.

The most obvious and fundamental difference between the circulation of initiative petitions and the collection of voter registration applications has to do with the purpose of each. The speech and political change that voter initiative sponsors seek cannot easily be accomplished without the circulation and collection of initiative petitions.  By contrast, the protected speech the Plaintiffs claim is burdened by the challenged legislation can be advanced irrespective of the collection of applications.  *See supra.*  Because of this, the collection of applications is not speech.[14]

---

[14] Even if the collection of initiative petitions were analogous to the collection of voter registration applications, there is still no absolute right to collect initiative petitions.  In *Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614 (8th Cir. 2001), the court upheld a requirement that those collecting initiative petitions be state residents.  On a constitutional challenge, nonresidents

> **(c)** **There is no independent constitutional right to collect voter registration applications.**

As explained above, the First Amendment's guarantees of free speech do not reach the conduct of collecting voter registration applications.  Furthermore, there is no independent constitutional right to collect these applications.  In *Coalition for Sensible & Humane Solutions v. Wamser*, 771 F.2d 395 (8th Cir. 1985), the plaintiffs were dissatisfied with the performance of the Board of Election Commissioners of the City of St. Louis.  Under state law, the Board was tasked with registering eligible voters by maintaining registration offices and to publicize and hold various registration drives throughout the community.  *Id.* at 397.  The Board also had the statutory authority to deputize other individuals to assist in these drives and other voter registration efforts.  *Id.*  Believing that the Board's voting drive efforts were not adequately reaching certain areas that included poor and minority citizens, and wishing to conduct their own registration drives, the Plaintiff's members sought appointment by the Board deputy registration officials.  *Id.* at 398.  The Board denied the request, and the Plaintiffs alleged a constitutional violation and sued.  *Id.*

In affirming the district court's dismissal, the Eighth Circuit agreed that the Plaintiffs had not stated a claim based on a constitutional violation.  *Id.* at 400.  The court agreed that the state

---

challenged the requirement, claiming that it burdened nonresidents' First Amendment rights. The court rejected the argument:

> However, many alternative means remain to non-residents who wish to communicate their views on initiative measures.  Non-residents are still free to speak to voters regarding particular measures; they certainly may train residents on the issues involved and may instruct them on the best way to collect signatures; and they may even accompany circulators.  The one restriction is that out-of-state residents *cannot personally collect and verify the signatures*, and that restriction is justified by the State's interest in preventing fraud.

*Id.* at 617 (citation omitted) (emphasis added); *accord Idaho Coal. United for Bears v. Cenarrusa*, 234 F. Supp. 2d 1159, 1164 (D. Idaho 2001).

had a regulatory interest in the prevention of fraud and the promotion of administrative efficiency. *Id.* While there is, of course, a fundamental right to vote, there is no constitutional right to be put in the position the plaintiffs sought. *Id.* at 399. Similarly, in this case, there is no constitutional right to collect voter registration applications—much less to collect them and subsequently fail submit them.[15]

### 5. *The challenged legislation does not chill the exercise of any protected constitutional rights.*

Chief among the Plaintiffs' claims is the idea that the potential fines and "strict liability" imposed by the challenged legislation chill their protected speech—and their purported protected activity of collecting registration applications. (Motion at 27.) The Supreme Court has recognized that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11, 92 S. Ct. 2318, 2324 (1972). As explained above, though, the First Amendment is not implicated by regulations on the collection,

---

[15] Notwithstanding the Plaintiffs' argument, the Ninth Circuit decision in *Monterey County Democratic Central Committee v. USPS*, 812 F.2d 1194, 1196 (9th Cir. 1987), does not stand for the proposition that the act of registering a voter is protected speech. (Motion at 14.) That case dealt with the limited issue of whether a Postal Service regulation limiting voter registration activities at post offices involved public or nonpublic fora. The regulation prohibited "partisan" groups from conducting drives on Postal Service property, *id.* at 1195, and the court rejected the argument that the regulation unfairly discriminated against partisan groups: "We reject the Committee's expansive characterization of the collective position of all partisan groups as a 'viewpoint.' By excluding all partisan groups from engaging in voter registration—conduct permitted by non-partisan groups—the Postal Service is not granting to one side of a debatable public question . . . a monopoly in expressing its view . . . ." *Id.* at 1198-99 (marks and citation omitted; ellipses in original). The *Monterey County* decision is just one of several that reject challenges to the Postal Service regulation, *see, e.g., Am. Postal Workers Union v. USPS*, 764 F.2d 858, 861 (D.C. Cir. 1985), and none supports an argument that all voter registration activities—including the collection of applications—are protected speech.

submission, and administration of voter registration applications.[16]  Despite their allegations that

they are ceasing all registration efforts—not just the collection of applications—the Plaintiffs

have not alleged that the legislation regulates those other registration efforts.  It does not.  The

Legislation does nothing to deter or chill protected First Amendment liberties; it only deters or

chills the mishandling and late submission of voter registration applications—a laudatory public

policy goal.

This is not like *Hustler v. Falwell*, 485 U.S. 46, 108 S. Ct. 876 (1988), cited by the

Plaintiffs.  The issue in that case was whether a rule imposing strict liability on publishers for the

publication of false statements would have the effect of reducing the publication of truthful

statements.  *Id.* at 52, 108 S. Ct. at 880.  The idea was that a publisher could be chilled by its fear

that its publication might include misstatements, which are "inevitable in free debate."  *Id.*  In

other words, a rule penalizing unprotected speech (publication of false statements) could chill

protected speech (truthful statements).  Similarly, in *Smith v. California*, 361 U.S. 147, 80 S. Ct.

215, the challenged criminal ordinance held booksellers strictly liable for the sale of obscene

materials.  *Id.* at 148, 80 S. Ct. at 216.  The Court concluded that the ordinance would have the

effect of chilling speech, because the bookseller would tend to restrict the books he sells—even

those that were not obscene—because of his "timidity in the face of his absolute criminal

liability."  *Id.* at 154, 80 S. Ct. at 219.  Because of the ordinance, "the distribution of all books,

both obscene and not obscene, would be impeded."  *Id.*  Again, a rule penalizing unprotected

speech (distribution of obscene books) would chill protected speech (distribution of non-obscene

---

[16] Even if there were a protected constitutional interest in the *collection* of voter
registration applications—which there is not—the "concern with chilling protected speech
attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from
pure speech toward conduct."  *Va. v. Hicks*, 539 U.S. 113, 124, 123 S. Ct. 2191, 2199 (2003)
(marks and citation omitted).

books).[17]  In this case, there is no regulation of speech, and there is no chilling of speech.  The

challenged legislation's regulation of conduct (collection and submission of voter registration

applications) does not limit the Plaintiffs' protected speech (their advocacy relating to voting

issues).

> **6.  *The challenged legislation does not violate Plaintiffs' right of free association.***

Plaintiffs also allege that the challenged law violates some associational interest by

penalizing their non-association with any political party.  In other words, Plaintiffs assert that

because the challenged law—without affecting political parties—discourages non-political

parties from collecting and submitting voter registration applications, it imposes an

unconstitutional burden on their right to choose to not associate with a political party.

In *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 117 S. Ct. 1364 (1997), the

Supreme Court considered whether a state law prohibiting candidates for office from appearing

on the ballot as the nominee of more than one party violated the associational rights of parties

that wished to nominate a candidate already nominated by another party.  The Court, noting that

"the State's asserted regulatory interests need only be sufficiently weighty to justify the

limitation," upheld the state law despite its tendency to encourage affiliation with the major

political parties.  *Id.* at 364, 117 S. Ct. at 1372.  The Court recognized the state's interests in the

---

[17] Another critical difference between *Smith* and the case at hand is that the challenged legislation in *Smith* included criminal sanctions.  The challenged legislation in this case includes only civil fines, which are less likely to lead to an unconstitutional chilling of rights.  *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99, 102 S. Ct. 1186, 1193 (1982) (expressing "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe").

integrity of the ballot and the stability of its political system and upheld the prohibition as a "reasonable regulation."  *Id.*[18]

Similarly, in *Clingman v. Beaver*, 544 U.S. 581, 125 S. Ct. 2029 (2005), the Court upheld Oklahoma's system of primary elections, which prohibited political parties from allowing voters registered with other political parties from voting in their elections.  While the Court recognized that Oklahoma's primary law compelled voters to choose a single affiliation, it noted that, as in *Timmons*, the law neither regulated any party's "internal processes," nor did it impair any party's ability "to communicate with the public as [it] wished."  *Id.* at 589, 125 S. Ct. at 2037.  As a result, the law imposed only a slight burden which was justified by the state's interest in a viable party system.[19]

In this case, the challenged law does not impair the Plaintiffs' ability to "communicate with the public as [they] wish."  "[T]he statute at issue does not 'directly and substantially' interfere with [Plaintiffs'] ability to associate for [their] purpose."  *Lyng v. Int'l Union*, 485 U.S.

---

[18] The Court also recognized that—notwithstanding the regulation—the plaintiffs were free to associate and express themselves:

> Minnesota has not directly precluded minor political parties from developing and organizing.  Nor has Minnesota excluded a particular group of citizens, or a political party, from participation in the election process.  The New Party remains free to endorse whom it likes, to ally itself with others, to nominate candidates for office, and to spread its message to all who will listen.

*Id.* at 361, 117 S. Ct. at 1371.  The Plaintiffs in this case, of course, are free to do all of these things notwithstanding the challenged legislation.

[19] Both *Timmons* and *Clingman* apply a higher standard of review because they involve restrictions on voting and ballot access, thereby implicating First Amendment freedoms. *Clingman*, 544 U.S. at 593, 125 S. Ct. at 2039 (light burden on limitations on primary voting subject to *Anderson* balancing test and are usually satisfied by "a State's important regulatory interests"); *Timmons*, 520 U.S. at 363, 117 S. Ct. at 1372 (upholding regulation against fusion candidacies as a minor burden).  In this case, there is *no* burden on the Plaintiffs' First Amendment rights, so even this intermediate level of scrutiny is unwarranted.  *See infra*.

360, 367, 108 S. Ct. 1184, 1189 (1988) (rejecting freedom of association claim based on state's failure to give striking union members food stamps). Therefore, the Plaintiffs have failed to sufficiently state a claim based upon the First Amendment freedom of association.

### B. The Legislation does not Improperly Discriminate Against Non-Political Parties.

In addition to their First Amendment claims, the Plaintiffs pursue an Equal Protection claim based on fact that the challenged legislation applies to them and not to political parties.[20] The different treatment between political parties and others results from the Legislature's recognition of substantial differences between them. And the Legislature's different treatment of these different organizations does not violate Fourteenth Amendment Equal Protection.

The United States Supreme Court recently considered an Equal Protection challenge to Federal campaign finance regulations. *McConnell v. FEC*, 540 U.S. 93, 124 S. Ct. 619 (2003). The Plaintiffs alleged that a portion of the legislation discriminated against political parties in favor of certain special interest groups, such as the NRA and the ACLU, by placing contribution limitations on the funds that parties may use for voter registration activities. *Id.* at 188, 124 S. Ct. at 686. The Court rejected the challenge: "Congress is fully entitled to consider the real-world differences between political parties and interest groups when crafting a system of campaign finance regulation." *Id.*; *accord FEC v. National Right to Work Commn.*, 459 U.S. 197, 210, 103 S. Ct. 552, 561 (1982). Congress has likewise recognized a difference between labor unions and unincorporated associations and regulated them accordingly. "The differing restrictions placed on individuals and unincorporated associations, on the one hand, and on unions and corporations, on the other, reflect a judgment by Congress that these entities have

---

[20] The legislation also excludes certain individuals registering family members and certain government employees and agents. § 97.012(36), Fla. Stat. The Plaintiffs do not challenge these limitations. (Compl. ¶ 59.)

differing structures and purposes, and that they therefore may require different forms of regulation in order to protect the integrity of the electoral process." *California Med. Ass'n v. FEC*, 453 U.S. 182, 201, 101 S. Ct. 2712, 2724 (1981) (rejecting Equal Protection challenge).

Not surprisingly, the Florida Legislature has similarly concluded that the differences between parties and non-parties merit different types of regulations.  In contrast to the absence of regulation for other registration organizations, Florida law extensively regulates the organization, powers, and duties of political parties:

- State law dictates that each political party be represented by a state executive committee and makes certain elected officials *ex-officio* members of their governing bodies.  *See* § 103.091(1), (6)(b), (6)(d)1., Fla. Stat.

- State law authorizes the creation and prescribes the internal structure of county executive committees.  *See* § 103.091(1), Fla. Stat. (directing that county executive committees be composed of at least one committeeman and committeewoman residing in each precinct); § 103.091(6)(a), Fla. Stat. (making certain members of the Legislature *ex-officio*, at-large committeemen or committeewomen).

- Political parties must file with the Department of State the names and addresses of the chair, vice chair, secretary, treasurer, and members of their state executive committees, and county executive committees must make a similar filing with supervisors of elections.  *See* § 103.091(3), Fla. Stat.

- Political parties are required to adopt a constitution, collect assessments, and nominate candidates according to procedures adopted by law.  *See* § 103.121(1), Fla. Stat.

- Each year, the funds of each state and county executive committee are audited.  *See id*.  The audit reports are filed with the Department of State and supervisor of elections, respectively, and are open to public inspection.  *See id*.

- The chair and treasurer of each executive committee are jointly liable for the proper and authorized expenditure of funds and are subject to criminal penalties for their misappropriation, unlawful expenditure, or improper accounting.  *See* § 103.121(2), (3) Fla. Stat.

- State law also prescribes the grounds, including conviction of any felony, on which a political party office becomes vacant, and authorizes judicial action against committee members who violate their oaths.  *See* §§ 103.131, *et seq.* Fla. Stat.

Perhaps most significantly, state and county executive committees are required to file quarterly disclosures detailing all contributions received and expenditures made. *See* §§ 106.29, 106.07 Fla. Stat. These reports identify, among other things, the recipient, amount, date, and purpose *of each itemized expenditure* and are publicly available on the internet. *See id*. The chair and treasurer of each executive committee are required to certify the correctness of each such report, and a knowing, false certification is punishable by criminal penalties. *See* § 106.29(2), Fla. Stat. Through this substantial regulation, Florida's political parties are registered with the state, accountable to the state, and identifiable by the state. In other words, the political parties are transparent, particularly in light of Florida's broad public records law, which makes all of these records easily accessible to the public. *See* Chapter 119, Fla. Stat. There is absolutely no parallel regulation for voter registration organizations.

In addition to substantial differences in the regulation of political parties and other organizations, there are obvious differences in the nature of the organizations. Political parties depend on broad public support for their very existence. In this sense, they are significantly more accountable to the public than their non-party counterparts. In contrast to political parties, voter registration organizations do not select and present slates of candidates for elections and are not subject to the same public or media scrutiny under which political parties operate. They do not necessarily depend on the votes and political decisions of others to achieve their objectives. Furthermore, the public at large has no opportunity to "vote against" third-party registration organizations. The Florida Legislature is entitled to rely on the substantial differences between political parties and others in crafting legislation that regulates the two types of organizations differently. The challenged legislation does not violate Equal Protection.

C.     __The Legislation is Not Subject to Strict Scrutiny Review.__

Throughout their memorandum, the Plaintiffs incorrectly insist that this Court should employ the strict scrutiny level of review.  As explained above, the challenged legislation does not regulate the Plaintiffs' speech and does not implicate their freedom of association.  In addition, it does not involve a suspect classification.  Accordingly, strict scrutiny review is unwarranted.  *See, e.g., Lyng v. Int'l Union,* 485 U.S. 360, 364, 108 S. Ct. 1184, 1189 (rejecting application of strict scrutiny review because "the statute does not infringe either the associational or expressive rights of appellees"); *Lofton v. Sec'y of the Dep't of Children & Family Servs.,* 358 F.3d 804, 818 (11th Cir. 2004) ("Unless the challenged classification burdens a fundamental right or targets a suspect class, the Equal Protection Clause requires only that the classification be rationally related to a legitimate state interest."), *cert. denied,* 543 U.S. 1081 (2005).

As an alternative argument, the Plaintiffs suggest that this Court should apply the *Anderson* balancing test, which is applied to regulations burdening voting rights.  (Motion at 22.) *Cf. Anderson v. Celebrezze*, 460 U.S. 780, 103 S. Ct. 1564 (1983).  The *Anderson* test, however, is applied only when a plaintiff's First or Fourteenth Amendment rights are implicated.  *See Green v. Mortham,* 155 F.3d 1332, 1337 (11th Cir. 1998); *Fulani v. Krivanek*, 973 F.2d 1539, 1543 (11th Cir. 1992).  That is not the case here.  At any rate, though, a balancing of the state's interests against the minimal "harm" the Plaintiffs assert would weigh heavily in the state's favor.

## II.     THE PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM.

In addition to failing to demonstrate a substantial likelihood of success on the merits, the Plaintiffs have failed to satisfy the other criteria necessary for the issuance of a preliminary injunction.  They cannot demonstrate irreparable harm.  According to the Motion, the Plaintiffs will be irreparably harmed because they cannot participate in the registration of voters for the

upcoming election.  (Motion at 34.)  The Plaintiffs claim they are "losing valuable time to engage in core political speech and association and to add new registrants to Florida's voter rolls."  *Id.*  To the extent they are losing time to do those things, it is because of their own decisions—not because of the challenged legislation.  As explained above, the Plaintiffs can engage in political speech, advocate their positions, and assist in voter registration—all without implicating the challenged legislation or risking a fine.  Their unwillingness to engage in voter registration activity without taking possession of the applications, and their purported inability (or unwillingness) to take control over, and responsibility for, the applications they do collect are insufficient to demonstrate irreparable harm.

## III.    THE PLAINTIFFS LOSE THE BALANCING OF HARM, AND THE PUBLIC INTEREST DOES NOT FAVOR AN INJUNCTION.

If this Court enjoined the enforcement of the challenged legislation, Florida voter applicants would be less likely to be properly registered.  Florida enacted the legislation to ensure that applicants who entrusted their applications to third parties would, in fact, have their forms submitted for processing.  Without the law, any person who entrusted his application to a third party would be less likely to achieve registration, and he would be more likely to lose his right to vote.  These interests are critical to the state and to voter registration applicants.  By contrast, the injunction would provide little practical benefit to the Plaintiffs, who, as explained above, are free to engage in their protected activities with or without the challenged legislation.  For these same reasons, the injunction would not serve the public interest.

## <u>CONCLUSION</u>

The challenged legislation regulates one thing:  the collection and submission of voter registration applications.  The regulated conduct is not speech, is not expressive conduct, and does not implicate any First Amendment protected rights.  The challenged legislation seeks to

protect voter registration applicants by making those entrusted with voter registration applications accountable for the timely submission of those applications. This accountability protects the electoral process by ensuring that those who register to vote through third-party voter registration organizations are ultimately registered. The Defendants and the Florida Legislature have the solemn duty to protect that process and defend the right of all eligible Floridians to register to vote.

Because the challenged legislation does not implicate any First Amendment protected speech or conduct, all of the Plaintiffs' First Amendment claims will fail. And because the legislation includes no impermissible discrimination, the Equal Protection claims likewise will fail. For these reasons, the Plaintiffs have not satisfied their substantial burden in seeking the preliminary enjoinment of a legislative enactment. Furthermore, the Plaintiffs have failed to demonstrate irreparable harm or that an injunction is in the public interest. Accordingly, the Defendants respectfully request that this Court deny the Plaintiffs' Motion.

Respectfully submitted, this 21st day of June, 2006.

> /s/ *Peter Antonacci*
> Peter Antonacci*
> Florida Bar No.:  280690
> Allen Winsor*
> Florida Bar No.:  016295
> Andy Bardos**
> Florida Bar No.:  822671
> George N. Meros, Jr.
> Florida Bar No.:  263321
> GRAYROBINSON, PA
> Post Office Box 11189
> Tallahassee, Florida  32302-3189
>   Phone:  850-577-9090
>   Fax:  850-577-3311
> email:  pva@gray-robinson.com
> *Attorneys for Defendants*
>  *  Pro hac vice application granted
> ** Pro hac vice application forthcoming

# 33988 v3

37

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing has been served by electronic mail and United

States mail this 21st day of June, 2006, to the following:

Gary C. Rosen
Becker & Poliakoff, P.A.
3111 Stirling Road
Fort Lauderdale, FL 33312
  Phone:  (954) 985–4133
  Email:  grosen@becker-poliakoff.com

Wendy R. Weiser
Renee Paradis
Brennan Center for Justice
at NYU School of Law
161 Avenue of the Americas, 12th Floor
New York, NY 10013
  Phone:  (212) 998–6730
  Email:  wendy.weiser@nyu.edu

Elizabeth S. Westfall
Jennifer Maranzano
Estelle H. Rogers
Advancement Project
1730 M. Street, NW, Suite 910
Washington, DC  20036
  Phone:  (202) 728-9557
  Fax:  (202) 728-9558
  Email:  ewestfall@advancementproject.org

Eric A. Tirschwell
Craig L. Siegel
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
  Phone:  (212) 715–9100
  Email:  csiegel@KRAMERLEVIN.com

/s/ *Peter Antonacci*
PETER ANTONACCI
Florida Bar No. 280690
ALLEN C. WINSOR
Florida Bar No. 016295
GRAYROBINSON, P.A.
Post Office Box 11189
Tallahassee, Florida  32302-3189
  Phone:  (850) 577-9090
  Fax:  (850) 577-3311
email:  pva@gray-robinson.com
        awinsor@gray–robinson.com

*Attorneys for Secretary of State and*
*Dawn Roberts*