

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Case No.: 1:06cv21265– SEITZ-MCALILEY

LEAGUE OF WOMEN VOTERS OF FLORIDA, PEOPLE
ACTING FOR COMMUNITY TOGETHER, *et al.,*

      Plaintiffs,

v.

SUE M. COBB, individually and in her official capacity as
Secretary of State for the State of Florida, and DAWN
ROBERTS, individually and in her official capacity as
Director of the Division of Elections,

      Defendants.
_____/

## **DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

      Defendants Sue M. Cobb, Secretary of State for the State of Florida, and Dawn Roberts, Director of the Division of Elections, submit this Reply in support of their Motion to Dismiss, which was filed in this Court on June 21, 2006.

I.  **THE CHALLENGED LEGISLATION DOES NOT IMPLICATE THE FIRST AMENDMENT.**

Central to the Plaintiffs' case is the novel argument that the *collection* of voter registration applications is speech protected by the First Amendment. To support this remarkable and unprecedented claim, the Plaintiffs contend that they "cannot effectively persuade other citizens to vote without being able to *collect voter registration applications."* (Reply at 16) (emphasis added). But there is a substantial and obvious gap in this argument: How does the *collection* of registration applications—effective or otherwise—manifest itself as speech or advocacy? The Plaintiffs' inability to provide a coherent answer to this critical question betrays the argument.[1]

The Plaintiffs provide several speculative illustrations searching for a connection between the registration of voters and the advancement of their objectives—but none of them demonstrates a connection to speech. For example, the Plaintiffs allege that their "success in registering new voters . . . depends on their ability . . . to collect applications." (Compl. ¶ 36; Resp. at 14.) Furthermore, they allege, "[m]erely distributing voter registration applications is insufficient to ensure the success of a voter registration drive." *Id.* But none of these "facts"

---

[1] The Complaint itself does not allege any speech value in the collection of applications. Nevertheless, in their Reply to the Motion for Preliminary Injunction (which is incorporated into the Response to the Motion to Dismiss), the Plaintiffs argue that "in order to effectively speak and associate using the particular mechanism of third-party voter registration, they must be able to collect applications." (Reply at 13.) They do not explain how the "mechanism of third-party voter registration" is an avenue of speech. It is, of course, an avenue of voter registration—a purely governmental function. Further confusing the simple issue, the Plaintiffs go on to allege that PACT communicated political support for an initiative when it "delivered applications on behalf of supporters." (Reply at 14.) They do not say to whom the applications were delivered—presumably a state voter registration official—or precisely how their political message was received. At any rate, the delivery of applications is no more speech than is the collection of them. "We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

transforms the collection of applications into protected speech.  The Plaintiffs' argument that they are entitled to First Amendment protection for conduct merely because it is *related to* their "policy goals" (Reply at 13) would, of course, turn constitutional jurisprudence on its head.

The Supreme Court has "extended First Amendment protection only to conduct that is inherently expressive." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc*., __ U.S. __, 126 S. Ct. 1297, 1310 (2006).  That the collection of applications is not speech is made even clearer by the fact that the Plaintiffs' collection of applications is accompanied by *actual* speech.  As in *Rumsfeld*, "[t]he expressive component of [plaintiffs'] actions is not created by the conduct itself but by the speech that accompanies it."  *Id.* at 1311.  And that conduct and speech accompany one another does not transform the former into the latter:

> If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it.  For instance, if an individual announces that he intends to express his disapproval of the Internal Revenue Service by refusing to pay his income taxes, we would have to apply *O'Brien* to determine whether the Tax Code violates the First Amendment.

*Id.*  Moreover, any reduction in the Plaintiffs' voter registration activities is not a direct result of the challenged legislation but a direct result of the Plaintiffs' decision to abandon them.  To the extent the Plaintiffs are engaging in less speech, it is of their own volition.[2]  Indeed, *any* legislative enactment may have the indirect consequence of affecting the quantity and type of speech available in the marketplace of ideas.  A tax increase, for example, may lead to a reduction of speech advocating a tax increase.  But a tax increase certainly does not regulate a

---

[2] The Plaintiffs insist that the Court must take as true for purposes of the motion to dismiss their allegation that the challenged legislation "has forced [Plaintiffs] to shut down" their voter drives. (Resp. at 12-13.)  That allegation, however, includes a legal conclusion that this Court need not accept.  The allegation presupposes that the challenged legislation regulates activities beyond the collection of applications, which it plainly does not.

person's speech rights. Likewise, a law regulating the collection of voter registration applications does not regulate the speech of voter registration advocates.

For these reasons, the challenged legislation does not chill any Plaintiff's First Amendment rights. Plaintiffs dismiss as "frivolous" the suggestion that they could carry on voter registration activities without fear of the challenged legislation's enforcement by simply not collecting the applications. But their one-paragraph response to that argument does not explain what particular speech is chilled. (Resp. at 15.) There is none. The challenged legislation regulates only the collection of applications, and the collection of applications is not speech.

## II.  THE LEGISLATION SERVES A NECESSARY PUBLIC PURPOSE.

In response to the Defendants' arguments regarding the valid legislative purpose of the challenged legislation, the Plaintiffs argue at the outset that the sufficiency of an act's purpose requires a factual inquiry that this Court may not indulge on a motion to dismiss. (Resp. at 1.) Defendants are not asking this Court to look outside the pleadings or make any factfinding at all. "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Communs.*, 508 U.S. 307, 315 (1993). The burden is on the Plaintiffs "to negative every conceivable basis which might support" the Legislature's decision, whether or not the basis has a foundation in the record. *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973) (internal quotation marks omitted). This is a burden, of course, that cannot be met in this case.

Even if the challenged legislation ultimately does nothing to advance the Legislature's goals in protecting the interests of voter registrants, there still is a logical basis for the policy as determined by the Florida Legislature. The Legislature certainly could reasonably assume that holding third-party voter registration organizations accountable for the applications they collect

# 34530 v2                                   3

would lead to an increase in the timely submission of such applications. "The State is not compelled to verify logical assumptions with statistical evidence." *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 812 (1976). As a matter of law, there are sufficient policy justifications for the challenged legislation.[3]

### III. THE CHALLENGED LEGISLATION DOES NOT IMPROPERLY DISCRIMINATE AGAINST NON-POLITICAL PARTIES.

As the Defendants have argued, and as the United States Supreme Court has recently made clear, practical differences between political parties and others can justify their differing treatment. *See McConnell v. FEC*, 540 U.S. 93, 188 (2003) ("Congress is fully entitled to consider the real-world differences between political parties and interest groups . . . ."). It is not the case that any differing treatment between political parties and others implicates the First Amendment freedom of association. The Plaintiffs argue that "the law forces them to associate against their will with a political party." (Resp. at 15.) The Supreme Court rejected this idea in *McConnell,* in which the challenged legislation imposed numerous restrictions on the fundraising abilities of political parties, including a soft-money ban, while allowing interest groups to continue raising soft money. *McConnell,* 540 U.S. at 187-188. Rather than concluding that the different treatment would "force" political party members to cease associating with political

---

[3] The Plaintiffs' position—that litigation seeking to invalidate laws based on insufficient legislative justification are immune from motions to dismiss—is completely unworkable. It would subject every legislative enactment to flyspecking litigation, and it would hobble the separation of powers doctrine. "A state legislature, in the enactment of laws, has the widest possible latitude within the limits of the Constitution. In the nature of the case it cannot record a complete catalogue of the considerations which move its members to enact laws. In the absence of such a record courts cannot assume that its action is capricious, or that, with its informed acquaintance with local conditions to which the legislation is to be applied, it was not aware of facts which afford reasonable basis for its action. Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function." *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 510 (1937).

parties to enjoy the "benefit" of raising soft money, the Court concluded "that this disparate treatment does not offend the Constitution." *Id.* at 188 (rejecting Equal Protection claim).[4]

Just as Congress had valid reasons for treating political parties and others differently in the context of campaign finance, the Florida Legislature had valid reasons for treating political parties and others differently in the context of voter registration. Political parties are inherently accountable to the state. The Plaintiffs respond to this argument by citing statutes imposing certain requirements on corporations and labor unions.[5] (Reply at 7.) That response ignores the fact that the challenged legislation applies generally to *all* individuals and associations that are not political parties. That certain types of entities—or even some of the Plaintiffs—may have some accountability to the state does not invalidate the classification or the Legislative rationale behind it. *See Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 814 (1976) ("[T]he Equal Protection Clause does not demand a surveyor's precision."); *Lyng v. Int'l Union*, 485 U.S. 360, 372 (1988) ("Congress need not draw a statutory classification to the satisfaction of the most sharp-eyed observers in order to meet the limitations that the Constitution imposes in this

---

[4] Furthermore, this case is not like *Iowa Socialist Party v. Slockett,* 604 F. Supp. 1391 (S.D. Iowa 1985). By creatively adding words to the quoted portion of that case, the Plaintiffs attempt to avoid a critical distinction. (Reply at 8.) The challenged law in *Slockett* treated Republicans and Democrats differently than minor party members. *Id.* at 1391. It was not a case, like this one, in which the challenged law included a distinction between *all* political parties and all others. Moreover, a more recent decision of the First Circuit described *Slockett*'s reasoning for applying strict scrutiny to a regulation imposing a "relatively minor" burden as "unpersuasive." *Werme v. Merrill*, 84 F.3d 479, 485 n.6 (1st Cir. 1996).

[5] Ironically, the labor union regulations cited by the Plaintiffs would, under the Plaintiffs' own argument, implicate the freedom of association and be invalid. For example, Plaintiffs explain that under Section 447.07, Florida Statutes, labor unions must keep accurate books and records. (Reply at 7 n.7.) Applying the Plaintiffs' rationale, this requirement (which does not apply universally) would "force" union members to cease association if they wished to receive the "benefit" of being free from such accountability requirements. The Plaintiffs' position would demand this absurd result, and it would turn nearly every legislative classification into a freedom of association claim.

setting."). Furthermore, there are only twenty-five registered political parties in Florida. This limited number allows the Secretary to monitor the parties' actions more closely than the countless individuals and organizations who routinely descend on Florida during election cycles.

The Legislature made a logical and justifiable assumption that state's registered political parties were less likely to cause the harm sought to be addressed. Notwithstanding the Plaintiffs' argument, the Defendants need not prove the existence of disparate harm. *Hughes*, 426 U.S. at 812 (rejecting argument that Maryland needed factual support for its legislative assumption).

### IV. PLAINTIFFS LACK STANDING TO PURSUE CLAIMS BASED ON FUNDAMENTAL RIGHT TO VOTE.

According to Count IV of the Complaint, the challenged legislation infringes upon the fundamental right to vote of some unidentified individuals. (Compl. ¶ 154.) The Complaint purported to include these individuals as actual parties, (Compl. ¶ 11), but the Plaintiffs' Response appears to abandon that procedural curiosity. The Plaintiffs now seem to argue only associational and third-party standing. (Resp. 3-12.) But just as they cannot invent co-plaintiffs, they cannot rely on associational or third-party standing where there is none.

#### A. Plaintiffs Do Not Have Associational Standing on Behalf of Their Members.

No associational standing is available unless a member of an association would have standing to bring the claim on his or her own behalf. *Hunt v. Wash. State Apple Adv. Comm'n*, 432 U.S. 333, 343 (1977). The Complaint includes no allegation that any member of any particular organizational Plaintiff has had his or her right to vote infringed. In their Response, the Plaintiffs attempt to evade this deficiency by pointing to the eighteen allegations that relate to the Plaintiffs' efforts to register their own members or others. (Resp. at 3.) But that the organizational Plaintiffs wish to register their own members is not to say that any Plaintiff's member has standing to pursue a constitutional claim based on the fundamental right to vote.

# 34530 v2

6

The Complaint alleges that "John and Jane Doe" are unable to vote "or will find it extremely difficult to do so" without the help of the organizational Plaintiffs. (Compl. ¶ 25.) But it includes no allegation that one of those "registrant plaintiffs" is a member of a particular organizational Plaintiff. Because the Plaintiffs have failed to allege that one of their constituents has standing to pursue the claims in Count IV, those claims must be dismissed. *See Nat'l Alliance for the Mentally Ill v. Bd. of County Comm'rs*, 376 F.3d 1292, 1296 (11th Cir. 2004) ("[Plaintiffs'] failure to identify an injured constituent prevents them from asserting associational standing.").

There is another critical reason why no Plaintiff has sufficiently alleged associational standing. Even if the Complaint included an allegation that an organizational Plaintiff's member would have substantial difficulty registering without the assistance of a third-party voter registration organization, there is no sufficient allegation of redressability. To establish standing, a plaintiff must allege "a substantial likelihood that her injury could be redressed by a favorable decision." *Scott v. Taylor*, 405 F.3d 1251, 1257 n.8 (11th Cir. 2005). If there truly were a substantial burden on the Doe Plaintiffs' ability to vote (which there is not), a favorable decision by this Court would not—without more—remove that obstacle. The Doe Plaintiffs' relief would only come with a favorable decision *and* the intervention of a third-party voter registration organization. And any likelihood of a third-party voter registration organization locating, reaching, and assisting any particular John Doe is purely speculative.[6] And for standing to exist, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (marks omitted);

---

[6] Indeed, it seems logical that if the organizational Plaintiffs could locate and identify such an individual, they would have done so at the outset of this litigation rather than styling the case to include John and Jane Does 1-100.

*accord Burton v. Central Interstate Low-Level Radioactive Waste Compact Comm'n*, 23 F.3d 208, 210 (8th Cir. 1994) (when a plaintiff's relief depends on the intervention of another party—intervention that may or may not occur—the plaintiff has not established redressability).[7]

### B.     Plaintiffs Do Not Have Third-Party Standing For the Registrant Plaintiffs.

The Plaintiffs also fail to establish third-party standing for the John and Jane Doe Plaintiffs. They now argue that they (the organizational Plaintiffs) are harmed by the Does' difficulty in registering because it limits their political power. (Resp. at 6-7.) This presupposes too much. First, whether the John and Jane Does would actually vote if registered is purely speculative. More importantly, it is hardly certain that the Does would exercise their votes to advance the Plaintiffs' goals. After all, Plaintiffs allege that they wish to conduct *nonpartisan* voter registration drives.[8] (Compl. ¶ 11.) The Complaint includes no allegations relating to the voting habits or political characteristics of the John and Jane Doe Plaintiffs. *See* Compl. ¶ 25 (describing Doe Plaintiffs).

Furthermore, there can be no third-party standing when there is no close relationship between a plaintiff and the third-party. The Complaint alleges no such close relationship, but the Plaintiffs advance one now: "Plaintiffs and the prospective registrants that they target have a

---

[7] And for this same reason, the John and Jane Doe claims fail on the merits. If the challenged legislation "severely burden[s]" the Does' fundamental right to vote, (Compl. ¶ 155), then the state's registration mechanisms must be constitutionally insufficient. And if that is the case, the Does would have a constitutional claim with or without the challenged legislation, and they would continue to have such a claim even if this Court grants the relief the Plaintiffs seek. As the Defendants have argued, Florida's voter registration opportunities are substantial and numerous.

[8] Plaintiffs rely on *Bay County Democratic Party v. Land*, 347 F. Supp. 2d 404, 421-23 (E.D. Mich. 2004) for the proposition that "organizational plaintiffs" suffer injury when their members cannot vote. (Resp. at 7.) The organizational plaintiffs in that case were not like the organizational Plaintiffs in this case—they were political parties and candidates. Furthermore, that case dealt with voting, not registration, so the harm was less speculative.

# 34530 v2                                             8

9 of 13

congruence of interests in ensuring that registrants may exercise their right to vote and participate in the political process." (Resp. at 8.) The Plaintiffs rely on *Harris v. Evans*, 20 F.3d 1118 (11th Cir. 1994) for their "congruence of interest" argument. In *Harris*, though, the Eleventh Circuit concluded that there was *no* congruence of interest between the plaintiffs and the third parties. *Id.* at 1123. The court noted that the purpose of the standing inquiry "will be served only when the interests of the litigant and the third party right-holder are properly aligned." *Id.* In this case, any "congruence of interest" between the Doe Plaintiffs and the organizational Plaintiffs is speculative at best. A John or Jane Doe may, for example, have no interest in increasing the organizational Plaintiffs' political clout. There is simply no requisite close relationship between the plaintiffs and unregistered voters.[9]

## V. CLAIMS AGAINST DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES MUST BE DISMISSED.

As the Defendants argued in their Motion, the Complaint includes *absolutely no* allegations of individual conduct on the part of the Defendants. The Plaintiffs now ask this Court to "infer that Defendants Cobb and Roberts, as the top officials of the Department . . . caused and/or approved the issuance of the proposed rules implementing the challenged law and the statement concerning its enforcement." (Resp. at 17.) An "inference" that an agency's top

---

[9] Nor is there an allegation in the Complaint that the Doe Plaintiffs are unable to bring litigation on their own behalf—the last required element for third-party standing. They argue that any plaintiff who alleged he was deprived his right to vote could not bring this litigation. "If particular prospective registrants were identified by name as Plaintiffs, their participation in this lawsuit would provide them with the information and wherewithal to register to vote. Such registrant plaintiffs would be unlikely to allow the registration deadline to lapse without submitting a voter registration application." (Resp. at 11-12.) This did not stop a plaintiff in another election case pending in this District. The named plaintiff in that case (who shares counsel with the Plaintiffs in this case) alleged that her voter registration application was considered incomplete. Rather than simply completing the application and registering, she elected to file a suit challenging the reason for her original application's rejection. *See Diaz v. Cobb*, 04-22572 (S.D. Fla.) (King, J.). At any rate, the Plaintiffs have failed to make allegations sufficient to demonstrate the Doe Plaintiffs' inability to represent their own interests.

officials are personally responsible for all actions of the agency is obviously unwarranted, and the Plaintiffs' position would subject *all* agency heads to personal liability for *all* agency action based purely on "inferences."  Neither the law nor common sense supports that remarkable position.  Indeed, it is well established that there is no vicarious liability under Section 1983. *See, e.g., Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).

Moreover, the Plaintiffs include no allegation that they are harmed by the proposed rules—which, incidentally, are not final.  Instead, they claim that the proposed rules "signaled clearly and publicly that the Department . . . intended to enforce the challenged law."[10]  (Resp. at 17.)  This Court simply may not impose personal liability on agency leaders based on the agency's announced intent to enforce presumptively constitutional legislative enactments.  *See Cooper v. Dillon*, 403 F.3d 1208, 1220 (11th Cir. 2005) (state officers may presume constitutionality of state statutes).[11]

## CONCLUSION

Because the Plaintiffs have failed to state an action upon which relief can be granted, and because they lack standing to bring certain of their claims, the Defendants respectfully request that this Court dismiss this action with prejudice.

---

[10] Curiously, the Plaintiffs suggest that the Defendants could have resolved the constitutional issues by issuing a narrowing construction through the rulemaking process.  (Resp. at 18.)  If this is the case, then this action must be dismissed because the Eleventh Circuit "practice is to uphold a state statute against a facial challenge if the statute is readily susceptible to a narrowing construction that avoids constitutional infirmities."  *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1257 (11th Cir. 2005).

[11] The Plaintiffs describe Defendants' alternative argument regarding qualified immunity as "unfounded."  (Resp. at 17.)   But they make no credible argument that the purported constitutional violations were clearly established under the law.

Respectfully submitted, this 20th day of July, 2006.

/s/ *Allen Winsor*
Peter Antonacci
Florida Bar No.: 280690
Allen Winsor
Florida Bar No.: 016295
Andy Bardos*
Florida Bar No.: 822671
George N. Meros, Jr.
Florida Bar No.: 263321
GRAYROBINSON, PA
Post Office Box 11189
Tallahassee, Florida  32302-3189
  Phone:  850-577-9090
  Fax:  850-577-3311
email:  pva@gray-robinson.com
*Attorneys for Defendants*
* Pro hac vice application forthcoming

# 34530 v2                                       11

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing has been served by electronic mail and United States mail this 20th day of July, 2006, to the following:

Gary C. Rosen
Becker & Poliakoff, P.A.
3111 Stirling Road
Fort Lauderdale, FL 33312
  Phone:  (954) 985–4133
  Email:  grosen@becker-poliakoff.com

Wendy R. Weiser
Renee Paradis
Brennan Center for Justice
at NYU School of Law
161 Avenue of the Americas, 12th Floor
New York, NY 10013
  Phone:  (212) 998–6730
  Email:  wendy.weiser@nyu.edu

Elizabeth S. Westfall
Jennifer Maranzano
Estelle H. Rogers
Advancement Project
1730 M. Street, NW, Suite 910
Washington, DC  20036
  Phone:  (202) 728-9557
  Fax:  (202) 728-9558
  Email:  ewestfall@advancementproject.org

Eric A. Tirschwell
Craig L. Siegel
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
  Phone:  (212) 715–9100
  Email:  csiegel@KRAMERLEVIN.com

/s/  Allen Winsor
PETER ANTONACCI
Florida Bar No. 280690
ALLEN C. WINSOR
Florida Bar No. 016295
GRAYROBINSON, P.A.
Post Office Box 11189
Tallahassee, Florida  32302-3189
  Phone:  (850) 577-9090
  Fax:  (850) 577-3311
email:  pva@gray-robinson.com
          awinsor@gray–robinson.com

*Attorneys for Secretary of State and Dawn Roberts*