UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-21265-CIV-SEITZ/MCALILEY

```
-------------------------------------------------------------------  x
```
LEAGUE OF WOMEN VOTERS OF FLORIDA,  :
PEOPLE ACTING FOR COMMUNITY TOGETHER  :
(PACT), FLORIDA AFL-CIO, AMERICAN  :
FEDERATION OF STATE, COUNTY AND  :
MUNICIPAL EMPLOYEES, COUNCIL 79  :
(AFSCME), SEIU FLORIDA HEALTHCARE UNION,  :
as organizations and as representatives of their members;  :
MARILYNN WILLS; and JOHN and JANE DOES 1-  :
100,  :
                                                         :
                    Plaintiffs,  :
                                                         :
            v.  :
                                                         :
SUE M. COBB, individually and in her official capacity  :
as Secretary of State for the State of Florida, and DAWN  :
ROBERTS, individually and in her official capacity as  :
Director of the Division of Elections within the  :
Department of State for the State of Florida,  :
                                                         :
                    Defendants.  x
```
-------------------------------------------------------------------
```

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STRIKE

For the following reasons, Plaintiffs respectfully request that the Court deny

Defendants' motion to strike Plaintiffs' declarations and to bar Plaintiffs' witnesses from

testifying at the preliminary injunction hearing:

1.      The premise of Defendants' application – that Plaintiffs did not send our

two additional substantive declarations to Defendants' by email on or before July 20,

2006 – is false.  In fact, on Wednesday, July 19, 2006, at 6:07 p.m. – well in advance of

the deadline set by the Court – the undersigned counsel for Plaintiffs served Defendants

by email with signed copies of the declarations of Ion Sancho, the Supervisor of Elections for Leon County, and Don Green, A. Whitney Girswold Professor of Political Science at Yale University. A copy of my email, with attachments, is attached hereto as Exhibit A.

2.      The body of this July 19, 2006 email to Defendants states: "Please find attached two declarations submitted by plaintiffs. We may submit an additional declaration."

3.      On Thursday, July 20, 2006, Plaintiffs also served Defendants with signed copies of the Sancho and Green declarations by U.S. mail.[1]

4.      On Thursday, July 20, 2006, at approximately 11:00 a.m, Plaintiffs filed the Sancho and Green declarations with the Clerk of the Court, along with a certificate of service that correctly stated that Plaintiffs had served Defendants by email and U.S. mail.[2] Copies of Plaintiffs' e-filing receipts are attached hereto as Exhibit B.

5.      Plaintiffs complied with the Court's July 17, 2006 Order requiring the parties to file all declarations by Thursday, July 20, 2006 at 11:00 a.m., and all of Defendants' arguments to the contrary are meritless.

6.      Indeed, although Defendants provided Plaintiffs with unsigned, draft affidavits from their witnesses on Wednesday, July 19, 2006, they did not provide

---

[1] As far as we are aware, Defendants never served Plaintiffs with copies of their affidavits pursuant to any method of service provided by Fed. R. Civ. P. 5. Defendants never sought, and Plaintiffs never provided, Plaintiffs' written consent to service by electronic means.

[2] In addition, Plaintiffs filed a declaration from Emily J. Groendyke, an associate at the law firm of Kramer Levin Naftalis & Frankel LLP, solely for the purpose of authenticating three of Plaintiffs' exhibits, which exhibits Plaintiffs had cited in their Complaint at paragraphs 43, 49 and 51.

Plaintiffs with final signed affidavits until Thursday, July 20, 2006 – one day after Plaintiffs provided Defendants with final, signed declarations. Indeed, one of Defendants affidavits is still unsigned.

7.      Moreover, in paragraph 7 of Defendants' motion, Defendants mischaracterize the nature of the parties' discussions prior to the Court's July 17, 2006 Order concerning the proposed preliminary injunction hearing. Plaintiffs never agreed to limit their affidavits to those specifically rebutting Defendant's affidavits; rather, Plaintiffs actually objected to the submission of any additional affidavits on the ground that by July 6, 2006, Plaintiffs preliminary injunction motion had been fully submitted. Nonetheless, in a gesture of good will and fairness, Plaintiffs agreed to a proposed schedule (which was never presented by the parties to the Court) that would have permitted Defendants to submit affidavits and also would have permitted Plaintiffs to submit additional declarations in response to Defendants' opposition papers. The Court's subsequent scheduling Order dated July 17, 2006, superseded this agreement between the parties.[3]

8.      In sum, Plaintiffs timely and properly provided Defendants with their two additional substantive affidavits; these two affiants have rearranged their schedules to be available to testify before the Court on Tuesday; and there is no basis to strike or otherwise exclude their testimony.

---

[3]   We note for the record that Defendants' Exhibit B, a letter from Allen Winsor to Craig Siegel dated July 14, 2006, incorrectly states that Plaintiffs indicated in a phone call that they had "already prepared a letter requesting documents." Plaintiffs actually stated that after the call they would write Defendants a letter laying out their specific requests for documents necessary to conduct a full and fair deposition of Defendants' witnesses. Plaintiffs sent the letter the following morning.

WHEREFORE, Plaintiffs' respectfully request that the Court deny Defendant's motion.

Respectfully submitted, this 24th day of July, 2006.

By: _____
CRAIG L. SIEGEL

Craig L. Siegel
Eric A. Tirschwell
Erin A. Walter
KRAMER LEVIN NAFTALIS &
    FRANKEL LLP
1177 Avenue of the Americas
New York, N.Y. 10036
Tel: (212) 715-9100
Cell: (917) 940-5421

Gary C. Rosen
Florida Bar No. 310107
BECKER & POLIAKOFF, P.A.
3111 Stirling Road
Ft. Lauderdale, Florida 33312
    Tel: (954) 985-4133

Elizabeth S. Westfall
ADVANCEMENT PROJECT
1730 M. Street, N.W., Suite 910
Washington, D.C. 20036
Tel: (202) 728-9557

Wendy R. Weiser
BRENNAN CENTER FOR JUSTICE
    AT NYU SCHOOL OF LAW
161 Avenue of the Americas, 12th Floor
New York, N.Y. 10013
Tel: (212) 998-6730

*Attorneys for Plaintiffs*

# Exhibit A

## Siegel, Craig

| | |
|---|---|
| **From:** | Siegel, Craig | | **Sent:** Wed 7/19/2006 6:07 PM |
| **To:** | 'pva@gray-robinson.com'; 'Allen Winsor' |
| **Cc:** | |
| **Subject:** | LWV v. Cobb |
| **Attachments:** | Ion Sancho.final declaration.pi.pdf(116KB)   Don Green.final affidavit.pi..pdf(312KB) |

Dear Pete and Allen,

Please find attached two declarations submitted by plaintiffs.  We may submit an additional declaration.

Yours,

Craig


<<Ion Sancho.final declaration.pi.pdf>> <<Don Green.final affidavit.pi..pdf>>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-21265-CIV-SEITZ/MCALILEY

------------------------------------------------------------- x
LEAGUE OF WOMEN VOTERS OF FLORIDA, PEOPLE          :
ACTING FOR COMMUNITY TOGETHER (PACT),              :
FLORIDA AFL-CIO, AMERICAN FEDERATION OF            :
STATE, COUNTY AND MUNICIPAL EMPLOYEES,             :
COUNCIL 79 (AFSCME), SEIU FLORIDA                  :
HEALTHCARE UNION, as organizations and as          :
representatives of their members; MARILYNN WILLS;   :     **DECLARATION OF ION**
and JOHN and JANE DOES 1-100,                       :     **SANCHO**
                                                    :
                    Plaintiffs,                     :
                                                    :
            v.                                      :
                                                    :
SUE M. COBB, individually and in her official capacity as  :
Secretary of State for the State of Florida, and DAWN      :
ROBERTS, individually and in her official capacity as      :
Director of the Division of Elections within the Department :
of State for the State of Florida,                  :
                                                    :
                    Defendants.                     :
------------------------------------------------------------- x

I, Ion Sancho, declare:

    1.    I am currently the Supervisor of Elections in Leon County, a position that I
have held since January 2, 1989.

**Third-Party Voter Registration Groups:**

    2.    In my experience, third-party registration groups increase the voter
registration rate of eligible voters, which in turn leads to increased
participation at the polls. These groups assist many lower-income and
transient voters to register to vote. Absent assistance from third-party
registration groups, these prospective voters would most likely not register to
vote.

    3.    In my eighteen years as the Leon Country Supervisor of Elections, I do not
recall having received a single voter registration application after a book

closing deadline from the League of Women Voters, the AFL-CIO, AFSCME, or the SEIU.

**Increase in Voter Registration Applications As Book Closing Deadline Approaches**

4.  During my tenure as Supervisor, as the book closing deadline approaches in election years, my office has received a larger number of voter registration applications than it receives in prior months. Although the numbers vary with different elections, this has been the case throughout my tenure, including in the period from 1989 to 1994.

5.  The voter registration applications my office receives in the period before book closing come from individuals registering on their own, third-party voter registration groups, and political parties. I am not aware of any appreciable difference between third party groups, individuals, and political parties in terms of the time spread in which they are most likely to submit registration applications.

6.  The large of number of applications submitted in the weeks and months prior to the deadline likely reflects intensified media attention on the election and campaigning on the part of candidates, which in turn sparks increased interest in the election on the part of prospective voters. Additionally, due to the socio-economic characteristics of prospective registrants who receive assistance from third-party voter registration organizations, such registrants are likely to delay registering until the period just prior to the registration deadline.

7.  In Leon County, I have anticipated this increase in applications and have hired additional staff and assigned staff to double shifts for the period between approximately three months before the book closing date until two weeks after book closing. As a result, I have not had difficulty processing large numbers of voter registration applications that are received very close to the book closing deadline.

**Submission of Voter Registration Applications by Third-Party Organizations and Partisan Organization in 2004**

8.  In 2004, my office received a small number of voter registration applications after the general election book closing deadline from both non-partisan, third-party voter registration organizations, and political parties alike.

9.  More specifically, our records show that in 2004 we received only four such late voter registration applications from all third party registration organizations (including political parties) -- although our records do not specify whether or how many of those four late applications came from

political parties, other third party groups, or both.  These same third party groups (including political parties) registered 20,943 new voters in 2004.

10.    Third party groups (including political parties) registered 62.7 percent of all newly registered voters in Leon County in 2004.

11.    Based on my eighteen years of service as a Supervisor of Elections, I do not see any appreciable difference in the timeliness of voter registration applications submitted by political parties, as compared to those submitted by non-partisan third-party voter registration groups.

12.    Given this law's strict liability and heavy fines, it will not effectively address voter registration problems and will instead diminish voter participation by making it riskier and more costly for private groups to register voters.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on _7/19_, 2006

Ion Sancho

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-21265-CIV-SEITZ/MCALILEY

| | |
|---|---|
| ----------------------------------------------------------------------- x | |
| LEAGUE OF WOMEN VOTERS OF FLORIDA, PEOPLE : ACTING FOR COMMUNITY TOGETHER (PACT), : FLORIDA AFL-CIO, AMERICAN FEDERATION OF : STATE, COUNTY AND MUNICIPAL EMPLOYEES, : COUNCIL 79 (AFSCME), SEIU FLORIDA : HEALTHCARE UNION, as organizations and as : representatives of their members; MARILYNN WILLS; : and JOHN and JANE DOES 1-100, : | **AFFIDAVIT OF DONALD P. GREEN ON BEHALF OF PLAINTIFFS** |

```
----------------------------------------------------------------------- x
LEAGUE OF WOMEN VOTERS OF FLORIDA, PEOPLE          :
ACTING FOR COMMUNITY TOGETHER (PACT),             :
FLORIDA AFL-CIO, AMERICAN FEDERATION OF           :
STATE, COUNTY AND MUNICIPAL EMPLOYEES,            :
COUNCIL 79 (AFSCME), SEIU FLORIDA                 :
HEALTHCARE UNION, as organizations and as         :
representatives of their members; MARILYNN WILLS; :
and JOHN and JANE DOES 1-100,                     :
                                                  :
              Plaintiffs,                         :
                                                  :
        v.                                        :
                                                  :
SUE M. COBB, individually and in her official capacity as  :
Secretary of State for the State of Florida, and DAWN      :
ROBERTS, individually and in her official capacity as      :
Director of the Division of Elections within the Department :
of State for the State of Florida,                         :
                                                  :
              Defendants.                         :
----------------------------------------------------------------------- x
```

**AFFIDAVIT OF DONALD P. GREEN ON BEHALF OF PLAINTIFFS**

# EXPERT AFFIDAVIT OF DONALD P. GREEN ON BEHALF OF PLAINTIFFS

### I.    Qualifications

1. My academic position is A.Whitney Griswold Professor of Political Science at Yale University.  I received my doctorate in political science from University of California, Berkeley in 1988.  I have taught political science at Yale University since 1989.  I was promoted to Professor of Political Science in 1994.  In 1996, I was appointed Director of Yale's Institution for Social and Policy Studies, an interdisciplinary policy center founded in 1968.  I also hold a joint appointment in Yale's Department of

Psychology. In 2003, I was elected Fellow of the American Academy of Arts and Sciences.

2. My expertise lies in the area of campaigns, elections and voter behavior. I regularly teach courses to undergraduate and graduate students on those topics. I have published extensively on, among other things, the topic of electoral campaigns, political parties, public opinion, and voter participation in leading political science journals such as the *American Political Science Review*, *American Journal of Political Science*, *Journal of Politics*, *Electoral Studies*, *Political Research Quarterly*, and *Political Analysis*. A complete list of my publications is included in my curriculum vitae attached as Exhibit A. I recently co-authored a book entitled *Get Out The Vote! How to Increase Voter Turnout* (Brookings Institution Press, 2004), which reports the results of more than a dozen studies of political campaigns and voter mobilization drives. In the course of conducting these studies and in the years since the book was published, I have worked closely with a wide array of partisan and nonpartisan campaigns, evaluating their efforts statistically and observing first hand their day-to-day operations.

3. Over the past 15 years, I have taught a variety of classes in the field of American politics and served as a reviewer for every major academic journal in this field. I have been a member of the American Politics section of the American Political Science Association since 1984 and have made scores of presentations at professional meetings and lecture series around the country. In 2005, I was elected to the Council of the American Political Science Association. I also serve on the Board of Overseers of the American National Election Study. My scholarship has won recognition from the National Science Foundation and substantial financial support from the James Irvine

2

Foundation, Pew Charitable Trusts, Smith Richardson Foundation, Harry Frank Guggenheim Foundation, and Russell Sage Foundation.

4. I am being paid $200 per hour for my work on this case, plus expenses. During the past six years, I have testified as an expert in the following cases: *McConnell v. Federal Election Commission*, *California Prolife Council et al. v. Fair Political Practices Commission et al.*, and *Daggett v. Webster*, and *Acorn et al. vs. Bysiewicz*.

5. Based on my extensive experience studying campaigns and voter turnout in elections at local, state and federal level, I declare under penalty of perjury that the comments in this document are true and correct.

## II.    Distributing vs. Gathering Registration Forms

6. In sum, there are three reasons to expect a registration form distribution campaign to be less effective than a registration form distribution and collection campaign. The latter (1) imposes fewer transaction costs on prospective registrants, (2) more effectively communicates the importance of voter participation, thereby increasing the motivation to vote, and (3) relies on productivity metrics that sustain incentives for high quality interactions between canvassers and prospective registrants.

7. First, any law or administrative rule that has the effect of increasing the transaction cost of registering to vote has the concomitant effect of diminishing voter turnout. Political scientists disagree about the precise strength of this causal relationship, but there is no disagreement about the validity of this general principle or the fact that voter turnout rates are predicted to a statistically significant degree by the ease with which people in different jurisdictions can register to vote.

3

8. This principle applies directly to the question of whether voter registration forms are more likely to be completed by prospective registrants if these forms are distributed *and collected* by groups conducting voter registration drives, as opposed to merely being distributed by these groups. A group that distributes forms but does not gather completed forms in effect fobs the transaction cost of sending in the form onto the prospective registrant, lowering the probability that they will in fact register to vote.

9. Beyond transaction cost-related concerns, it should be added that distributing forms without collecting them communicates an altogether different message to prospective registrants. When forms are distributed and gathered, the prospective registrant is implicitly told that his or her act of registration is of sufficient importance to merit the patience of the person waiting to gather the forms. When a person simply hands out forms, the message is different; it is more akin to "Here is a form to fill out and mail. You are on your own. Good luck."

10. It may be objected that voter registration workers could take a much more hands-on approach even when they do not collect completed forms. Volunteers, it may be argued, could actively assist applicants as they complete the registration form and encourage them to find postage and a mailbox. This type of personal touch might characterize some small-scale volunteer campaigns, but this approach breaks down when applied to large-scale registration campaigns, which rely on a mix of volunteers and paid staff in order to cover large geographic areas, such as the State of Florida. Registration drive supervisors monitor the productivity of those conducting registration drives by counting the number of registration forms that they collect. Without the completed forms, it is difficult to know which workers are most productive or which areas generate

the greatest number of new registrants. For these reasons, a group's inability to gather completed forms undercuts the efficiency of a registration campaign. As the metric of productivity shifts from the number of completed forms gathered to the number of forms distributed, workers will naturally shift their emphasis in dealing with prospective registrants, favoring larger quantities of brief interactions.

11. This shift in productivity metrics is likely to occur even among unpaid volunteers. Although unpaid volunteers do not have a direct economic incentive to meet quotas, their organizational leadership has an incentive to generate quantitative productivity data as a means of justifying their allocation of volunteer resources and their fundraising requests to potential donors. The leadership will therefore change the way in which they train and deploy registration volunteers. The net effect of these changing organizational imperatives is lower quality interactions with prospective registrants, which in turn undercuts the effectiveness of voter registration efforts.

12. One of the key lessons generated by the experimental literature on voting is that the personal touch is crucial to success. Consider the experimental evidence on the effects of face-to-face communication on voter turnout. As I demonstrate in my *Get Out the Vote* book, a variety of studies have established that a get-out-the-vote script is far more influential when delivered in person rather than by phone. Making direct personal contact with voters makes a difference. At the same time, the specific content of the get-out-the-vote appeal tends not to alter its effectiveness. I interpret this pattern to mean that most of what is communicated at the doorstep is symbolic: voters are informed by the mere fact that someone has taken the trouble to encourage them to vote that others care

5

deeply about their participation. In much the same way, I believe, registration efforts that gather completed registration forms implicitly underscore the importance of participation.

### III. Registration Drives as Associative Activity

13. In principle, registration drives could be conducted solely by political parties. However, any policy that effectively limits the capacity of non-party groups to conduct voter registration and outreach ignores the role that non-party groups play in the development and change of political parties and politics. Political parties are not static entities. They instead represent fluid coalitions, the composition of which is the subject of ongoing intra-party and extra-party competition. Non-party interest groups are often actors that attempt to change the balance of power within and between parties. Throughout American history, non-party actors (e.g., Abolitionists, Progressives, Moral Majority) have mobilized their adherents and transformed themselves from non-party actors to part of the dominant coalition within a party. Subjecting non-party interest groups to different rules when it comes to registering voters disrupts this process by putting extra-party interest groups at a distinct disadvantage vis-à-vis their established party counterparts.

14. From the standpoint of prospective registrants, non-party registration drives offer an important opportunity to express their support for non-party actors in the political process. Members of new immigrant groups, for example, often feel excluded from political parties, who are perceived to favor more established voting blocs. Non-party actors are therefore able to gain political support in these immigrant communities through outreach efforts that go beyond the efforts of the parties; and in turn, voters who register through these groups are, in so doing, able to express their frustration with the

6

parties and their outreach efforts. Again, making it more difficult or risky for non-party groups to conduct these voter registration efforts impedes the natural process by which voters and interest groups express themselves in the American party system.

15. A law that singles out non-party organizations with threatened sanctions undercuts the associative activity that is central to our constitutional design. A system that, in effect, allows only parties to register voters undermines the associative and expressive rights of social groups that find themselves outside dominant party coalitions. Consider again the case of recent immigrants. The strategic logic of maximizing votes impels parties to give greater attention to so-called high-propensity voters than to newly naturalized citizens from minority communities. Certain non-party organizations make a special point of filling this gap, conducting voter registration and education campaigns in these ethnic communities. Voters, in turn, respond to these organizations' efforts and register to vote when approached by these outreach campaigns precisely because of the reputation these organizations have gained as credible representatives of minority interests. This kind of associative activity and political expression is threatened by a law that makes voter registration campaigns the sole province of political parties.

## III. Probable Effects of Penalizing Groups for Gathering Completed Forms

16. Any legal rules that make it risky – catastrophically risky in this case – for groups to gather completed forms will put these groups out of the business of conducting what might be called "neighborhood outreach" registration campaigns. By neighborhood outreach campaigns, I mean the kinds of campaigns in which individuals are visited at their homes or approached in public places and encouraged to complete registration

7

forms.  Large-scale registration campaigns of this kind were responsible for the record-breaking surge in voter registration in swing states during the summer of 2004.

17. Why will this style of registration campaign die out?  The answer is that the success of a face-to-face encounter with a prospective registrant hinges on the ability to gather the completed registration card.  Otherwise, the neighborhood registration campaign is analogous to a direct mail campaign, in which voters are merely given registration materials.  Direct mail campaigns are generally much less expensive than campaigns that involve the hiring and supervision of a ground operation.  The economics of (merely) distributing registration cards will eliminate neighborhood outreach campaigns by non-party actors.

18. A growing number of political observers are expressing concern about the de-personalization of politics and sense of political disengagement that it engenders.  Any policy that impedes the growth of community-based groups engaged in political outreach efforts and replaces them with automated and impersonal campaign tactics threatens to reverse the gains in civic engagement that were witnessed in the last presidential election cycle.

## IV. Impairing Registration Efforts Results in Lower Voter Turnout

19. Non-party actors use registration campaigns during the weeks prior to the close of registration as a stepping stone to the voter education and voter mobilization efforts that lead up to Election Day.  Neighborhood registration activity – the process of meeting voters and registering them – provides three direct benefits to any voter education and get-out-the-vote effort.  First, it builds a personal relationship between the voter and the canvasser (or the canvasser's organization).  Voters, particularly residents

of low-income communities, often complain about the tendency of traditional political actors to pay attention to them only in the closing days of a campaign. By establishing a personal relationship well before Election Day, a registration campaign builds trust in the political process, conveys the authenticity of the group's commitment to the community, and signals the group's interest in bringing new voters into the political process.

20. Second, the process of registering voters facilitates voter education and get-out-the-vote campaigns directly. New registrants' contact information becomes immediately available to the group that registers them, facilitating the rapid creation of databases that make timely get-out-the-vote campaigns possible. This data-basing aspect of a registration drive is of special importance to groups that have as part of their mission the mobilization of certain demographic groups. For example, in my extensive experience assembling and analyzing voter files, I have found that in local jurisdictions registration rolls do not include key pieces of information, such as race, ethnicity, or age. A group endeavoring to mobilize new registrants from one or more of these demographic segments would have difficulty doing so on the basis of the registration list alone. This information gap is overcome when new registrants are met face-to-face during the voter registration process. Note that political parties in Florida do not face this problem (or at least not to the same degree as interest groups), because registrars specifically encourage voters to declare their party affiliation when registering.

21. Finally, the process of registering voters may enhance the effectiveness of get-out-the-vote contacts in the closing days of the election. Although experimental evidence on this point is mixed, there is, on balance, reason to believe that the most effective get-out-the-vote drives are carried out by groups that register and then re-contact the people

they aim to mobilize. This register-and-re-contact mobilization strategy seems more effective than a mobilization strategy that targets newly registered people with whom the organization had no prior contact.

**V. Summary**

22. Laws that impede the voter registration efforts of non-party organizations harm the electoral system. The particular law at issue in this case changes the incentive structure within which these organizations operate in ways that I believe will diminish voter turnout and impair the representation of groups that would otherwise be the targets of voter registration drives. By confining registration drives to party-led efforts, the new law undercuts rights of association and expression that were enjoyed under the status quo ante, wherein interest groups dramatized the gaps in party representation by reaching out to communities outside the dominant party coalitions.

I declare under penalty of perjury that the foregoing is true and correct.

Signed _____     Executed on _7/19/2006_

# Exhibit B

Southern District of Florida E-File System

**2 document(s) submitted 7/20/2006 10:59:25 AM.**

Case #06CV21265
Style: League of Women Voters of Florida v. Sue M. Cobb, et al.
Title of Document: Declaration of Emily J. Groendyke

Gary C. Rosen, would you like to file more documents? Yes No

Southern District of Florida E-File System

**1 document(s) submitted 7/20/2006 11:00:34 AM.**

Case #06CV21265
Style: League of Women Voters of Florida v. Sue M. Cobb, et al
Title of Document: Declaration of Ion Sancho

Gary C. Rosen, would you like to file more documents? Yes No

Southern District of Florida E-File System

**1 document(s) submitted 7/20/2006 11:02:21 AM.**

Case #06CV21265
Style: League of Women Voters of Florida v. Sue M. Cobb, et al.
Title of Document: Affidavit of Donald P. Green on Behalf of Plaintiffs

Gary C. Rosen, would you like to file more documents? Yes No

Southern District of Florida E-File System

**1 document(s) submitted 7/20/2006 11:57:25 AM.**

Case #06CV21265
Style: League of Women Voters of Florida v. Sue M. Cobb, et al.
Title of Document: Notice of Filing Plaintiffs' Declarations

Gary C. Rosen, would you like to file more documents? Yes No

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct coy of Plaintiffs'

Opposition to Defendants' Motion to Strike was served by electronic mail and by Federal

Express on the 24th day of July, 2006, upon the following:

> Peter Antonacci, Esq.
> Gray Robinson, P.A.
> 301 S. Bronough Street, Suite 600
> Post Office Box 11189
> Tallahassee, FL 32302-3189

_____
Craig L. Siegel