

Aug 2 2006

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-21265-CIV-SEITZ/MCALILEY

------------------------------------------------------------------- x
LEAGUE OF WOMEN VOTERS OF FLORIDA, PEOPLE
ACTING FOR COMMUNITY TOGETHER (PACT),
FLORIDA AFL-CIO, AMERICAN FEDERATION OF
STATE, COUNTY AND MUNICIPAL EMPLOYEES,
COUNCIL 79 (AFSCME), SEIU FLORIDA
HEALTHCARE UNION, as organizations and as
representatives of their members; MARILYNN WILLS;
and JOHN and JANE DOES 1-100,

          Plaintiffs,

          v.

SUE M. COBB, individually and in her official capacity as
Secretary of State for the State of Florida, and DAWN
ROBERTS, individually and in her official capacity as
Director of the Division of Elections within the Department
of State for the State of Florida,

          Defendants.
------------------------------------------------------------------- x

**NOTICE OF FILING PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW**

PLAINTIFFS, League of Women Voters of Florida, People Acting for Community Together (PACT), Florida AFL-CIO, American Federation of State, County and Municipal Employees, Council 79 (AFSCME), SEIU Florida Healthcare Union, as organizations and as representatives of their members; Marilynn Wills; and John and Jane Does 1-100 (collectively "Plaintiffs"), by and through their undersigned counsel, submit Plaintiffs' Supplemental Memorandum of Law.

Dated: August 2, 2006

| | |
|---|---|
| Gary C. Rosen<br>Florida Bar No. 310107<br>BECKER & POLIAKOFF, P.A.<br>3111 Stirling Road<br>Ft. Lauderdale, Florida 33312<br>Tel: (954) 985-4133 | Wendy R. Weiser<br>Renée Paradis<br>BRENNAN CENTER FOR JUSTICE<br>    AT NYU SCHOOL OF LAW<br>161 Avenue of the Americas, 12th Floor<br>New York, N.Y. 10013<br>Tel: (212) 998-6730 |
| Elizabeth S. Westfall<br>ADVANCEMENT PROJECT<br>1730 M. Street, N.W., Suite 910<br>Washington, D.C. 20036<br>Tel: (202) 728-9557 | Eric A. Tirschwell<br>Erin A. Walter<br>Craig L. Siegel<br>KRAMER LEVIN NAFTALIS &<br>    FRANKEL LLP<br>1177 Avenue of the Americas<br>New York, N.Y. 10036<br>Tel: (212) 715-9100<br><br>By: _____<br>    Eric A. Tirschwell<br><br>*Attorneys for Plaintiffs* |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

---

LEAGUE OF WOMEN VOTERS OF FLORIDA, PEOPLE
ACTING FOR COMMUNITY TOGETHER (PACT),
FLORIDA AFL-CIO, AMERICAN FEDERATION OF
STATE, COUNTY AND MUNICIPAL EMPLOYEES,
COUNCIL 79 (AFSCME), SEIU FLORIDA
HEALTHCARE UNION, as organizations and as
representatives of their members; MARILYNN WILLS;
and JOHN and JANE DOES 1-100,

        Plaintiffs,

v.

SUE M. COBB, individually and in her official capacity as
Secretary of State for the State of Florida, and DAWN
ROBERTS, individually and in her official capacity as
Director of the Division of Elections within the Department
of State for the State of Florida,

        Defendants.

**06-21265-CIV-
SEITZ/McALILEY**

---

# PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW

Plaintiffs submit this supplemental memorandum of law in response to Defendants' recent submission dated July 30, 2006, which raises new arguments never addressed in their prior briefing.[1] Defendants argue that this Court should ignore the strict liability imposed by the challenged law as written and enacted. Apparently conceding that if the law were enforced as written it would impose strict liability in violation of the Constitution, defendants try to fall back on the possibility that the state might exercise discretion in not enforcing its own law. They suggest that this possibility provides sufficient justification for, or even requires, this Court to refrain from enjoining the enforcement of this unconstitutional law, relying instead on the good will of the state of Florida and its officials to refrain from infringing on plaintiffs' rights. This is not adequate relief, and it is simply not the standard that governs First Amendment challenges.

## I. The Possibility That the State Might Choose Not to Enforce its Unconstitutional Law Is Not a Sufficient Basis for This Court to Abstain From Enjoining It

Defendants' Supplemental Memorandum of Law makes four arguments meant to suggest that state discretion in enforcing the challenged law is an adequate substitute for injunctive relief from this Court. Each of these arguments misstates the proper inquiry in a First Amendment case: when First Amendment rights are at stake, plaintiffs should not and do not have to wait for the state to fine them before obtaining the relief they need to engage in core political speech and association without fear or threats of penalties.

### A. The Secretary of State's Discretion in Applying the Law Militates in *Favor* of Injunctive Relief

Defendants argue that the Secretary of State could choose not to enforce the law in certain circumstances; could choose and has chosen (in other contexts) to limit her investigatory powers by self-promulgated rule; and could choose to not impose fines. But they do not—nor

---

[1] Plaintiffs received defendants' most recent memorandum by e-mail at 3:22 pm on Sunday, July 30, 2006, notwithstanding defendants' representation to the Court that they would serve it on the morning of Friday, July 28, 2006.

1

could they—point to any court decision refusing to enjoin a state law under the First Amendment on the ground that the state officials "could" exercise discretion in its enforcement. In fact, the opposite is true: when executive officials are granted the ability to exercise discretion—and hence to discriminate—in enforcing a law that touches on the First Amendment, *that alone* may be enough to render the law *unconstitutional*. *See, e.g., City of Chi. v. Morales*, 527 U.S. 41, 60-64 (1999) (plurality opinion) (striking down ordinance that did "not provide sufficiently specific limits on the enforcement discretion of the police"); *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992) ("A government regulation that allows arbitrary application is [unconstitutional] because such discretion has the potential for becoming a means of suppressing a particular point of view." (internal quotation marks omitted)).

## B. The State's Administrative Process Is Irrelevant Here

Defendants argue that, because third-party voter registration groups might receive the benefit of administrative process before being fined, the challenged law is somehow less unconstitutional. They are wrong, and it is not surprising that they cannot cite a single case where a court declined a First Amendment challenge on that ground. A speech-restrictive fine imposed after a hearing is no less unconstitutional than one imposed before a hearing, as confirmed by the multitude of Supreme Court cases invalidating under the First Amendment even criminal laws, which necessarily provide the utmost process. *Cf. Morales*, 527 U.S. at 45. In any event, under Florida law, plaintiffs could not even raise their constitutional objections in an administrative hearing, since "it is axiomatic that an administrative agency has no power to declare a statute void or otherwise unenforceable." *Palm Harbor Special Fire Control Dist. v. Kelly*, 516 So. 2d 249, 250 (Fla. 1987).

2

### C. The Unlikely Possibility of a Narrow Construction of the Law Does Not Affect Plaintiffs' Motion

Whether or not a state court might construe the statute, contrary to its clear meaning and to the apparent intent of the legislature, not to apply strict liability is irrelevant here. No state court has given "the ordinance any construction at variance with the apparent plain import of its language," and this Court is "thus relegated, at best, to the words of the ordinance itself." *Coates v. Cincinnati*, 402 U.S. 611, 612-14 (1971). The First Amendment does not require plaintiffs to rely on the remote future possibility that state courts will interpret the law so as not to bankrupt them for exercising their rights.

### D. A Facial Challenge Is Appropriate Here

Defendants cite *dicta* in *United States v. Salerno*, 481 U.S. 739, 745 (1987), for the proposition that a facial challenge must "establish that no set of circumstances exists under which the Act would be valid." But that standard is not relevant here because *Salerno* did not involve a First Amendment challenge, which the Supreme Court has repeatedly said permits broader facial challenges. *See, e.g., Salerno*, 481 U.S. at 745 (differentiating First Amendment cases, which permit overbreadth challenges, from its statement concerning facial challenges).[2] Indeed, both *Meyer v. Grant*, 486 U.S. 414, 417 (1988), and *Buckley v. American Constitutional Law Foundation* ("*ACLF*"), 525 U.S. 182, 187-88 (1999), permitted facial challenges to laws that had a chilling effect on speech and association. In any event, the challenged law indeed would be unconstitutional in every application inasmuch as it serves to burden speech and association on the basis of strict and joint and several liability.

---

[2] Moreover, "[t]o the extent [the Supreme Court] ha[s] consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself." *Morales*, 527 U.S. at 55 n.22.

3

## II. Defendants Have not Demonstrated that Strict Liability is Necessary to Further Important State Interests

Under *Anderson v. Celebrezze*, 460 U.S. 780 (1983), in assessing the constitutionality of state election regulations, a court must

> first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Id.* at 789; *see also Fulani v. Krivanek*, 973 F.2d 1539 (11th Cir. 1992). Under this framework, when an election regulation imposes a *severe* burden on First Amendment activity, it is subject to exacting scrutiny. *See, e.g., ACLF*, 525 U.S. at 192 n.12; *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). When its burdens are lesser, the law will be upheld only if its requirements are "reasonable and nondiscriminatory" and serve "important regulatory interests," *Anderson*, 460 U.S. at 788, which make it "necessary to burden plaintiffs' rights." *Id.* at 789.

### A. The Character and Magnitude of the Injury to Plaintiffs' Rights

The challenged law, including its strict liability component, imposes a severe burden on Plaintiffs' First and Fourteenth Amendment rights. The uncontested testimony shows that the law has completely deterred each of the plaintiffs from engaging in any voter registration activity.[3] Professor Green's unrefuted testimony further establishes that this deterrence is the natural and inevitable effect of the challenged law, especially because of its strict liability, but also because of its strict ten-day deadline and its personal and joint and several liability. (Tr. vol.

---

[3] The sole exception is one small voter registration drive that AFSCME conducted in Jacksonville over the course of two days. To protect itself from penalties under the challenged law, AFSCME had to go to Herculean lengths and to spend fifteen times its normal budget to organize this drive. (Tr. Vol. 1, 141-44 (Alma Gonzalez).)

4

1, 66-67, July 25, 2006.) Defendants' evidence substantiates this effect: since the law went into effect, only a handful of groups, most of them small, have even expressed their intent to engage in voter registration by registering with the state. (Tr. vol. 2, 134-35, July 26, 2006 (Donna Miller).) The net effect of the law is a drastic decrease in the one-on-one political conversations that are characteristic of voter registration drives. This is exactly the kind of injury that the Supreme Court has found especially problematic in cases involving election-related regulations.

In *ACLF*, the Supreme Court explained that, in making the judgments required by *Anderson*, courts must "be vigilant . . . to guard against undue hindrances to political conversations and the exchange of ideas." 525 U.S. at 192 (1999). Thus, the Court explained, if a law "significantly inhibit[s] communication with voters about proposed political change," *id.*, or "produces a speech diminution," *id.* at 194, then courts should apply the more exacting scrutiny used in *Meyer*, 486 U.S. at 414, which struck down a law prohibiting the payment of initiative petition circulators. *ACLF*, 525 U.S. at 192. The *ACLF* Court noted that laws that have this kind of effect fall within the severe burden box of the *Anderson* test. *Id.* at 192 n.12. As Justice Thomas said in his concurrence, restrictions on "'core political speech' so plainly impose a 'severe burden'" under the first part of the *Anderson* test that courts need not assess the severity of the burden first. *Id.* at 208 (Thomas, J., concurring). In other words, under the first part of the *Anderson* test, laws that impede communication and association out in the world, as opposed to through the ballot, create *per se* severe burdens on speech and association and are subject to more exacting scrutiny.[4]

---

[4] The Eleventh Circuit's decision in *Biddulph v. Mortham*, 89 F.3d 1491 (1996), acknowledged the importance of this distinction between general regulations of elections and laws that affect political activity out in the world. The *Biddulph* court said that strict scrutiny does not apply to "*general* initiative regulations" (*i.e.*, those that set out the requirements for getting an initiative on the ballot), but it *does* apply to "the regulation of the circulation of petitions--which is 'core political speech.'" *Id.* at 1497. That same distinction applies here.

5

Defendants have repeatedly argued that the penalties imposed by the law reach only conduct and not speech. However, regardless of whether this Court applies the strict scrutiny used in *Meyer*, the Court's analysis in that case directly answers defendants' contention. *Meyer* makes clear that the First Amendment is not concerned with what particular aspect of an activity is being regulated. Rather, in assessing the burden imposed on First Amendment activity, the *Meyer* Court looked to whether the specific conduct being regulated was part of an activity that is "*characteristically intertwined*" with protected speech and association. *Meyer*, 486 U.S. at 422 n.5. If so, and if the law has the "*inevitable effect of reducing the total quantum of speech on a public issue*," then the First Amendment requires that it be judged under exacting scrutiny. *Id.* at 423. The law at issue in *Meyer* did not directly regulate an expressive activity; paying petition circulators is not itself a speech or associative act. But that did not matter; what was important to the Court was that the *ultimate effect* of prohibiting those payments was that there would be fewer one-on-one conversations about important political issues. *Id.* at 424. Similarly, the requirement that petition circulators be registered voters struck down in *ACLF* did not directly regulate speech or association, but it had the effect of reducing the pool of circulators. *ACLF*, 525 U.S. at 194-95. The same is true here.[5]

The key phrase, "characteristically intertwined," comes from a Supreme Court case striking down a law limiting door-to-door charitable solicitation, *Schaumberg v. Citizens for a Better Environment*, 444 U.S. 620 (1980). The full passage from that case provides:

---

[5] In their reply brief to their motion to dismiss, defendants suggest that this *Meyer* analysis leads to a slippery slope. Specifically, they say that if the test is the effect on speech or association, then even a tax increase could be challenged as unconstitutional because it might have the effect of stopping speech calling for more taxes. But the *Meyer* inquiry is not whether, by some remote causal relationship, a regulation has an incidental effect on speech. The term "inevitable effect" carries a meaning of a closer causal connection than defendants' speculative example. Moreover, the Court specifically explained which laws are covered: those that regulate an activity that is "characteristically intertwined" with protected speech and association.

6

> Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken *with due regard for the reality* that solicitation is *characteristically intertwined with* informative and perhaps persuasive *speech* seeking support for particular causes or for particular views on economic, political, or social issues, and for the *reality* that *without solicitation the flow of such information and advocacy would likely cease*.

*Id.* at 632 (emphasis added) (quoted in *Meyer*, 486 U.S. at 422 n.5). That is exactly the case here. While collecting voter registration forms, standing alone, might be subject to reasonable, non-discriminatory regulations, the evidence in this case makes clear that collecting forms is "characteristically intertwined" with the protected speech and association that take place in voter registration drives. The evidence also shows not only that it is *likely* that the "the flow of information and advocacy" in voter registration drives would cease if collection were penalized but also that it in fact *has* ceased.

This passage in *Schaumberg* responded to an attempt by defendants in that case to parse a cohesive activity into discrete components, an attempt fully rejected by the Court:

> It is urged that the ordinance should be sustained because it deals only with solicitation and because any charity is free to propagate its views from door to door in the Village without a permit as long as it refrains from soliciting money. But this represents a far too limited view of our prior cases.

*Schaumburg*, 444 U.S. at 628. The defendant in *Meyer* also tried to parse out particular aspects of the activity of circulating petitions. But, as we discuss on page 11 of our Reply brief, the *Meyer* Court rejected that argument. This Court should similarly reject defendants' attempt to parse out particular aspects of the cohesive activity of voter registration drives.

In short, under *Meyer*, *Schaumberg*, and a host of other Supreme Court cases, the touchstone of the First Amendment is not the specific aspect of an activity that is being regulated, but rather whether that activity as a whole is typically accompanied by protected speech or association. Here, voter registration is, and the strict liability imposed by the law has

7

had the effect of deterring that entire activity, even if it technically penalizes only the collection of forms. The law must therefore be justified under exacting scrutiny.[6]

### B. The Precise Interests Forwarded by the State Do Not Justify Strict Liability or Personal and Joint and Several Liability

#### 1. Interest in ensuring that voter registration forms are timely submitted

Florida has a valid interest in ensuring that voter registration applications are timely submitted. But defendants have not met their burden of demonstrating even that third-party groups generate more late forms than do individuals registering on their own, NVRA agencies, or political parties—much less that they create a uniquely serious problem necessitating these draconian remedies. And contrary to defendants' contention, it is *their* burden. The economic regulation cases they cite are simply not relevant here. In the First Amendment context, regardless of the level of scrutiny, it is not enough for defendants to assert that the legislature *could have* concluded that there was a problem; they must show an actual problem. But the only evidence that defendants put forward to justify the sweeping law is vague and unsubstantiated testimony that there were a handful of incidents involving late forms from a few third-party voter registration organizations in 2004. (Tr., vol 2., 153-157, 170-174 (Donna Miller).) This is not legally sufficient to conclude that third party groups create a problem substantial enough to justify the State's draconian strict liability and severe fines remedy. What is more, Leon County

---

[6] It is for this reason that the two "expressive conduct" cases defendants cite are not at all applicable here. See *Rumsfeld v. Forum for Acad. & Inst. Rights ("FAIR")*, 126 S. Ct. 1297 (2006); *United States v. O'Brien*, 391 U.S. 367 (1968). Both cases were civil disobedience cases in which the plaintiffs did not challenge the legality of the government laws they were protesting, but rather claimed that their conduct of non-compliance with those laws was protected by the First Amendment because it was expressive – that is, it expressed disapproval with the law. In neither case was the underlying conduct "characteristically intertwined" with protected speech and association the way voter registration is. Moreover, in neither case did the government prohibition at issue have the "inevitable effect" of reducing protected speech and association that typically accompanies the conduct the way the challenged law here does. Prohibiting the burning of draft cards does not undermine the reason for engaging in war protest speech and is not at all likely to reduce that speech. But prohibiting the collection of voter registration forms makes it highly unlikely that groups will do voter registration at all.

8

Supervisor Ion Sancho testified that his office experienced virtually no problems with late voter registration applications from third-party groups. (Tr., vol. 2, 150-151.) Plaintiffs have also shown that in 2004, the percentage of applications submitted after the voter registration deadline in Florida was not materially different than in the previous four presidential election years and in fact was *lower* than in 2000 and 1996. (*See* PX 17.) In other words, it is factually incorrect that third-party groups are more likely to submit forms late than citizens acting on their own.

Even if Defendants could establish some particular problem with third-party groups, they have not demonstrated that strict and joint and several liability is necessary to serve the state's interests in ensuring that applications are submitted on time. The law penalizes even those groups and individuals that act with reasonable care, holding plaintiffs liable for innocent mistakes, a third party's malicious acts, and other events beyond their control. While the state has not demonstrated that third-party groups are any more likely than political parties, the voters themselves, or even government agencies to return forms late, even if they had, they have not demonstrated how a system targeted to penalizing the particular actors who may act recklessly or deliberately would not be sufficient to address this problem. A separate provision of Florida law does just that. Fla. Stat. § 104.0615(4) (criminalizing the "knowing[] ... obstruct[ion] or delay [of] the delivery of voter registration forms"). The challenged law simply goes way too far in burdening plaintiffs' rights to withstand scrutiny under the *Anderson* balancing test.

### 2. Interest in preventing voter fraud

While Florida has an undeniable interest in preventing voter fraud, defendants have put forward absolutely no evidence of voter fraud, let alone any fraud that could conceivably be prevented by the challenged law. Indeed, there is absolutely no causal connection that can reasonably be drawn between this law and the prevention of voter fraud. Defendants do not

9

explain how high monetary penalties, a strict liability scheme for which there is personal, joint and several liability, or an arbitrary ten-day deadline could possibly help prevent the submission of fraudulent voter registration forms. The law is simply not rationally related to that interest.

### 3. Interest in efficient administration

While administrative efficiency may be a legitimate state interest, case after case has held that it is not a sufficient justification for burdening constitutional rights. *See, e.g., Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217-18 (1986); *Dunn v. Blumstein*, 405 U.S. 330, 351 (1972). In this case, defendants have demonstrated only that third-party groups were responsible in part for an unprecedented number of citizens registering to vote in 2004. Evidence to be introduced by plaintiffs, on the other hand, demonstrates that the rate at which voter registration applications were submitted in 2004 was the same as it was in the previous four presidential election years. (*See* PX 15-17; *see also* Tr., vol. 1, 74 (Prof. Don Green); *id.* 151-54 (Ion Sancho).) To the extent the state's problems in administering the elections of 2004 were the result of more of its citizens becoming engaged in the democratic process, it cannot complain of the increased cost involved in allowing them to do so. The state simply does not have a legitimate interest in defraying the administrative burdens of ensuring that its citizens can register to vote. *See, e.g., Tashjian*, 479 U.S. at 217-18 (finding administrative burden caused by increased number of voters in Republican primary insufficient to justify restriction).

Defendants have not demonstrated how an interest in efficient administration is served by holding third-party groups strictly liable or making their volunteers, employees and board members personally, joint and severally liable for severe fines. In fact, Ion Sancho testified that working with third-party groups improved his ability to administer the Leon County Supervisor's office. (Tr. vol. 1, 147-50, 154-57.) Alma Gonzalez's testimony confirms the fact that third-

10

party groups helped to improve the administration of the counties' voter registration processing systems. (*Id.* 53-58.) Moreover, even if the law helped in reducing burdens of election administration, defendants have not shown that this interest makes it at all "necessary to burden plaintiffs' rights" in this way. The evidence makes clear that defendants had ample notice of the increase in the number of voter registration applications and did not take sufficient steps to staff their offices, train their staff, and properly process the new applications. Where such steps were taken, as in Leon County, there were no problems in handling voter registration applications. Defendants have simply not shown that they could not solve their administrative problems without burdening plaintiffs' rights.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that this Court enter an order prohibiting defendants from enforcing Fla. Stat. §§ 97.0575 and 97.021(36).

Dated: August 2, 2006

Gary C. Rosen, Florida Bar No. 310107
Kathy E. Brewer
BECKER & POLIAKOFF, P.A.
3111 Stirling Road
Ft. Lauderdale, Florida 33312
Tel: (954) 985-4133

Elizabeth S. Westfall
Jennifer Maranzano
ADVANCEMENT PROJECT
1730 M. Street, N.W., Suite 910
Washington, D.C. 20036
Tel: (202) 728-9557

Wendy R. Weiser
Renée Paradis
BRENNAN CENTER FOR JUSTICE AT
 NYU SCHOOL OF LAW
161 Avenue of the Americas, 12th Floor
New York, N.Y. 10013
Tel: (212) 998-6730

Eric A. Tirschwell
Craig L. Siegel
Erin Walter
KRAMER LEVIN NAFTALIS &
 FRANKEL LLP
1177 Avenue of the Americas
New York, N.Y. 10036
Tel: (212) 715-9100

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of Plaintiffs' Supplemental Memorandum of Law, dated August 2, 2006, was served by electronic mail and regular United States mail, postage prepaid, on the 2nd day of August, 2006, upon the following:

> Peter Antonacci, Esq.
> GrayRobinson, P.A.
> 301 S. Bronough Street, Suite 600
> Post Office Box 11189
> Tallahassee, FL 32302-3189

_/s/ Eric A. Tirschwell_
Eric A. Tirschwell