**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 06-21265-CIV-SEITZ/MCALILEY

LEAGUE OF WOMEN VOTERS OF FLORIDA,
PEOPLE ACTING FOR COMMUNITY TOGETHER,
FLORIDA AFL-CIO, AMERICAN FEDERATION OF
STATE AND MUNICIPAL EMPLOYEES, COUNSEL
79 (AFSCME), SEUI FLORIDA HEALTHCARE UNION,
as organizations and as representatives of their members;
MARILYNN WILLS; and JOHN AND JANE DOES
1-100,

       Plaintiffs,

v.

SUE M. COBB, individually and in her official capacity
as Secretary of State for the State of Florida, and DAWN
ROBERTS, individually and in her official capacity as
Director of the Division of Elections within the
Department of State for the State of Florida,

       Defendants.
_____/

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION  AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

       THIS MATTER is before the Court on Plaintiffs' Motion for Preliminary Injunction **[DE 10]**

and Defendants' Motion to Dismiss **[DE 26]**.  Plaintiffs contend that a new Florida state law

(hereinafter the "Third-Party Voter Registration Law" or the "Law"), Fla. Stat. §§ 97.021(36),

97.0575 (2005), which imposes fines on all organizations, except political parties, that collect voter

registration applications but fail to timely submit them, violates their rights under the First and

Fourteenth Amendments to the United States Constitution.  Specifically, Plaintiffs argue that the

Third-Party Voter Registration Law interferes with their speech and association rights while

-1-



unjustifiably exempting political parties (Counts I and II). Plaintiffs further argue that the Law chills and burdens their exercise of free speech and association (Count III) and burdens the John and Jane Does' right to vote (Count IV).

"The right of voting . . . is the primary right by which all other rights are protected. To take this right away, is to reduce a man to slavery . . . ." Thomas Paine, Dissertation On The Principles Of Government, 1795. While neither the Plaintiffs nor the Defendants quarrel with this principle, the parties disagree over what measures are necessary to protect and promote that right. Plaintiffs argue that the Third-Party Voter Registration Law sweeps too broadly, impinging upon their important First Amendment freedoms while only tangentially serving its intended purpose. They also argue that because the Law burdens their voter registration collection efforts, it will be more difficult for underrepresented and minority citizens to register to vote. Defendants, however, contend that the Florida legislature acted within its purview to regulate third party voter registration organizations in order to protect the rights of Florida citizens at the ballot box. Defendants further contend that because the Third-Party Voter Registration Law regulates only conduct, Plaintiffs' regulated activities do not have any communicative value.

Having reviewed all relevant portions of the record and after conducting a preliminary injunction hearing and oral argument, the Court grants in part and denies in part Plaintiffs' Motion for Preliminary Injunction and Defendants' Motion to Dismiss. As to Counts I and II, the Court finds that the Third-Party Voter Registration Law unconstitutionally discriminates in favor of political parties by excluding them from the definition of "third party voter registration organization." As to Count III, the Court finds that the Third-Party Voter Registration Law's combination of heavy, strict, joint and several liability fines is unconstitutional as it chills Plaintiffs'

First Amendment speech and association rights. As to Count IV, the Court grants Defendants' Motion to Dismiss because, on the face of the Complaint, Plaintiffs do not have standing to address the rights of Florida citizens generally. The Court also dismisses the claims against Defendants in their individual capacities.

## I.   PROCEDURAL BACKGROUND

Plaintiffs commenced this action on May 18, 2006, seeking declaratory and injunctive relief as well as nominal damages against Defendants in their individual capacities. (*See* Joint Proposed Findings of Fact ("Facts") ¶¶ 1, 2.)   The Plaintiffs include: (1) two nonprofit community organizations -- the League of Women Voters of Florida (the "League") and People Acting for Community Together Now ("PACT"); (2) three nonprofit labor union organizations -- Florida AFL-CIO, Council 79 of the American Federation of State, County, and Municipal Employees ("AFSCME"), and SEIU Florida Healthcare Union ("SEIU"); (3) one individual member of the League -- Marilynn Wills; and (4) John and Jane Does 1-100. (Facts ¶¶ 1, 4.) Defendants are Sue Cobb, individually and in her official capacity as Secretary of State for the State of Florida, and Dawn Roberts, individually and in her official capacity as Director of the Division of Elections within the Department of State for the State of Florida. (Facts ¶ 1.)

On June 6, 2006, Plaintiffs filed a Motion for Preliminary Injunction and Incorporated Memorandum of Law in Support of their Motion. (Facts ¶ 3.) On June 21, 2006, Defendants filed a Response to the Motion for Preliminary Injunction and a Motion to Dismiss the Complaint. (Facts ¶ 3.) Plaintiffs filed a Reply in support of the Motion for Preliminary Inunction on July 7, 2006, and a Response to the Motion to Dismiss on July 10, 2006.  (Case No. 06-21265, DE 31, 32.) Defendants filed a Reply in support of the Motion to Dismiss on July 20, 2006. (*Id.*, DE 37.) The

Court conducted its preliminary injunction hearing on July 25, 2006, which continued to July 26, 2006. (*Id.,* DE 43, 47.) The Court heard the oral argument of the parties on August 3, 2006. (*Id.,* DE 49.)

## II.     THE VOTER REGISTRATION PROCESS IN FLORIDA

Prior to 1995, only state officials and individuals deputized by supervisors of elections as registrars could collect voter registration applications in Florida. (Facts ¶ 11.) Thus, in order to conduct voter registration activities, an individual had to seek appointment as a volunteer deputy voter registrar, reside in the particular county, and complete a training session. Fla. Stat. § 98.271 (1993). The law did not allow a supervisor of elections to deny appointment based on an individual's "race, sex, religion, political affiliation, organizational involvement, or political activity." *Id.* § 98.271(2)(a).

In 1993, Congress passed the National Voter Registration Act ("NVRA"), which went into effect on January 1, 1994. (Facts ¶ 11.) In passing the NVRA, Congress found that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections," and accordingly passed the NVRA to "increase the number of eligible citizens who register to vote." 42 U.S.C. § 1973gg(a)(3), (b)(1). Thereafter, in 1995, Florida implemented the NVRA and began permitting third party groups to collect voter registrations without first being deputized by a supervisor of elections. (Facts ¶ 11.) This expansion of means to register not only increased political advocacy by third party groups but also gave unregistered citizens more choices as to how they could register to vote. In addition, under Florida law, voter registration forms "must be accepted in the office of any supervisor, the division [of elections], a

driver license office, a voter registration agency, or an armed forces recruitment office." Fla. Stat. § 97.053(1).

After a voter registration application is collected, it must be processed by a supervisor of elections before a voter is registered to vote. (Facts ¶ 12.) This process requires particular attention, including but not limited to reviewing applications for completeness, requesting follow-up information from the applicants to complete the applications, and entering data into the voter registration system. (Aff. of Donna Miller ("Miller Aff.") ¶ 8(c).) Thereafter, the supervisors of elections must ensure that voter information cards are produced and distributed to voters. (*See* Tr. I at 103.)[1]

## III.   PLAINTIFFS' VOTER REGISTRATION ACTIVITIES PRIOR TO THE ENACTMENT OF THE THIRD-PARTY VOTER REGISTRATION LAW

### 1.    The League of Women Voters of Florida

The League is a non-partisan, not-for-profit corporation that is run solely by member volunteers.[2] (Decl. of Dianne Wheatley Giliotti in Supp. of Pls.' Mot. for Prelim. Inj. ("Giliotti Decl.") ¶¶ 6, 8.)  The League promotes political accountability through informed and active participation of citizens in government and influences public policy through education and advocacy. (*Id.* ¶¶ 6, 9.)  One of the League's primary goals is to promote effective voter participation in government by (1) conducting voter registration drives throughout the state; (2) holding educational

---

[1] For purposes of this Order, Tr. I refers to the July 25, 2006, Unofficial Transcript of the Preliminary Injunction Hearing, and Tr. II refers to the July 26, 2006, Unofficial Transcript of the Preliminary Injunction Hearing. The Court and the parties both used the Unofficial Transcripts in order to expedite the resolution of Plaintiffs' motion. The page numbering in the Unofficial Transcript may differ from that in the Official Transcript.

[2] The League is affiliated with the national League of Women Voters (the "National League"). (*See* Tr. II at 30.) Carrie Chapman Catt founded the National League in 1920 right before the passage of the 19th Amendment to the United States Constitution, which gave women the right to vote. (Giliotti Decl. ¶ 4.)

forums and candidate debates open to the public; (3) publishing a quarterly newsletter and hosting a website; (4) distributing both a non-partisan bi-annual election guide and objective information regarding proposed constitutional amendments in Florida; and (5) distributing information on certain issues and topics. (*Id.* ¶ 9.)

The League conducts annual voter registration drives through 27 local Leagues. (*Id.* ¶ 11.) Registering new voters is an important part of accomplishing the League's goal of increasing political participation by underrepresented and disenfranchised communities, particularly residents of low-income, African American, and Hispanic communities. (*Id.* ¶ 12.) When the League conducts its voter registration drives, volunteers hand out pamphlets, discuss the importance of registering to vote, provide information about voting, and inform new voters about how they can contact their elected officials. (*Id.* ¶ 14.)

The League also assists voters in filling out voter registration applications, and then collects and submits them to the Supervisors of Elections. (Gilotti Decl. ¶ 16.) The League finds that this collection and submission is necessary to the success of their voter registration drives. (*Id.* ¶ 18.) As League President Dianne Gilotti, who has 33 years of experience registering voters, has stated, "the vast majority of people we speak to will not necessarily properly complete and submit applications without assistance." (*Id.*)

2.    People Acting for Community Together

PACT is a non-profit organization made up of 38 member churches, synagogues, public school parent associations, and other community-based organizations. (Decl. of Aaron Dorfman in Supp. of Pls.' Mot. for Prelim. Inj. ("Dorfman Decl.") ¶¶ 1, 2.) These organizations represent over 100,000 individual members. (*Id.* ¶ 3.) PACT's mission is to unite, organize, and train leaders from

diverse congregations, schools, and community groups to build a powerful community voice.  (*Id.* ¶ 4.) PACT serves primarily low-income and under-served communities, including communities of color and immigrant communities.[3]  (*Id.* ¶ 6.)

PACT encourages its members to become registered and to vote because it results in public officials taking PACT's members more seriously and listening to PACT's issues.  (*Id.* ¶ 17.)  Thus, according to PACT, voter registration is a vital part of its overall mission.[4]  (*Id.*)  Because the majority of PACT's members are low-income, they are less likely to be registered to vote, making PACT's registration efforts particularly necessary.  (*Id.*)

PACT's voter registration drives follow a typical format.  (*Id.* ¶ 21.)  First, PACT's staff members and paid community organizers are trained in voter registration procedures.  (*Id.*)  Such organizers then meet with several leaders of a congregation and plan a voter registration drive.  (*Id.* ¶ 22.)  Thereafter, volunteers from the congregation will set up a voter registration area after church services for a few weeks, allowing members to complete the forms after church and to submit them to a volunteer.  (*Id.* ¶¶ 23, 24.)  At the end of a voter registration drive, a PACT volunteer takes the voter registration applications to an elections office.  (*Id.* ¶ 25.)  Because the drives generally take place over the course of several weeks, PACT regularly turns in applications more than ten days after their completion.  (*Id.* ¶ 26.)

---

[3] According to PACT, "[m]ost of the people that we represent feel like they don't have a voice and so we are really needing to work with them, encourage them that yes your vote does matter, it does make a difference if you participate in the system." (Tr. II at 12.)

[4] For instance, in 2001, PACT initiated an advocacy campaign to increase public transportation in Miami-Dade County.  PACT's voter registration efforts were an essential component of its organizing strategy on this issue and directly contributed to the success of the ballot initiative.  As Aaron Dorfman, PACT's Executive Director, stated: "I believe that most of the folks we registered were registering because they wanted to support the transportation initiative we were working on.  And they went out and voted for it and encouraged others they knew to vote for it as well." (*See* Dorfman Decl. ¶¶ 9-16.)

PACT's voter registration efforts entail conversations about important political issues and political engagement. Volunteers talk to low-income members "about the importance of being registered and of voting in order to impact the issues that are touching their life right now." (Tr. II at 14.) PACT's volunteers personally encourage fellow congregants to register to vote "to advance issues of common concern to the congregation." (Dorfman Dec. ¶ 26.)

PACT views the collection and submission of forms as an important part of the voter registration process. According to PACT, "[i]t shows them we are with them in this process, it makes it easier for them, [and] it makes it highly more likely that they will register and vote. . . . [W]e have certainly gone through periods where people just extol the virtue of registering and voting and most people don't take any action on it." (Tr. II at 17.)

3.    Florida AFL-CIO

Florida AFL-CIO is a voluntary association of unions that comprises approximately 450 affiliated local unions throughout the state and represents more than 500,000 active and retired Floria workers in the state. (Decl. of Cynthia Hall in Supp. of Pls.' Mot. for Prelim. Inj. ("Hall Decl.") ¶¶ 4.) Florida AFL-CIO's mission is to improve the lives of working families in Florida. (*Id.* ¶ 4.) It accomplishes this mission by, *inter alia*, encouraging workers to register and vote, to exercise their full rights and responsibilities of citizenship, and to perform their rightful part in the life of their local, state, and national communities. (*Id.*)

Florida AFL-CIO conducts non-partisan registration drives through its local unions. (*Id.* ¶¶ 7, 8.) Each local union decides the most effective way to register its members, and such methods vary based on the type of workforce each union represents. (*Id.* ¶ 9.) However, the success of the voter registration drives depends upon the following: (1) having one-on-one interactions between

-8-

union members and coordinators; and (2) collecting and delivering the voter registration application to a supervisor of elections. (Supplemental Decl. of Cynthia Hall in Supp. of Pls.' Mot. for Prelim. Inj. ("Supp. Hall Decl.") ¶ 4.) This is because Florida AFL-CIO has found that "if we mail the applications they get properly submitted, but when we hand people the application and allow them to take it with them, they often get put aside and never mailed in." (*Id.* ¶ 7.)

When Florida AFL-CIO conducts its voter registration drives, volunteers will encourage members to register to vote by "explaining how decisions made by elected officials at all levels of government affect working families and union jobs." (Hall Decl. ¶ 10.) "[C]oordinators will explain to public sector employees that local and state elected officials have enormous influence over collective bargaining and the funding for government entities, such as schools, that employ thousands of union workers." (*Id.*) In addition, Florida AFL-CIO will inform members that they "can have an impact" and that voting enhances the ability of Florida AFL-CIO to influence the policy decisions made by elected officials. (*Id.* ¶¶ 10, 11.)

    4.    <u>Council 79 of the American Federation of State, County, and Municipal Employees</u>

AFSCME is a labor union and nonprofit organization that represents approximately 250,000 government employees and 20,000 members through 90 local unions in the state of Florida. (Decl. of Alma Gonzalez in Supp. of Pls.' Mot. for Prelim. Inj. ("Gonzalez Decl.") ¶¶ 2, 4.) AFSCME's primary mission is to advocate for the members of its bargaining unit in labor negotiations in the workplace and to utilize political action and legislative advocacy to promote social and economic justice in the workplace. (*Id.* ¶ 3.) Because AFSCME's members are government employees, most of the workplace issues its members care about are resolved by elected officials, and thus, electoral

participation is vital to its mission.  (*Id.* ¶ 7.)

AFSCME operates a sophisticated political advocacy program.  (*See* Tr. I at 130-132.) It employs a communications director, and communicates its message through a year-round communications program, consisting primarily of personal contact, telephone and facsimile contacts, and e-mails.[5]  (*Id.*)  In recent years, AFSCME has participated in the political process by, for example, contributing $100,000 to the Association of Community Organization for Reform Now (ACORN), a political advocacy organization, to support a campaign to place a minimum wage initiative on the ballot. (Tr. I at 126-127.)

AFSCME conducts member-to-member voter registration drives which are run by volunteer coordinators. (*Id.* ¶ 10.)  AFSCME trains its volunteers on legal rules, voter registration techniques, and the technical component of voter registration.  In addition, AFSCME encourages its volunteers to talk about the importance of voting as part of AFSCME's struggle to have a voice in the workplace. (*Id.* ¶¶ 10, 11.) When conducting its voter registration activities, AFSCME volunteers not only assist members in correctly filling out the applications, but they also perform the following advocacy related tasks: (1) collect completed applications; (2) review applications for completion and accuracy; (3) copy applications and update AFSCME's database; (4) submit applications to a supervisor of elections;  and (5) follow up to make sure that any problems are resolved. (Gonzalez Dec. ¶¶ 11, 12; Supplemental Decl. of Alma Gonzalez in Supp. of Pls.' Mot. for Prelim. Inj. ("Supp. Gonzalez Decl.") ¶¶ 7, 10-11.)

---

[5] AFSCME occasionally utilizes radio advertising and rarely uses television advertising as part of its communications program.  (Tr. I at 121.)

-10-

The ability to collect voter registration applications enables AFSCME to have follow-up communications with registrants about issues of common concern. (Supp. Gonzalez Decl. ¶ 11.) For example, once AFSCME updates its database, it sends newly registered voters education materials, including materials about candidates and issues. (*Id.*) Furthermore, AFSCME's application efforts facilitates their follow-up with the supervisors of elections to resolve any problems with incomplete applications or missing information and to ensure that their members are properly added to the voter rolls.[6] (*Id.* ¶¶ 10, 11.)

According to AFSCME, unless it collects voter registration applications and follows through with the supervisors of elections, "the vast majority of applications completed by AFSCME's members are not likely to get submitted and fully processed in time for our members to vote." (*Id.*) This is due to a variety of reasons, including that AFSCME members: (1) frequently work long hours and have other family and work responsibilities; (2) get confused about the proper postage for the application, given its unusual size and heavy weight; (3) get confused about where to submit the form, especially when the members work and live in different counties; and (4) are unsure whether they have to submit photo identification or are unaware of the precise deadlines. (*Id.* ¶ 8.)

5.    <u>SEIU Florida Healthcare Union</u>

SEIU is a local union that represents approximately 13,000 private sector healthcare workers in 89 healthcare facilities in the state of Florida. (Declaration of SEIU Vice President Dale Ewart in Supp. of Pls.' Mot. for Prelim. Inj. ("Ewart Decl.") ¶¶ 2, 4.) SEIU's mission is to represent the economic, social, and political interests of Florida healthcare workers. (*Id.* ¶ 4.) SEIU conducts

---

[6] The collection of voter registration applications also allows AFSCME to later provide proof that it submitted a voter registration application on behalf of a member. (*Id.* ¶ 11.)

annual voter registration drives because the healthcare industry is heavily regulated and funded by political bodies. (*Id.*) Correspondingly, SEIU's ability to address its members' concerns about issues like education and immigration are tied directly to its members' engagement in the political process. (*Id.*)

Each year, SEIU volunteers engage in one-on-one voter registration drives with their co-workers. (*Id.* ¶ 5.) SEIU trains its volunteers so that they are familiar with the information required by the application and comfortable with assisting co-workers. (*Id.* ¶ 7.)  These drives are conducted in conjunction with efforts to educate SEIU's members about legislative issues of concern, and SEIU volunteers "encourage members to participate in the political system by registering to vote and contacting their legislators."  (*Id.* ¶ 8.)

SEIU collects and submits voter registration applications as part of its voter registration drives for two separate reasons.  First, "it has been our experience that if you don't do that then the likelihood that those individuals will actually get registered to vote is much lower."  (Tr. II at 69.) In addition, if SEIU collects and submits the applications, it can update its list of members who are registered to vote, thereby preventing volunteers from bothering such persons a second time and providing useful information for its "get out the vote" activities. (Tr. II at 70.)

6.    Marilynn Wills

Marilynn Wills is an individual member of the League and has been registering voters since the late 1960's or early 1970's. (Wills Decl. ¶¶ 3, 6.) Prior to 1995, Ms. Wills served as a volunteer deputy registrar. (Facts ¶ 26.)  In this capacity, she conducted voter registration drives in public without the assistance or supervision of a supervisor of elections. (*Id.*)

Under the current system, when Ms. Wills conducts voter registration activities, she hands out information about issues of concern, provides information about the League, and distributes information on early voting. (*See* Wills Decl. ¶¶ 8-10.) Ms. Wills has also registered voters while collecting signatures for petition drives. (*Id.*) For instance, Ms. Wills and the local Tallahassee League collected voter registration applications while collecting petitions relating to a proposed constitutional amendment to create a redistricting commission and a local ballot initiative petition. (Tr. II at 95-99.)

## IV.    THE THIRD-PARTY VOTER REGISTRATION LAW

During its 2005 regular session, the Florida Legislature enacted Chapter 2005-277 to regulate, among other things, the handling and submission of voter registration applications by third party organizations. (Facts ¶ 24.) On June 20, 2005, Governor Bush signed Chapter 2005-277 into law. (*Id.* ¶ 24.) The Law became effective on January 1, 2006. 2005 Fla. Laws 277 § 79.

The Third-Party Voter Registration Law regulates "third party voter registration organizations," which includes all persons and organizations that solicit or collect voter registration applications, except for political parties.[7] Fla. Stat. § 97.021(36). The Law also exempts (1) persons that collect voter registration applications from their spouse, child, or parent; or (2) persons that collect voter registration applications as an employee or agent of the division, supervisor of elections,

---

[7] Florida currently recognizes 25 political parties, which are: Florida Democratic Party, Republican Party of Florida, America First Party of Florida, American Libertarian Party, American Poor People Party, American Reform Party of Florida, British Reformed Sectarian Party, the Christian Party, Constitution Party of Florida, Faith & Patience Inc. N.P.G.G., Family Values Party, Florida Socialist Workers, Green Party of Florida, Inc., Independence Party of Florida, Independent Democrats of Florida, Independent Party of Florida, Libertarian Party of Florida, the Moderate Party, Possibility Party, Progressive Libertarian Party, Prohibition Party, Reform Party, Socialist Party of Florida, Surfers Party of America, Veterans Party of America. (Joint Submission of Stipulated Facts ("Stipulation") ¶ 5.)

Department of Highway Safety and Motor Vehicles, or a voter registration agency. *See* Fla. Stat. §

97.021(36)(b), (c). Plaintiffs are not, however, challenging these exemptions.

Pursuant to the Law, third party voter registration organizations must ensure that all voter-

registration applications are "promptly delivered to the division or the supervisor of elections." Fla.

Stat. § 97.0575(3). The Law further provides that if a third party voter registration organization fails

to act "promptly," the (1) individual collecting the voter registration application, (2) the entity's

registered agent, and (3) those individuals responsible for the entity's day-to-day operation shall be

held jointly and severally liable for the following fines:

> (a) A fine in the amount of $250 for each application received by the division or the supervisor of elections more than 10 days after the applicant delivered the completed voter-registration application to the third-party voter registration organization or any person, entity, or agent acting on its behalf.

> (b) A fine in the amount of $500 for each application collected by a third-party voter registration organization or any person, entity, or agent acting on its behalf, prior to book closing for any given election for federal or state office and received by the division or the supervisor of elections after the book closing deadline for such election.[8]

> (c) A fine in the amount of $5,000 for each application collected by a third-party voter registration organization or any person, entity, or agent acting on its behalf, which is not submitted to the division or supervisor of elections.

*Id.* § 97.0575(3)(a)-(c). These fines are in addition to any applicable criminal penalties, including

the provisions of Fla. Stat. § 104.0615(4), which makes it a violation of the law to "knowingly

destroy, mutilate, or deface a voter registration form or election ballot or obstruct or delay the

delivery of a registration form or election ballot." Furthermore, a person who violates Fla. Stat. §

---

[8] Book closing, which is 29 days before an election, is the date by which a voter must submit his or her voter registration application to vote in an upcoming election. Nevertheless, if an application is received after book closing, the supervisors of elections will process it and register the applicant to vote for the next election. Thus, under this provision of the Law, if a voter registration organization collects an application the day before book closing, and submits it the day after book closing, it is subject to the $500 fine, despite the fact that the individual will ultimately be registered.

104.0615(4) commits a felony in the third degree, and may be punished by up to five years in jail,

a fine of $5,000.00, or both. Fla. Stat. §§ 104.0615(5), 775.082(3)(d), 775.083(1)(d).

The Third-Party Voter Registration Law holds third-party voter registration organizations

strictly liable for meeting the above deadlines. *See id.* § 97.0575(3). It allows for no exceptions,

even for groups or individuals that have exercised all reasonable care in collecting and delivering

voter registration applications, or whose failure to comply with the law results from no fault of their

own. As Maria I. Matthews, Assistant General Counsel for the Florida Department of State, has

stated, third-party voter registration organizations will be fined even "if some situation arises beyond

the control of the organization." (Pls.' Mot. for Prelim. Inj., Ex. G.)

If a third party voter registration organization complies with the Law's reporting

requirements, however, the above fines will be reduced by three-fourths. *See id.* § 97.0575(1), (3).

The reporting requirements include the following: (1) identifying the registered agent and those

individuals responsible for the day-to-day operations of the organization; and (2) submitting a

quarterly report providing the precise date and location of any organized voter-registration drives

conducted by the organization in the prior quarter. *Id.* § 97.0575(1). Failure to comply with the

reporting requirements does not subject the third party voter registration organization to any civil or

criminal penalties, but rather makes such organization ineligible to receive the fine reduction. *Id.*

§ 97.0575(2).[9]

---

[9] To date, thirteen third-party voter registration organizations have registered with the Division of Elections under the Law. (Facts ¶ 25.) These organizations include Alachua County Democratic Black Caucus, National Coalition on Black Civic Participation, Inc. - Black Youth Vote! Florida, Indian River County Branch NAACP, Farmworker Ministry, Inc., Teamsters Union Local No. 385, People for the American Way Foundation, Mi Familia Vota, City of Gainesville, ACORN, Santa Fe College Student Government, Roy Allen, Highlands County School Teacher, LPJ Worship and Praise Ministries. (Miller Aff., Ex. A.) The Defendants have not identified the remaining two organizations.

The Florida Secretary of State issued a proposed rule implementing the Third-Party Voter Registration law on February 24, 2006. (*See* Pls.' Ex. 9.) The proposed rule provides that "any person claiming to have been registered by a third party voter registration organization but whose name does not appear as an active voter on the voter registration rolls may file a written complaint with the Division of Elections." (*Id.*) In addition, a supervisor of elections "may report to the Division any potential violation" of the Law. (*Id.*) Once a complaint or report is filed, the Division of Elections "may investigate" the alleged violation, and if a violation is found, the Division "shall issue an administrative order," which includes, *inter alia*, the name of the third party voter registration organization, the number of applications involved, where the violations occurred, the amount of the fine, and the amount of the fine reduction if the entity has complied with the Law's reporting requirements. (*Id.*) The Secretary of State has not yet issued a final rule.

## V.   IMPACT OF THE THIRD-PARTY VOTER REGISTRATION LAW ON PLAINTIFFS' VOTER REGISTRATION ACTIVITIES

The Third-Party Voter Registration Law creates risks for Plaintiffs, as well as their members and volunteers. As will be discussed in more detail below, the Law's fines could severely drain the finances of each of the nonprofit Plaintiffs and decimate their voter registration budgets. (Tr. II at 87-88; Dorfman ¶ 29; Ewart ¶¶ 9-11; Hall ¶¶ 14-17, 19; Giliotti ¶¶ 19, 21, 23, 26, 29; Gonzalez ¶¶ 21-22.) Moreover, for Plaintiffs' members, many of whom are low- or middle-income, even lesser or reduced fines would be devastating. (Dorfman Decl. ¶ 28; Ewart Decl. ¶¶ 9, 11; Hall Decl. ¶¶ 14, 17; Giliotti Decl. ¶¶ 21, 29; Gonzalez Decl. ¶ 22.) Thus, Professor Donald Green testified that, in his expert opinion, because the Third-Party Voter Registration Law makes it "catastrophically risky" for non-partisan organizations to collect applications, the likely and predictable effect of the

challenged Law is "to put out of business non-party run voter registration drives."[10] (Tr. I at 65-66;
Aff. of Donald Green on Behalf of Pls. ("Green Decl.") ¶ 16.)

If third party voter registration organizations permanently cease their voter registration
efforts, Florida citizens will be stripped of an important means and choice of registering to vote and
of associating with one another. Indeed, according to Ion Sancho, Supervisor of Elections in Leon
County, "third-party registration groups increase the voter registration rate of eligible voters," and
were responsible, together with political parties, for 62.7% of all newly registered voters in Leon
County in 2004. (Decl. of Ion Sancho ("Sancho Decl.") ¶¶ 2, 10.) Moreover, according to Professor
Green, when an individual registers through a third party group, such individual is expressing an
intent to associate with that group and to send a message that (a) they support that group and what
it stands for; and (b) the dominant political powers that be should take that group and its agenda
seriously. (*See* Green Decl.) This is also true for the union Plaintiffs' members, who, as Alma
Gonzalez testified, often register through their unions to bolster the union's political clout. (Tr. I at
133, 136.)

Underlying Professor Green's expert opinion that the Third-Party Voter Registration Law
will end third party registration drives is his belief that without the ability to collect and submit
applications, Plaintiffs' voter registration drives will be unsuccessful. (Green Decl. ¶ 6.) This is
because the personal collection of applications: (1) imposes fewer costs on the prospective registrant;
and (2) more effectively communicates the importance of voter participation. (*Id.*) Furthermore,
while passive voter registration campaigns may be successful when potential registrants are highly

---

[10] Professor Green also noted that given the "rough and tumble world out there," political opponents could
use the Third-Party Voter Registration Law to exact enormous costs on one another by "swiping a stack of
completed registration cards." (Tr. I at 67.) This would trigger a $5,000 fine for each lost application.

motivated, well-educated, and/or relatively affluent, such drives generally "just don't work" because they lack the "personal touch," of effective campaigns. (Tr. I at 68.) Furthermore, the inability to collect voter registration forms impairs Plaintiffs' ability to develop databases of the persons they helped to register, thereby hindering their ability to facilitate future mobilization and get-out-the-vote efforts. (Green Decl. ¶ 20.)

Professor Green did acknowledge that third party groups could continue their voter registration drives and communicate the same message without collecting the applications. (Tr. I at 86-88.) Indeed, they could, in theory, deliver the same "personal touch" and affect voter registration levels by personally advocating for registration. (*Id.* at 90-91.) However, Professor Green rejected such possibility as a practical matter because it ignores the economic incentives by which campaigns are deployed and organized. (*Id.* at 86-88.)

The parties have stipulated that, in the past, none of the organizational Plaintiffs has collected applications before a book closing deadline and then submitted them after the deadline (Stipulation ¶¶ 3-4, 9.) Nonetheless, as will be discussed below, the Plaintiffs regularly do not meet the Law's 10-day deadline. In addition, Plaintiffs are concerned that if they continue their voter registration drives, they will not meet the Law's deadlines for submitting at least some voter registration forms; this is because their statewide voter registration drives are run largely—and in some cases, exclusively—by hundreds of volunteers who are trained but who necessarily operate with little oversight. (Dorfman ¶ 30; Ewart ¶¶ 5, 7, 10; Hall ¶¶ 8, 16; Giliotti ¶¶ 13, 23; Gonzalez ¶¶ 13-14.)

1.   The League of Women Voters of Florida

In March 2006, the League imposed a moratorium on voter registration for the first time ever. (Giliotti Decl. ¶ 19.) The League was concerned about that it would be liable for severe fines under

the Law given that its registration drives are conducted by volunteers throughout the state. (*Id.* ¶ 23.) For example, if 20 applications were accidentally lost or destroyed in a hurricane, flood or fire, the resulting fine would wipe out the League's entire annual budget. (*See id.* ¶ 26.) Likewise, if 20 applications were inadvertently submitted by a League volunteer in Tallahassee on the eleventh day after they were collected – even if the applications were submitted well in advance of a book closing deadline – the resulting $5,000 fine would eliminate the local Tallahassee League's entire yearly income. (*See* Wills Decl. ¶ 15.) The League's concerns are heightened by the fact that many of its volunteers are elderly and are "at higher risk, if you will, for serious illness, and even death." (Tr. II at 37.) But for the moratorium, the League would have collected at least several thousand voter registration applications for the upcoming elections.[11] (Giliotti Decl. ¶ 22.)

In addition, it is not manageable for the League to comply with the Law's reporting requirements, as it has a limited budget, a minimal number of paid employees, and conducts activities through 27 separate local Leagues. (Gilotti Decl. ¶ 28.) According to President Dianne Gilotti:

> [W]e would have to make sure that they [the local Leagues] recorded every single incident of where they held the voter registration drive, with whom, etc. And then we would need to get that information to the state office to compile a report for the whole state. And quite frankly, number one, we did not feel we could get the complete information. Right now when we go to request local leagues we are very happy if half of them report back to us. And the second thing is, now I've got a person that works 26 and a half hours. I would probably have to add staff, assuming I had money to add staff, to comply with this quarterly requirement to send this form in.

(Tr. II at 42.) Thus, given the League's limited yearly budget of $80,000.00, the League has

---

[11] Despite the moratorium, it is possible that some local Leagues are continuing to conduct voter registration drives, given that they operate autonomously. (Tr. II at 47-48.) In addition, individual League members in Martin County, Florida, have become deputized by their local supervisor of elections office so that they can continue, on an individual basis, to conduct voter registration drives. (*Id.* at 47.)

refrained from registering voters. (Giliotti Decl. ¶¶ 23-26.) The League will, however, continue to advocate for improved voter registration and other issues. (Facts ¶ 19.)

Finally, the League has not considered abandoning its non-partisan status in order to continue its registration activities in Florida. Although the League encourages its members to be political, it "would never abandon its non[-]partisan policy." (Tr. II at 40.) Rather, the League has, since its inception, considered its non-partisan status important to ensure that "as the political atmosphere . . . changed in the United States and the states in the country, that we wouldn't be going with the ebb and the flow." (*Id.*)

2.   People Acting for Community Together

As long as the Third-Party Voter Registration Law exists, PACT will not conduct voter registration drives in 2006. (Dorfman Decl. ¶ 27.) Given PACT's voter registration format, voter registration applications are regularly turned in more than ten days after their completion, making the Law too costly for PACT. (*See id.* ¶¶ 25, 29.) While PACT acknowledges that it could figure out a way to comply with the ten-day deadline, such deadline is "really challenging" and would "take extra staff time an[d] energy to figure out a way to comply [which in turn] takes time away from doing other things that help us advance our mission." (Tr. II at 26.) Furthermore, the Law is particularly burdensome on PACT's low-income volunteers: "[T]o . . . somebody who makes 17, 18, 20 thousand dollars a year, $500 is a huge amount of money." (Tr. II at 14.) This is especially true given that "things just come up in people's lives . . . . [T]heir sister dies in Georgia and they leave [for] a week and they still have voter registrations . . . . There is a big liability there for that." (*Id.* at 16.)

PACT has similarly determined that the registration requirements under the Law impose too significant a burden. (Dorfman Decl. ¶ 30.) According to PACT, "[j]ust keeping track of drives at 38 churches, synagogues, and community organizations is a significant burden." (*Id.*) Thus, PACT has determined that it does not have the resources to implement a new record keeping procedure. (*Id.*)

In 2004, PACT registered 1,341 of its constituent members from predominantly Hispanic, Caribbean, and African-American congregations and parent-teacher groups. (*Id.* ¶ 19.) However, if the new Law remains in effect, PACT will not conduct voter registration drives in either 2006 or 2008. (*Id.* ¶ 27.) PACT does, however, continue to advocate its political ideas, especially in the areas of education, immigration, healthcare, and affordable housing. (Facts ¶ 22.)

### 3.   Florida AFL-CIO

Florida AFL-CIO has been forced by the Third-Party Voter Registration Law to stop registering its members to vote in 2006 because it cannot afford the risk that Florida AFL-CIO and its members, employees, directors, and officers will have to pay the severe fines threatened by the law. (Hall Decl. ¶ 14.) Florida AFL-CIO faces a substantial risk that it will be fined under the law because its local unions conduct more than 450 decentralized voter registration drives each year, and each local coordinator is responsible for collecting and submitting the voter registration applications. (*Id.* ¶ 16.) Thus, there is a high likelihood that some of these coordinators will not submit some applications in the manner the new Law prescribes, such as the 10-day deadline. (*Id.*) Florida AFL-CIO also believes that there is a high likelihood that due to circumstances beyond a member's control – such as the hurricanes that have hit Florida in the past two years – some applications will

be destroyed and not submitted. (*Id.*)  Accordingly, Florida AFL-CIO will not be able to meet its goal of registering at least 10% of its members this year. (*Id.* ¶ 7.)

The Third-Party Voter Registration Law is also hampering the ability of Florida AFL-CIO members to organize together to engage in effective political speech and action and has chilled the willingness of Florida AFL-CIO's members to register new voters. (*Id.* ¶ 24.) Nevertheless, Florida AFL-CIO does continue to advocate in favor of its political ideas. (Facts ¶ 23.)

Florida AFL-CIO has also determined that it will not be able to comply with the Law's quarterly reporting provisions.  "It would be severely burdensome and extraordinarily costly for Florida AFL-CIO to divert one or more of its ten employees away from their current responsibilities to contacting each of our more than 450 local unions every quarter to compile an accurate and detailed report providing the date and location of every voter registration drive across the state." (Hall Decl. ¶ 20.)  Indeed, many of Florida AFL-CIO's local unions have no computers or offices, and thus contact must be made primarily through mail, phone calls, and personal visits. (*Id.* ¶ 21.) Requiring volunteers to maintain records of this information would thus be severely burdensome and a waste of time, resources, and staff. (*Id.*)

> 4.    Council 79 of the American Federation of State, County, and Municipal Employees

AFSCME has "drastically cut back" on its voter registration efforts because of the challenged Law. (Gonzalez Decl. ¶ 13.) Because AFSCME's registration is conducted largely by autonomous local unions, without much direct oversight other than initial training, it would be difficult for AFSCME to guarantee compliance with the new Law. For instance, because some local unions may have meetings only once a month, members may hand over their collected forms only at this time, well after ten days have passed. (*Id.* ¶ 14.) Accordingly, AFSCME has only conducted drives this

-22-

year in Jacksonville.[12]  (Gonzalez Decl. ¶ 15.)

The difficulty of ensuring full compliance with the challenged Law is illustrated by AFSCME's weekend voter registration drive in Jacksonville, where one of its 90 local unions was "in crisis" because of a labor dispute with a government-funded hospital.  (Tr. I at 141-44.)  In an attempt to register community members who would join the union in "communicat[ing] to candidates" during a primary election season "that there are registered voters in their jurisdictions that care about [the] hospital," AFSCME spent significant resources. Specifically, AFSCME employed 25 volunteers and spent $2,500, about 15% of AFSCME's typical yearly budget for its statewide voter registration activities. (*Id.*) These additional personnel and added expenditures were necessary to reduce the risk that AFSCME would be subject to devastating fines under the challenged Law.  Ordinarily, AFSCME would use only about 7 volunteers and spend only about $200 registering voters door-to-door on one weekend.  (*Id.*)

AFSCME has decided not to register as a third party voter registration organization under the Law because "the autonomous nature of our local unions makes it very difficult to monitor the exact time and address of each member-to-member voter registration drive."  (Gonzalez Decl. ¶ 16.) AFSCME does, however, have "many, many reports that have to be filed" with respect to other aspects of the organization.  (Tr. I at 50-51.)

5.    SEIU Florida Healthcare Union

The new Law has also forced SEIU to stop registering its members and the members of its bargaining unit to vote because it cannot afford the risk that its members, employees, directors, and

---

[12] Although AFSCME has also approved of voter registration drives in Miami and Chattahoochee (*See* Gonzalez Decl. ¶ 15), it is unclear whether such drives actually took place (*See* Tr. I at 140).

officers will have to pay the fines under the Third-Party Voter Registration Law. (Ewart Dec. ¶ 9.) Because SEIU's voter registration efforts are decentralized and require a large number of volunteers, there is a high likelihood that some of the applications that it collects will not be submitted in a timely manner, including the 10-day deadline. (*Id.* ¶ 10.)

Furthermore, Dale Ewart, Vice President of SEIU, testified that SEIU will probably not be able to comply with the requisite quarterly reporting requirements. (*Id.* ¶ 12.) According to Mr. Ewart, it would be severely costly and burdensome for SEIU to divert one or more of its employees from their current responsibilities to compile an accurate report providing the date and location of every voter registration drive across the state. (*Id.*) Compliance would require SEIU to contact approximately 300 volunteers across the state every quarter. (*Id.*) In addition, the reporting requirements would require those individuals collecting the applications to maintain burdensome records, discouraging SEIU's members from volunteering to do the job. (*Id.*) SEIU does, however, submit periodic reports to the Department of Labor and the Internal Revenue Service as required by the laws regulating its other union activities. (Tr. II at 72-73.)

6.   Marilynn Wills

Marilynn Wills would like to register new voters this year, but will not do so because of her concerns about the fines the new Law imposes. (Wills Decl. ¶ 11.) Ms. Wills is afraid that some mistake or accidental delay may result in being fined hundreds or thousands of dollars. (*Id.* ¶ 12.) She also knows of other individuals that have registered voters in the past but have stopped doing so out of concern about the fines. (*Id.* ¶ 13.)

## VI.   VOTER REGISTRATION ACTIVITY

Voter registration applications may be submitted at any time of the year.  (Facts ¶ 15.) Nevertheless, Plaintiffs and Defendants agree that by far, more applications are submitted immediately before book closing.  (*Id.*)  Indeed, over the past five presidential elections, there has been increased voter registration activity and interest in the period immediately preceding the book closing deadline for both the primary and general elections, causing a predictable spike in the number of applications submitted at that time.[13]  (Pls.' Ex. 15.)  This predictable "crescendo" in activity (Tr. I at 74), is the result of intensified media attention and campaigning, which in turn sparks interest on the part of prospective voters (Sancho Decl. ¶ 6).

According to Ion Sancho, Supervisor of Elections for Leon County, one can and should anticipate and meet the increase in applications by hiring additional staff and assigning staff to double shifts.  (*Id.* ¶ 7.)  Indeed, because the pattern of application submissions is consistent over time and predicable (*See* Pls.' Ex. 15), Mr. Sancho prepares for the surge in voter registration applications near book closing. (Sancho Decl. ¶ 7.)  Thus, Mr. Sancho testified that he has "not had difficulty processing large numbers of voter registration applications that are received very close to the book closing deadline." (*Id.*)  Furthermore, the Help America Vote Act provides federal funds that supervisors can use to enhance their ability to process applications, and the Florida Division of Elections can and has offered additional resources to the supervisors of elections to help them process the large number of applications near book closing. (42 U.S.C. § 15401(b); Tr. I at 103-04; Pls.' Ex. 2.)

---

[13] In addition, during the seven days prior to book-closing for the general election, the supervisors of elections received 14% of all applications for the year 1988, 19% in 1992, 7% in 1996, 12% in 2000, and 14% in 2004.  (Pls.' Ex. 16.)

Plaintiffs presented evidence that election officials did not prepare for the large number of applications submitted just prior to book closing in 2004. For instance, Alma Gonzalez of AFSCME testified: "What we found was that there were many[,] many supervisors of elections that were short staffed or whose staff was not adequately prepared or trained to manage the new voter registration card, the new requirements." [14] (Tr. I at 56-58.) Similarly, the NVRA Coordinator for the Florida Division of Elections, Donna Miller, conceded that her office was ill equipped to handle the 2004 elections cycle because of her own inexperience and lack of anticipation for the large numbers of applications.[15] (Tr. II at 128-32.) This evidence undercut her testimony that third party organizations were the principle cause of the problems that the Secretary of State's office and the supervisors of elections' offices experienced in 2004.

Plaintiffs also presented evidence that poor technology and election law changes also led to administrative difficulties for the supervisors of elections. (Tr. I at 56.) According to Alma Gonzalez, these changes, coupled with the new interpretations of the law, created another problem for the supervisors of elections. (*See* Tr. I at 57) (stating, "more interpretations were coming out and the supervisors frankly had a lot of things that they had to deal with in terms of the interpretation of the law as well"). In addition, Alma Gonzalez testified that the supervisors of elections "were still doing business in the 1980s way and not doing business in terms of the 2000 way." (Tr. I at 56.)

---

[14] Alma Gonzalez further testified that in 2004, "a high number of the application forms that we [AFSCME] had submitted were not appearing on the rolls." (Tr. At 55.)

[15] For instance, Ms. Miller testified that before obtaining such position, she did not have any experience in the election process other than "listening to all the news an[d] reading what was going on," and "talk[ing] to the employees of the Division of Elections." Furthermore, Ms. Miller testified that in comparison to the 2002 elections, the 2004 election was "chaos and overwhelming" because she had never been through a presidential election. (Tr. II at 128-32.)

## VII.   INSTANCES OF LATE SUBMISSIONS

The parties have stipulated that both non-partisan third party voter registration organizations and political parties in Florida submit voter registration applications that they collect from prospective registrants. (Facts ¶ 2.) In addition, the parties have stipulated that both non-partisan third party voter registration organizations and political parties have, in the past, collected completed voter registration applications before a book closing deadline and submitted a portion of those applications after the book-closing deadline. (*Id.* ¶ 3.) For instance, Plaintiffs submitted a letter from Patricia Hollarn, the Supervisor of Elections for Okaloosa County, which indicates that the Republican Party submitted late applications in 2004.[16] (Pls.' Ex. 7.) In addition, Defendants submitted a letter from the Broward County Supervisor of Elections to ACORN that indicates that ACORN dropped off 2400 applications three days after the book closing for the 2004 primary election.[17] (Defs.' Ex. 1.)

At the preliminary injunction hearing, Ms. Miller testified about the submission of voter registration applications very near or after book closing. With respect to applications received before book closing, Ms. Miller testified that the practice of third party organizations to hold applications and then submit them in the days immediately before book closing makes it very difficult for Florida's supervisors of elections to process such applications. (Miller Aff. ¶ 8.) Ms. Miller conceded, however, that she does not actually review the date of the applications, and that such

---

[16] Ms. Hollarn was not a witness at the preliminary injunction hearing.

[17] The Supervisor of Elections for Broward County was also not a witness at the preliminary injunction hearing.

applications could have been collected that day. (Tr. II at 138.)  Ms. Miller also testified about groups turning in applications after the book closing deadline, although the exact number of such applications was not clear from her testimony.  Initially, she testified that she received approximately 500 applications after book closing, and that it was possible that "some or all of them" were submitted by political parties. (Tr. II at 136.)  Ms. Miller later testified, however, that she received approximately 1000 applications after book closing from ACORN, 500 from the NAACP, and 1000 from Women Voice, Women Vote.  (Tr. II at 136, 148-49, 170)    Ms. Miller acknowledged, however, that she did not know when such applications were collected. (*See e.g.* Tr. II at 158-59.) She also revised her testimony to indicate that it was possible that "some" of the late submissions were from political parties.[18]  (Tr. II at 178.)

In all, Defendants have submitted evidence of approximately 5000 voter registration applications submitted after book closing.  This represents approximately .0033% of the 1.51 million voter registration forms submitted in Florida for the 2004 cycle from third party groups and individuals. (Pls.' Ex. 18.)  Likewise, the Division of Elections statistics show that each presidential election year, only a small percentage of forms are submitted in the week after book-closing.[19]  (Pls." Ex. 17.)  As to these applications, it is not clear whether they were actually submitted "late," or

---

[18] At the preliminary injunction hearing, the testimony of the witnesses created the definite impression that Defendants were primarily troubled with the actions of ACORN during the 2004 elections (*See e.g.* Tr. II at 150, 165-67). Although there was little evidence of problems associated with ACORN, Defendants did question Plaintiffs about certain newspaper articles accusing ACORN of acting fraudulently in the 2004 elections. (Tr. I at 128-29). Defendants did not, however, present any evidence of fraudulent conduct.  Furthermore, although two lawsuits were filed in Miami pertaining to such alleged fraudulent conduct, the courts dismissed such lawsuits, with the plaintiffs stipulating that ACORN did not make fraudulent misrepresentations with respect to one lawsuit (*See* Pls.' Exs. 13) and with the Court entering judgment in favor of ACORN against the plaintiff for defamation in the second lawsuit (*See* Pls.' Exs. 14).

[19] Specifically, the Supervisors of Elections received .47% of all applications in the seven days after book closing in 1988, .45% in 1992, 1.61% in 1996, 1.38% in 2000, and 1.03% in 2004.  Thus, the number of applications received after book closing has decreased each presidential cycle since 1996. (Pls.' Ex. 17.)

whether they were simply signed and collected after book closing.  Furthermore, the statistics do not indicate whether such "late" forms are submitted by third party organizations, political parties, or individuals on their own behalf.

Overall, the Court finds that there is no appreciable difference in the timeliness of voter registration applications submitted by political parties, as compared to those submitted by non-partisan voter registration groups.  This finding is consistent with the testimony of Ion Sancho, who has eighteen years of election-related experience.  (Sancho Aff. ¶ 11.)  Likewise, Professor Green testified that political parties are not inherently more accountable to prospective registrants in terms of submitting their forms.[20]  (Tr. I at 70.)

## VIII.  PRELIMINARY INJUNCTION STANDARD OF REVIEW

"A preliminary injunction is a powerful exercise of judicial authority in advance of trial." *N.E. Fla. Ch. of Ass'n of Gen. Contr. of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).  To obtain preliminary injunctive relief, a plaintiff must establish the following prerequisites: (1) a substantial likelihood of success on the merits; (2) that plaintiff will suffer irreparable injury if an injunction does not issue; (3) that the threatened injury to plaintiff outweighs any harm that might result to the defendant; and (4) that the injunction will not be adverse to the public interest. *See id.* at 1284-85.  Where a plaintiff seeks to enjoin the enforcement of a legislative enactment, the relief "must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts." *Id.* at 1205.  Thus, the plaintiff must carry the burden of persuasion as to each of

---

[20] Professor Green testified that political parties may be less accountable than non-partisan groups to the extent that they believe they will be more likely to avoid enforcement of any punitive registration laws.  (Tr. I at 71-72.)

the four prerequisites. *See United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir.1983).

## IX.    THE THIRD PARTY VOTER REGISTRATION LAW DISCRIMINATES AGAINST PLAINTIFFS IN FAVOR OF POLITICAL PARTIES AND CHILLS THEIR EXERCISE OF FREE SPEECH AND ASSOCIATION

In Counts I and II, Plaintiffs contend that the Third-Party Voter Registration Law unjustifiably exempts political parties while burdening their First and Fourteenth Amendment rights. Similarly, in Count III, Plaintiffs contend that even if the Law included political parties, its chilling affect is so significant that it is unconstitutional and must be enjoined. Constitutional challenges to state election laws are analyzed using the framework established in *Anderson v. Celebreeze*, 460 U.S. 780 (1982).[21]  *See Fulani v. Krivanek*, 973 F.2d 1539, 1542-44 (11th Cir. 1992).   Because there is not a "'litmus-paper test' that will separate valid from invalid restrictions . . . , a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation." *Anderson*, 460 U.S. at 789.  Thus, under *Anderson*, a court must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments.   *Id.* at 789. Thereafter, the state must identify its precise interests and the extent to which those interests justify the burden imposed by the law. *Id.* "Only after reviewing all these factors is the reviewing court in a position to decide whether the challenged provision is constitutional." *Id.*

1.    Character and Magnitude of Plaintiffs' Injury

Plaintiffs contend that the Third-Party Voter Registration Law curtails their speech and

---

[21]  Although both parties addressed the *Anderson* test in their respective briefs, each argues that a different standard is applicable.  According to Plaintiffs, because the Third-Party Voter Registration Law burdens their core political speech, the Court must subject the Law to strict scrutiny. *See McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 347 (1995); *Meyer v. Grant*, 486 U.S. 414 (1988).  Contrariwise, Defendants argue that the *Anderson* test is only utilized in ballot access cases, and that the Court should instead apply a rational basis test.  Having carefully considered both parties' arguments, the Court finds that the Law is most appropriately viewed as an election regulation, and thus will apply the *Anderson* test.

association rights in a manner that prohibits them from successfully carrying out their protected First Amendment activities.  In support of this position, Plaintiffs maintain that (1) their inability to collect and submit voter registration applications will reduce the total quantum of political speech and association; and (2) the Law penalizes them for their non-association with political parties.

    (a)    <u>The Third-Party Voter Registration Law Chills Plaintiffs' First Amendment Rights</u>

Plaintiffs first argue that the Third-Party Voter Registration Law goes beyond merely regulating the collection and submission of voter registration applications.  According to Plaintiffs, the collection and submission of applications is inextricably intertwined with their ability to advocate in support of their issues and associate with their members and unregistered Florida citizens.  In response, Defendants contend that Plaintiffs' regulated conduct does not have any communicative value.

The situation before the Court is analogous to that in *Meyer v. Grant*, 486 U.S. 414 (1988), where the Supreme Court declared unconstitutional a Colorado law that made it a felony for the proponent of a new law to pay petition circulators.  In *Meyer*, although Colorado argued that the law only regulated conduct (Pls.' Reply, Ex. 1, Brief for Appellants.), the Supreme Court held that Colorado's "refusal to permit appellees to pay petition circulators restricts political expression" because the "inevitable effect" of the state law was to "reduc[e] the total quantum of speech on a public issue." *Id.* at 422-23.  The Supreme Court stated that the law reduced speech in two ways:

> First, it limit[ed] the number of voices who will convey appellees' message and the hours they can speak and, therefore, limit[ed] the size of the audience they can reach. Second, it ma[de] it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide attention.

*Id.* at 422-23.

Here, as in *Meyer*, the Third-Party Voter Registration Law has reduce the total quantum of speech. There is no dispute that Plaintiffs, all of whom are dedicated to increasing voter registration and voting, have shut down their voter registration drives because of the Law's heavy, strict, and joint and several liability penalties. This has, in turn, reduced the quantum of political speech and association, as the Plaintiffs all testified that as part of their voter registration drives, they persuade others to vote, educate potential voters about upcoming political issues, communicate their political support for particular issues, and otherwise enlist like-minded citizens in promoting shared political, economic, and social positions.

     (i)    *Speech or Conduct?*

Defendants' principal opposition to Plaintiffs' motion is that the Law only regulates conduct -- the collection and submission of voter registration applications, and not the speech accompanying such conduct. Relying on the Supreme Court's holding in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, ___ U.S. ___, 126 S. Ct. 1297 (2006), Defendants maintain that unlike conduct such as burning the American flag, the collection of voter registration applications is not "inherently expressive." *See id.* at 1112-13 (stating "[W]e [have] rejected the view that conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."). Defendants further argue that the Law does not prevent Plaintiffs from conducting voter registration drives, assisting in the filling out of applications, and collecting and submitting applications. Indeed, Plaintiffs are only limited to the extent that collected voter registration applications must be submitted in ten days, which is five days more than agencies such as the Department of Motor Vehicles, and before book closing.

The Supreme Court rejected a similar argument in *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980).  In that case, the plaintiff organization challenged the facial validity of an ordinance that prohibited door-to-door charitable solicitation on the ground that its solicitation was "characteristically intertwined" with advocacy.  *See id.* at 627-32.  In support of the ordinance, the defendant argued that the plaintiff was free to "propagate its views from door to door in the Village without a permit" provided it refrained from solicitation.  *Id.* at 628.

In striking down the ordinance, the Supreme Court first held that the communication of ideas and the advocacy of causes accompanying the plaintiff's charitable solicitation was worthy of First Amendment protection.  *Id.* at 632.  Thereafter, the Court rejected the defendant's attempt to separate the plaintiff's solicitation from the accompanying speech, noting the "reality that solicitation is characteristically intertwined with information and perhaps persuasive speech," as well as "the reality that without solicitation the flow of such information and advocacy would likely cease."

In the instant case, Plaintiffs' testimony has demonstrated that the success of voter registration drives is severely undermined when third party organizations cannot collect voter registration applications.  Furthermore, it is an undisputed fact that Plaintiffs have completely, or nearly completely, ceased their voter registration drives because of the Law's combination of significant, strict, joint and several liability fines.  Ignoring this reality, Defendants ask the Court to uphold the Law because Plaintiffs could, hypothetically, communicate the same messages to potential voters by (1) meeting with them face-to-face; (2) assisting them with the application; (3) encouraging them to vote; and (4) advocating for their causes.  As in *Village of of Schaumburg*, however, Defendants ask too much.  Because the collection and submission of voter registration drives is intertwined with speech and association, the question is not whether Plaintiffs' conduct

-33-

comes within the protections of the First Amendment, but whether Defendants have regulated such conduct in a permissible way.

(ii)     <em>Right to Success?</em>

Defendants also argue that Plaintiffs are asking for a constitutional right to success in their voter registration activities. They cite to *Kidd v. Cox*, Case No. 06-CV-0997-BBM, 2006 U.S. Dist. LEXIS 29689 (N.D. Ga. May 16, 2006) (three-judge court), to show that Plaintiffs' position is beyond the pale. *Kidd*, however, is inapplicable to this case. In *Kidd*, plaintiffs raised a First Amendment political gerrymandering claim, arguing that the redistricting burdened their ability to elect the candidate of their choice. The *Kidd* court found that plaintiffs failed to identify any restriction on their freedom of political expression, as plaintiffs could still "run for office, express their political views, endorse and campaign for their favorite candidates, vote, or otherwise influence the political process through their expression." *Id.* at *50. The court thus held that "[t]he First Amendment guarantees the right to participate in the political process; it does not guarantee political success." *Id.* at *49-50 (citing *Badham v. EU*, 694 F. Supp. 664, 675 (N.D. Cal. 1988) (three-judge court)).

Unlike the *Kidd* plaintiffs, Plaintiffs in this case have identified important First Amendment freedoms that are at stake - the right to advocate and pursue association free from the burdens and heavy penalties of the Third-Party Voter Registration Law. Plaintiffs are not asking for success in their voter registration drives, but a right to continue their speech and advocacy in furtherance of the political process. Where an individual has asserted a First Amendment right, the Supreme Court has held that such person is entitled to exercise such right in an effective manner. *See Meyer*, 486 U.S.

-34-

at 424.  Thus, in *Meyer*, the Supreme Court rejected the state's position that the proponents of the new law could use other means to disseminate their ideas, stating:

> Colorado's prohibition of paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication. That it leaves open "more burdensome" avenues of communication, does not relieve its burden on First Amendment expression. The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.

*Id.* at 424.  Accordingly, the First Amendment protects the instant Plaintiffs' right to select what they believe to be the most effective means of conducting their voter registration drives to ensure their voices are heard in the political process.

        (b)    The Third-Party Voter Registration Law Penalizes Plaintiffs Based On Their Non-Association With Political Parties

Plaintiffs also maintain that the Law is unconstitutional because it penalizes them for not associating with political parties.  "[T]here is no longer any doubt that the First and Fourteenth Amendments protect certain forms of orderly group activity. . . [including] the right 'to engage in association for the advancement of beliefs and ideas." *NAACP v. Button*, 371 U.S. 415, 430 (1963). Indeed, "political belief and association constitute the core of those activities protected by the First Amendment."  *Elrod v. Burns*, 427 U.S. 347, 359 (1976) (plurality opinion) (holding that Cook County, Illinois could not condition retention of public employment on the employee's support of the "in-party").

*Rhode Island Minority Caucus, Inc. v. Baronian*, 590 F.2d 372 (1st Cir. 1979) is instructive on the applicability of the First Amendment to Plaintiffs' activities.  In *Rhode Island Minority Caucus, Inc.*, the plaintiffs argued that the defendant's procedures of conditioning appointment as

a voter registrar on affiliation with the local Democratic or Republican parties or the League of Women Voters violated their First Amendment right of association. They maintained:

> [T]hey, themselves, should not be disqualified simply because they choose not to associate with those groups. Further, they argue that whatever the importance of political parties to this nation's electoral processes, it is not necessary to the process of voter registration to condition service as a registrar upon membership in either of the major political parties, the League, or any other organization.

*Id.* at 376-377. While the First Circuit affirmed the district court's denial of a preliminary injunction because plaintiffs failed to demonstrate that they would suffer irreparable harm, the First Circuit nevertheless found that plaintiffs had raised "a substantial first amendment question." The First Circuit stated that although "there is no right, in the abstract, to be appointed to a public office such as that of voter registrar," the First Amendment does protect "the right to be considered for such positions unhampered by invidiously discriminatory registrars." *Id.* at 376.

Since the implementation of the NVRA in 1995, the State of Florida has authorized Plaintiffs to conduct their voter registration activities, including the collection and submission of voter registration applications, without being a member of a political party and without the fear of the fines the challenged Law imposes. (*See* Facts ¶ 11.) This benefit has not only allowed Plaintiffs to successfully complete their voter registration drives, but also to advocate for their causes and to speak with a collective voice. Plaintiffs have further demonstrated that they cannot continue their voter registration activities in the manner that they previously enjoyed, whereas political parties are free to continue their voter registration activities without concerns for the Law's penalties or reporting requirements. Thus, the Third-Party Voter Registration Law discriminates against third party organizations based upon their non-association with political parties.

2.      Defendants' Precise Interests In Support of the Third-Party Voter Registration Law

The second step of an *Anderson* analysis is to "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule," determining "the legitimacy and strength of each of those interests." *Anderson*, 460 U.S. at 789. Below is an examination first of Defendants' justifications for the disparate treatment of political parties, followed by Defendants' justifications for the severe, strict, joint and several liability fines under the Law.

(a)      Defendants' Interests In Treating Political Parties Differently Under The Law and The Necessity of Such Distinction

*Anderson*'s second step analysis requires courts not only to examine the general purposes of a challenged law, but also the precise reasons for the differing treatment. *See Fulani*, 973 F.2d at 1546 (noting that the State not only had to justify its fee, but also the unequal availability of the fee waiver). This step is essential in order to determine whether such interest "makes it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789. Here, Defendants contend generally that the Law is designed to protect the rights of Florida citizens to vote. Defendants further postulate that political parties are excluded from the reach of the Law in light of the extensive regulations that they are already subjected to and the differences in the nature of the organizations.

The fact that political parties are subject to state regulations does not support Defendants' position that the Law's disparate treatment is justified. Although political parties may be highly regulated with respect to many of their activities, Defendants have not cited one regulation that pertains to the collection of voter registration applications. Moreover, given that nonprofit corporations and labor unions are also regulated in this state, this argument makes even less sense as a viable justification for disparate treatment. (*See* Pls.' Reply at 6-7, n.5-n.8.)

-37-

Likewise, the alleged differences in the "nature" of political parties and other organizations conducting voter registration drives does not justify the Law's discriminatory provisions.  While Defendants are correct that legislatures are "fully entitled to consider the real-world differences between political parties and interest groups" in crafting legislation,  *See McConnell v. Federal Election Commission*, 540 U.S. 93, 188 (2003), the record in this case does not include any salient differences between non-partisan groups and political parties.  Unlike *McConnell* where the Supreme Court's record was replete with examples of the "unique position" of national political parties vis-a-vis soft money, *See id.* at 144-145, here there is no evidence whatsoever that political parties are better than other non-partisan organizations at collecting and submitting voter registration forms in a timely and responsible manner.

The Court recognizes that Florida has an important state interest in ensuring that the failings of third parties do not strip Florida citizens of their right to vote.  However, Defendants have failed to explain how the exemption of political parties from the definition of third party voter registration organization under the Law accomplishes this asserted interest.[22]  Rather, Defendants' stated

---

[22] Indeed, the following testimony from the State Administrative Council, Florida House of Representatives, on April 20, 2003, demonstrates that there was little discussion or debate of the decision to exclude political parties from the definition of third party voter registration organization:

| Chairperson: | Representative Reagan, you are recognized on Amendment number 1 [to HB 1567]. |
| --- | --- |
| Rep. Reagan: | Thank you Mr. Chairman.  Amendment number 1.  This Amendment removes political parties from the definition of third-party registration organizations.  And primarily, political parties are already subject to extensive provisions under Chapter 1-3. |
| Chairperson: | Members, you have heard an explanation of Amendment number 1.  Is there any, are there any, questions?  Is there any public testimony on Amendment number 1?  Is there any debate?  Is there objection?  Without objection, so Amendment number 1 adopted.  Representative Reagan, you can now move to Amendment number 2. |

(*See* Pls.' M. Prelim. Inj., Ex. H.)

-38-

justification for the Law is undermined by its exclusion of political parties given that political parties collect voter registration applications and are no more accountable than non-partisan groups with respect to submitting them. *See e.g. Florida Star v. B.J.F.*, 491 U.S. 524, 540-41 (1989). Based on this unjustified underinclusiveness and Defendants' failure to identify any relevant, real world differences between political parties and non-partisan groups in this regard, the Third-Party Voter Registration Law's exclusion of political parties is facially invalid as it violates the First and Fourteenth Amendment of the United States Constitution.

  (b) <u>Defendants' Interests In the Remaining Provisions Of The Challenged Law</u>

  *Anderson* also requires an examination of Defendants' precise interests in the remaining provisions of the Third-Party Voter Registration Law. As previously stated, Defendants assert that the overall purpose of the Law is to ensure that Florida citizens have the right to vote. Defendants claim that the Third-Party Voter Registration Law achieves this purpose because it (1) protects Florida's interest in ensuring that all voter registrations are properly and timely submitted; (2) holds organizations accountable for the applications they collect; and (3) prevents fraud.

  Defendants' stated interests are indisputably important and within the purview of the Florida legislature. Indeed, "[t]he right to vote is fundamental, forming the bedrock of our democracy." *Wexler v. Anderson*, 452 F.3d 1226 (11th Cir. 2006). Thus, an individual that submits his or her voter registration application to a third party should have confidence that such application will arrive at the correct supervisor of elections' office prior to book closing. When voter registrations are steadily submitted in advance of book closing, state officials have more time to process the applications, commit less mistakes, and can return incomplete applications for re-submission. Furthermore, accountability on the part of organizations handling voter registrations is undoubtedly

-39-

a good thing, as it reduces the likelihood that applicants are not registered.   And of course, Defendants have an interest in preventing fraud.

(c)   <u>The Necessity of the Law to Advancing Defendants' Interests</u>

While Defendants have put forth compelling justifications for the Law in general, *Anderson* requires this Court to consider whether the Law's punitive provisions are necessary to advance Defendants' stated interests.   As to this point, Defendants have not demonstrated that the combination of strict liability, heavy fines, and joint and several liability is necessary to ensure that third party organizations do not strip Florida citizens of their right to vote.

First, as discussed in the factual findings, the evidence in this case does not demonstrate a significant problem with voter registration applications stemming from third party voter registration organizations.   Undoubtedly, the supervisors of elections office had a difficult time processing applications near book closing during the 2004 presidential election.   However, the evidence demonstrates that a large part of that difficultly arose from the general increase in the number of voter registration applications received that year and the lack of preparation on the part of the supervisors of elections offices.   While there was anecdotal evidence of some problems associated with third party voter registration organizations, the weight of the evidence suggested that Defendants' problems stem from other sources.

Second, Defendants have not addressed the unregistered citizen's interest in having and exercising choices as to how to register to vote.   Since 1995, Florida has given citizens the option of registering to vote through third party voter registration organizations.   This ability not only gives individuals a much broader means of registering, but also allows them to communicate their support for ideas and groups and to increase the political power of the organizations of which they are

-40-

members. The Law has essentially nullified a significant array of registration vehicles for Florida's citizens, especially those to whom the Plaintiffs dedicate their efforts.

Next, Defendants have not addressed why the Third-Party Voter Registration Law's civil penalties scheme is necessary given that Florida law already imposes criminal penalties on those who "knowingly destroy, mutilate, or deface a voter registration form or an election ballot or obstruct or delay the delivery of a voter registration form or election ballot." Fla. Stat. § 104.0615(4). The criminal law allows for both jail and monetary fines, and addresses Defendant's core concerns of holding organizations accountable and preventing fraud.[23]

Fourth, Defendants have not provided any evidence much less an explanation for the necessity of the amount of the fines or the imposition of joint and several liability on volunteers, their organizations, and their registered agents. Given that third party voter registration organizations are often non-profit organizations, and have limited budgets, it is unclear why such steep fines are necessary to promote Defendants' stated interests. Likewise, the imposition of joint and several liability is problematic for both volunteers and organizations. Volunteers are simply not willing to spend their time and effort on voter registration activities when the consequences of imperfect compliance are significant fines. As Marilynn Wills stated, she is "no longer registering voters" because of her "concerns about the serious fines imposed by the new law." Correspondingly, the organizational Plaintiffs testified that they are concerned about being held liable for the actions of

---

[23] The Third-Party Voter Registration Law's civil penalties scheme holds organizations liable for the $500 fine, even if they meet the ten day deadline, i.e. where they collect the voter registration application the day before book closing, yet submit it the day after, notwithstanding the fact the citizen would ultimately be eligible to vote. Although Defendants argue that the new Law is intended to protect citizens from losing their votes, they have not provided any evidence that the 5000 registrations submitted after book closing were the registration forms of citizens who desired to vote in the elections for that book closing, i.e. that those citizens in fact lost their right to vote in that election.

-41-

volunteers who are not accountable to them, and over which they have no control.  Unfortunately, Defendants have not addressed such concerns.

Instead of explaining why the Third-Party Voter Registration Law's strict liability provisions are necessary to promote Defendants' interests, Defendants argue that the Law does not really impose strict liability because (1) the Secretary has discretion to investigate alleged violations of the Law; (2) the Secretary has discretion in assessing fines; and (3) the State's administrative process would provide Plaintiffs with an opportunity to contest any fines imposed in the future.  Thus, according to Defendants, Plaintiffs concerns about strict liability fines are merely hypothetical at this point, and thus invalid on a facial challenge.  In support of this position, Defendants cite *Florida League of Professional Lobbyists, Inc. v. Meggs*, 87 F.3d 457 (11th Cir. 1996), where the Eleventh Circuit upheld a Florida state law that required extensive disclosures of lobbying expenditures and rejected the plaintiff's "hypothesized, fact-specific worst-case scenarios" about events that could happen in the future.

The instant case is distinguishable from *Meggs* because the threat of fines has rationally chilled Plaintiffs' exercise of free speech and association, as well as that of Plaintiffs' volunteers.[24] That the Secretary has discretion in applying the Law does not mitigate the fact that the Plaintiffs' constitutionally protected activities have completely or nearly completely ceased.  Moreover, the record before the Court demonstrates that Plaintiffs routinely do not submit voter registration applications within the ten days required by the Law, and thus the threat of crippling fines is not hypothetical, but imminent.  Indeed, unlike *Meggs*, where the Court was faced with "hypothetical

---

[24] In fact, the Assistant General Counsel for the Florida Department of State has confirmed that third-party voter registration organizations will be fined even "if some situation arises beyond the control of the organization."

borderline situations," Plaintiffs have presented evidence demonstrating that it is highly likely that they will be subject to the fines under the Third-Party Voter Registration Law, especially given the volunteer nature of their voter registration drives.

In balancing Defendants' asserted interests against the character and magnitude of the constitutional burdens the new Law imposes, the Court is mindful of the general importance of protecting Florida citizens' right to vote. However, Defendants have not demonstrated how the Third-Party Voter Registration Law's penalties and exclusion of political parties advances their interests, or why such provisions are necessary given the *de minims* nature of the problems arising from third party voter registration organizations and the existing criminal penalties. Rather, the Law's demonstrated impact is to limit the means of voter registration in Florida, contradict the longstanding tradition of not discriminating against non-political parties with respect to voter registration, and burden the Plaintiffs' protected speech and associational rights. While the Court is extremely reluctant to set aside an enactment of the Legislature, given the magnitude of Plaintiffs' First Amendment freedoms at stake in this case, the Third-Party Voter Registration Law's civil penalties scheme and exclusion of political parties is unconstitutional.

## X.    PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION WITH RESPECT TO COUNTS I-III.

Although Plaintiffs have demonstrated a substantial likelihood of success on the merits, in order to obtain preliminary injunctive relief, Plaintiffs must also establish that they  will suffer irreparable injury if an injunction does not issue, that such injury outweighs any harm that might result to the Defendants, and that the injunction will not be adverse to the public interest. Plaintiffs have demonstrated each of these prerequisites.

1.    Irreparable Injury

Plaintiffs have suffered and will continue to suffer irreparable harm unless the Court enjoins the challenged statute.  The undisputed evidence demonstrates that Plaintiffs have halted or significantly scaled back their voter registration operations and are losing valuable time to engage in core political speech and association and to add new registrants to Florida's voter rolls.  In fact, in the absence of an injunction, Plaintiffs will not be able to register Florida voters by the October 10, 2006, book closing deadline for the November 7, 2006, general election.  *See Elrod*, 427 U.S. at 373) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Am. Civil Liberties Union of Fla, Inc. v. Miami-Dade County School Bd.*, No. 06-CIV-21577, __ F. Supp. 2d __, 2005 WL 2055719, *40 (S.D. Fla. July 24, 2006).

2.    The Balance of Hardships and the Public Interest

The remaining two factors also favor the granting of an injunction.  As discussed *supra*, given that the Defendants have not demonstrated that the Law is necessary to further their asserted interests, and because Plaintiffs have important First Amendment freedoms at stake, the balance of interests clearly favors injunctive relief.  Likewise, a preliminary injunction would significantly advance the public interest.  Absent injunctive relief, the amount of First Amendment-protected political speech and activity will be reduced and the public will receive less information about current political issues and have fewer opportunities to associate with Plaintiffs in a meaningful way.  Accordingly, Plaintiffs are entitled to preliminary injunctive relief.

## XI.   PLAINTIFFS' COUNT IV CLAIMS ARE DISMISSED WITHOUT PREJUDICE

In Count IV of the Complaint, Plaintiffs contend that the Third-Party Voter Registration Law impermissibly interferes with the right to vote of John and Jane Does 1-100.  According to Plaintiffs, although the Law does not completely foreclose the right to vote, it does impose a significant interference with this constitutionally protected right.  In response, Defendants have raised a facial attack to this Court's subject matter jurisdiction, challenging Plaintiffs' standing to bring this claim on behalf of the unnamed John and Jane Does.

Before the Court can address the merits of Count IV, it must address Defendants' challenge to Plaintiffs' standing.  If Plaintiffs do not have standing to raise Count IV, then the Court does not have power to entertain the claim.  *See Warth v. Seldin*, 422 U.S. 490, 499 (1975).  Indeed, [i]n the absence of standing, a court is not free to opine in an advisory capacity about the merits of a plaintiff's claims," *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir.), *cert. denied*, __ U.S. ___, 126 S.Ct. 377 (2005), and "the court is powerless to continue," *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 409 (11th Cir.1999).  Furthermore, because Defendants' raised a facial attack to Plaintiffs' standing, the Court is limited to examining the allegations in the Complaint. *Chiles v. Thornburgh*, 865 F.2d 1197, 1201 (11th Cir. 1989).

Plaintiffs contend that they have membership standing and third party standing.  An association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Nat'l Parks Conservation Ass'n v. Norton*, 324

-45-

F.3d 1229, 1244 (11th Cir. 2003) (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Here, because Plaintiffs do not allege that the John and Jane Does are members of their respective organizations, Plaintiffs cannot pursue their membership standing theory.[25]

A litigant may also bring a claim on behalf of a third party if the following three criteria are met: (1) the litigant must have suffered an injury in fact, thus giving it a sufficiently concrete interest in the outcome of the dispute; (2) the litigant must have a close relationship to the third party; and (3) there must exist some hindrance to the third party's ability to protect his or her own interests. *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991). As to this argument, Plaintiffs' allegations are again insufficient as to each factor above. Although Plaintiffs argue that they are harmed by the John and Jane Does' difficulty in registering because it limits their political power, their allegations as to this point are speculative as contained in the current Complaint. Plaintiffs can only hope that registered voters will actually exercise their right to vote in advance of Plaintiffs' goals. In addition, Plaintiffs have neither alleged a close relationship between themselves and Florida citizens generally, nor explained why the John and Jane Does cannot represent their own interests. Accordingly, the Court must dismiss Count IV without prejudice.

## XII.   PLAINTIFFS' CLAIMS AGAINST DEFENDANTS IN THEIR INDIVIDUAL CAPACITY MUST BE DISMISSED

Plaintiffs sued Defendants in both their individual and official capacities. "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color

---

[25] The Court recognizes that Plaintiffs have presented evidence that the John and Jane Does are members of at least some of their organizations. However, if Plaintiffs wish to pursue this theory, they must file an Amended Complaint that includes these core allegations as to each separate Plaintiff.

of state law." *Ky v. Graham*, 473 U.S. 159, 165 (1985). Here, Plaintiffs' Complaint does not contain any allegations relating to actual, specific conduct of the Defendants. Although the Complaint does include conclusory allegations that "defendants, acting under color of state law, have deprived and will deprive plaintiffs of [constitutional rights]," such allegations are insufficient to survive dismissal. In fact, the thrust of Plaintiffs' Complaint is that the challenged Law, not Defendants' conduct, violates their constitutional rights. Accordingly, the claims against Defendants in their individual capacities must be dismissed.

## XIII.  CONCLUSION

For the reasons stated above, it is hereby

ORDERED that Plaintiffs' Motion for Preliminary Injunction is GRANTED IN PART AND DENIED IN PART.

1.      Plaintiffs' Motion is GRANTED  as to Counts I, II, and III.

2.      The Defendants are ENJOINED from enforcing the provisions of Fla. Stat. § 97.0575 (3)(a)-(c) that subject third-party voter registration organizations to financial penalties for failing to submit voter registration applications in the manner prescribed by the law.

3.      The Defendants are further ENJOINED from excluding political parties from the definition of third party voter registration organization in Fla. Stat. § 97.021(36).

4.      Plaintiffs' Motion for Preliminary Injunction is DENIED as to Count IV.

AND IT IS FURTHER ORDERED that Defendants' Motion to Dismiss is hereby GRANTED IN PART AND DENIED IN PART.

1.      Defendants' Motion is DENIED as to Counts I, II, and III.

2.      Defendants' Motion is GRANTED as to Count IV.   Count IV is DISMISSED WITHOUT PREJUDICE.

3.      Plaintiffs' claims against Defendants in their individual capacity are DISMISSED.

4.      Plaintiffs shall have until and including **September 29, 2006**, to file an Amended Complaint.

DONE AND ORDERED in Miami, Florida, this 28 day of August, 2006.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:
Magistrate Judge McAliley
Counsel of Record

-48-